IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| ANDREW HALLDORSON,<br>On behalf of the Constellis Employee Stock<br>    Ownership Plan, and on behalf of a class of all<br>    other persons similarly situated,<br><br>and TIM P. BRUNDLE,<br><br>        Plaintiffs,<br><br>      v.<br><br>WILMINGTON TRUST RETIREMENT AND<br>    INSTITUTIONAL SERVICES COMPANY,<br><br>        Defendant. | No. 1:15-cv-1494 (LMB/IDD) |

## MEMORANDUM OPINION

After hearing oral argument on several motions,[1] the Court granted defendant

Wilmington Trust Retirement and Institutional Services Company's ("Wilmington" or

"defendant") Motion for Summary Judgment [Dkt. No. 25],[2] after concluding that plaintiff

Andrew Halldorson ("Halldorson" or "plaintiff") is barred from pursuing this civil action

because of a Separation Agreement and General Release ("Release") he signed in 2015. This

Memorandum Opinion explains in more detail the reasons for that decision.

---

[1] Defendant's Motion to Dismiss First Amended Class Action Complaint [Dkt. No. 20], Jan. 14, 2016; Defendant's Motion for Leave of Court to File a Surreply Opposing Plaintiff's Motion for Leave to Amend Complaint [Dkt. No. 78], Apr. 8, 2016; and Plaintiff's Motion for Class Certification [Dkt. No. 54], Mar. 16, 2016, were denied. Order [Dkt. No. 89] 1, Apr. 15, 2016. Plaintiff's Motion for Leave to Amend Complaint [Dkt. No. 48], Mar. 14, 2016, was granted in part and denied in part, and Plaintiff's Motion to Take Non-Party Deposition [Dkt. No. 77], Apr. 8, 2016, was granted. Id. at 1-2.

[2] The named defendant no longer exists as a legal entity because it was merged into Wilmington Trust, N.A. on November 1, 2015. Def.'s Mot. to Dismiss First Am. Class Action Compl. [Dkt. No. 20] 1 n.1, Jan. 14, 2016 ("Def.'s Mot. to Dismiss").

## I.   BACKGROUND

This action arises out of plaintiff's allegations that defendant engaged in transactions prohibited by the Employee Retirement Income Security Act of 1974 ("ERISA"). From February 9, 2009 to August 18, 2015, plaintiff was a Senior Director of Business Development for Triple Canopy, Inc., a subsidiary of Constellis Group, Inc. ("Constellis"). Def.'s Mem. in Supp. of Its Mot. for Summ. J. [hereinafter Def.'s Br.], Def.'s Statement of Facts [Dkt. No. 26] ¶¶ 1-2, Jan. 27, 2016 ("Def.'s SOF"); Pl.'s Opp'n to Def.'s Mot. for Summ. J. [hereinafter Pl.'s Opp'n], Pl.'s Disputed Facts [Dkt. No. 31] ¶¶ 1-2, Feb. 11, 2016. As an employee, he participated in the Constellis Employee Stock Ownership Plan ("the ESOP"). First Am. Compl. [Dkt. No. 14] ¶ 2, Dec. 28, 2015 ("Am. Compl.").[3] Plaintiff brings this action on behalf of similarly situated participants in the ESOP, arguing that Wilmington's decision to have the ESOP acquire shares of Constellis resulted in losses suffered by the ESOP and violated various ERISA provisions. Id. ¶ 1.

In 2013, Constellis established the ESOP, a retirement plan governed by ERISA, and hired defendant to act as the Trustee for the ESOP. Id. ¶¶ 3-8; see also Def.'s SOF ¶ 4; Pl.'s Statement of Disputed Facts ¶ 4. The ESOP was established and governed by two documents, the Constellis Employee Stock Ownership Plan ("Plan Document") and the Constellis Employee Stock Ownership Trust ("Trust Document"). See Def.'s Mot. to Dismiss, Ex. 1, Decl. of Jennifer Matz, Ex. 1, Constellis Employee Stock Ownership Plan [Dkt. No. 20-2], Jan. 14, 2016 ("Plan Document"); Def.'s Mot. to Dismiss, Ex. 1, Decl. of Jennifer Matz, Ex. 2, Constellis Employee

---

[3] Plaintiff amended his complaint as a matter of right on December 28, 2015. All references to his amended complaint pertain to that complaint, rather than to the second amended complaint that has since been filed with leave of court and which substitutes Tim P. Brundle as the sole plaintiff in this action. Second Am. Compl. [Dkt. No. 90], Apr. 19, 2016.

Stock Ownership Trust [Dkt. No. 20-3], Jan. 14, 2016 ("Trust Document"). Defendant acted as

"a directed trustee, which means that the trustee invests the assets of the Plan as instructed by the

Administrator or by an investment manager (if appointed)." Def.'s Br., Ex. A, Decl. of Amy

Muhlendorf [hereinafter Muhlendorf Decl.], Ex. 2, Summary Plan Description [Dkt. No. 26-1] 1,

Jan. 27, 2016 ("Plan Description"); see also Def.'s SOF ¶ 5; Pl.'s Statement of Disputed

Facts ¶ 5. Constellis acted as the Administrator of the ESOP and therefore was vested with

various powers, including "the administrative discretion necessary to resolve issues with respect

to an employee's eligibility for benefits." Id. The ESOP was a defined contribution plan designed

primarily to invest in Constellis stock. Pl.'s Opp'n, Pl.'s Statement of Undisputed Material Facts

[Dkt. No. 31] ¶¶ 1, 4, Feb. 11, 2016; Def.'s Reply, Wilmington Trust's Response to Facts

Asserted by Pl. [Dkt. No. 36] ¶¶ 1-8, Feb. 17, 2016. As a defined contribution plan, its

participants could "contribute up to a specified amount to individual accounts" and receive

"whatever the account has accumulated through contributions and earnings" at the time of

retirement. Howell v. Motorola, Inc., 633 F.3d 552, 556 (7th Cir. 2011).

