REDACTED VERSION

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| TIM P. BRUNDLE, on behalf of the Constellis Employee Stock Ownership Plan, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No.  1:15CV1494-LMB-IDD ) |
| WILMINGTON TRUST, N.A., as successor to Wilmington Trust Retirement and Institutional Services Company, | ) ) ) ) |
| Defendant. | ) ) |

## DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS
## MOTION FOR SUMMARY JUDGMENT

COMES NOW Defendant Wilmington Trust, N.A. ("Wilmington"), by counsel, and states as follows in support of its Motion for Summary Judgment.

## I.    INTRODUCTION

Plaintiff filed a one-count Third Amended Complaint ("Complaint"), alleging Wilmington engaged in a prohibited transaction forbidden by §§ 406(a)-(b) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1106(a)-(b). Plaintiff does not allege a separate breach of fiduciary duty claim.  The Complaint challenges a transaction in which Constellis Group, Inc.'s ("Constellis," or the "Company") Employee Stock Ownership Plan ("the ESOP") purchased the stock of Constellis (the "ESOP Transaction") in December 2013.    As the undisputed facts establish, Wilmington committed no prohibited transaction because the ESOP Transaction was for "adequate consideration" under the exception found in ERISA § 408(e)(1).  *See* 29 U.S.C. § 1108(e)(1).

Unlike many ESOPs that have been challenged in court, this case represents an example of "how to do it right."  This is not a case about insiders acting for their own benefit or greed. Wilmington was an independent trustee who engaged an independent and qualified financial advisor and highly qualified lawyers, all of whom were experts in their fields.  Wilmington appropriately investigated its advisors' qualifications, actively engaged in the valuation process, asked multiple questions, double checked the financial advisor's work, carefully documented its meetings and communications, and actively negotiated the terms of the ESOP transaction.

As a result of Wilmington's good faith, deliberate process and investigation, the ESOP paid no more than fair market value for the stock.  Summary judgment is warranted because Wilmington has carried its burden to prove that adequate consideration was paid by showing it

1

REDACTED VERSION

arrived at its determination of fair market value by way of a "prudent investigation under circumstances then prevailing." *Perez v. Bruister*, 823 F.3d 250, 262-63 (5th Cir. 2016).

Avoiding an unnecessary and expensive trial is particularly appropriate on these facts because Congress, the Supreme Court, and the Fourth Circuit have recognized the policy judgment to encourage the creation of ESOPs and have specifically instructed courts to refrain from "regulations and rulings [that] block the establishment and success of [such] plans." *See* Tax Reform Act of 1976, Pub. L. No. 94-455, § 803(h), 90 Stat. 1590 (1976), quoted in *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2465-66 (2014); *Difelice v. U.S. Airways, Inc.,* 497 F.3d 410, 425 (4th Cir. 2007). It is undisputed that Wilmington's financial advisor, Stout Risius Ross, Inc. ("SRR"), prepared a 124-page report, opining that "the terms and conditions of the [2013 transaction], taken as a whole, are fair to the ESOP from a financial point of view." (Dep. Ex. 2, at 69.) Along with SRR's report on the fairness of the stock purchase, SRR gave its independent written opinion that the consideration paid by the ESOP was not greater than fair market value, the loan terms were as favorable as a comparable loan resulting from an arms-length transaction, and the terms of the transaction were fair to the ESOP. (Dep. Ex. 16.)

Wilmington's prudent process is further confirmed because an independent buyer purchased Constellis in July 2014, seven months after the December 2013 ESOP transaction, for Redacted , which was within the range of what SRR's appraiser found to be the enterprise value of Redacted . Although the participants of the ESOP had not contributed any money to the ESOP when it was created in December 2013, as a result of the July 2014 sale, they immediately became vested. As explained below, the case law emphasizes that an ESOP is not designed to guarantee retirement benefits. Nevertheless, the participants in this case enjoyed a

REDACTED VERSION

windfall.  Plaintiff's account, for example, rose from nothing in December 2013 to $19,015.25 in his new profit-sharing account as of December 31, 2014.

For all of these reasons, Plaintiff's claim fails as a matter of law, and the undisputed facts establish that Wilmington's approved purchase price for the Constellis stock constituted "adequate consideration" as defined by ERISA.

## II.   <u>PROCEDURAL HISTORY</u>

On November 10, 2015, former Plaintiff Andrew Halldorson filed a Class Action Complaint against Wilmington.  (Dkt. No. 1.)  On December 15, 2015, Wilmington filed a motion to dismiss the Complaint.  (Dkt. No. 10.)   On December 28, 2015, Halldorson filed his First Amended Class Action Complaint ("Amended Complaint"). (Dkt. No. 14.)  On January 14, 2016, Wilmington filed a motion to dismiss the Amended Complaint alleging that that Halldorson had failed to state a claim under *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2466 (2014).  (Dkt. No. 20.)  On January 27, 2016, Wilmington filed a motion for summary judgment based on a release executed by Halldorson.  (Dkt. No. 25.)  On March 16, 2016, Halldorson filed his First Motion to Certify a Class.  (Dkt. No. 54.)  On April 15, 2016, this Court entered an Order denying Wilmington's motion to dismiss, denying class certification, and granting Wilmington's motion for summary judgment.  (Dkt. No. 89.)[1]

On April 19, 2016, a Second Amended Complaint was filed, which substituted Brundle as Plaintiff.  (Dkt. No. 90.)  The parties then engaged in extensive discovery, including 13 depositions.  On July 5, 2016, Brundle filed his Third Amended Complaint, which Wilmington answered.  (Dkt. Nos. 136-137.)  Discovery ended on July 15, 2016.  (Dkt. No. 100.)  This matter is set for an eight- to ten-day bench trial beginning November 28, 2016.  (Dkt. No. 142.)

---

[1] This Court's grant of summary judgment against Halldorson and its denial of Plaintiff's Motion to Certify a Class are currently on appeal with the Fourth Circuit.

III.     **STATEMENT OF UNDISPUTED MATERIAL FACTS**

**A. Background of the ESOP**

1.      Constellis is a family of companies and global provider of security, advisory, training, and mission support services worldwide to government, corporate, and non-profit clients. (Decl. of A. Muhlendorf ¶ 3.)[2]  Four shareholders, Thomas E. Katis, Matthew R. Mann, Howard A. Acheson Trust, and John O. Peters ("Sellers"), owned the majority of Constellis shares.  (Dep. Ex. 84, at 1.)[3]  Constellis began to consider an ESOP in the summer of 2013. (Constellis Dep. 14:14-16:2, 17:6-19:16, attached hereto as Ex. B; Dep. Ex. 84, at 1.)   The Sellers, particularly Mann and Katis, wanted to "make sure the employees [were] taken care of" by building a long-term employee savings plan and also achieve tax savings for the Company. (Ex. B at 20:8-19, 21:9-16, 24:22-25:11.)   The ESOP was in addition to any other benefits received by employees since the ESOP did not replace any benefits.  (Dep. Ex. 134, at 81.)

2.      In the fall of 2013, Constellis engaged the law firm Greenberg Traurig to assist in structuring the ESOP.[4]    (Ex. B at 14:14-16:2, 17:6-19:16.)    At Greenberg Traurig's recommendation, the Company also engaged CSG Partners LLC ("CSG"), an investment bank experienced in ESOP transactions, to advise Constellis concerning the ESOP structure and transaction. (*Id.* at 19:6-10, 21:2-22:21.)

3.      Under its Engagement Agreement with Constellis, CSG advised Constellis on the hiring of transaction professionals, including the Trustee, and acted as liaison between the Company and the transaction professionals.  (Dep. Ex. 187, § 1(c) and 1(d); Ex. B at 37:12-22.) George Thacker, Managing Director for CSG, explained that CSG represented Constellis as the

---

[2] Triple Canopy, Inc. is a subsidiary of Constellis.  (Decl. A. Muhlendorf ¶ 3.) (Dkt. No. 26-1.)
[3] Deposition Exhibits referenced herein are attached in numerical order as Ex. A.
[4] The Sellers had separate legal counsel from that of Constellis.  (CSG Dep. 82:12-19, attached hereto as Ex. C.)

