IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

TIM P. BRUNDLE, on behalf of the            )
    Constellis Employee Stock Ownership Plan,   )
    and on behalf of a class of all other persons )
    similarly situated                          )
                                                )
       Plaintiff                            )
                                                )
    v.                                          )     1:15-cv-1494 (LMB/IDD)
                                                )
WILMINGTON TRUST, N.A., as successor to     )
    Wilmington Trust Retirement and             )
    Institutional Services Company              )
                                                )
       Defendant.                           )

## REDACTED MEMORANDUM OPINION

On October 20, 2016, the Court issued an order denying defendant's Motion to Exclude

Expert Testimony of Dana Messina, granting in part and denying in part plaintiff's Motion for

Partial Summary Judgment, and denying defendant's Motion for Summary Judgment. This

memorandum opinion supplements the reasoning articulated in open court.[1]

    Plaintiff Tim P. Brundle ("plaintiff" or "Brundle") is an employee of Constellis Holdings,

Inc. ("Constellis"),[2] and was a participant in an employee stock ownership plan ("ESOP")

established for the benefit of Constellis employees. Brundle has sued defendant Wilmington

Trust N.A. ("defendant" or "Wilmington"), the trustee for the ESOP in connection with two

transactions: the ESOP's acquisition of 100% of the outstanding voting shares of Constellis in

---

[1] Because the record contains financial data that is presently under seal, the Court has redacted
the publicly available version of this memorandum opinion; however, all under seal filings will
be unsealed if this civil action goes to trial because the financial data at issue are essential
evidence and the trial will not be sealed.

[2] Constellis Holdings, Inc., acquired Constellis Group, Inc., on July 25, 2014; references to
"Constellis" in this memorandum opinion are to the latter.

December 2013 ("2013 Purchase") and the ESOP's sale of the same shares to ACADEMI, Inc.,

in July 2014 ("2014 Sale"). Specifically, plaintiff alleges that the 2013 Purchase violated the

Employee Retirement Income Security Act of 1974's ("ERISA") prohibition on transactions

with a "party in interest," 29 U.S.C. § 1106(a), and that Wilmington received a fee for its

services as the ESOP's trustee from Constellis, an interested party, which plaintiff alleges

violated ERISA's ban on such a fee, 29 U.S.C. § 1106(b). Wilmington's primary defense is that

the 2013 Purchase and its fee were permissible under the exceptions to § 1106 found in 29

U.S.C. § 1108. Defendant also pleaded several other defenses in its Answer to the Third

Amended Complaint ("Ans."): (a) failure to state a claim for which relief can be granted; (b) lack

of standing; (c) proper discharge of fiduciary duties; (d) ignorance of "facts by reason of which

the liability is alleged to exist;" (e) failure to allege facts that form the basis of an award of

attorneys' fees; (f) accord, satisfaction, payment, waiver, and release; (g) absence of tangible loss

to the plaintiff; (h) absence of particularized injury to the plaintiff; failure to state a claim for any

"representative claims;" (i) failure to "adequately represent the interests of the ESOP plan

participants as required by Rules 23.1 and/or 23.2 of the Federal Rules of Civil Procedure;" and

(j) failure to meet the pleading standards required by Rule 23.1 of the Federal Rules of Civil

Procedure.[3] Ans., Dkt. 137 at 8–14. Plaintiff has moved for summary judgment with respect to

the defenses of ignorance and accord, satisfaction, payment, waiver, and release.

## I.     FACTUAL BACKGROUND

Constellis is a major government contracting firm that "bills itself as a global provider of

security, training and mission support services." Compl., Dkt. 136 ¶ 7; Ans., Dkt. 137

---

[3] Defendant withdrew the defenses based on Rules 23.1 and 23.2 in its opposition to plaintiff's
motion. Def. Opp., Dkt. 194 at 30.

¶ 7. Before December 2013, Thomas Katis, Matthew Mann, John Peters, and the Howard A. Acheson Trust (collectively, the "Sellers") owned over 85% of the outstanding shares of Constellis and controlled three out of four seats on its board of directors. Pl. SJ Opp., Dkt. 195 at 2. According to Juliet Protas ("Protas"), Constellis' general counsel, the Sellers and Constellis began seriously considering the formation of an ESOP during the summer of 2013. Protas Dep., Dkt. 163-3 at 14:16–15:9. An ESOP is a form of employee retirement benefit plan "designed to invest primarily in securities issued by its sponsoring company." Donovan v. Cunningham, 716 F.3d 1455, 1458 (5th Cir. 1983). Constellis hired law firm Greenberg Traurig and investment bank CSG Partners LLC ("CSG"), including its managing partner George Thacker ("Thacker"), to advise Constellis about whether an ESOP would be a good fit for the company. Def. SJ Memo., Dkt. 167 at 4. Following a presentation from Thacker, Constellis elected to go forward with the formation of the ESOP. Protas testified that the Constellis board was favorably impressed by the "tax savings" the ESOP would achieve, in addition to the prospect of "build[ing] a long-term savings plan for . . . employees." Protas Dep., Dkt. 167-3 at 25:3–11. Katis and Mann also felt that the ESOP would give them a "long-term exit strategy." Id.

A PowerPoint presentation prepared by CSG, dated September 13, 2014, corroborates these basic goals for the ESOP. On a slide titled "Overview-Objectives," five objectives appear: (1) "liquidity for shareholders;" (2) "shareholders retain upside and control;" (3) "tax savings for company;" (4) "incentivize management and employees;" (5) "company's growth and longevity." Dkt. 195-43 at 7. The presentation informed Constellis' board that the shareholders would "retain full control over [Constellis'] operations," and explained how the transaction would turn Constellis into a "tax-free business." Id. CSG also reported that the ESOP would be

3

a "valuable incentive for [the] management team and employees" that did "not affect shareholders' cash flows." Id.

Although the presentation made clear that the company had to be "owned 100% by [the] ESOP" to become "fully tax free," it also cautioned against a "traditional 100% ESOP," recommending instead "a more advanced 100% structure that CSG developed." Id. at 19. Under the "more advanced" structure, the Sellers would retain "25% economic value" after the transaction through warrants that would entitle them to acquire around 15,000 shares of voting stock. Id. at 20; Def. SJ Memo., Dkt. 167 at 13–14. As CSG explained, "Sellers will capture the value of the warrants by (1) selling the warrants back to Triple Canopy[4] in the future, or (2) selling the company. Sellers will control the company post transaction, so retain this flexibility [sic]." Dkt. 195-43 at 20. There is no evidence that Wilmington saw this presentation or knew about its contents before approving the 2013 Purchase.

According to Protas, CSG recommended that Constellis engage Wilmington as trustee for the ESOP. Protas Dep., Dkt. 163-3 at 36:4–11. Wilmington was hired on September 24, 2013. Pl. SJ Opp., Dkt. 195 at 3. For its work on the 2013 Purchase, Wilmington received a flat $▇▇▇ fee, although it stood to gain an annual recurring fee of over $▇▇▇ if the transaction were approved.[5] Dkt. 167-9 at 117. There is no evidence that Constellis shopped around for any other trustee. Wilmington admits that it receives its "largest percentage of referrals from CSG and earned more fees from CSG-referred deals than any other source." Pl. SJ Opp., Dkt. 195 at 3. According to Thacker, Wilmington was selected in part because of its large fiduciary

---

[4] Triple Canopy is the largest of Constellis' wholly-owned subsidiaries.