Plaintiff alleges that on December 19, 2013, defendant caused the ESOP to purchase

47,586.54847 shares of Constellis stock from the four S-Corporation shareholders of Constellis

or their trusts ("Sellers"). Am. Compl. ¶¶ 10, 12. The ESOP paid $4,235 per share, resulting in a

total purchase price of $201,529,033. Id. ¶¶ 12-13. The purchase, in effect, resulted in the ESOP

acquiring all of the Constellis common stock from entities that the plaintiff alleges were "parties

in interest" as defined by ERISA § 3(14), 29 U.S.C. § 1002(14).[4] Id. ¶ 11-12. As part of this

---

[4] "Parties in interest" include employees, officers, directors, or 10 percent or more shareholders
of any employer or employee organization whose members are covered by a plan. ERISA
§ 3(14)(H), 29 U.S.C. § 1002(14)(H). Plaintiff alleges that the Sellers fit this description

transaction, defendant caused the ESOP to take a loan of $152,335,331 from the Sellers, and Constellis guaranteed that debt. Id. ¶¶ 14-15.

Roughly seven months later, on July 25, 2014, Constellis Holdings, Inc. ("Constellis Holdings") acquired Constellis "for an enterprise value of $119,685,124." Id. ¶ 16. To complete this purchase, Constellis Holdings paid $20,000,000 in cash and assumed $99,685,124 in loans to the Sellers.[5] Id. On that date, the ESOP was converted to a profit sharing plan, Def.'s Br., Muhlendorf Decl. [Dkt. No. 26-1] ¶ 7, Jan. 27, 2016, which plaintiff contends resulted in the ESOP participants becoming vested in their Participants' Accounts. See Pl.'s Statement of Undisputed Material Facts ¶¶ 22-24.

Plaintiff asserts that the sale of Constellis to Constellis Holdings, when compared to the ESOP's purchase of Constellis stock seven months earlier, reflects a 40% decline in Constellis' value,[6] that this "massive decline in the value of Constellis in just seven months cannot plausibly be explained by anything other than a deficient valuation of Constellis [by Wilmington] on behalf of the ESOP as part of the ESOP transaction," and that the "arm's length transaction" in July 2014 "is more indicative of the true value of Constellis on December 19, 2013 than a valuation performed under the supervision and direction of the Sellers' handpicked trustee." Am. Compl. ¶¶ 18, 22, 29.

---

"because they were officers, directors, or employees of Constellis and/or owned 10% or more of Constellis." Am. Compl. ¶ 11.

[5] Plaintiff alleges that ESOP participants did not vote on this acquisition because all voting rights had been conferred on Wilmington. Am. Compl. ¶ 20.

[6] Plaintiff alleges that this 40% decline reflects a decrease in value of $81,843,909. Am. Compl. ¶ 18.

4

As further support for his claim that Wilmington overvalued Constellis when making the ESOP transaction, plaintiff alleges that Constellis stock "underperformed similarly-sized U.S. companies" and other companies involved in the "defense, homeland security, and space" industries between July 1, 2013 and June 30, 2014, and that defendant failed to consider that "[i]n the years preceding the ESOP Transaction the McClean [sic] Group had consistently valued Constellis at 30-40% less" than what the ESOP paid in 2013 and that more than "50% of Constellis' annual profits came from a single, extremely lucrative government contract," which was due to expire approximately two years after the stock purchase and had "little prospect of . . . being renewed" or replaced by a similar contract. Id. ¶¶ 23-27.

Based on these allegations, plaintiff's one-count amended complaint claims that defendant engaged in prohibited transactions forbidden by ERISA § 406(a)-(b), 29 U.S.C. § 1106(a)-(b). Specifically, the amended complaint alleges that defendant, as a plan fiduciary: (1) caused the ESOP to borrow money from the Sellers, who were parties in interest, in violation of ERISA § 406(a)(1)(B), 29 U.S.C. § 1106(a)(1)(B); (2) caused the ESOP to engage in a sale or exchange of Constellis stock with the Sellers, in violation of ERISA § 406(a)(1)(A), 29 U.S.C. § 1106(a)(1)(A); (3) "caus[ed] the ESOP to acquire Constellis securities and transact[]" with the Sellers," in violation of ERISA § 406(a)(1)(E), 29 U.S.C. § 1106(a)(1)(E); (4) "acted for the benefit of the Sellers in a transaction in which the Sellers were adverse to the ESOP," in violation of ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2); and (5) "received payment from Constellis and/or the Sellers for serving as the Trustee . . . with respect to the ESOP transaction," in violation of ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3). Am. Compl. ¶¶ 38-45.

Plaintiff filed his complaint pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), which permits an ESOP plan participant to bring a suit for relief under ERISA § 409, 29 U.S.C.

§ 1109 against a plan fiduciary "who breaches any of the responsibilities, obligations, or duties imposed" by ERISA. ERISA § 409(a), 29 U.S.C. § 1109(a). Such a fiduciary is "personally liable" for "any losses to the [ESOP]" that resulted from a fiduciary breach and is also subject to other relief, including equitable relief, deemed appropriate by the court.[7] Id. Plaintiff claims that defendant caused the ESOP to lose approximately $81,000,000 by engaging in the purportedly prohibited transactions. Am. Compl. ¶ 49. He seeks an order requiring defendant to make up this loss to the ESOP and to "restore any profits" it has gained "through [its] use of [the ESOP's] assets." Am. Compl., Prayer for Relief [Dkt. No. 14] ¶ D, Dec. 28, 2015.

Plaintiff also seeks a declaratory judgment that Wilmington "caused the ESOP to engage in prohibited transactions" and an injunction barring defendant "from further violations of ERISA and its fiduciary duties" and ordering defendant "to adopt [better] policies and procedures." Id. ¶¶ A-C. Lastly, plaintiff seeks an award of "reasonable attorneys' fees and costs of suit,"[8] disgorgement of any fees received by defendant as Trustee, prejudgment interest, an order that defendant "distribute all assets . . . held by the ESOP or any successor trust," and an order certifying this action as a class action.[9] Id. ¶¶ F-J.

---

[7] The fiduciary may also be removed pursuant to this section. ERISA § 409(a), 29 U.S.C. § 1109(a).

[8] Attorneys' fees are available pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), which provides that "[i]n any action under this subchapter (other than an action described in paragraph (2)) by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party."