4

REDACTED VERSION

sponsoring company, and did not represent either the Sellers or the Trustee.  (Ex. C at 15:6-16:9, 17:17-18:10, 19:1-20:10.)

4.      Thacker explained CSG's interest in avoiding an ESOP transaction price that is higher than fair market value because it would lead to multiple problems for the Company, including (1) triggering a review and audit by the Department of Labor and/or lawsuits; (2) overburdening the Company with debt; and (3) creating a repurchase obligation problem, where the Company has to buy back the ESOP shares.[5]  (Ex. C at 19:1-20.)

5.      Greenberg Traurig and CSG recommended to Constellis' General Counsel, Juliet Protas, that Wilmington would be a good Trustee for the ESOP Transaction.  (Ex. C at 37:13-25; 41:23-42:15; 153:9-154:22; Ex. B at 36:1-37:22.)  CSG recommended Wilmington because of its ESOP expertise, the processes and procedures it had in place as a Trustee, its financial strength, and its positive track record with clients and the DOL.  (Ex. C at 153:9-154:22.)

6.      Greg Golden, Vice President at Wilmington, took the lead for the Trustee on the ESOP Transaction and dealt with the day-to-day issues during the due diligence process.  (Matz Dep. 56:6-9; Wilmington Dep. 34:11-13, 115:3-17, attached hereto as Exs. D and E, respectively.)  Protas was impressed with Golden.  (Ex. B at 36:1-22 (testifying that she spoke with Golden before engaging Wilmington, "had a long conversation," "understood kind of what their role was and felt he was very, very competent").)  Golden has worked with qualified retirement plans at Wilmington for twenty years.  (Golden Dep. 16:16-17:18, attached hereto as Ex. F.)  He has a Bachelor's Degree in Business Administration with a concentration in Finance and a Master's of Business Administration.  (*Id.*)

---

[5] SRR, in its December 2013 Analysis of Transaction Fairness, applied the "fair market value" standard set forth under ERISA and the DOL's Proposed Regulation Relating to the Definition of Adequate Consideration (Prop. Reg. Section §2510.3-18(b)(2)(ii)).  (Dep. Ex. 2, at 3.)

7.      Wilmington has a Fiduciary Services Sub-Committee ("FSSC"), which oversees ESOPs and was charged with deciding whether to approve the ESOP transaction.  (Ex. D at 18:3-21:7.)  The FSSC had five voting members in the fall of 2013 and several other attendees, which included representatives from Wilmington's retirement services, compliance, and investment departments.  (Ex. F at 60:15-21; 88:16-89:13.)[6]  Jennifer Matz, Vice President at Wilmington, was the chair of the FSSC.  (Ex. D at 10:15-19, 18:3-8.)  Matz also oversees a team that services various types of retirement plans, including ESOPs, and the team has handled approximately 40 ESOP transactions since 2010.  (*Id.* 9:18-10:19, 17:11-13, 29:19-30:1, 40:19-41:9.)

8.      The FSSC hired an independent valuation firm and a law firm to guide it in the negotiation.  (*Id.* 23:20-25:21, 31:14-32:1; Ex. E at 114:4-8.)  Wilmington engaged SRR to perform a valuation of the Constellis stock, and the FSSC formally approved SRR's engagement on October 10, 2013.  (Dep. Ex. 144.)  Wilmington independently made the decision to hire SRR as its valuation expert based on SRR's reputation and knowledge of finance and ESOPs.  (Ex. B at 35:18-22; Ex. F at 41:4-15; Ex. E at 38:16-22, 61:6-62:15; Ex. D at 27:19-30:13, 59:13-60:10.)  SRR is the first choice of the major trust companies CSG works with when the ESOP transaction is large and complex.  (Ex. C at 60:10-25.)[7]

9.      In 2013, SRR was one of approximately 12 prescreened valuation firms that Wilmington used in ESOP transactions.  (Ex. D at 27:19-28:5, 30:7-13.)   In June 2013, Wilmington instituted a formal annual due diligence review of the firms it engaged to perform fairness opinions for ESOPs.  (Dep. Ex. 230.)  Pursuant to its written procedures, Wilmington

---

[6] Karen Bonn, as Wilmington's relationship liaison for Constellis, sat in the FSSC meetings but was recused from voting.  (Ex. F at 284:9-22; Ex. D at 76:22-77:16.)

[7] SRR has also been retained by Plaintiff's counsel in at least one other recent case.   *Charron v. Sallyport Global Holdings,* 15-256 (2d Cir. March 1, 2016) (involving enterprise valuation of privately held corporation).

subjects its valuation firms to a prescreening process, during which the valuation firm completes a due diligence questionnaire.  (Dep. Exs. 230, 231; 243, 244; Ex. E at 54:13-55:10.)  Through this process, SRR described its significant expertise in providing fairness opinions and its experience in the government contracting industry.  (Dep. Ex. 231.)[8]

10.     The FSSC also hired Dennis Summers and Emily Horn from the law firm Taylor English Duma LLP ("Taylor English") to provide legal advice on behalf of the ESOP.  (DTX 24.)[9]  Taylor English is one of four preferred firms Wilmington uses for complicated transactions involving mid-range and large deals.  (Decl. G. Golden ¶ 6, attached as Ex. M.)  Summers and Horn specialize in ESOP transactions, and Wilmington chose Taylor English to advise Wilmington in its role as Trustee because of the firm's expertise in multiple industries and the depth of their ESOP team.  (*Id.*)  Summers and Horn were heavily involved in the due diligence process on behalf of Wilmington.  (Ex. B at 34:17-35:4 ("Denny Summers and Emily Horn, I dealt with them literally daily, they were the ones who basically ran the deal on their side.").)

11.     SRR and Taylor English spent several weeks in October and November performing the valuation, reviewing the Company's projections, and interfacing both with Constellis employees and representatives of CSG.  (Dep. Exs. 48, 78, 86, 148, 149, 189, 190; DTX 19, 25, 30, 33, 34, 36, 39; Ex. G at 125:11-17.)  On or about October 24, 2013, SRR and Summers held a face-to-face meeting with Constellis' CEO, CFO, other Constellis representatives and counsel from Greenberg Traurig.  (Dep. Exs. 189, 190.)  Bonn also was present, and Golden participated by telephone.  (*Id.*; Ex. B at 56:21-58:11.)  The meeting focused

---

[8] Scott Levine, CPA/ABV, CFA, ASA and Aziz El-Tahch, CFA, the two main SRR employees who worked on the Constellis valuation, had performed 1,500 and 750 ESOP valuations, respectively, as of April 2013.  (Dep. Ex. 231, at 2.)  Both are Managing Directors and Certified Financial Analysts.  (Dep. Ex. 2, at 11330.)  El-Tahch was one of three principal authors of the fairness opinions referenced herein.  (Ex. G at 27:12-28:4, 33:17-34:15.)
[9] DTX Exhibits referenced herein are attached in numerical order as Ex. L.

on Constellis representatives answering questions about, e.g., the Company's business, contracts, pipeline of future business, and financial projections.  (Ex. G at 31:19-32:14, 121:20-122:10.)

12.    When it received Constellis' financial projections, SRR engaged in its due diligence, which included many communications and emails with Constellis and CSG both before and after the October 24, 2013 meeting.  (Dep. Ex. 86; DTX 33, 36; Ex. G at 45:19-51:2; Ex. B at 23:5-24:21; Decl. R. Randall ¶ 10, attached as Ex. N.)