[5] As part of an agreement to pay "all reasonable expenses" associated with the trusteeship, Constellis agreed to cover Wilmington's legal fees as long as Wilmington's conduct was not "prohibited by § 410 of ERISA" or the result of "a breach of fiduciary duty, gross negligence, or the willful misconduct of Wilmington." Def. SJ Opp., Dkt. 191 at 4–5.

insurance policy and fidelity bond amount, and because it was one of approximately three firms with substantial experience in ESOP transactions.  Thacker Dep., Dkt. 163-4 at 153:15–154:22.

A Wilmington vice president, Greg Golden ("Golden"), was Wilmington's primary point of contact for the Constellis ESOP transactions.  Def. SJ Memo., Dkt. 167 at 5.  Wilmington had a Fiduciary Services Sub-Committee (FSSC) consisting of four voting members who had the authority to give final approval to any transaction involving Constellis.  Id. at 6.  The FSSC members were Golden; Jennifer Matz ("Matz"), another Wilmington vice president and the chair of the FSSC; John Lindak ("Lindak"); and Boyd Minnix ("Minnix").  Id.[6]

Wilmington hired its own legal counsel, Taylor English Duma ("Taylor English"), and financial advisor, Stout Risius Ross ("SRR"), to assist it in evaluating the proposed ESOP. According to Golden, Wilmington hired SRR "based on [its] knowledge on [sic] the finance and ESOPs," and Taylor English "based on the knowledge they have on [sic] ESOPs."  Golden Dep., Dkt. 163-7 at 41:12–17.  Rather than starting from scratch every time Wilmington had to hire a new valuation firm, it maintained a list of approximately 12 preapproved firms; SRR was one of them.  Matz Dep., Dkt. 163-5 at 28:1–17.  Firms seeking to be on the list had to fill out a "due diligence questionnaire."  Dkt. 167-12 at 1.  In its questionnaire, SRR represented that it had 15 professionals working in its ESOP group.  Id.  "Typical valuation credentials" of those professionals included Chartered Financial Analysts ("CFAs"), Certified Public Accountants ("CPAs"), Accreditations in Business Valuation ("ABVs"), and Accredited Senior Appraisers ("ASAs").  Id. at 2.  SRR reported that it worked on "at least 20 transactions each year providing fairness and solvency opinions for ESOP trustees" and had provided "hundreds of fairness

---

[6] A fifth voting member of the FSSC, Karen Bonn ("Bonn"), was recused from votes related to the Constellis ESOP because she was Wilmington's liaison with Constellis.  Id. at 6 n.6.

opinions" in its history. Id. at 1. SRR had "a large number of clients in the defense/government contracting and engineering industries." Id. The majority of SRR's work for Wilmington on the Constellis ESOP transaction was performed by Scott Levine ("Levine"), CPA/ABV, CFA, ASA, and Aziz El-Tahch ("El-Tahch"), CFA. Def. SJ Memo., Dkt. 167 at 7 n.8.

When considering transactions such as the 2013 Purchase and 2014 Sale, there are two key metrics of a company's value: enterprise value and equity value. Enterprise value is "the amount the business is worth, looking at . . . the left-hand side of the balance sheet," meaning before taking into account any liabilities. Def. SJ Memo., Dkt. 167 at 10 n.11. Equity value is the enterprise value minus the company's debts, or "the value that the owners of the company have." Id. There are two commonly employed methods for arriving at enterprise and equity value: the discounted cash flow ("DCF") method, which uses cash flow projections and then discounts them to arrive at an estimate, and the guideline public company method ("GCM"), which uses "metrics of other businesses of similar size in the same industry" to estimate a value.[7] The parties agree that in the context of valuing a privately-held corporation like Constellis, the DCF method is generally more reliable than the GCM method, but disagree sharply about the proper application of each method to the 2013 Purchase. See Def. SJ Memo., Dkt. 167 at 10–11; Pl. SJ Opp., Dkt. 195 at 26.

Before the ESOP was created, Constellis had been appraised regularly for five years by Andy Smith of The McLean Group ("McLean"), most recently on January 31, 2013. Pl. SJ Opp., Dkt. 195 at 4. That valuation was conducted "to estimate the Fair Market Value of the

---

[7] See Ben McClure, "Discounted Cash Flow Analysis," Investopedia, http://www.investopedia.com/university/dcf/ (last visited Oct. 31, 2016); "Comparable Company Analysis," Investopedia, http://www.investopedia.com/terms/c/comparable-company-analysis-cca.asp (last visited Oct. 31, 2016).

common stock [of Constellis] on a per share basis for [Constellis'] equity compensation plan and financial reporting purposes." Dkt. 167-2 at 5. The valuation was based on a minority stake; consequently, McLean discounted its value for "lack of control," which it considered necessary "since a minority interest does not have the ability to apply significant influence over the decisions of a company." Id. at 66. It applied a second discount, for lack of marketability, because "there are generally no active markets to freely trade a minority interest in a privately-held company." Id. The McLean report arrived at an estimated enterprise value of $████ and an equity value of $████. Id. at 11. It then divided that number by the number of shares to arrive at a pro rata fair market value for each share. Id. It was only at this phase that McLean applied the two discounts described above. Id. After applying those discounts, McLean estimated the fair market value of a single share of Class A voting stock as of January 31, 2013, as $███. Id.

SRR began the process of valuing Constellis by collecting revenue projections from management, which were supplied by CSG. El-Tahch Dep., Dkt. 163-8 at 45:5–11. El-Tahch testified that it is SRR's usual practice to rely on management representations about future revenues, on which SRR performs "due diligence." Id. at 46:3–9. According to El-Tahch, SRR considered criteria such as who prepared the projections, the quality of analysis, the company's experience preparing projections, how the company has performed relative to prior projections, and general industry conditions. Id. at 46:3–49:14. In the case of Constellis, El-Tahch found that the projections were prepared by non-shareholders, meaning the preparing employees had no "apparent" incentive to inflate their estimates. Id. at 47:15–19. Constellis also had experience formulating projections, doing so "at least annually and sometimes updated . . . midyear." Id. at 47:22–48:1. El-Tahch also considered the underlying records and analysis to be better-than-

average, observing that Constellis' system for tracking contracts was "very robust" and that

Constellis had a "very granular understanding of the company's growth prospects." Id. at 46:10–

16. Likewise, he found Constellis' revenue projections to be supported "based upon . . . due

diligence and e-mail correspondence," a finding buoyed by his conclusion that Constellis'

projections "were more conservative than what their backlog would suggest." Id. at 48:7–11.

Golden circulated SRR's draft "preliminary valuation analysis" on November 12, 2013.

Dkt. 195-30 at 1–2. That analysis purported to rely on several sources of information including,

but not limited to, "Constellis' audited financial statements," its internal projections, a site visit,

"discussions with certain members of the senior management of Constellis," and "publicly

available information and financial data on publicly traded companies considered similar to

[Constellis]." Id. at 9. SRR used both the GCM and DCF methods to calculate value, merging

the two in a weighted average that put a greater emphasis on the DCF method. Id. at 39. In a

short, generalized analysis, SRR concluded that "[b]ased on the facts and circumstances related

specifically to the Constellis equity, we applied a 10.0% control premium to the stock prices of

the guideline companies used in the Guideline Company Method to account for any enhanced

benefits that may be realized by a controlling shareholder of Constellis." Id. at 84. SRR also

decided to include only a 5% discount for limited marketability, concluding that "unlike typical,

privately held, non-ESOP companies, Constellis will have a repurchase obligation (often referred

to as a 'put' option) to redeem shares from terminated employees. The effect of such put option

is that it greatly improves the marketability of the underlying closely held Company's shares."