[9] In the Order issued on April 15, 2016, plaintiff's Motion for Class Certification was denied, and although the filing of a second amended complaint was permitted, the Order stated that the action would proceed only with the substituted plaintiff and would not be certified as a class action. Order at 1, n.2.

Defendant filed a motion to dismiss plaintiff's amended complaint, arguing that the complaint fails to state a claim upon which relief may be granted. Def.'s Mot. to Dismiss 1. Less than two weeks after filing that motion and several months before the discovery deadline, defendant filed a motion for summary judgment. Def.'s Mot. for Summ. J. [Dkt. No. 25], Jan. 27, 2016. Although discovery has not yet closed, the summary judgment motion raised a dispositive issue for which discovery was not needed. That motion is based on the uncontested fact that on August 27, 2015, plaintiff signed a Release, in exchange for severance pay and "other benefits to which he would not otherwise have been entitled." Def.'s Statement of Facts ¶ 6; Pl.'s Statement of Disputed Facts ¶ 6. The Release stated that it was to be governed by and subject to interpretation under Virginia law "without respect to conflicts of law." Def.'s Br., Muhlendorf Decl., Ex. 1, Separation Agreement and General Release [Dkt. No. 26-1] § 17, Jan. 27, 2016 ("Release"). Section Three of the Release provided that plaintiff would receive eight weeks of severance pay as well as "outplacement services," and further provided that plaintiff "acknowledges and agrees that he/she is not entitled to any additional compensation or benefits from the Company (including without limitation any . . . benefits under any Company plan . . . ) other than set forth in this Section." Id. § 3. In Section Four, plaintiff agreed, in consideration of those severance benefits, "to waive, release, and forever discharge the Company, its parents, subsidiaries, affiliates (including all entities that are direct and indirect subsidiaries of Constellis Holdings, LLC) and each such entity's owners, trustees, officers, directors, attorneys, agents, employees, stockholders . . . from any and all claims, known or unknown . . . that Employee may have relating to or arising out of his/her employment." Id. § 4. The agreement explicitly stated that this release of claims included claims under ERISA. Id.[10]

_____

[10] "Employee's Release includes, but is not limited to, any claims of wrongful discharge, breach

7

Section Five provided that plaintiff "acknowledges that he/she has been advised to consult with legal counsel," that he "is familiar with the principle that a general release does not extend to [material] claims" that are unknown to the releaser when "executing the release," and that he "agrees to expressly waive any rights he/she may have to that effect," id. § 5; however, Section Six excluded specific claims from plaintiff's Release, including claims with respect to any rights "to accrued and vested benefits under any pension or savings plan sponsored by the Company subject to the terms and conditions of such plans and applicable law." Id. § 6. The final section of the Release was a full integration clause, which provided that by signing the Release, plaintiff represented that "he/she has not relied on any statement or representation made by anyone associated with the Company, including any employee, officer, director, or agent of the Company, that is not expressly contained in this Agreement." Id. § 25.

Despite that integration clause, plaintiff avers that on the day he signed the Release, he met with two attorneys for Constellis and Triple Canopy who told him that the agreement "did not apply to the ESOP[,] . . . that the ESOP did not belong to the company, that it was separate from the company, and that it was held in trust outside of the custody and control of the company." Pl.'s Opp'n, Ex. 1, Decl. of Andrew Halldorson [Dkt. No. 31-1] ¶¶ 11-12, Feb. 11,

_____

of express or implied contract, claims for wages, commissions or expenses, claims for housing allowances, relocation costs, interest or outplacement costs, fraud, misrepresentation, defamation, slander and libel, liability in tort, claims of any kind that may be brought in any court or administrative agency, any claims under Title VII of the Civil Rights Acts of 1964 and 1991, as amended, the Americans with Disabilities Act, the Age Discrimination in Employment Act, the Employee Retirement Income Security Act of 1974, the Family and Medical Leave Act, the National Labor Relations Act, as amended, the Immigration Reform and Control Act, as amended, the Workers Adjustment and Retraining Notification Act, as amended, the Occupational Safety and Health Act, as amended, N.C.G.S. 95-28.1, N.C.G.S. 95-28.2, N.C.G.S. 95-230, the North Carolina Retaliatory Employment Discrimination Act, the Virginia Human Rights Act, the Virginians with Disabilities Act, or any other federal, state or local law relating to your employment, employee benefits or the termination of your employment." Release § 4 (emphasis added).

2016 ("Halldorson Decl."). Although plaintiff acknowledged that he had "been advised by the Company to review all the provisions of the Agreement with an independent attorney of [his] own selection and . . . had the opportunity to do so," Release § 25, it does not appear that plaintiff chose to consult with independent counsel before signing the Release. Plaintiff avers that he "did not interpret the term 'affiliate' [as used in the Release] to include the ESOP or its successor plan" and "did not interpret the release to cover claims about [his] ESOP benefit[s]" because the Release explicitly excluded vested benefits. Halldorson Decl. ¶ 13. Plaintiff also provides documents purporting to show that he was "100% vested" in the 2013 and 2014 allocations of Constellis shares to his ESOP account, resulting in a "[v]ested [b]alance" of $24,313.17. Id. ¶¶ 5-10; see also id., Exs. 1-2.[11]

## II.   DISCUSSION

Contrary to plaintiff's view of the Release, defendant argues that the clear terms of the Release bar plaintiff from pursuing his current claims against defendant and that defendant is therefore entitled to summary judgment. Plaintiff counters that the claims in this lawsuit are excluded from the Release because he is only raising a claim related to vested benefits. He also contends that defendant was not included among the entities released by the terms of the Release. Defendant responds that the complaint alleges a "prohibited transactions claim," not a claim for vested benefits, and that defendant is included among the released parties under the terms of the Release.

---

[11] Whether plaintiff became vested in the Constellis shares in his account does not appear to be disputed; however, the timing of when that vesting occurred does appear to be disputed. Pl.'s Statement of Undisputed Material Facts ¶ 24; Wilmington Trust's Response to Facts Asserted by Pl. ¶ 24.