13.    In managing its business, Constellis reevaluated its financial forecast approximately every three months, and its former CFO and General Counsel both described the company's projections as "conservative."  (T. Magnani Dep. 19:13-20:6; 62:13-20, attached hereto as Ex. H; Ex. B at 59:7-60:10 ("we always believed in the theory of . . . promise like low and deliver high, and so we always had very conservative projections"); Dep. Ex. 190 at 2.) Constellis' projections were comprised of three parts:  (1) backlog; (2) options; and (3) pipeline. (Ex. N ¶ 7.)   The backlog represented funded existing contracts, the options represented additional option years for existing contracts, and then the pipeline represented opportunities and contracts Constellis hoped to win.  (*Id.*)  Constellis used a system CRM software package for government contractors to track new opportunities and weigh each opportunity in the pipeline. (*Id.* ¶ 8.)   Constellis implemented intricate rules on how each opportunity was weighed depending on where the opportunity was in the pipeline, past performance, the identity of the customer, and what the customer's relationship was to Constellis.  (*Id.*)  These rules ensured that the final projections were reasonable and not overly ambitious.   (*Id.*)   Former Plaintiff Halldorson, who performed sales forecasting while employed with Constellis, testified that the Constellis employees involved in creating the projections would not have provided inaccurate or overstated financial numbers or projections.   (Halldorson Dep. 72:7-74:16, 208:6-209:22,

attached as Ex. K.)  Wilmington and SRR found Constellis' process of creating projections to be more thorough than other companies it had reviewed in its ESOP practice.  (Ex. D at 126:22-127:18 ("Constellis, in their projections, risk-ranked their contracts . . . [and] had a pretty robust process to rank their contract renewals and that was, you know, subsequently tied into projections and giving us comfort. . . . It's not typical that, you know, when a company puts projections together, that they get that specific on contracts and the likelihood of, you know, risk-ranking contracts and likelihood of renewal versus loss.").)

14.    Although SRR relied on Constellis' projections and Constellis' written confirmation that the financial information was prepared in good faith (Dep. Ex. 15), SRR still performed its own due diligence.  (Ex. G at 45:19-49:14.)  According to El-Tahch, "this company had a very robust process for tracking its existing contracts, both funded and unfunded backlog, its pipeline opportunities.  And they had a series of rules by which they assigned probabilities to each opportunity.  So they had a very granular understanding of the company's growth prospects."  (*Id.* at 46:10-16.)  According to El-Tahch, there was never any indication from anyone at Constellis that the projections were overly aggressive; in fact, SRR requested and received written representations from Constellis' CEO that its projections were accurate in all material respects.  (Dep. Ex. 15; Ex. G at 124:20-125:9.)

15.    In addition, SRR noted that Constellis' performance as of October 2013 substantially exceeded the 2013 financial projections Constellis had prepared in January 2013. Actual EBITDA performance for 2013 was more than 20 percent better than what the Company had previously forecast.  (Dep. Ex. 78 at SRR-Constellis-0021555; Dep. Ex. 1, at 49.) Constellis' sales forecasts for 2013 were lower than the previous three years.  (Messina Dep. 39:10-40:1, attached hereto as Ex. J; Dep. Ex. 78.)  Constellis' 2014 sales projections were lower

than the years 2010 through 2012.  *Id.*  Constellis' sales projections for 2015 were lower than actual sales in 2011 and 2012.  (Ex. J at 40:2-4; Dep. Ex. 78.)  Projected sales by Constellis for 2018 were lower than actual sales in 2011.  (Ex. J at 40:10-14; Dep. Ex. 78.)

16.     SRR submitted its draft analysis of transaction fairness to the FSSC on November 12, 2013.  (Dep. Exs. 148, 149.)[10]  Golden and Bonn had been working with SRR throughout the due diligence process.  (DTX 29, 32, 35, 38; Ex. D at 64:6-65:6.)  The FSSC was given a copy of the report to review before the scheduled FSSC meeting on November 14, and Matz and Golden testified they read the analysis before the meeting.  (Dep. Ex. 149; Ex. F at 85:10-86:20; Ex. D at 75:9-22.)  SRR established a range of enterprise value of Redacted          and a range of equity value of Redacted          .[11]  (Ex. D at 25:16-26:8; Dep. Ex. 149 at 35; Dep. Ex. 12 at 23648; Ex. G at 136:18-138:2.)

17.     To arrive at this value, SRR used a weighted average of two valuation methods: (1) the discounted cash flow method ("DCF"); and (2) the guideline public company method. (Dep. Ex. 149 at 35(a).)  SRR more heavily weighted the DCF "in recognition of the limited operational comparability of the guideline publicly traded companies."  (Ex. G at 58:12-18, 96:9-97:6.)  Appraisers commonly use a weighted average when they find that one of the methods is

---

[10] No one on the Constellis side or the Sellers' side saw SRR's valuation.  (Ex. C at 79:14-22.) CSG performed its own valuation of Constellis in the fall of 2013, which was approximately 4.8 times EBITDA.  Both the Sellers and Bank of America, Constellis' external lender, thought that valuation was too low.  (Ex. C at 151:7-153:8.)

[11] "Equity value is the value that the owners of the company have. So, if a company has an enterprise value, once you subtract out the debt, the remaining value is the equity value."  (Ex. J at 16:19-22.)  "Enterprise value is the amount that a business is worth, looking at it, essentially the left-hand side of the balance sheet. So, if you were looking at a house, if you had a house worth $500,000.00 that is the enterprise value.  If you have a $200,000.00 mortgage on it, the equity value would be the enterprise value of the house, minus the mortgage, would be the equity value."  (*Id.* at 17:1-10.)  *See Charron v. Sallyport Global Holdings,* 640 Fed. App'x 80, 83 (2d Cir. 2016) ("Both parties' experts define [enterprise value] generally as the overall value of the entire business—in other words, the value of its anticipated future cash flows.").

more reliable than the other, such as when the guideline companies were not as comparable as the appraiser would have liked.  (Tarbell Dep. 68:3-70:3, attached hereto as Ex. I.)  Jeffrey Tarbell, Wilmington's expert, agreed it was appropriate to give the DCF more weight than the guideline public company method.  (*Id.*)  The sources of information SRR reviewed to reach its valuation are listed in on pages 3-4 of SRR's draft and final reports.  (Dep. Exs. 2, 12.)[12]

18.      Wilmington prefers to see multiple methods in the valuation firm's analysis, and the FSSC discussed the basis for each of SRR's methods in detail.  (Ex. F at 269:16-272:7; Dep. Exs. 27, 58, 152, 153.)  Plaintiff's expert, Dana Messina, conceded that valuations are by nature inexact and that reasonable and competent valuation professionals can disagree about valuations. (Ex. J. at 12:8-13:11.)[13]

19.      The Company sent an initial offer to the Trustee on November 13, 2013 with a per share offer of ^Redacted .  (DTX 45.)  The FSSC met on November 14 to decide to approve a specific range of value for the stock and to approve a counteroffer.  (Dep. Exs. 50, 152.)  Matz, Golden, Bonn, Summers, Horn, El-Tahch, Levine, and other members of the FSSC attended the meeting.  (Dep. Ex. 18.)  Multiple committee members asked questions during this meeting. (Ex. G at 138:5-144:13; Ex. F at 86:1-20, 101:5-10, 112:6-118:2; Ex. D at 78:17-22, 85:13-86:5; Dep. Exs. 18, 50, 153, 154.)  Following consideration of SRR's detailed report and advice of legal counsel, the FSSC approved a range of fair market value of ^Redacted  to ^Redacted  per share, (Ex. F at 116:15-117:7; Dep. Ex. 153), but decided that it would only approve a per share price that fell at or below the midpoint of SRR's estimated range of value.  (Ex. F at 99:18-118:5; Ex.

---

[12] SRR issued Wilmington a draft Analysis of Transaction Fairness on November 12, 2013, and it finalized the analysis on December 20.  The differences between the draft and final report are not material.  (Dep. Exs. 2, 12.)

[13] *See Donovan v. Cunningham*, 716 F.2d 1455, 1473 (5th Cir. 1983) ("Appraisal of a closely held stock is a very inexact science" involving a "level of uncertainty inherent in the process and variety of potential fact patterns.").