Id. at 40. SRR's valuation determinations are summarized in the following table:

| ENTERPRISE VALUE RANGE | |
|---|---|
| GCM Method | $█ million to $█ million |
| DCF Method | $█ million to $█ million |
| Combined | $█ million to $█ million |
| FAIR MARKET VALUE OF EQUITY RANGE | $█ million to $█ million |
| MEDIAN FAIR MARKET VALUE OF EQUITY | $█ million |
| FAIR MARKET VALUE OF EQUITY PER SHARE RANGE | $█ to $█ |
| FAIR MARKET VALUE OF EQUITY PER SHARE MEDIAN | $█ |

Id. at 41.

The parties dispute Wilmington's level of activity during the period when SRR was

preparing the report. Defendant argues that Golden and Bonn were "working with SRR

throughout the due diligence process." Def. SJ Memo., Dkt. 163 at 10. The minutes of a

meeting held on October 24, 2013, among SRR, Taylor English, Greenberg Traurig, and

Constellis show that although Bonn, the non-voting member of Wilmington's FSSC, attended,

no voting member of the FSSC was at that meeting. Dkt. 195-38. Additionally, one email

between SRR and Taylor English shows that Bonn was copied, but it does not show Bonn

participating in the discussion. See Dkt. 167-16 at 4–5. According to FSSC chairwoman Matz,

Golden was the FSSC member "most intimately involved" with the Constellis ESOP transaction,

Matz Dep., Dkt. 185-8 at 54:19; however, none of the emails or depositions cited by defendant

demonstrate any involvement by Golden between Wilmington's decision to retain SRR and his

circulating SRR's draft evaluation on November 12, 2013. See Dkts. 167-16 at 4–5, 13–18, 26–

29; 167-17 at 4–8; 163-5; 163-6; 163-7. Moreover, as of two days before the FSSC was

scheduled to review the draft valuation report, Golden had not seen the draft and believed the

meeting was going to be cancelled because he had not yet heard anything about the draft report

from SRR. Dkt. 195-31 ("I assume since we have not had any calls on this one I can cancel the

full committee meeting for Constellis on Thursday . . . Please confirm.").[8]  As for the other

voting FSSC members, Matz has acknowledged that she was not involved in the transaction

during that time, and there is no deposition testimony from Lindak and Minnix or any other

evidence that they engaged with the Constellis ESOP transaction during the preparation of

SRR's report.

Ordinarily, Wilmington requires that it receive a draft valuation report at least 48 hours

before an FSSC meeting to enable its personnel to discuss that report.  Dkt. 195-53 at 3.  SRR

missed that deadline by about three and a half hours.  Golden circulated the report to the FSSC at

4:58 p.m. on Tuesday, November 12, 2013, for a meeting scheduled to begin at 1:30 p.m. on

Thursday, November 14, 2013.  Dkt. 195-30; Dkt. 195-11.  Golden testified that he "read

basically all" of the report in that time, but admitted that he had not read "every single sentence."

Dkt. 163-7 at 86:9–10.  Matz did not specifically remember reading the SRR draft report, but

testified that reading such drafts is "standard practice" and she was accordingly "sure [she] read

it."  Dkt. 185-8 at 75:9–22.

Neither of the two deposed FSSC members, Matz and Golden, recalls the November 14

meeting in significant detail, although both claim that Wilmington asked several questions about

the basis of SRR's valuation.  See Dkt. 185-8 at 102:19–106:6; 163-7 at 86:11–20.  Both took

handwritten notes at the meeting and directed counsel to refer to them when asked at their

depositions about what the group discussed on November 14.  Dkt. 163-7 at 86:14; Dkt. 185-8 at

---

[8] The response from SRR's El-Tahch came two minutes later: "No-we are absolutely on schedule.  We plan on sending our preliminary report to your committee this afternoon or tomorrow.  We have to have the committee meeting as scheduled Thursday for the tender offer, even if the deal won't close until December."  Dkt. 195-31.  El-Tahch was referring to a Constellis requirement that minority shareholders be given 20 days' notice of any potential buyout.  Golden Dep., Dkt. 185-9 at 79:14–21.

78:19–22. Matz's notes primarily relay topics of conversation including: "setting price for tender offer;" the requirements for minority shareholder notification; SRR's final fair market value price; an overview of Constellis' market position; the "conservative" nature of the projections; the low potential for headline making news; a potential for an action to recover money Constellis had overcharged the government on a particular contract;[9] the differences between GCM and DCF valuation; the transaction's financing; the post-transaction value of Constellis; and the price the trustee was willing to offer per share (which appears to have been anywhere below SRR's reported median). Dkt. 195-11. Those notes do not reflect any substantive information about the topics. Golden's notes, which are harder to follow, also primarily list these topics. Dkt. 195-32. Of significance to some of plaintiff's arguments, these handwritten notes do not appear to indicate that Wilmington raised any questions about the appropriateness of the 10% control premium SRR applied in valuing the stock.

Golden testified that he was aware of the McLean valuation before approving the 2013 Purchase, but there is no indication that it was discussed at the November 2013 meeting and he admits that he never personally reviewed it. Dkt. 238-4 at 13:15–14:1. In explaining that decision, Golden testified in an extremely unconvincing manner: "You know, they were discussed and I discussed them with individuals that I understood did review them, but just the pertinence to what we—the relativity. You know, those reports relative to what we were—you know, our task. I didn't think they were applicable once I understood the nature of the reports." Id. at 14:6–13. Asked why they were not applicable, Golden continued, "Those McLean reports, it was a valuation firm . . . hired by the company . . . [t]o value itself. . . . It was to value

---

[9] The Sellers ultimately agreed to indemnify the ESOP with respect to this particular risk, which involved approximately $█ million. Def. SJ Memo., Dkt. 167 at 12 n.14.

internal—I believe internal transfers of stock, or for maybe tax reporting or something like that. It was—and they would have been on—you know, for one, it was an independent valuation as we would see that. It was—you know, it was—a valuation firm hired by the company to value itself, and just the purpose of the reports with the—I think they were done, to my understanding, was on the minority non-controlling interest. And it just wasn't—just the overall applicability to what we were doing wasn't relative."[10] Id. at 14:6–15:12.

On November 13, one day before the FSSC meeting, Constellis and the Sellers, acting through CSG, initially priced the shares at $██. Dkt. 167-17. On Friday, November 15, at 3:02 p.m., Constellis reduced the asking price to $██ per share. Dkt. 195-12 at 8. At 4:28 p.m., Thacker wrote in an email to Wilmington, "I received the Trustee's offer via the telephone for $██, which [Constellis] declines. We would propose $██ as the appropriate per share value for the term sheet. In the interest of time, please respond to this valuation offer while the term sheet is being finalized (we expect to send it within the next 30 minutes[)]." Id. at 7 (emphasis in original). Taylor English responded at 4:50 p.m. that Wilmington's "best and final offer" was $██ per share, the exact number that SRR reported as the median of its fair market value range. Id. at 6. CSG and Constellis accepted that offer nine minutes later. Id. Negotiations over other terms continued until Friday, November 22, 2013, most notably over the "strike price" of the warrants that the Sellers would hold, or the price at which they would be able to exercise their option to repurchase voting stock in Constellis after the sale to the ESOP. Id. at 1–6. Ultimately, Constellis decided to use the same price that the ESOP was paying per share as the strike price, which Thacker represented was better for the ESOP than the strike price originally included in the term sheet. Id. at 2. Closing was set for December 20, 2013.