## A.  **Standard of Review**

Pursuant to Federal Rule of Civil Procedure 56(a), a party may move for summary judgment, and the court shall grant the party's motion "if the movant shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Any permissible inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion;" however, "such inferences must 'fall within the range of reasonable probability and not be so tenuous as to amount to speculation or conjecture.'" JKC Holding Co. LLC v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001) (quoting Thompson Everett, Inc. v. Nat'l Cable Adver., L.P., 57 F.3d 1317, 1323 (4th Cir. 1995)). Moreover, to defeat a defendant's motion for summary judgment, there must be sufficient evidence "on which the jury could reasonably find for the plaintiff," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); "merely a scintilla of evidence" will be insufficient. Am. Arms Int'l v. Herbert, 563 F.3d 78, 82 (4th Cir. 2009). Finally, any alleged dispute must be "material" and "genuine" to defeat a motion for summary judgment, meaning it must have the potential to "affect the outcome of the suit under the governing law." Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001) (emphasis omitted).

## B.  **Motion for Summary Judgment**

Because defendant bases its motion for summary judgment solely on the affirmative defense that plaintiff waived his right to bring the instant action by executing the Release, no discovery is needed to resolve this issue, which is essentially an issue of law. Defendant argues that ERISA-based plans like the ESOP are affiliates of the employer and that accordingly, the ESOP is an affiliate of Constellis and Wilmington is the ESOP's Trustee. As such, defendant

10

contends that plaintiff is barred from bringing this suit against Wilmington because in signing the Release, plaintiff explicitly released all claims against "the Company, its parents, subsidiaries, affiliates . . . and each such entity's owners, trustees, officers, directors, attorneys, agents, employees, stockholders," including any claims under ERISA. Def.'s Br. 2; see also Release § 4. Moreover, defendant argues that not only does the Release explicitly release ERISA claims, but any claim regarding the 2013 transaction and the 2014 sale would be one that plaintiff could have or should have known about at the time he signed the release in August 2015. Id. at 9. Defendant also argues that plaintiff's effort to characterize his lawsuit as a claim for vested benefits which would not be covered by the Release is a "red herring," because plaintiff's amended complaint explicitly seeks recoupment of losses suffered by the ESOP, while separate ERISA provisions not involved in plaintiff's complaint govern suits for vested benefits. Id. at 10. Lastly, defendant argues that plaintiff's contention that the Release only releases Constellis and does not apply to Wilmington ignores the inclusion of Constellis "affiliates" and their "trustees" in the Release, and that multiple courts have held that ERISA plans are either "affiliates" of employers or equivalent to the employer with respect to similar agreements. Id. at 12. Defendant contends that, for all these reasons, plaintiff lacks standing to pursue this action individually or on behalf of other ESOP participants.

Plaintiff responds that suits like his that are brought pursuant to §§ 502(a)(2) and 409 of ERISA are suits for vested pension benefits and therefore that his claim is of the kind that was specifically excluded from his Release. Pl.'s Opp'n 10-13. He also argues that the ESOP's governing documents do not permit a release of a claim to vested pension benefits under these circumstances, and he further asserts that Wilmington was not covered by the Release. Id. at 18-19.

11

### 1. __Knowing and Voluntary Waiver__

Plaintiff briefly attempts to argue that because the ESOP was not mentioned in the Release, he could not knowingly and voluntarily have waived any claims with respect to the ESOP.[12] Id. at 19. He supports this position with his affidavit, in which he avers that the Triple Canopy attorneys present when he signed the Release told him that the ESOP was not covered by the Release. Halldorson Decl. ¶¶ 11-12. That claim is contradicted by the clear terms of the Release, which advised plaintiff, an experienced businessman, to consult with independent counsel. Release § 25. That he apparently ignored that advice does not demonstrate any lack of knowledge or voluntariness. Additionally, defendant provides two affidavits from the Triple Canopy attorneys present when plaintiff signed the Release, both of which contradict plaintiff's contentions. Def.'s Reply in Supp. of Its Mot. for Summ. J. [hereinafter Def.'s Reply], Ex. A, Decl. of Gearoid Moore [Dkt. No. 36-1] ¶¶ 5-6, Feb. 17, 2016; Def.'s Reply, Ex. B, Decl. of Juliet Protas [Dkt. No. 36-2] ¶ 5, Feb. 17, 2016. Any dispute over what plaintiff may or may not have been told by the attorneys is actually irrelevant given the Release's clear language, in which plaintiff acknowledges that he was not relying on any representations that contradicted the terms of the agreement. Release § 25. Accordingly, the Court finds that plaintiff signed the Release knowingly and voluntarily and therefore he is bound by its terms.

### 2. __Claims for Vested Pension Benefits__

Plaintiff raises a number of arguments that the Release did not cover the claim he pursues in this action. First, plaintiff argues that his amended complaint seeks vested ESOP benefits of the kind that were explicitly excluded from the Release. Pl.'s Opp'n 10-11. Plaintiff relies almost

---

[12] No federal statute controls purported waivers of ERISA claims; accordingly, the parties only dispute whether plaintiff's waiver was knowing and voluntary. Def.'s Br. 7; Pl.'s Br. 19-20.

exclusively on In re Mutual Funds Investment Litigation, 529 F.3d 207 (4th Cir. 2008) to support

his argument that a suit under § 502(a)(2) which alleges a diminished account value caused by

fiduciary breaches and seeks relief under § 409 is in fact a suit for vested pension benefits.

Plaintiff claims that the case "is directly on point," Pl.'s Opp'n 11; however, the In re Mutual

Funds court actually addressed the different question of whether former employees who had

"cashed-out of [their defined contribution retirement] plans" and consequently had vested

benefits could be considered "participants" with "statutory standing" to sue under §§ 502(a)(2)

and 409(a). In re Mutual Funds, 529 F.3d at 210. Plaintiff quotes the court's statement that a

"plaintiff who colorably claims that under the plan and ERISA he was entitled to more than he

received on the day he cashed out . . . presses a claim for vested benefits," Pl.'s Opp'n 11

(quoting In re Mutual Funds, 529 F.3d at 215) (internal quotation marks and alteration omitted),

but he omits the latter part of that sentence: "and [he] must be accorded participant standing." In

re Mutual Funds, 529 F.3d at 215 (quoting Graden v. Conexant Sys. Inc., 496 F.3d 291, 300 (3d

Cir. 2007)) (internal quotation marks omitted).