G at 138:5-144:13; Dep. Exs. 18, 153.)  Wilmington, through SRR and Taylor English, then

negotiated with Greenberg Traurig and CSG over the terms of the ESOP transaction.  (DTX 63,

70, 71, 73, 74, 75, 77, 84, 85, 90, 95; Dep. Ex. 224.)  Taylor English conducted extensive due

diligence on Constellis, its contracts, insurance, litigation, and other issues and issued a detailed

due diligence report to the FSSC and SRR.  (DTX 92.)

20.     After several back and forth negotiations of price and the other transaction terms[14]

between Constellis' representatives and the Trustee's representatives (which included Bonn,

Golden, SRR, and Taylor English on the Trustee side), the parties reached an agreement on a

sale price of $4,235 per share on November 15, 2013, the midpoint of SRR's estimated range of

value. (Dep. Ex. 201, 218; DTX 45, 46, 56, 59, 62, 64, 65; Ex. G at 125:18-127:7, 128:21-129:4,

131:9-22.)

21.     The FSSC met again on December 18, 2013 to issue a final approval on the sale

and discussed SRR's valuation analysis and financial statement analysis and Taylor English's

due diligence analysis.  (Dep. Ex. 27, 58, 159, 161.)  SRR also issued a fairness opinion with

regard to the ESOP transaction, opining that the transaction was for fair market value, the

interest rate on the Initial Seller Notes, the Initial ESOP Loan, and the Refinanced Internal ESOP

Loan was not in excess of a reasonable rate, the financial terms of those loans and notes are at

least as favorable to the ESOP as would be the financial terms of a comparable loan, resulting

from arms-length negotiations between independent parties, the exercise price of the Warrants

was at least equal to 90% of the fair market value of the underlying common stock on a per share

---

[14] One such transaction term related to an ongoing DCAA audit of Constellis where the DCAA
had questions about Redacted in charges.  The Trustee team negotiated a special indemnity
whereby the amount of the note owed to the Sellers would have been reduced by whatever
amount Constellis might have to pay back to the government.  (Ex. F at 97:1-99:11.)

basis, and the terms and conditions of the ESOP Transaction are fair to the ESOP. (Dep. Ex. 2, at 69; Dep. Ex. 16.)

### B.  Terms of the ESOP Transaction

22.    On December 20, 2013, the ESOP purchased 47,586.55 shares of Class A common stock of Constellis from the Sellers, representing 88.4% of the Sellers' total shares, for Redacted , a rate of $4,235 per share.  (Dep. Ex. 84.)  Concurrent with the ESOP's purchase, Constellis redeemed the remaining voting stock, so that the ESOP became the holder of 100% of Constellis voting stock.  (Dep. Ex. 2, at 7-8.)

23.    The ESOP purchase consideration was paid 31.4% in cash and 68.6% in promissory notes issued by the ESOP to the Sellers in the aggregate amount of Redacted bearing interest at an annual rate of 5.0% with an eight-year term.  (Dep. Ex. 84, at § 2.2; DTX 114.)  The Company provided a loan to the ESOP to fund the transaction.  (TED022807 to TED022826[15]; DTX 117.)  The Initial ESOP Loan would bear interest at an annual rate equal to the long-term Applicable Federal Rate ("AFR"), amortize with level principal payments, and have a term of 25 years.  (TED022807 to TED022826 at §§ 2.02, 2.03.)

24.    The parties then engaged in an internal refinancing on December 27, 2013, where the ESOP issued to the Company a promissory note in an amount equal to the outstanding balance of the Initial Seller Notes assumed by the Company plus the unpaid balance of the Initial ESOP Loan.  (TED027370 to TED027390.)[16]  The Refinanced Internal ESOP Loan bore interest at an annual rate equal to the long-term AFR and had a term of 25 years.  (*Id.* at §§ 2.02, 2.03.)

25.    Following the ESOP purchase, the remaining 6,227.35 shares of Class A Common Stock were exchanged for 125 shares of newly issued non-voting stock and warrants

---

[15] This document is included in Ex. L.
[16] This document is included in Ex. L.

(the "Warrants") to acquire 15,737.18 shares of Class A Voting Common Stock.  (Dep. Ex. 84, at § 5.2.)  One-half of the Warrants would expire in 10 years (the "Series A Warrants"), and the other half would expire in 15 years (the "Series B Warrants"). (DTX 119, at ¶ 14(e); CLLC040299 to CLLC040313, at ¶ 14(e).)[17]

26.     The Trust Document authorizes Wilmington to purchase Company stock subject to its provisions. (Dkt. 20-3, Section 2.04(i).) It also authorizes Wilmington to borrow money from a "disqualified person," provided that loans made or guaranteed by "disqualified persons" meet the requirements of Section 2.04(u). (*Id.*, Section 2.04(u).)

27.     According to the Investor Rights Agreement ("IRA"), subsequent to the ESOP Transaction, the Company's Board of Directors would consist of five members (the board having six months from the date of the Agreement to select and appoint an initial independent member of the Board), which shall include one independent director.  (Dep. Ex. 245, at § 3.4.)  The holders of 51% of the outstanding Warrants were given the right to designate three persons to the Board for so long as all of the Series A Warrants were not exercised or terminated; however, an important carve out existed where the Trustee was not required to follow the provision if such designation "cause[d] the Trustee to violate its fiduciary obligations under ERISA."  (*Id.*)  The ESOP could also terminate this right by paying off the loan and terminating the Warrants.  (*Id.*)

28.     Moreover, under the Company Bylaws, the Trustee as holder of at least one-fifth of all the outstanding shares of the Company could call a special meeting, during which, as holders of a majority of the shares, it could oust and replace the Board.  (Dep. Ex. 136, at § 3.2.)

---

[17] This document is included in Ex. L.

29.     Under the IRA, the Company could not provide payments to management without the consent of the Trustee.  (Dep. Ex. 245, at § 3.1(a).)  The IRA also required the Company to provide such financial information as the Trustee reasonably requested.  (*Id.*, at § 3.1(c).)

30.     The 2013 Form 5500 Annual Return/Report for the ESOP states: "A Company contribution was accrued on December 31, 2013 and paid to the Plan in May 2014 in the amount of $52,705,632, which included accrued interest." (DTX 206, at WT_00004809.)   The Company's contribution not only reduced the amount due on the ESOP loan to Redacted, but also released $52 million in stock to participant accounts.  (*Id.*)

**C.  After ESOP Transaction Closes**

31.     Subsequent to the ESOP transaction and during the first quarter of 2014, the Company's financial outlook became more uncertain due to the increased risk of several contracts.  For instance, in 2010, the Company won a fixed price "KBOSSS" contract to provide fixed site security at two military bases in Kuwait for the U.S. Army.  (Dep. Ex. 134, at 17.)  In February 2014, the Company was informed by the prime contractor that it intended to run a formal competition for the portion of the contract for which Constellis was the teaming partner. (Dep. Ex. 134, at 17; Dep. Ex. 163, 167; SRR-Constellis-0014455[18].)

32.     Additionally, Constellis won several task orders under the Worldwide Protective Services ("WPS") contract vehicle for mobile and fixed-site protective services with the Department of State ("DoS") for certain facilities in Iraq.  (Dep. Ex. 134 at 17; SRR-Constellis-0014453[19].)  The incumbent subsequently protested the win, and in January 2014, the DoS rescinded the contract award to the Company and requested best and final offers from Constellis and the incumbent.  (Dep. Ex. 134 at 17; Dep. Ex. 163, 167; SRR-Constellis-0014453.)  As a

---

[18] This document is included in Ex. L.
[19] This document is included in Ex. L.

result of the protest and increased uncertainty regarding these and other smaller contracts, Company management lowered the probability of winning certain contracts, and changed its financial projections to include a greater share of revenue derived from the Company's pipeline rather than backlog.  (Dep. Ex. 134, at 17-18; Dep. Ex. 163, 167.)[20]

### D.  July Sale Transaction

33.     After the ESOP Transaction closed, representatives from ACADEMI, a major Constellis competitor, approached Constellis about buying the Company in February 2014.  (Ex. B at 106:14-21.)