---

[10] All grammatical errors in these answers appear in the original.

In the day or two leading up to closing,[11] the FSSC met again to issue a final approval of the sale. Matz's handwritten notes suggest that the FSSC members discussed the ownership structure in place before the 2013 Purchase closed, the Board structure to be put in place after the transaction, the final fairness analysis, the strike price, and the $█ million audit underway. Dkt. 195-13.

In connection with the closing, SRR issued its final valuation and transaction fairness opinion, dated December 20, 2013.[12] Although the final median fair market value per share calculation was the same, other figures in the final valuation departed from the November draft. The following table shows the two side-by-side for comparison:

| Valuation Metric | November 2013 | December 2013 |
|---|---|---|
| ENTERPRISE VALUE RANGE<br>GCM Method<br>DCF Method<br>Combined | $█ million to $█ million<br>$█ million to $█ million<br>$█ million to $█ million | $█ million to $█ million<br>$█ million to $█ million<br>$█ million to $█ million |
| FAIR MARKET VALUE OF EQUITY RANGE | $█ million to $█ million | (The December report did not contain this line item) |
| MEDIAN FAIR MARKET VALUE OF EQUITY | $█ million | (The December report did not contain this line item) |
| FAIR MARKET VALUE OF EQUITY PER SHARE RANGE | $█ to $█ | $█ to $█ |
| FAIR MARKET VALUE OF EQUITY PER SHARE MEDIAN | $█ | $█[13] |

---

[11] In their statements of undisputed facts, the parties agreed that this meeting was on December 18, see Def. SJ Memo. 21, but an Outlook calendar entry from Matz suggests it might have been on December 19, Dkt. 195-13.

[12] It is unclear whether the FSSC had the December version of the report at its meeting on December 18 or 19.

[13] Using the traditional method of calculating a median, the median of the November 2013 range is $█, and the median of the December 2013 range is $█.

Compare Dkt. 195-30 at 41, with Dkt. 167-3 at 66.  The differences can be explained in part by a downward revision in Constellis' cash on hand.  The November report relied on a projected December 31, 2013, figure of $█ million.  Dkt. 195-30 at 39.  The December report instead used the November 30, 2013, balance sheet, which reflected $█ million cash on hand. Dkt. 167-3 at 64.  Another revision from November to December was the dilution from stock options that Constellis would need to pay in connection with the 2013 Purchase.  The November report estimated this dilution to be between $█ million to $█ million.  Dkt. 195-30 at 41.  In December, SRR concluded that "only 200 stock options with a strike price of $█ were exercised as part of the Transaction," and consequently changed the estimate range to $█ to $█.  Dkt. 167-3 at 65.  This revision largely offset the $█ million difference in cash on hand when it came to the final valuation.

Incorporating these revisions, SRR opined "that the transaction was for fair market value, the interest rate[s] . . . [were] not in excess of a reasonable rate, the financial terms . . . are at least as favorable to the ESOP as . . . a comparable loan, resulting from arms-length negotiations between independent parties, the exercise price of the Warrants was at least equal to 90% of the fair market value of the underlying common stock on a per share basis, and the terms and conditions of the ESOP Transaction are fair to the ESOP."  Def. SJ Memo., Dkt. 167 at 12–13.

On December 20, 2013, the 2013 Purchase closed.  Def. SJ Memo., Dkt. 167 at 13.  "The ESOP purchased 47,586.55 shares of Class A common stock from the Sellers, representing 88.4% of the Sellers' total shares, for $█," which amounted to a rate of $█ per share.  Id. at 13–14.  "Concurrent with the ESOP's purchase, Constellis redeemed the remaining voting stock, so that the ESOP became the holder of 100% of Constellis voting stock."  Id.  The ESOP purchased the Constellis stock by paying 31.4% of the price in cash and covering the

14

remaining 68.6% with promissory notes issued by the ESOP to the Sellers in the aggregate

amount of $▇▇ million, bearing interest at an annual rate of 5.0% with an eight-year term.[14] Id.

The cash for the transaction came from Constellis in the form of a loan bearing an annual interest

rate equal to the long-term Applicable Federal Rate ("AFR"), amortized with level principal

payments, and having a term of 25 years. Id. "Following the ESOP purchase, the remaining

6,227.35 shares of Class A Common stock were exchanged for 125 shares of newly issued non-

voting stock and warrants (the 'Warrants') to acquire 15,737.18 shares of Class A Voting

Common Stock. One-half of the Warrants would expire in 10 years (the 'Series A Warrants'),

and the other half would expire in 15 years (the 'Series B Warrants')." Id. (internal citations

omitted).[15]

     The Investor Rights Agreement ("IRA") provided that, after the transaction, Constellis'

board of directors would "consist of five individuals, at least one of whom shall be independent

from management of [Constellis], who shall be selected by the remaining members of the Board,

provided that as of the date of this Agreement the Board may consist of four individuals, and the

Board shall have six months from the date of this Agreement to select and appoint the initial

independent member of the Board."[16] Dkt. 195-54 at 6 (emphasis in original). With respect to

choosing directors, the IRA provided that "for so long as all of the Series A Warrants have not

been exercised or terminated, the holders of at least 51% of the outstanding Series A Warrants

shall have the right to designate three of the members of the Board, and to select the replacement

---

[14] The parties engaged in an internal refinancing on December 27, 2013, in which Constellis
assumed the promissory notes from the Sellers. Def. SJ Memo., Dkt. 167 at 13.

[15] The parties have stipulated to these terms of the transaction.

[16] The independent director was not appointed during the period between the 2013 Purchase and
the 2014 Sale, meaning the board had only four members during that time. Tr. of Hearing, Dkt.
259 at 12:9–11 (Oct. 20, 2016).

Board member in the event of the resignation, death or incapacity of any member of the Board

designated by such holders, in each case provided that such designation does not cause the

Trustee to violate its fiduciary obligations under ERISA." Id. Triple Canopy's by-laws also

provided that "the holders of not less than one-fifth of all the outstanding shares of the

Corporation entitled to vote on" a matter to hold a "Special Meeting" of the board to discuss a

matter, which defendant argues could be used by the ESOP or its trustee to "remove and replace"

the board. Dkt. 167-9 at 100. The IRA also gave Wilmington, as the trustee, the right to "such

regularly prepared annual financial reports . . . and projections . . . and . . . such other financial

information as the Trustee reasonably requests from time to time; provided that [Constellis] shall

only be obligated to deliver information already in its possession and shall not be required to

prepare additional information to comply with the Trustee's request." Dkt. 195-54 at 5

(emphasis in original).

On December 31, 2013, "[a Constellis] contribution was accrued . . . and paid into the

[ESOP] in May 2014 in the amount of $█████, which included accrued interest.