     The Fourth Circuit did not explicitly define all suits under § 502(a)(2) as claims for

vested benefits; rather, it simply decided that plaintiffs with such vested benefits had standing as

"participants" to sue for fiduciary breaches under §§ 502(a)(2) and 409(a). See id. at 216.[13]

Halldorson's claim differs from those raised in In re Mutual Funds, where the plaintiffs

specifically sought to "recover amounts that they claim[ed] should have been in their accounts

had it not been for alleged fiduciary impropriety," id. at 210 (emphasis added), and "asserted that

because of imprudent investment decisions by the fiduciaries, their individual accounts in [their]

---

[13] The court went on to determine that the plaintiffs had constitutional standing as well. In re
Mutual Funds, 529 F.3d at 219.

respective plans were diminished." Id. at 217 (emphasis added). In contrast, Halldorson is suing "to require Wilmington to make good to the ESOP losses resulting from its violations of ERISA" and does not refer to any amount he claims should have been in his account. Am. Compl. ¶ 32. Therefore, even if In re Mutual Funds determined that claims for amounts that allegedly should be in plan accounts are ones for vested pension benefits, plaintiff has not alleged the same type of claim.

Similarly, plaintiff's discussion of Seventh Circuit precedent, including Harzewski v. Guidant Corporation, 489 F.3d 799 (7th Cir. 2007), and the Supreme Court's ruling in LaRue v. DeWolff, Boberg & Associates, Inc., 552 U.S. 248 (2008), see Pl.'s Opp'n 13 n.4, misconstrues those decisions and their significance for this litigation. As in In re Mutual Fund, both Harzewski and LaRue dealt primarily with the question of under what circumstances a plan participant has a cause of action under ERISA § 502(a)(2). In Harzewski, the Seventh Circuit ruled that the plaintiffs, who had "cashed out of the plan during the course of the suit," remained "participants" with the ability to sue for breaches of fiduciary duty under § 502(a)(2), but clarified that such plaintiffs must "show that they are claiming an amount of money to which they are entitled by the plan documents over what they received when they retired." Harzewski, 489 F.3d at 803-04. The LaRue court held only "that although § 502(a)(2) does not provide a remedy for individual injuries distinct from plan injuries, that provision does authorize recovery for fiduciary breaches that impair the value of plan assets in a participant's individual account." LaRue, 552 U.S. at 256. Neither decision defined lawsuits brought pursuant to § 502(a)(2) as suits for vested pension benefits; additionally, plaintiff's claim here is again different from those raised in both actions, because he does not make any allegations regarding the value of the assets in his own individual account.

Plaintiff further argues that defendant incorrectly describes his claim as one for damages, and cites In re Mutual Funds for the proposition that his claim is one for "additional benefits, not damages." Pl.'s Opp'n 12 (quoting In re Mutual Funds, 529 F.3d at 216). This assertion mischaracterizes defendant's brief, which quotes the amended complaint's request for "losses suffered by the ESOP and other relief" and contrasts that with an action seeking recovery of benefits under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B). See Def.'s Br. 10. The description of the relief sought in the amended complaint uses plaintiff's words, not defendant's, and those words demonstrate the distinction between an action brought by a participant "for appropriate relief under section 1109," ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), and one brought by a participant "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B). Plaintiff seeks only the former.[14]

Although plaintiff's reliance on In re Mutual Funds is unhelpful, defendant provides more relevant authority demonstrating both that plaintiff's claim is not one for vested benefits and that under the terms of the Release, plaintiff gave up the claim he raises in his amended complaint. Defendant cites Howell v. Motorola, Inc., 633 F.3d 552 (7th Cir. 2011), and Stargel v.

---

[14] In fact, defendant argues that plaintiff could not seek the latter against defendant because it is the Administrator of the Constellis ESOP, not the Trustee, that makes determinations regarding benefits. Def.'s Br. 10. The ESOP Claims Procedure provides that either a Committee is appointed to administer the claims procedure or, if no Committee is appointed, the Administrator will make determinations regarding claim benefits. Plan Document, Administrative Policy Regarding the Claims Procedure 1 ("Claims Policy"). It does not appear that any Committee was appointed for the Constellis ESOP. The Policy further states that all claims should be filed with the Administrator and that "[t]he Administrator, in its sole and complete discretion, will make all initial determinations as to the right of any person to benefits." Id. Moreover, defendant's status as a "directed trustee" further indicates that defendant could not make any determination regarding benefits. See Plan Description 1.

SunTrust Banks, Inc., 968 F. Supp. 2d 1215 (N.D. Ga. 2013), vacated on other grounds, 791 F.3d

1309 (11th Cir. 2015), to support its argument that courts have rejected "[s]imilar attempts to

evade contractual releases." Def.'s Br. 11. In Howell, several plaintiffs brought claims for

breaches of fiduciary duty related to the Motorola 401(k) Savings Plan, a defined-contribution

pension plan. Howell, 633 F.3d at 554. One of the plaintiffs had signed a General Release stating

that he "unconditionally and irrevocably release[d], waive[d] and forever discharge[d] Motorola,

Inc. and its affiliates, parents, successors, subsidiaries, directors, officers, and employees, from

ANY and ALL causes of action," including those arising under ERISA; however, the General

Release also stated that the plaintiff was "not releasing any claims for benefits under the

Motorola employee benefits plan" or "waiving any other claims or rights which cannot be

waived by law." Id. at 558 (emphasis in original).