34.     The Company and ACADEMI entered into negotiations during which ACADEMI made an initial offer to purchase the Company for total consideration of approximately Redacted which included no consideration payable to the ESOP.  (Dep. Ex. 134, at 15.)  As owner of 100% of the Constellis voting shares, no sale could occur without the involvement and approval of the Trustee.  (DTX 181, at TED017031; Dep. Ex. 172, 242; Ex. E at 84:16-85:14.)  Thus, Constellis contacted Wilmington in March 2014 to retain it as Trustee in the proposed Sale Transaction.  (Ex. E at 21:17-22; 137:4-138:21.)  Wilmington again selected Taylor English as its legal advisor and SRR to perform a valuation of the Company and render a written opinion as to whether: (1) the consideration to be received by the ESOP for its Class A common shares of the Company was not less than the Fair Market Value of such shares; and (2) the terms and

---

[20] Two other updates bear mentioning.  In the second quarter of 2014, the Department of Defense informed Constellis that its contract to provide guards at Camp Leatherneck would terminate in July 2014 rather than November 2014, resulting in less revenue than expected.  (Dep. Ex. 13 at 18.)  Also, on March 24, 2014, the DCAA sent a letter to Constellis demanding that the Company remit Redacted  for overpayment.  *Id.* The Company responded, and Company management intended to pursue the matter in court if the issue was not resolved.  *Id.* As mentioned above, the stock purchase agreement for the Original ESOP Transaction contained a special indemnity provision relating to the Company's dispute with the DCAA and the potential liability associated with the claim.  (Dep. Ex 84 at 30; see also Dep. Ex. 134 at 18.)

conditions of the Sale Transaction were fair to the ESOP from a financial point of view.  (Dep. Ex. 134 at 2.)  The FSSC held multiple meetings between April and July 2014 to evaluate and negotiate the offer.  (Dep. Exs. 28, 54, 55, 56, 57, 163, 164, 165, 166, 169, 170, 171, 172, 173, 174, 175, 237, 239; DTX 169, 170.)  Importantly, the projections Constellis provided to SRR to evaluate the sale transaction to ACADEMI were created in the same manner and using the same process as the projections used to evaluate the ESOP transaction.  (Ex. N ¶ 9.)

35.     ACADEMI, Constellis, and the Trustee engaged in several back and forth negotiations of the sale price.  On March 25, 2014, the Company received a letter of intent from ACADEMI that offered total consideration of Redacted    to purchase the Company, including Redacted of proceeds payable to the ESOP.  (WT_00026928-26936, at 26929.)[21] After further negotiations, on April 28, 2014, the offer was an implied Enterprise Value of Redacted   , of which Redacted would be payable to the ESOP.  (Dep. Ex. 134 at 15.) On April 30, 2014, ACADEMI revised its offer to an implied Enterprise Value of Redacted   , with proceeds to the ESOP of Redacted and a Redacted discount on the Seller Notes.  (Dep. Ex. 134 at 15.)  The ESOP executed a Letter of Intent on May 5, 2014, in which ACADEMI offered a purchase price at an implied Enterprise Value of Redacted   , which included [Redacted] of proceeds to the ESOP and a Redacted discount on the Seller Notes.  (Dep. Ex. 134 at 15.)  During this period, SRR had performed another valuation of Constellis and had issued an estimated range of enterprise value of Redacted        . (Dep. Ex. 134 at 73-76.)

36.     Also, as part of the sale, the participants of the ESOP would immediately and fully vest.  (Dkt. No. 20-2, § 11.2(b).)  This represented a significant benefit to the participants, as none were vested under the terms of the Plan Document.  (See Dkt. No. 20-2, Plan Document,

---

[21] This document is included in Ex. L.

§ 4.6.)  Unless a participant reached Normal Retirement Age (in which case he would be 100%

vested), his vested interest was determined by a 6-year graded schedule in which his vested

interest remained 0% until he completed 2 years of service (at which time he would have been

20% vested). (*Id.*)  To determine a participant's years of service for vesting, the plan excluded

service during any time for which Constellis did not maintain the ESOP. (*Id.*)  Plaintiff and the

other participants had less than one Year of Service at the time of the ESOP's termination and

therefore were not vested in their ESOP account.  (*Id.*)

37.     The terms of the sale were finalized on July 25, 2014, and Constellis was bought

by the newly formed entity Constellis Holdings Inc.  (Dep. Ex. 134 at 15; Dkt. No. 26-1, Decl.

A. Muhlendorf ¶ 4.)  On July 25, 2014, SRR issued a fairness opinion with regard to the Sale

Transaction, opining that the transaction was for fair market value.  (DTX 200.)

### E.  The Price of the July 2014 Sale Transaction was Within SRR's Range of Enterprise Value Seven Months Earlier.

38.     Notably, Plaintiff is not claiming that the July 2014 Sale Transaction to

ACADEMI was for less than fair market value.  (Third Am. Compl. ¶¶ 26-27 (describing it as

"an arms length transaction just over seven months after the December 19, 2013 ESOP

Transaction.").)  Messina admits that the enterprise value of Constellis implied in the ESOP's

sale was "close" to the valuation performed by SRR in December 2013. (Ex. J at 25:4-10.)  In

fact, the sale price was  Redacted      in July 2014, which was within the range of SRR's

estimated range of enterprise value of Redacted          in December 2013.  (Dep. Ex. 2, at

61.)

39.     The ESOP was converted into a non-ESOP defined contribution retirement plan

in connection with this acquisition because it no longer held Company stock. (Dkt. No. 20-2, §

11.2; Dkt. No. 26-1; Ex. E at 40:1-8; 40:14-41:18.)

40.     Plaintiff was a participant in the ESOP.  (Dkt. No. 136 at ¶ 2; Dkt. No. 137 at ¶ 2.)
Plaintiff contributed no assets to the ESOP and was not vested in his ESOP account until the
ESOP was converted to a profit-sharing plan on July 25, 2014. (Dkt. No. 20-2, § 4.6.)  As a
result of the ESOP transaction, Brundle's account rose from nothing to $19,015.25 in his new
profit-sharing account as of December 31, 2014.  (Dep. Ex. 69.)  As of December 31, 2014, there
were 1097 active participants in the plan. (Dkt. No. 56-11.)

41.     Wilmington did not charge or receive any commission on the two transactions.
For each transaction, the Trustee received a flat fee and was entitled to receive the payments
regardless of whether it approved the ESOP or Sale Transaction. (Dep. Ex. 147 at 9; Dep. Ex.
242, at 8.)

**F.  The Valuation of Constellis Stock By Plaintiff's Expert is Not Reliable.**

42.     The Court should exclude the opinion testimony of Dana Messina[22] under Fed. R.
Evid. 702 because:

1)  Messina's opinion of Constellis' value is based on unsupported financial
    assumptions contrary to Constellis' own financial projections and thus is not
    based on sufficient facts or data under Fed. R. Evid. 702(b).

2)  Messina's Report failed to even mention, much less factor into his valuation,
    ACADEMI's July 2014 purchase of Constellis stock at an implied enterprise
    value of Redacted  in July 2014, showing Messina's lack of objectivity, bias
    and attempted advocacy. Fed. R. Evid. 702(a).

3)  Messina's Report contains multiple factual misstatements intended to diminish
    the December 2013 valuation of Constellis stock.

4)  Messina's testimony is not the product of reliable principles and methods.  Fed. R.
    Evid. 702(c).

5)  Messina has not reliably applied principles and methods to the facts of the case.
    Fed. R. Evid. 702(d).

---

[22] Wilmington is filing a separate motion to exclude the testimony of Mr. Messina.

43.     The parties substantially agree on the definitions of "equity value" and "enterprise value." (Ex. J at 16:19-22; 17:1-10.)   Messina's calculation of Constellis' enterprise value, however, is completely unreliable under Federal Rule of Evidence 702.