[Constellis'] contribution not only reduced the amount due on the ESOP loan to $█████, but

also released $█ million in stock to participant accounts." Def. SJ Memo., Dkt. 167 at 15

(internal citations omitted).

Constellis experienced several setbacks in the first part of 2014. "For instance, in 2010,

[Constellis] won a fixed price 'KBOSS' contract to provide fixed site security at two military

bases in Kuwait for the U.S. Army. In February 2014, [Constellis] was informed by the prime

contractor that it intended to run a formal competition for the portion of the contract for which

Constellis was the teaming partner." Def. SJ Memo., Dkt. 167 at 15 (internal citations omitted).

In January 2014, the Department of State rescinded a major contract to perform work on several

task orders in the Worldwide Protective Services program, which required Constellis to resubmit a "best and final offer." Id. These two changes and alterations to "other smaller contracts" resulted in a diminution of Constellis' value. Id. at 16.

In February of 2014, ACADEMI, one of Constellis' major competitors, expressed an interest in acquiring Constellis. Def. SJ Memo., Dkt. 167 at 16. Constellis retained Wilmington to act as trustee for the proposed sale, and Wilmington brought SRR and Taylor English back on board to advise it. Id. ACADEMI's initial offer was to pay $■ million, with no consideration to the ESOP. Id. "ACADEMI, Constellis, and the Trustee engaged in several back and forth negotiations of the sale price. On March 25, 2014, [Constellis] received a letter of intent from ACADEMI that offered total consideration of $■ million to purchase [Constellis], including $■ million of proceeds payable to the ESOP. After further negotiations, on April 28, 2014, the offer was an implied Enterprise Value of $■ million, with proceeds to the ESOP of $■ million and a $■ million discount on the Seller Notes. The ESOP executed a Letter of Intent on May 5, 2014, in which ACADEMI offered a purchase price at an implied Enterprise Value of $■ million, which included $■ million of proceeds to the ESOP and a $■ million discount on the Seller Notes." Id. at 17.

SRR issued a new Analysis of Transaction Fairness in connection with the 2014 Sale, dated July 25, 2014. Dkt. 167-9 at 62. Depending on the resolution of the KBOSSS contract and other issues, at that time it estimated Constellis' enterprise value to be between $■ million and $■ million.[17] Id. at 43–45. SRR also considered it a benefit to the ESOP that the plan

---

[17] Because the 2013 Purchase was heavily leveraged, the equity value is not a helpful comparator between the two transactions.

participants would fully vest immediately as a result of the 2014 Sale.[18] Id. at 50. In light of these considerations and the other factors SRR considered, it opined that "the Total ESOP Consideration is not less than the Fair Market Value of the Class A common shares of [Constellis] owned by the ESOP; and the terms and conditions of the Transaction, taken as a whole, are fair to the ESOP from a financial point of view." Id. at 53. Plaintiff has not attacked the fairness of the 2014 Sale or SRR's 2014 valuation and analysis, which was conducted using the same basic methodology SRR used in preparing its 2013 reports. Def. SJ Memo., Dkt. 167 at 18. Wilmington was paid an additional $▮▮▮▮ flat fee for its services in 2014. Dkt. 195-52 at 8.

   The 2014 Sale closed on July 25, 2014, when a newly formed entity, Constellis Holdings, Inc., purchased Constellis. Def. SJ Memo., Dkt. 167 at 18. As a result of the sale, the ESOP no longer owned Constellis stock. Because an "employee stock ownership plan" cannot continue to exist without owning employer stock, the ESOP was converted into a "non-ESOP defined contribution retirement plan" after the sale. Id.[19] The Constellis board voted the same day to seek a "favorable determination letter" from the Internal Revenue Service ("IRS"), which would allow Constellis to terminate the newly-created defined contribution plan. Pl. SJ Opp., Dkt. 195 at 10. On December 1, 2015, the IRS informed Constellis that its review would be delayed indefinitely because the Department of Labor had opened an investigation into the actions of Wilmington and any other fiduciaries in connection with the Constellis ESOP. Id. at 11. The

---

[18] At oral argument, the defendant stipulated that any Constellis employee who had worked more than 1000 hours in both 2013 and 2014 had vested 20% at the time of the 2014 Sale. Tr. of Hearing, Dkt. 259 at 5:11–13 (Oct. 20, 2016).

[19] A defined contribution plan sets aside a specific amount of money each year to be allocated to employee retirement accounts.

Department of Labor's investigation is ongoing and Constellis has not received a final favorable determination letter from the IRS. Id.

## II.     DISCUSSION

Plaintiff has moved for partial summary judgment with respect to its burden under § 1106(a) to prove that the 2013 Purchase was prohibited by ERISA and under § 1106(b)(3) that Wilmington received a prohibited payment from a party in interest to the transaction. Plaintiff also moves for summary judgment on several of Wilmington's ancillary defenses. Defendant has moved to exclude the testimony of plaintiff's financial expert Dana Messina under Daubert v. Merrell Dow Pharms., 509 U.S. 579 (1993),[20] and for summary judgment against all of plaintiff's claims, asserting that it has met its burden of establishing that §1108(e) authorized the 2013 Purchase and its fee.

### A. Summary Judgment Standard of Review

Summary judgment is warranted where "there is no genuine dispute as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When the parties file cross-motions for summary judgment, the court "must consider each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." Krpan v. Registry of Interpreters for the Deaf, Inc., No. 1:15-cv-458, 2016 WL 889662, at *4 (E.D. Va. Mar. 8, 2016) (internal citations and quotation marks omitted). For

---

[20] Although defendant points out that Messina does not appear to have received a formal education or professional certification in finance, it does not seriously contest his qualifications. See Def. Excl. Memo., Dkt. 180. Before founding his consulting firm, Messina was a partner at various hedge funds. Dkt. 195-21 at 33. In his current capacity, he is a primary consultant for the Department of Labor on ESOP related transactions. Pl. Excl. Opp., Dkt. 204 at 9. Defendant challenges the sufficiency of the facts and data on which Messina relied. Def. Excl. Memo., Dkt. 178 at 8, 13, 17–20. The Court rejected defendant's argument and has accepted Messina as a qualified expert. The merits of his opinions about the transaction will be determined at trial. See United States v. Brown, 415 F.3d 1257, 1269 (11th Cir. 2005).

each motion, the court will "resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion." Id. (internal citations and quotation marks omitted). Nevertheless, "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient" to defeat summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). For a dispute to be "genuine," there must be "evidence such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. Likewise, to amount to a "material" dispute, the issue must potentially "affect the outcome of the suit under the governing law." Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001).

If the nonmovant bears the burden of proof, the moving party may nevertheless prevail by demonstrating "that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 322–25 (1986). To survive summary judgment, the nonmoving party must raise "specific facts" rather than mere "metaphysical doubts" to refute the movant's position. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986) (internal quotation marks omitted). If the nonmoving party fails to raise such facts to support an "essential element" of its claim, the moving party is entitled to judgment as a matter of law. Rhodes v. E.I. du Pont de Nemours & Co., 636 F.3d 88, 94 (4th Cir. 2011).