The Howell plaintiff argued that "a lawsuit complaining about a breach of fiduciary duty

under ERISA can still be a 'claim for benefits;'" however, the court agreed with "Motorola's

position that the carve-out for 'claims for benefits' under the Plan [could not] be co-extensive

with all ERISA claims without doing violence to the contract as a whole." Id. at 559-61. The

court declined to determine whether all claims for breach of fiduciary duty fall outside the scope

of claims for benefits, and instead confined its holding to an interpretation of "what the parties to

[the] particular contract (the release) meant." Id. at 560. Accordingly, although Howell does not

broadly define what constitutes a claim for benefits as opposed to other ERISA claims under

§ 502(a)(2), it provides guidance for interpreting releases of ERISA claims and indicates that

plaintiff's reading of the Release he signed would "do[] violence to the contract as a whole." Id.;

see also Daugherty v. Diment, 385 S.E.2d 572, 574 (Va. 1989) ("In construing [business]

documents as a whole, the court will not treat any word or clause as meaningless if any

reasonable interpretation consistent with the other portions of the contract can be ascribed to it.").

Stargel is even more applicable to the instant suit. The Stargel plaintiffs had participated in "an employee stock ownership plan designed for investment primarily in company stock" and raised claims of breach of fiduciary duty in addition to prohibited transaction claims. Stargel, 968 F. Supp. 2d at 1219-20. One of the plaintiffs had also executed a Confidential Settlement Agreement and Release, in which she released all claims under ERISA, including "claims under any SunTrust employee benefit plan, other than Claims related to Stargel's entitlement to receive any vested benefits earned under any such plan." Id. at 1221 (alteration omitted). The agreement further stated that although the agreement should "be interpreted in the broadest possible manner in favor of . . . [the] Released Parties," nothing in the document would "be construed as a waiver of Stargel's right to any vested employee benefit, including vested amounts accrued in her 401(k), pension, and retirement accounts." Id. at 1221-22.

The court rejected the plaintiff's argument that her claims were ones for "vested benefits" and were therefore excluded from the release, reasoning that her complaint did "not contain a cause of action to recover lost benefits, vested or otherwise." Id. at 1223. Like Halldorson, the Stargel plaintiff raised claims only under ERISA § 502(a)(2) and did not raise a claim under ERISA § 502(a)(1)(B). Id. The Stargel court also referred to the Howell decision, finding that the plaintiff's "broad interpretation of the carveout provision would render large portions of the Release meaningless" and that the contract clearly showed that the plaintiff had "waived her right to raise the claim she asserts in this case." Id. at 1223-24. These decisions demonstrate that as a matter of both statutory and contract interpretation, plaintiff's claim is not one for vested benefits that would survive his Release.

17

Plaintiff argues that neither decision is applicable to the instant litigation, because <u>Howell</u> only dealt with the particular terms of the contract involved and <u>Stargel</u> "was abrogated in any event." Pl.'s Opp'n 12-13, 12 n.3. Plaintiff also contends that it is defendant's reading of the Release that would "render[] the exception for vested pension benefits a nullity," because the release of claims should be read to cover claims for welfare benefits, which do not vest, rather than claims for vested pension benefits. <u>Id.</u> at 17. A plain reading of plaintiff's amended complaint shows that it lacks any reference to amounts of benefits due to him and does not raise a claim under ERISA § 502(a)(1)(B); accordingly, the reasoning of <u>Howell</u> and <u>Stargel</u> is persuasive and overcomes plaintiff's arguments to the contrary.

Finally, defendant makes the cogent point that the Release actually excluded claims for "accrued and vested benefits," not those for just "vested benefits." Def.'s Reply 7. ERISA defines an "accrued benefit" in a defined contribution plan as "the balance of the individual's account." ERISA § 3(23)(B), 29 U.S.C. § 1002(23)(B). Under this definition, the Release's carve-out for "accrued and vested benefits" logically applies to a claim for the balance of those benefits already in a plaintiff's account, rather than to claims on behalf of an ESOP as a whole or claims that a plaintiff is entitled to more benefits than exist in his account.[15] For all these reasons, plaintiff fails to establish that his claim was excluded from the Release, because it is not a claim

---

[15] Defendant also argues that plaintiff is not claiming "vested benefits" because the ESOP defined "vested" as a "nonforfeitable percentage in an account," rather than an undetermined legal claim, and further contends that plaintiff had not vested in his ESOP account until the 2014 acquisition occurred. Def.'s Reply 8-9, 8 n.2. Plaintiff argues that he was vested in his ESOP account earlier, Pl.'s Opp'n 10-11; however, this dispute is not material because regardless of whether or not plaintiff was vested in his account, the claim he raises is not one for vested benefits.

for accrued and vested benefits; rather, his claim is that defendant engaged in transactions prohibited by ERISA, a claim encompassed by his Release.

### 3. <u>Violation of the Plan Document and Trust Document</u>

Plaintiff's argument that a release of the claim he raises here would violate the terms of the ESOP Plan Document and Trust Document also fails. Plaintiff points to the Trust Document's admonition that "[t]he interests of Participants, Beneficiaries and other persons entitled to benefits under the Trust and Plan are not subject to the claims of their creditors and may not be voluntarily or involuntarily assigned, alienated, or encumbered," and argues that defendant's interpretation of the Release "violates the Trust Document that it executed and is duty-bound to follow." Pl.'s Opp'n 18 (quoting Trust Document, Art. X, § 10.04) (internal quotation marks omitted). As defendant argues, Def.'s Reply 14, this provision simply complies with ERISA's "anti-alienation provision," which requires that every "pension plan shall provide that benefits provided under the plan may not be assigned or alienated." ERISA § 206(d)(1), 29 U.S.C. § 1056(d)(1); <u>see also</u> <u>United States v. Herrmann</u>, 910 F. Supp. 2d 844, 846 (E.D. Va. 2012) (referring to 29 U.S.C. § 1056(d)(1) as "ERISA's anti-alienation and assignment provision").

Furthermore, defendant provides persuasive authority from the Seventh Circuit demonstrating that an anti-alienation provision only bars the release of vested pension entitlements but does not affect "contested pension claims," including claims that a plaintiff "deserves more benefits than he accrued under the terms of [his] plan" because "the plan administrator somehow violated his fiduciary duty." <u>Hakim v. Accenture U.S. Pension Plan</u>, 718 F.3d 675, 682 (7th Cir. 2013). In <u>Hakim v. Accenture United States Pension Plan</u>, 718 F.3d 675 (7th Cir. 2013), the court confirmed that "general releases of [contested pension] claims are valid

as long as the signing party has actual knowledge of the claims (or could have discovered those claims with a reasonable inquiry)." Id. Here, the 2013 transaction and the July 2014 sale occurred more than a year before plaintiff signed the Release, and his amended complaint relies exclusively on those events to allege that defendant engaged in prohibited transactions.[16] Accordingly, he had at least constructive knowledge of his claims before he released them. Under the reasoning of Hakim, therefore, the anti-alienation provision embodied in the Trust Document does not bar the release of that claim.