Q.     And what was your calculated enterprise value?

A.     "On this page 26 that you are looking at, it is -- for the discounted cash flow, it was Redacted; and on the page 27, it was Redacted; and then the page 29, which is the enterprise value, based on the average of the two different methodologies from the previous pages, Redacted ."

(Ex. J at 17:21-18:7.)

44.     Messina admits that ACADEMI's July 2014 purchase of 100% of Constellis voting stock from the ESOP had an implied enterprise value of Redacted . (Ex. J at 19:6-24:18; Dep. Ex. 134, at 15, 16.)   He admits that the SRR December 2013 valuation of Redacted

was "relatively close" to ACADEMI's implied enterprise valuation of Constellis at Redacted . (Ex. J at 25:4-10.)[23]

45.     Messina used two different methodologies in his own determination of Constellis' enterprise value, each methodology generating widely divergent values.   Messina's DCF methodology calculated Constellis' enterprise value as only Redacted . (Dep. Ex. 24, at 26; Ex. J at 17:21-18:7.)   Messina's public guideline company method calculated Constellis' enterprise value as Redacted . (Dep. Ex. 24, at 27; Ex. J at 18:1-7.)   The difference of Redacted

(66%) in Messina's two calculations makes his methodology suspect as a matter of

---

[23] Plaintiff makes much of the fact that SRR reviewed but found not relevant a valuation performed by the McLean Group as of January 1, 2013, some 10-11 months before SRR performed its own valuation.   The January 2013 McLean valuation was of a single share of stock for tax purposes with respect to Constellis' executive compensation program. (Ex. J at 21:22-22:21.)   Messina admits that valuation of a single share of Constellis stock held by an executive is not equivalent to valuation of 100% of Constellis voting stock. (*Id.* at 80:1-19.)

common sense and professional valuation standards.  (Dep. Ex. 129, at 6-7, 41; Ex. I at 36:10-11.)

46.     Messina makes no attempt in his report to reconcile the enormous difference in his two calculations and instead simply averages these different valuations and asserts that the "true" enterprise value of Constellis in December 2013 was Redacted   .  This value is nearly Redacted *less* than the implied enterprise value paid by ACADEMI. (Dep. Ex. 134, at 15.)

47.     Although Plaintiff asserts that the July 2014 ACADEMI purchase from the ESOP is "indicative of the true value of Constellis on December 19, 2013," Messina never even mentions the ACADEMI purchase or its implied enterprise valuation of Constellis, stating that "I didn't think it was relevant to what we were asked to do." (Ex. J at 26:11-15.)  Messina conceded that the "relatively close" enterprise valuations of ACADEMI and SRR could be a helpful fact to support SRR's December 2013 valuation of Constellis. (Ex. J at 25:4- 26:5.)

48.     Messina was purporting to do an actual valuation of Constellis stock in December 2013, not to simply determine whether SRR conducted a reasonable and reliable valuation of Constellis in the fall of 2013.[24]  (Dep. Ex. 24, at 3.)  Messina claims that his valuation represents the true value of Constellis on December 2013 (*Id.* at 6, Ex. J at 18:1-7); therefore any relevant evidence of value as of December 2013 should be considered if available to Messina.  It is undisputed that ACADEMI was in an excellent position to assess the value of Constellis in late 2013 and early 2014 because ACADEMI and Constellis were in similar businesses.  (Ex. J at 18:12-19:5, 44:12-45:21.)

---

[24] In contrast, Tarbell does not attempt to undertake a valuation of Constellis stock as of December 2013, but rather assessed whether the SRR valuation was reliable based on information available as of that date.   (Dep. Ex. 128, at 6-7; Ex. I at 20:20-21:13.) Tarbell found that SRR's valuation was "credible and reliable."   (Ex. I at 37:8-38:3; see also Dep. Ex. 128, at 6.)

49.     Messina reaches his low valuation of Constellis by concluding that Constellis' financial projections are "too rosy" and inventing his own projections for Constellis' future revenue and EBITDA.  (Dep. Ex. 24, at 5, 14-18; Ex. J at 26:19-27:19, 41:4-22, 43:8-44:11, 66:3-67:8.)

50.     Messina conceded that–unlike SRR or ACADEMI–he never spoke to Constellis management to assess the reasonableness of Constellis' financial projections.  (Ex. J at 42:1-43:13.)  Messina agreed that both Constellis and ACADEMI were in a better position than he to assess their future prospects, customers, and contracts.  (*Id.* at 42:10-16; 44:12-45:21, 68:5-69:7.)  Messina acknowledges that ACADEMI was a buyer of Constellis stock and knew the industry in which Constellis and ACADEMI competed.  (*Id.* at 18:12-19:5, 44:12-45:21.)  ACADEMI knew Constellis and the business Constellis did and were going after much of the same business.  (*Id.* at 44:12-47:1.)

51.     Constellis' 2013 projections made in January 2013 were conservative. SOF ¶ 13. Actual EBITDA performance for 2013 was more than 20 percent better than what the company had previously forecast. SOF ¶ 15. Messina did not mention this in his report.  (Ex. J at 39:1-13.)

52.     Messina undertook no factual or statistical analysis to support his opinion that Constellis' financial projections were too rosy. (Ex. J at 41:4-22.)

## IV.   ARGUMENT

### A.  Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323-324

REDACTED VERSION

(1986).  A court must construe the facts in the light most favorable to plaintiff and may not make credibility determinations or weigh the evidence. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Edell & Assocs., P.C. v. Law Offices of Peter G. Angelos*, 264 F.3d 424, 435 (4th Cir. 2001). There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-50 (citations omitted). *Gariety v. Vorono*, 261 Fed. App'x 456, 460 (4th Cir. 2008).

### B.  ESOPs Are Not Designed to Guarantee Retirement Benefits.

An ESOP is an ERISA plan permitted to invest primarily in "qualifying employer securities," which means shares of the employer's stock.  29 U.S.C. § 1107(d)(6).   "Since the ESOP acts as both an employee retirement benefit plan and a method of corporate finance through employee ownership, it is not designed to guarantee retirement benefits."  *Armstrong v. Amsted Indus., Inc.*, No. 01c2963, 2004 U.S. Dist. LEXIS 14776, at *4 (N.D. Ill. July 30, 2004) (citation omitted); *see also Difelice, supra,* at 425 (noting Congress has found the benefits of holding undiversified employer stock in ESOPs "outweigh the risks").

### C.  Wilmington Did Not Cause the ESOP to Engage in a Prohibited Transaction.

Plaintiff claims that Wilmington violated ERISA § 406 by causing the ESOP to pay more than fair market value for the Constellis stock in December 2013.  ERISA prohibits a fiduciary from causing the plan to engage in a "prohibited transaction," meaning "caus[ing] the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—(A) sale or exchange, or leasing, of any property between the plan and a party in interest…."  ERISA § 406, 29 U.S.C. § 1106(a)(1).[25]

---

[25] Wilmington agrees that Katis and Mann were parties in interest under ERISA.

REDACTED VERSION

The December 2013 ESOP Transaction (the only transaction about which Plaintiff complains) is exempt and permissible under ERISA § 408(e).   Under this section, the prohibition under § 406 "shall not apply to the acquisition or sale by a plan or qualifying employer securities . . . if such acquisition, sale, or lease is for adequate consideration . . . if no commission is charged with respect thereto, and . . . [if] the plan is an eligible individual account plan . . . ." 29 U.S.C. § 1108(e); *see also Perez v. Bruister*, 823 F.3d 250, 262 (5th Cir. 2016). Where, as here, the asset is "other than a security for which there is a generally recognized market," ERISA defines "adequate consideration" as "the fair market value of the asset as determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan and in accordance with regulations promulgated by the Secretary."   ERISA § 3(18), 29 U.S.C. § 1002(18).   Section 408 is an affirmative defense, so a defendant bears the burden of proof. *Bruister*, 823 F.3d at 262; *Harris v. Amgen, Inc.*, 717 F.3d 1042, 1059 (9th Cir. 2013) (citing *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996).   It is undisputed that the ESOP was an eligible plan and that no commission was charged on the ESOP transaction.  For the reasons explained below, the ESOP paid adequate consideration for Constellis stock in December 2013, and thus Wilmington is not liable under § 406 as a matter of law.