B. ERISA Framework

Because an ESOP is designed to invest in employer securities, it can be jeopardized by conflicts of interest and the inherent volatility of stock prices. See Donovan, 716 F.2d at 1458, 1466. Consequently, tension often arises between Congress' desire to promote ESOPs as "an effective merger of the roles of capitalist and worker," and ERISA's strong policy "of safeguarding the interests of participants by vigorously enforcing standards of fiduciary responsibility." Id. Reflecting this tension, the statutory scheme demands a two-step inquiry when considering a transaction involving an ESOP. First, is the transaction one that falls into a

category banned by 29 U.S.C. § 1106?[21] Second, is the particular transaction at issue authorized

by any of the exemptions to § 1106 found in 29 U.S.C. § 1108?

Unless exempted by § 1108, § 1106(a)(1) prohibits a plan's fiduciary from causing "the

plan to engage in a transaction, if he knows or should know that such transaction constitutes a

direct or indirect—(A) sale . . . of any property between the plan and a party in interest; [or] (B)

lending of money or other extension of credit between the plan and a party in interest."  The

plaintiff bears the burden of showing that the provisions of § 1106 apply to a transaction.

Section 1108(e), in pertinent part, exempts a transaction from the § 1106 ban if a

defendant can satisfy three criteria: (1) the plan must be "an eligible individual account plan (as

defined in section 1107(d)(3) of this title);" (2) "no commission is charged with respect [to the

transaction];" and (3) "such acquisition, sale, or lease is for adequate consideration."  See Elmore

v. Cone Mills Corp., 23 F.3d 855, 864 (4th Cir. 1994) (confirming that the burden of proving that

a transaction is authorized by § 1108 is on the defendant).  The parties dispute whether the ESOP

was an "eligible individual account plan" and whether it paid no more than "adequate

consideration" in connection with the 2013 Purchase.

To be an "eligible individual account plan," at least nine regulatory criteria must be

satisfied.  See 29 U.S.C. §§ 1107(d)(3)(A); 1107(d)(6); 26 C.F.R. § 1.401-1(a)(3).  One such

criterion is that the plan be "established by an employer for the exclusive benefit of his

employees or their beneficiaries."  26 C.F.R. § 1.401-1(a)(3)(ii).  The regulations further provide

that "although the employer may reserve the right to change or terminate the plan, and to

discontinue contributions thereunder, the abandonment of the plan for any reason other than

---

[21] Section 1106 is widely considered a supplement to ERISA's general obligation that a fiduciary act in good faith; it "prohibit[s] certain categories of transactions believed to pose a high risk of fiduciary self dealing."  Henry v. Champlain Enters., Inc., 445 F.3d 610, 618 (2d Cir. 2006).

business necessity within a few years after it has taken effect will be evidence that the plan from

its inception was not a bona fide program for the exclusive benefit of employees in general." Id.

at § 1.401-1(b)(iv)(2). Similarly, if "the plan is so designed as to amount to a subterfuge for the

distribution of profits to shareholders, it will not qualify as a plan for the exclusive benefit of

employees even though other employees who are not shareholders are also included in the plan."

Id. at § 1.401-1(b)(iv)(3).

ERISA defines "adequate consideration" as "the fair market value of the asset as

determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan and

in accordance with regulations promulgated by the Secretary [of Labor]." 29 U.S.C. § 1002(18).

The parties dispute the best reading of this provision. According to plaintiff, the Court must

determine both whether the fiduciary arrived at its valuation in good faith and whether that

valuation deviated unacceptably from the true fair market value. Pl. Opp., Dkt. 195 at 22–23. In

support of this argument, plaintiff urges the Court to rely on regulations proposed by the

Department of Labor in 1988, but never finalized, which would clearly establish such a two-step

inquiry and provide enumerated criteria for each prong. See Perez v. Bruister, 823 F.3d 250, 262

n.13 (5th Cir. 2016) (citing 53 Fed. Reg. 17,632, 17,633 (proposed May 17, 1988)). In contrast,

defendant urges the Court to focus primarily on the process defendant used. Def. Memo.,

Dkt. 167 at 30.

Defendant's reading of the statute is closer to the mark. "Proposed regulations are, of

course, not binding." Bruister, 823 F.3d at 262 n.13. Moreover, although many courts have

been informed by the criteria listed in the proposed regulations, "[n]one of the courts 'adopting'

the Secretary's test actually apply its specifically enumerated substantive requirements." Id.

Instead, they fold some of the criteria into a broader, multifactor approach. See id. This does not

mean that the subjective good faith of the defendant alone satisfies § 1108(e). Donovan, 716

F.2d at 1467 ("[A] pure heart and an empty head are not enough."). The question is "not easily

satisfied by application of bright-line rules," Donovan, 716 F.3d at 1465, and the court must

consider the totality of the circumstances to determine whether "adequate consideration" has

been established. See, e.g., Bruister, 823 F.3d at 263–65; Keach v. U.S. Trust Co., 419 F.3d 626,

636–37 (7th Cir. 2005); Donovan, 716 F.2d at 1465–68.

Courts have held that it is desirable for a fiduciary to consult with an outside expert when

determining fair market value. Bruister, 823 F.3d at 263. Doing so is a strong piece of evidence

that the defendant discharged its fiduciary obligations in good faith. Id. But an independent

evaluation is not a "magic wand that fiduciaries may simply wave over a transaction to ensure

that their responsibilities are fulfilled. It is a tool and, like all tools, is useful only if used

properly." Donovan, 716 F.2d at 1474. A fiduciary must therefore engage in a "prudent

investigation" in light of "the circumstances then prevailing." Id. at 1468.

One step in discharging that obligation is appropriately vetting the qualifications of the

independent experts retained. Bruister, 823 F.3d at 264. Reliance on an expert can be justified

by "many factors, including the expert's reputation and experience[.]" Bussian v. RJR Nabisco,

Inc., 223 F.3d 286, 301 (5th Cir. 2000). Another consideration is the relationship that the

fiduciary, or its independent evaluators, have with the party in interest or its agents. Bruister,

823 F.3d at 264. Evidence that one or more of these entities might have an ongoing relationship,

or be working together, can render a fiduciary's reliance on the complicit parties unjustified. Id.

Even if a fiduciary takes appropriate steps to vet the qualifications of its experts, it must

ensure that the experts' work does not suffer from reasonably obvious flaws. See Donovan, 716

F.2d at 1474. A prudent fiduciary must analyze the independent appraisal in light of everything

it knows about a proposed transaction. See id. ("Had the [fiduciaries] compared the [independent appraisal] with the information at their disposal when they bought [employer stock], they should have realized" that "two critical assumptions . . . no longer were valid."). Concerns may also arise when the fiduciary or its independent advisers are pressed for time. Perez v. First Bankers Trust Servs., Inc., No. 12-cv-8648, 2016 WL 5475997 (S.D.N.Y. Sept. 28, 2016).

Of course, not every misstep or road not taken by a fiduciary will necessarily create an inference of bad faith. Keach, 419 F.3d at 638. "When the record establishes that the overlooked matter was one that no one perceived to be a material concern at the time or to be outcome determinative, it cannot be said that the overall investigation was imprudent or in bad faith. ERISA's fiduciary duty of care 'requires prudence, not prescience.'" Id. (quoting DeBruyne v. Equitable Life Assurance Soc'y of the U.S., 920 F.2d 457, 465 (7th Cir. 1990)). This principle has special relevance in the context of valuing closely held stock, which is a notoriously "inexact science." Donovan, 716 F.2d at 1473.