### 4. **Defendant's Status Under the Release**

Plaintiff also argues that the ESOP is not an "affiliate" of Constellis within the meaning of the Release and therefore that claims against Wilmington as a "trustee" of that "affiliate" were not released by plaintiff when he signed the Release. Plaintiff primarily relies for this argument on Barron v. UNUM Life Insurance Company of America, 260 F.3d 310 (4th Cir. 2001), which he claims stands for the proposition that an employer and an employee benefit plan are separate entities, meaning that a release referring only to the employer does not also release claims regarding the plan. Pl.'s Opp'n 20. Plaintiff argues that this Fourth Circuit case "decides this

---

[16] Plaintiff supports some of his allegations by citing to a report produced in December 2013, which was attached by defendant to its initial motion to dismiss. See Pl.'s Statement of Undisputed Material Facts ¶¶ 1, 7-8; Def.'s Mem. of Law in Supp. of Mot. to Dismiss, Ex. A, Form 5500, Constellis Employee Stock Ownership Plan, Financial Statements and Supplementary Information [Dkt. No. 11-1], Dec. 15, 2015. This document, which contains an "Independent Auditors' Report," "Financial Statements," and notes explaining the financial statements, was addressed "[t]o the Trustee and Participants" of the Constellis ESOP and signed by the independent auditors that produced it on October 10, 2014. Id. at 1-2. It addresses the ESOP's finances as of December 31, 2013; as such, it discloses the 2013 stock purchase, describes the investment in Constellis stock and accompanying "indebtedness" as "related party and party-in-interest transactions," and states that the ESOP was terminated after 2013. Id. at 10-11. This document, made available to ESOP participants before plaintiff signed the Release in August of 2015, demonstrates that plaintiff had at least constructive, if not actual, notice of his claim before signing the Release.

question against Wilmington," id.; however, plaintiff completely mischaracterizes the Barron decision.

Barron concerned a plaintiff who had participated in an employee benefit plan administered by UNUM Life Insurance Company of America ("UNUM") while she worked for Advanced Computer Techniques ("ACT"). Barron, 260 F.3d at 312. When the plaintiff left her position with ACT, she signed a general release that included a provision releasing all claims against UNUM, including claims for benefits under the plan that UNUM administered for ACT. Id. at 312-13. Several years later, plaintiff began working for Comcast Cablevision of Delmarva, Inc. ("Comcast") and participated in an employee benefit plan through Comcast that, "coincidentally," was also administered by UNUM. Id. at 313. In a dispute that developed over Comcast's plan, UNUM attempted to bar the plaintiff's claims against that plan based on the release she had executed while she worked for ACT. Id. at 313-14. The Fourth Circuit ruled that the plaintiff's release only applied to her claims against UNUM with respect to the ACT plan and not to any subsequent claims. Id. at 316-18. Specifically, the court found that the ACT release "was for the benefit of the plan to which it related and could not have been applied to other plans," and further stated that "in connection with each plan, UNUM was acting independently as a fiduciary for the plan and not on its own behalf," meaning "that the Release obtained in connection with [the plaintiff's] claim against the Advanced Computer Plan could not be used to bar a claim made by her against the Comcast Plan." Id. at 317-18.

The Barron decision does not establish that an employer and its employee benefit plan are separate entities; rather, it establishes that a plan administrator may not use a release executed in favor of one employer's plan to bar claims related to an entirely separate employer's plan. The

situation at bar involves just one release, one employer, and one plan, and therefore is not

governed by Barron.[17]

Neither party provides authority from the Fourth Circuit addressing the specific question

raised here, and it appears that the question has caused some disagreement among courts. See

Sullivan v. Cap Gemini Ernst & Young U.S., 573 F. Supp. 2d 1009, 1018 (N.D. Ohio 2008)

("Decisions outside this circuit come down on both sides of the issue."). For example, in

Antoniou v. Thiokol Corporation Group Long Term Disability Plan (Plan No. 503), 849 F. Supp.

1531 (M.D. Fla. 1994), the court determined that an employer and an employee benefit plan are

two separate legal entities and therefore a release executed in favor of the employer does not also

release claims against the plan. Id. at 1534; see also Hubbert Prudential Ins. Co. of Am., 105

F.3d 669, 1997 WL 8854, at *3 (10th Cir. Jan. 10, 1997) (citing Antoniou for the proposition that

an employer and a plan are "two separate entities, and a release of one does not operate to release

the other"); Laurenzano v. Blue Cross & Blue Shield of Mass., Inc. Ret. Income Trust, 191 F.

Supp. 2d 223, 233 (D. Mass. 2002) (citing Barron and Antoniou to support the statement that

"the [administrator of a plan] is a legal entity separate from [the employer], ERISA § 502(d), 29

U.S.C. § 1132(d), so releasing [the employer] does not automatically release the

[administrator]."). Antoniou and other courts reached this conclusion based primarily on ERISA

§ 502(d)(1), 29 U.S.C. § 1132(d)(1), which states that "[a]n employee benefit plan may sue or be

sued under this subchapter as an entity," see Antoniou, 849 F. Supp. at 1534 (citing this

provision to support its argument that "the law recognizes the separate existence of employee

---

[17] Accordingly, the additional authority plaintiff cites to show other courts' reliance on the Barron decision is also inapplicable here.

benefit plans");[18] however, although that provision allows plans to sue or be sued under certain circumstances, it does not require that a plan be deemed a separate entity in all circumstances.