Importantly, a fiduciary is entitled to obtain advice from experts and rely on that advice to make fiduciary decisions and, although it does not automatically insulate a trustee from liability, "securing an independent assessment from a financial advisor or legal counsel is evidence of a thorough investigation." *Keach v. U.S. Trust Co.*, 419 F.3d 626, 636-37 (7th Cir. 2005); *see also Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 300-01 (5th Cir. 2000) (citing *Donovan v. Cunningham*, 716 F.2d 1455, 1474 (5th Cir. 1983) ("ERISA fiduciaries need not become experts" in valuations)).  To satisfy § 408, a fiduciary must "investigate the expert's

qualifications," "provide the expert with complete and accurate information," and "make certain

that reliance on the expert's advice is reasonably justified under the circumstances." *Keach,* 419

F.3d at 637;[26] *see also Bussian*, 223 F.3d at 301 (quoting *Howard*, 100 F.3d at 1489; *Donovan*,

716 F.2d at 1467-68 (requiring an inquiry into whether the fiduciaries "arrived at their

determination of fair market value by way of a prudent investigation in the circumstances then

prevailing").

   *Elmore v. Cone Mills Corp.*, the only Fourth Circuit decision to address the standard in

prohibited transaction claims, briefly addressed a trustee's burden to prove adequate

consideration. *Elmore v. Cone Mills Corp.*, 23 F.3d 855, 864 (4th Cir. 1994).[27]

> Plaintiffs and the Secretary of Labor correctly point out that in order to avoid liability for
> a prohibited transaction under § 406, Cone Mills bears the burden of proving the
> transaction was for adequate consideration in compliance with § 408(e). Nevertheless, as
> an initial matter, we reiterate our view that Plaintiffs' acknowledgement of their burden
> of proof on this issue during trial waived their challenge to its allocation on appeal. Even
> if this were not so, *there is no evidence that the district court's findings that "defendants
> acted reasonably and prudently in the selection and retention" of an appraiser and
> "were justified in relying on [the] appraisal of the junior preferred stock" were clearly
> erroneous. . . . Moreover, Plaintiffs failed to present any evidence that the stock was in
> fact worth less than the $ 100 for which it was appraised and failed to prove that they*

---

[26] *Bruister* used an extended list of factors: whether a fiduciary's reliance on an expert advisor is
justified "is informed by many factors, including the expert's reputation and experience, the
extensiveness and thoroughness of the expert's investigation, whether the expert's opinion is
supported by relevant material, and whether the expert's methods and assumptions are
appropriate to the decision at hand."  *Bruister*, 823 F.3d at 263.

[27] The Fourth Circuit has not expressly adopted the DOL's proposed regulations for the definition
of adequate consideration.   Several circuits have followed the DOL's proposal requiring a
fiduciary to show <u>both</u> the payment of fair market value <u>and</u> that the fair market value was
determined in good faith.   *See* Proposed Regulation Relating to the Definition of Adequate
Consideration, 53 Fed.Reg. 17,632, 17,633 (May 17, 1988); *Keach v. U.S. Trust Co.*, 419 F.3d
626, 636 n. 5 (7th Cir. 2005); *Bruister*, 823 F.3d at 262-263 (citing *Donovan v. Cunningham*,
716 F.2d 1455, 1467 (5th Cir. 1983)).   The Eighth Circuit, however, has held that an otherwise
prohibited transaction may be exempt absent good faith if a hypothetical prudent trustee would
have nonetheless engaged in the transaction. *Herman v. Mercantile Bank, N.A.*, 143 F.3d 419,
421 (8th Cir. 1998).   Regardless of the standard used and as explained herein, the undisputed
facts establish both that Wilmington caused the ESOP to pay fair market value and the fair
market value was determined in good faith.

> *suffered a loss.* As distinguished from the facts in *Reich v. Valley Nat'l Bank*, 837 F. Supp. 1259 (S.D.N.Y. 1993), relied on by Plaintiffs and the Secretary of Labor, Cone Mills's junior preferred stock has held its value, it has been "put" for at least $100 per share each time an employee has retired, and Cone Mills has never missed a dividend payment.

*Id.* at 864 (emphasis added).

### 1.   The Trustee Determined the Fair Market Value in Good Faith.

In this case, Wilmington acted reasonably and prudently in the selection and retention of its advisors and appropriately reviewed and relied on their work.   Wilmington had prior experience with SRR and also reviewed its qualifications and experience through its annual due diligence review in June 2013 before engaging it as the appraiser for the ESOP transaction.  SOF ¶¶ 8-9.  El-Tahch, the primary author of SRR's valuation, had extensive experience valuating private companies and government contractors.  SOF ¶¶ 8-9.  Wilmington also appropriately selected Taylor English lawyers Summers and Horn, who both have extensive experience advising trustees in ESOP transactions.  SOF ¶ 10.

Wilmington also probed SRR's work.  As the evidence establishes, Golden had multiple discussions with El-Tahch and Taylor English throughout the due diligence process, discussed ranges of value with SRR before the November 14, 2013 FSSC meeting, received and studied the draft analysis of transaction fairness, and discussed Constellis' projections and major contracts.  SOF ¶¶ 11, 16, 18, 19, 20, 21.  Both Bonn and Golden attended a kick off meeting with Constellis executives on October 24, 2013, with Bonn attending in person and Golden attending by phone, and Constellis provided details about its business during the meeting.  SOF ¶ 11.  Moreover, the FSSC discussed in detail SRR's preliminary valuation report, including, but not limited to SRR's two valuation methods (DCF and the guideline public company method), a recent bid submitted to purchase the Company, the Company's financial projections and backlog,

the Company's contracts, the 2010 DCAA audit of one of the Company's contracts, and other matters.  SOF ¶¶ 16, 18, 19, 20, 21.  The Meeting Minutes and Golden and Matz's notes all show that the members of the FSSC were engaged and asked questions.  *Id.*

The FSSC met again on December 18, 2013 to issue a final approval on the sale and discussed SRR's valuation analysis and financial statement analysis and Taylor English's due diligence analysis.  SOF ¶ 21.  Wilmington's notes, emails and testimony show that it understood the transaction and asked appropriate questions.   SOF  ¶¶  11, 16, 18, 19, 20, 21.   Thus, Wilmington was justified in relying on SRR's appraisal and arrived at its fair market value in good faith.

Wilmington's actions are similar to those of the trustee in *Keach v. U.S. Trust Co.*, where, as here, the case "cannot be characterized as lacking the requisite good faith on the part of the fiduciaries."  *Id.* at 638.   The Seventh Circuit found under § 408 that the trustee had appropriately relied on the fairness opinion of their independent valuation expert and the legal due diligence of their counsel, especially when the trustee had taken "considerable lengths to understand [the company's] business," including directly talking to members of management, reviewing financial documents, and probing the assumptions in the company's financial forecasts. *Id.* at 637.  The court found that the fiduciary had satisfied its duty even though it did not consider the risk of governmental regulation of the sweepstakes industry or threats posed by the company's dependence on sweepstakes in assessing the value of its stock, which directly led to the company's collapse a few years after the ESOP.  *Id.* at 628, 638.