C. Section 1106(a) Claims and Section 1108(e) Defense

1. Section 1106(a) Criteria

Setting aside § 1108, there is no genuine dispute that the 2013 Purchase would be a violation of § 1106(a). Wilmington, the fiduciary, caused the ESOP, a plan, to purchase stock from a party in interest, employer Constellis. Defendant stipulated to these facts at oral argument. Tr. of Hearing, Dkt. 259, 24:12–13. It nevertheless argues that the transaction was in fact permitted under § 1108(e). Plaintiff has not moved for summary judgment with respect to defendant's affirmative defense based on § 1108(e), and defendant's ability to raise its affirmative defense is not hampered by a finding that the plaintiff has satisfied his burden to show that the criteria of § 1106(a) are met. Accordingly, plaintiff's motion for summary

judgment on this issue has been granted, which means that he will not be required to adduce evidence at trial that the 2013 Purchase violated § 1106. This holding does not determine whether the defendant is liable, because defendant has properly raised the § 1108 affirmative defense.

### 2. Section 1108(e) Affirmative Defense

Defendant next argues that it has satisfied the requirements of § 1108(e) as a matter of law and should be granted summary judgment. Def. Memo., Dkt. 167 at 28. Plaintiff responds that genuine disputes of material fact remain as to whether the ESOP was an "eligible account plan" under that subsection and whether the ESOP paid no more than "adequate consideration" for the 2013 Purchase. Pl. Opp., Dkt. 195 at 20, 22. The Court agrees with plaintiff's view of the evidence.

#### i. Eligible Account Plan

Defendant argues that it satisfies the eligibility requirement because the ESOP was intended to be ERISA compliant. In making that argument, defendant cites DeFelice v. U.S. Airways, Inc., where the court observed in its factual background that the 401(k) at issue was "intended . . . 'to provide retirement income' and 'to operate for the exclusive benefit of eligible employees and their beneficiaries.'" 497 F.3d 410, 414 (4th Cir. 2007) (quoting the plan's organizing documents). DeFelice was not an ESOP case and the 401(k)'s "eligibility" or "qualification" under § 1107 was not at issue. See id. Nothing in the DeFelice opinion suggests that the employer's good faith would excuse a plan from fully complying with the regulatory requirements for eligibility.

The record demonstrates a genuine dispute about whether defendant satisfies the Department of Labor's "exclusive good faith" test. Constellis and Wilmington began

negotiations that would lead to the termination of the ESOP less than two months after it was created. In light of the regulatory instruction that it is evidence of misfeasance if the plan ceases to exist within a few years of its creation, the brief six-month life span of the Constellis ESOP creates a genuine dispute about the purpose for which it was created. Moreover, the documents that explained the proposed ESOP are replete with references to the tax advantages of an ESOP, and describe how the Sellers stood to gain multi-million dollar bonuses if the plan were successfully established.[22] Dkt. 195-2 at 65. The plan's bona fides are also called into question by Thacker's testimony about why Wilmington was selected as trustee—his first answer was the size of its insurance policy and fiduciary bond, and it was not until questioning by Wilmington's counsel that he also alluded to defendant's substantive qualifications and experience. Dkt. 163-4 at 41:25–42:15; 153:15–154:22. Although an insurance policy and bond might be perfectly innocent considerations, that they figured so prominently in Thacker's reasoning, in connection with CSG's rejection of a "traditional 100% ESOP" for a "more advanced" structure, raises suspicion.

ii. Adequate Consideration

Even if no dispute existed about the ESOP's § 1107 eligibility, several material disputes preclude the Court from finding, as a matter of law, that the ESOP paid no more than adequate consideration as required by § 1108(e).

First, a genuine dispute exists about whether Wilmington adequately probed the conclusions SRR reached in its 2013 reports. For example, SRR increased the value of the stock by 10% based on a very questionable control factor. Plaintiff has established that a substantial

---

[22] Unlike the "adequate consideration" prong, the eligibility determination is independent of Wilmington's good faith. See 29 U.S.C. § 1108(e). As a result, evidence to which Wilmington was not privy in 2013 is still relevant to that determination.

degree of control over Constellis was going to remain with the Sellers after the sale went

through. They were to control three out of five seats on the board,[23] and through the warrants

retained the right to repurchase voting stock from the ESOP. Wilmington knew these provisions

when it was considering the 2013 Purchase, but there is no evidence that it ever questioned SRR

about the inclusion of a control premium, despite the ESOP's lack of control in fact. Nor does

the SRR report provide a fulsome explanation for including a control premium; it simply

explains the concept of a control premium in general and, in a single sentence, concludes that a

10% premium should apply in Constellis' case.[24]  Dkt. 195-30 at 84. Accordingly, a reasonable

trier of fact could conclude that a prudent fiduciary would have more thoroughly questioned the

inclusion of a 10% control premium.

Broader disputes exist with respect to Wilmington's level of engagement with the SRR

report as well. Defendant, which bears the burden of proof, has presented no evidence that two

of its four voting FSSC members, Lindak and Minnix, ever read the SRR reports. FSSC

chairwoman Matz testified that she must have read the report before the November 14 meeting,

but does not actually recall doing so. Golden, the person "most intimately involved," testified

that he read "basically all" of the draft report, which does not convey a very thorough review.

Neither Golden nor Matz personally recalls much about the substance of the meetings the FSSC

held concerning the 2013 Purchase. Even more troubling is that Golden testified that he knew

about the McLean valuation, which had been completed 10 months earlier, but did not read it or

---

[23] Defendant asserts that the ESOP could hold a special meeting to oust the directors under the Triple Canopy bylaws, Def. SJ Reply, Dkt. 235 at 11, but it has not established that the Triple Canopy bylaws would necessarily govern Constellis' board procedures.

[24] Defendant counters that this is a "modest" premium because control premiums more often run between 30% and 40%. See Def. Memo., Dkt. 167 at 29; Dkt. 195-30 at 84. That may be, but the record still contains little evidence about how SRR chose 10% instead and no evidence that Wilmington investigated the appropriateness of that choice.

feel that it needed to be taken into account.  Although defendant's counsel and its experts have repeatedly stressed that the McLean price was heavily discounted because it was done on a single-share basis,[25] had Wilmington read the report it would have seen that McLean did not apply the lack of control and marketability discounts until after it had calculated the equity value of Constellis.  Dkt. 167-2 at 11.  McLean's undiscounted equity value was $████, more than $██ million below the median equity value estimated by SRR.  Had Wilmington taken the time to review that report, it might well have asked questions about why the disparity was so significant.

There is also no evidence that Wilmington raised any questions about the adjustments from the November to December reports, which involved multiple seven-figure changes, but nevertheless resulted in an identical median per-share price.  It is undisputed that, for the deal to close, the December 20 price had to be identical to the November price, suggesting that the parties had an incentive to maintain the price at $███.  Moreover, Wilmington raised no questions about the fact that the "median" reported by SRR was not, according to traditional mathematical approaches, the actual median of the value range in the December report.  Although the difference was only $██ per share, it may still have been significant given that Wilmington used the median to set its maximum price.  Moreover, $██ per share amounts to a total price difference of nearly $██ million in a transaction involving 47,586.55 shares.  Wilmington demonstrated sensitivity to such fluctuations when it was unwilling to accept Constellis' penultimate offer of $███ per share, just $██ more than the price it agreed to pay.