In the absence of controlling Fourth Circuit precedent, the reasoning of the courts discussed below, all of which found that an employee benefit plan and its administrator were covered by a release, is more persuasive and will be adopted here. For example, in Goepfert v. Trustmark Insurance Company, 541 F. Supp. 2d 1052 (E.D. Wis. 2008), the court found that a release provision covered an employee benefit plan as an "affiliate" of the employer, because "ERISA does not require an employee benefit plan to be explicitly named in an exculpatory agreement even though suit may be commenced against the plan as an entity." Id. at 1055-56. The Goepfert court reasoned that because the employee benefit plan was "an entity established by [the employer], acting in its capacity as an employer seeking to provide benefits to its employees, [that] would not exist separate and apart from [the employer]," it was "closely associated with [the employer]" and was deemed an "affiliate" under the terms of the release. Id. at 1056; see also Sullivan, 573 F. Supp. 2d at 1021-22 (stating that "[t]his case and Goepfert are indistinguishable," agreeing with the Goepfert court that a release need not "explicitly refer to an ERISA plan in order to be enforced against the plan," and "conclud[ing] that [the employer] and the Plan are so closely associated as to be 'affiliates' within the meaning of the waiver").

The district court in Howell v. Motorola, Inc., No. 03 C 5044, 2005 WL 2420410 (N.D. Ill. Sept. 30, 2005) and the court in Bordonaro v. Union Carbide Corp., No. Civ. A. 01-1177, 2002 WL 32824 (E.D. La. Jan. 11, 2002) also interpreted releases to apply to employee benefit plans that were not named in the release. See Howell, 2005 WL 2420410, at *7 ("In this case, the

---

[18] Antoniou also involved a release provision with more narrow language than the one at issue here. Antoniou, 849 F. Supp. at 1534.

broad language of the Release included all affiliates of [the employer]. [Plaintiff] would be hard-pressed to argue that any of the Defendants he named in this lawsuit were not affiliates, including the [plan's trustee]."); Bordonaro, 2002 WL 32824, at * 3 ("For purposes of contract interpretation, there is nothing that compels the conclusion that an ERISA benefits plan, for all purposes, must be considered a distinct entity from that of the establishing entity."). Similarly, in a recent decision in the Eastern District of Virginia, the court ruled that similar language in a settlement agreement was "clear" in that it released the employee benefit plan and its trustees as "affiliated entities" and "trustees." Dunn v. Aclairo Pharm. Dev. Grp., 401(K) Plan, No. 1:15-cv-975, 2016 WL 592787, at *3 (E.D. Va. Feb. 10, 2016) (internal quotation marks omitted).[19]

       With respect to the instant action, the clear terms of the Release signed by plaintiff and the structure of the Constellis ESOP support the same conclusion. The ESOP was formed for the benefit of Constellis' employees, Constellis acted as the Administrator for the ESOP and therefore retained full discretion to determine benefits claims under the plan, and Wilmington was chosen by Constellis to act as the directed Trustee for the ESOP. Accordingly, the ESOP was sufficiently associated with Constellis to qualify as an "affiliate" under the terms of the

---

[19] Due to the timing of the decision in Dunn v. Aclairo Pharmaceutical Development Group, 401(K) Plan, No. 1:15-cv-975, 2016 WL 592787 (E.D. Va. Feb. 10, 2016), defendant cited this slip opinion for the first time in its Reply. Def.'s Reply 1. At oral argument on February 19, 2016, plaintiff sought to introduce additional materials related to Dunn v. Aclairo; although the Court did not allow additional materials to be introduced, the Court gave plaintiff's counsel the opportunity to describe the content and relevance of those materials. Tr. of Mots. Hr'g [Dkt. No. 39] 4:23-5:8, Feb. 19, 2016. After oral argument, plaintiff sought leave to file a surreply related to Dunn and briefs filed in that action, see Pl.'s Mot. for Leave to File Two Dunn v. Aclairo Briefs Referenced at Oral Argument [Dkt. No. 40], Feb. 22, 2016, which motion the Court denied. Order [Dkt. No. 43], Feb. 23, 2016. As that Order states, plaintiff was given sufficient opportunity to present any argument related to the decision, id. at 1; however, when given that opportunity, plaintiff's counsel simply reiterated the failed argument that plaintiff's claim is one for vested pension benefits. Tr. of Mots. Hr'g 5:9-7:9.

Release, and as a "trustee" of that "affiliate," defendant was a Released Party under that agreement.

Furthermore, the Release clearly provided that plaintiff released all claims arising under ERISA, with the exception of claims for accrued and vested benefits, which would have to be brought against the Administrator, not the Trustee. Release § 4; Claims Policy 1. Plaintiff tries to argue that the Release's use of a parenthetical to describe "affiliates" as "including all entities that are direct and indirect subsidiaries of Constellis Holdings, LLC," shows that the Release only referred to corporate entities, id. at 21-22; however, he fails to demonstrate that the ESOP is not the type of entity encompassed by that language or that the parenthetical list is an exhaustive one. See Def.'s Reply 17 n.7 (citing Nestel WIP Lease Corp. v. Saunders, 666 S.E.2d 317, 321-22 (Va. 2008) (stating that the court was "willing to adopt . . . definitions of the word 'including'" under which "the word 'includes' is usually a term of enlargement, and not of limitation, and therefore conveys the conclusion that there are other items includable, though not specifically enumerated." (quoting Fed. Election Comm'n v. Mass. Citizens for Life, Inc., 769 F.2d 13, 17 (1st Cir. 1985) (internal quotation marks omitted))).

### III.   CONCLUSION

In sum, after being advised to consult with his own counsel, plaintiff, an experienced businessman, signed a straightforward Release in which he released his claims against Constellis and its "affiliates," which include the Constellis ESOP and the "trustee" of that "affiliate," Wilmington. That Release prevents plaintiff from pursuing this litigation further, and therefore summary judgment has been granted in favor of defendant. Because there is no just reason for delay, particularly because the legal question of Halldorson's Release is distinct from the questions raised by the newly filed second amended complaint, the Clerk will be directed to enter

judgment in favor of defendant as to Halldorson pursuant to Federal Rule of Civil Procedure 54(b).

Entered this 22 day of April, 2016.

/s/

Leonie M. Brinkema
United States District Judge

Alexandria, Virginia

26