This case is a far cry from cases holding the fiduciary was not entitled to the adequate consideration exemption.  In *Cunningham*, the trustees' investigation was insufficient because they relied on a stale valuation prepared thirteen to twenty months before the ESOP

27

transactions. 716 F.2d at 1468-69. In *Chao v. Hall Holding Co.*, 285 F.3d 415, 487 (6th Cir. 2002), the trustees engaged in a prohibited transaction when they relied on a valuation of the wrong company, were not consulted on major decisions and did not engage in any negotiation of the stock price. Finally, in *Perez v. Bruister*, the company went out of business two and one half years after the last ESOP transaction, and one of the trustees (also the owner) engaged in bad conduct by, *inter alia*: (1) firing the first appraiser for being too thorough; (2) causing his personal lawyer to influence the appraiser's valuations to get the highest selling price; (3) obtaining drafts of the appraisal before the other trustees; (4) excluding the ESOP's counsel from all communications regarding valuation; and (5) adjusting the figures to obtain a higher valuation. 823 F.3d at 259-60, 264. None of these factors is present in this case; Wilmington determined the fair market value in good faith and has satisfied its burden under § 408(e).

### 2.   The ESOP Transaction Was for Adequate Consideration Under 408(e).

In addition to Wilmington discharging its fiduciary duties in good faith, the SRR valuation, the ACADEMI purchase and the report and testimony of Jeffrey Tarbell, and the other record evidence show that the ESOP purchased the Constellis stock for adequate consideration: "the fair market value of the asset as determined in good faith by the trustee." 29 U.S.C. § 1108(e)(1)(A) and § 1002(18)(B).

Plaintiff has no reliable evidence that the ESOP purchased Constellis stock for less than adequate consideration. *See Elmore*, 23 F.3d at 864. SRR's Enterprise Value Range of [Redacted] was corroborated by the testimony and report of Jeffrey Tarbell and was consistent with the implied Enterprise Value of Redacted in the ACADEMI purchase. SOF ¶ 38, 44, 46, 47, 48.

The unreliable testimony of Mr. Messina should not be accepted because his opinions are not supported by facts or data, his testimony is not the product of reliable principles and methods, and he has not reliably applied principles and methods to the facts of the case. Fed. R. Evid. 702(b), (c), and (d); *see Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993); *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999); *Antioch Co. Litig. Trust v. Morgan*, 633 Fed. App'x. 296, 298-306 (6th Cir. 2015) (affirming exclusion of testimony of plaintiff's expert and summary judgment for fiduciary in ESOP case); *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008).

Messina's testimony is unreliable, as described in more detail in Wilmington's forthcoming motion to exclude his testimony, because:

- He failed to consider Constellis' financial projections and instead made up his own lower projections without showing a factual or data-based methodology underlying his projections.  (SOF ¶¶ 49, 50, 52.)

- He failed to consider clear evidence of the reliability of Constellis' financial projections. (SOF ¶¶ 13, 14, 15, 47, 50, 51.)

- He evidenced an unprofessional and dismissive attitude toward the SRR valuations, asserting repeatedly that the SRR financial analysis was "bullshit" and asserting without evidence that SRR "blindly accepted" Constellis' financial figures. (SOF ¶ 49.)

- He rejected the modest 10% control premium that SRR applied in the guideline company method in valuing the ESOP's purchase of 100% of Constellis voting stock, refusing to accept the clear control rights that the ESOP purchased in December 2013, and the demonstrable evidence of the ESOP's control rights in the ESOP's negotiations over the July 2014 purchase of the ESOP's stock. (Dep. Ex. 129 at 22-26.)

- Rather than acknowledging the ESOP's control rights as holder of 100% of Constellis voting stock, Mr. Messina instead double-counted a minority discount to the ESOP purchase, as if the 100% of Constellis voting stock was equivalent to a single share of stock held by a minority shareholder.  (Dep. Ex. 129 at 30-32, 38-40.)

- Mr. Messina ignored that when ACADEMI purchased 100% of the voting stock from the ESOP in July 2014, the former Selling Shareholders agreed to a substantial Redacted discount to the notes they had received as part of the purchase price in the December 2013 transaction with the ESOP.  (Dep. Ex. 129 at 24-25.)

An "investment's diminution in value is neither necessary, nor sufficient, to demonstrate a violation of a fiduciary's ERISA duties." *Difelice, supra*, at 425. In a fully leveraged ESOP transaction, it is typical for the equity value of the Company to drop immediately after the sale, but that drop is due to the debt assumed by the Company. (SRR Dep. 163:3-178.)

Plaintiff's expert pointed to nothing other than his own opinion, unsupported by facts or data as required by Rule 702, that the Constellis projections were overly "rosy." Without any facts, data or reliable methodology, Mr. Messina created two wildly divergent valuations of Constellis and averaged them, purporting to value Constellis nearly Redacted less than where SRR valued Constellis in December 2013 and ACADEMI valued Constellis seven months later. SOF ¶¶ 43, 45, 46. Plaintiff's unsupported contentions are based on nothing more than speculation and cannot be used to withstand summary judgment. *See Francis v. Booz Allen & Hamilton, Inc.*, 452 F.3d 299, 308 (4th Cir. 2006).

Wilmington followed a prudent process in its determination of fair market value of the Constellis stock. "Whether [a trustee] properly approved the buy-out transaction despite the prohibition in § 1106 depends on whether its process was sufficient to fulfill the procedural requirement of adequate consideration." *Fish v. Greatbanc Trust Co.*, 749 F.3d 671, 681 (7th Cir. 2014). The undisputed facts establish that the ESOP purchased the Constellis stock for adequate consideration: "the fair market value of the asset as determined in good faith by the trustee." 29 U.S.C. § 1108(e)(1)(A) and § 1002(18)(B). For the reasons stated above, as well as those which may be made in the reply brief and any hearing, Wilmington has satisfied the requirements in § 408(e)'s exception to the prohibited transaction rule and is entitled to summary judgment on Plaintiff's claim.

**WILMINGTON TRUST, N.A.**

REDACTED VERSION

By Counsel

                 /s/ Sarah Aiman Belger
Sarah Aiman Belger (VSB No. 67947)
John E. Thomas, Jr. (VSB No. 81013)
*Counsel for Defendant*
**McGuireWoods LLP**
1750 Tysons Boulevard, Suite 1800
Tysons, Virginia  22102-4215
Telephone:  (703) 712-5350
Facsimile:  (703) 712-5299
James P. McElligott, Jr. (VSB No. 14109)
*Counsel for Defendant*
**McGuireWoods LLP**
Gateway Plaza
800 East Canal Street
Richmond, VA  23219-3916
Telephone:  804-775-4329
Facsimile:  804-698-2111
Email:  jmcelligott@mcguirewoods.com

Summer L. Speight (VSB No. 80957)
*Counsel for Defendant*
**McGuireWoods LLP**
Gateway Plaza
800 East Canal Street
Richmond, VA  23219-3916
Telephone:  804.775-1839
Facsimile:  804-698-2128
Email:  sspeight@mcguirewoods.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of August, 2016, I electronically filed a copy of the foregoing with the Clerk of Court using the Court's CM/ECF System which will send notification of such filing to all registered filers:

Gregory Y. Porter (VSB No. 40408)
Ryan T. Jenny
  (admitted *pro hac vice*)
Patrick Owen Muench
  (admitted *pro hac vice*)
*Counsel for Plaintiff*
**Bailey & Glasser, LLP**
1054 31st Street, N.W., Suite 230
Washington, D.C.  20007
Telephone:  202-463-2101
Facsimile:  202-463-2103
Email:  gporter@baileyglasser.com
rjenny@baileyglasser.com
pmuench@baileyglasser.com

Athanasios Basdekis (VSB No. 50913)
Brian Alexander Glasser
  (admitted *pro hac vice*)
*Counsel for Plaintiff*
**Bailey & Glasser, LLP**
209 Capitol Street
Charleston, WV  25301
Telephone:  304-345-6555
Facsimile:  304-342-1110
Email:  bglasser@baileyglasser.com
tbasdekis@baileyglasser.com


            /s/ Sarah Aiman Belger
Sarah Aiman Belger (VSB No. 67947)
*Counsel for Defendant*
**McGuireWoods LLP**
1750 Tysons Boulevard, Suite 1800
Tysons, Virginia  22102-4215
Telephone:  (703) 712-5350
Facsimile:  (703) 712-5299
Email:  sbelger@mcguirewoods.com

81485252_5

32