---

[25] Notably, this explanation was not provided by any actual Wilmington employee.  Golden's meandering response when he was asked about the issue, see supra, pages 11–12, suggests he did not fully grasp why the McLean report might be applicable.

Plaintiff has also adduced evidence that raises concern about the timeline of Wilmington and SRR's review of the transaction. Golden initially believed that, because he had heard nothing from SRR, the November 14 meeting would have to be postponed. El-Tahch's response made it clear that the meeting could not be postponed if the transaction was going to close on schedule, and that SRR was mindful of the need to meet that deadline. The FSSC's meeting with SRR to review its analysis lasted only an hour and a half, and the negotiations to settle the price began in earnest the very next day. The quick turnaround involved in this transaction raises additional questions about the thoroughness of Wilmington's review. Similarly, the active period of negotiation over the price was just two hours, and Wilmington only succeeded in talking Constellis down to the maximum price that Wilmington had determined it was willing to pay. There is no evidence in the record at this point that Wilmington made any arguments to bring the price down during the negotiations—it simply threw out lower numbers without any real explanation. These facts suggest that Wilmington may not have been engaged in a sufficiently vigorous negotiation on behalf of the ESOP.

These concerns are amplified by the evidence plaintiff has presented of the close relationship between Wilmington and CSG, which represented Constellis throughout the proceedings. Given that Wilmington receives the largest percentage of its referrals from CSG, and had several ongoing transactions with CSG in other contexts, a reasonable trier of fact could conclude that Wilmington was motivated to maintain that relationship. It might also have affected how hard Wilmington could or would press CSG during negotiations over the stock price. For example, the email exchange during the negotiations reveals that Wilmington made one counteroffer by phone. Dkt. 195-12 at 7. Thirty-one minutes later, the parties agreed on a price that was exactly equal to the maximum price Wilmington was willing to pay. Id. at 6. Of

course, these facts by themselves do not prove that any collusion occurred, but they do raise a sufficient question about the negotiation process to defeat summary judgment, especially given that inferences must drawn in favor of the plaintiff with respect to the § 1108(e) defense.

To be sure, defendant has several strong pieces of evidence on its side as well. Defendant has presented significant evidence of SRR's qualifications and experience in the field, and raised valid concerns about the thoroughness of Messina's conclusions on behalf of the plaintiff. Merely having some evidence, even good evidence, does not satisfy the summary judgment standard, especially where, as here, the moving party bears the burden of proof and the legal question requires examining the totality of the circumstances. In that respect, this civil action resembles First Bankers Trust Services, recently decided in the Southern District of New York, where the defendant-trustee had shown that

> among other things, it: (1) ensured the data provided by [the employer] was complete and accurate by representation and warranty provisions regarding the veracity of the financial and company information provided; (2) questioned the financial forecasts made by [the employer] at due diligence meetings; (3) retained . . . an indisputably qualified expert to prepare a valuation of [the employer]; (4) attended and participated in meetings with [the employer, the expert, and legal counsel]; (5) questioned the assumptions and methodologies employed to value [the employer]; and (6) specifically discussed [the employer's] relationship with [a major client] and the attendant opportunities and risks associated with that relationship.

2016 WL 5475997 at *13. Despite all those precautionary steps, defendant was not entitled to summary judgment because questions remained about:

> (1) [the trustee's] true motivations driving its decisions to select [the valuation advisor]; (2) [the valuation advisor's] independence; (3) the relevance of [an offer from the eventual buyer]; (4) the reasonableness of treating the financial information and projections provided by [the employer] as presumptively accurate; (5) the rigor with which [the trustee] reviewed and challenged the [valuation advisor's] methodologies; and (6) [the trustee's] failure to negotiate and ultimately approve the [t]ransaction at the designated purchase price.

Id.

Here, as in <u>First Bankers Trust Services,</u> the defendant took a number of steps to ensure that it arrived at a fair market value. Nevertheless, questions remain about the relationships and motivations of the various parties, the "rigor" with which Wilmington reviewed SRR's evaluation, and the integrity of the negotiating process. Although no single piece of plaintiff's evidence is a smoking gun, he has presented sufficient evidence that Wilmington failed to act as a reasonably prudent fiduciary to defeat summary judgment at this stage. Accordingly, defendant's motion for summary judgment has been denied with respect to the § 1108(e) affirmative defense.

D. <u>Section 1106(b) Claims and Section 1108(b) Defense</u>

Section 1106(b) prohibits a fiduciary from acting "on behalf of a party . . . whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries" or receiving "any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." 29 U.S.C. § 1106(b)(2)–(3). An exception is once again found in § 1108(b), which provides that § 1106 does not apply to a transaction "[c]ontracting or making reasonable arrangements with a party in interest for . . . services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefore."

Plaintiff's argument is simple: Wilmington received a payment from Constellis, a party "dealing with" the ESOP. Therefore, it violated § 1106(b). This argument plainly ignores the exception in § 1108(b). Defendant bears the burden of proving that the fee it received from Constellis was "reasonable" in exchange for "services necessary for the establishment or operation of the plan." The record on this defense is not well-established at this stage. Material disputes remain about whether Wilmington's fee was "necessary" to establish the ESOP, or if it could have been financed some other way. Similarly, the record includes almost no evidence to

help the Court determine whether the fee was "reasonable," such as information about how much trustees typically earn in connection with transactions such as the 2013 Purchase and 2014 Sale. Without such evidence, the Court cannot conclude that either party is entitled to judgment as a matter of law, and both parties' motions for summary judgment with respect to § 1106(b) have been denied.

### E. Wilmington's Sixth Defense: Ignorance

Wilmington defends its inclusion of the ignorance defense in its answer by relying on its § 1108(e) defense—in other words, if there were circumstances that rendered the 2013 Purchase a bad deal about which Wilmington was ignorant, Wilmington claims the § 1108(e) defense is satisfied. Def. SJ Opp., Dkt. 194 at 30–31. In addition to being at best an inartful formulation of the law of § 1108(e), this defense is unnecessary. Wilmington adequately pleaded the § 1108(e) defense as "Defense One" in its Answer to the Third Amended Complaint. Dkt. 137 at 8. Preserving it through a separately pleaded ignorance defense is therefore redundant, and defendant has not argued that there is any other cognizable ignorance defense to a § 1106(a) claim. Accordingly, plaintiff is entitled to summary judgment with respect to the affirmative defense of "ignorance."

### F. Wilmington's Eighth Defense: Accord, Satisfaction, Wavier, and Release

There is no genuine dispute about the application of the defenses of accord, satisfaction, wavier, or release as to plaintiff Brundle, the only plaintiff currently in the case. Wilmington does not allege that any of those defenses prohibits Brundle from a recovery if liability is established; it merely argues that the defense should be preserved for any future class members who might join if liability is eventually established. Def. SJ Opp., Dkt. 194 at 30. Because granting plaintiff's motion for summary judgment on this defense as to Brundle will not

32

prejudice defendant's ability to raise the defense against proposed class members at a later date, plaintiff's motion as to this issue has been granted.

### III.      CONCLUSION

For these reasons, and those articulated in open court, defendant's Motion to Exclude Expert Testimony has been denied; plaintiff's Motion for Partial Summary Judgment has been granted in part and denied in part; and defendant's Motion for Summary Judgment has been denied.

Entered this 3ʳᵈ day of November, 2016.

Alexandria, Virginia

/s/ _____

Leonie M. Brinkema
United States District Judge