IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| TIM P. BRUNDLE, on behalf of the<br>Constellis Employee Stock Ownership Plan<br>and a class of other individuals similarly<br>situated,<br><br>          Plaintiff<br><br>     v.<br><br>WILMINGTON TRUST N.A., as successor to<br>Wilmington Trust Retirement and Institutional<br>Services Company<br><br>          Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) )<br><br>1:15-cv-1494 (LMB/IDD) |

## MEMORANDUM OPINION

Plaintiff Tim P. Brundle ("plaintiff" or "Brundle") is a former employee of Constellis

Group, Inc. ("Constellis"), and a former participant in an Employee Stock Ownership Plan

("ESOP") sponsored by Constellis. Defendant Wilmington Trust N.A. ("Wilmington") was the

trustee for the ESOP in connection with Constellis' creation of the ESOP. Creating the ESOP

involved purchasing 100% of Constellis' voting stock in December 2013 (the "2013 Purchase").

Less than a year after the ESOP was created, all its stock was sold (the "2014 Sale"). Plaintiff

alleges that the 2013 Purchase involved transactions and payments prohibited by the Employee

Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1106, resulting in the ESOP

paying an inflated price for the Constellis stock. Specifically, plaintiff alleges that the $4,235 per

share paid in 2013 was not the fair market value of such stock, resulting in the ESOP overpaying

for the stock by $103,862,000, see PTX[1] 512, which plaintiff seeks to recover for the ESOP.

---

[1] Throughout this Memorandum Opinion, plaintiff's trial exhibits are referred to as "PTX," and
defendant's are referred to as "DTX." PTX 512 is the summary chart of plaintiff's damages

Following a bench trial, and for the reasons that follow, the Court holds that Wilmington is liable for violating § 1106(a)(1)(A), causing $29,773,250 in damage to the ESOP, but not liable for violating § 1106(a)(1)(B) or § 1106(b).[2]

## I.   FINDINGS OF FACT

An ESOP is a form of employee retirement benefit plan "designed to invest primarily in securities issued by its sponsoring company." Donovan v. Cunningham, 716 F.3d 1455, 1458 (5th Cir. 1983). Under the terms of the Plan Document ("Plan") governing Constellis' ESOP, the participant employees would not immediately own the stock purchased by the ESOP. Rather, the stock would be held by a trust and allocated to employees over time, as an incentive to remain with Constellis. The Plan defines a year of service as 1,000 hours. DTX 120 at 28, 13. An employee begins to become vested in his shares at the completion of the second year of service, an amount that increases 20% per year until reaching 100% in the sixth year. Id. Alternatively, the employee would become fully vested upon reaching the designated retirement age while employed by Constellis. Id.

### A. Constellis Background

Thomas Katis ("Katis") and Matthew Mann ("Mann") founded Constellis' predecessor, Triple Canopy, Inc. ("Triple Canopy"), as a private security firm in the fall of 2003. Tr. at 1091:5–8. Troubled by the unsavory reputation of the private security industry at that time, they

---

expert. During the course of the trial, plaintiff's estimate of damages was adjusted downward. See infra Part III.

[2] This civil action began when Brundle and another plaintiff, Andrew Halldorson ("Halldorson"), filed their complaint on November 10, 2015. [Dkt. 1]. The Court ultimately granted defendant summary judgment as to Halldorson, because he had waived these claims in an agreement with Constellis. [Dkts. 95, 96]. Following a series of amended complaints, defendant moved for summary judgment, and plaintiff cross-moved for partial summary judgment. The Court granted plaintiff's motion in part and denied defendant's motion. [Dkts. 258, 261].

hoped to build Triple Canopy into a company that would be a source of pride for its employees, who were primarily retired members of the U.S. Armed Forces. Id. at 1095:20–22. Although the founders had a significant operational role at the outset, they began to step back in the spring of 2004, naming Ignacio Balderas ("Balderas") as Chief Executive Officer ("CEO"). Id. at 1092:8–14. Triple Canopy's primary clients were the U.S. Department of State ("DoS") and U.S. Department of Defense ("DoD"). Id. at 1094:23–24. Over the next several years, the company experienced steady growth, id. at 1095:13–14, landing a series of large contracts to provide security both for physical locations, known as "fixed site security," and for key personnel, known as "personal security," Tr. at 19:14–19. Triple Canopy also began to acquire other security firms. See id. at 1093:17–1094:3. These acquisitions led the company to reorganize itself into Constellis, which became the parent company, with Triple Canopy being its largest subsidiary. See id.

The first form of deferred compensation Constellis offered to its employees was an employee stock option program. See Tr. at 1099:5–13. Driven in part by a desire to monetize that program for the employees, in the fall of 2007 Constellis began considering an offer from Cerberus Capital Management to purchase the company. Id. Although the parties engaged in extensive negotiations, the deal fell through. In 2010, with no prospective sale on the horizon, Constellis cashed out its employee stock option plan as part of a restructuring and replaced it with a profit sharing plan that used Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA") as its benchmark. Tr. at 318:14–20.[3]

---

[3] EBITDA is a "way to . . . break the company's financial performance down to an earnings level." Tr. at 318:14–16.

The next serious offer to buy Constellis came in 2012, when the investment banking firm Teneo Holdings, Inc., attempted to broker a deal in which a private equity firm, Vestar Capital Partners ("Vestar"), would be the buyer. Although Vestar initially offered a price in the range of $340 to $350 million, it reduced its offer to $275 million as the closing date approached. Tr. at 1136:8–9. The deal fell through because of this last minute reduction, which Katis characterized as a "classic private equity move." Id. at 1100:6–12

By the end of 2013, Katis owned 31.1% of Constellis' outstanding stock, Mann owned 29.2%, Howard Acheson ("Acheson") owned 11.1%, John Peters ("Peters") owned 5.6%, and "other minority shareholders" held the remaining shares. PTX 2 at 14. Collectively, Katis, Mann, Acheson, and Peters are known as the "Sellers."[4]

**B. Considering an ESOP**

In June of 2013, Constellis board member Simon Crane ("Crane") approached its general counsel Juliet Protas ("Protas") about the possibility of forming an ESOP. Tr. at 1417:9–14. Several factors motivated Crane and the Sellers to consider this option. Katis believed that an ESOP provided him an "exit strategy" while being consistent with his vision of Constellis as a company focusing on taking care of its employees. Id. at 1418:16–22. Creating an ESOP is often driven by the shareholders' desire for liquidity, id. at 945:10–11, although Katis testified that he had no urgent need for liquidity when the Constellis ESOP was formed, id. at 1184:3.

Protas was receptive to the idea of an ESOP, in part because she had participated in a panel discussion with ESOP specialist Scott Meza of Greenburg Traurig LLP ("GT") a month earlier. Tr. at 1417:18–19. She took Crane's suggestion to Balderas, who authorized her to

---

[4] Other than Katis, all the Sellers were represented by trusts or other corporate entities. See PTX 265 at TED-002870–002879.

4

explore the idea. Id. at 1418:3–7. At GT's recommendation, Protas retained investment bankers

CSG International ("CSG"), including managing partner George Thacker ("Thacker"), to advise

Constellis on the prospect of an ESOP. Id. at 1421:9–11.

CSG prepared a series of PowerPoint presentations for the Sellers and Constellis

management about what an ESOP is and how to go about forming one. See PTX 626, 628. The

first, titled "Preliminary ESOP Structural Analytics" and dated September 25, 2013, explained

that the "Status Quo" left the shareholders with "no exit strategy" and that they were "limited to

dividends for liquidity." PTX 626 at 6. Under those circumstances, CSG reported that an ESOP

"optimizes results for all parties." Id. at 9 (emphasis in original). For the Sellers, this meant

creating an "attractive liquidity structure," optimizing "after-tax cash flow," receiving

"$307.8MM net of taxes over 6 years," retaining "control until fully paid," and participating "in

future growth/[mergers and acquisitions] opportunities." Id. (emphasis in original). CSG also

pointed out that by selling their shares to an ESOP, the Sellers would be able to roll over capital

gains taxes, saving 23.8% on federal taxes. Id. at 18. Employees would benefit through a

management incentive program and by obtaining equity in the ESOP. Id. at 9. Creating an

ESOP in 2013 would result in Constellis becoming a "tax-free business" beginning in 2014 and

receiving approximately $30 million through a tax refund for taxes paid in 2013; however, to

fully realize these tax benefits, an ESOP had to own 100% of the company's stock. Id.

CSG did not recommend a "traditional 100% ESOP." PTX 626 at 17. Instead, it

proposed "a more advanced 100% structure that CSG developed." Id. In this "more advanced"

ESOP structure, the Sellers would sell the ESOP 90% of their shares, and exchange the

remaining 10% for warrants, id., which Katis described as "equity-like," Tr. at 1173:15. The

warrants would be financial instruments entitling the Sellers to buy back equity in Constellis at a

designated price, known as the "strike price," during a certain period of time. See id. at 1173:19–21. Under CSG's proposed structure, the Sellers as warrant holders would retain significant elements of control over the company, most notably the ability to appoint a majority of the board of directors. Id. at 1603:21–22. Although the warrants would not create immediate value for the Sellers, eventually the sellers would be able to capture the warrants' value "by (1) selling the warrants back . . . in the future, or (2) selling the company." PTX 626 at 17. Under CSG's proposal, the Sellers would "control the company post transaction," giving them the "flexibility" to follow through on these options. Id.

In addition, because an ESOP rarely, if ever, begins its life with substantial assets, it is created by a heavily leveraged transaction in which the ESOP borrows the funds with which it buys the stock. Under the plan proposed by CSG, the Constellis ESOP was to borrow from the Sellers to buy their stock, meaning that the Sellers would also become the company's creditors. CSG pointed out that because the Sellers would "control the [b]oard," they would also "control the timing of payment" on that debt. Id. at 19. CSG even suggested that Constellis might take on new debt in order to pay down the seller notes more quickly. Id.

CSG's presentation stressed the after-tax benefits to the shareholders of selling Constellis to the ESOP, PTX 626 at 26, and the Court finds that these after-tax benefits for the Sellers were a major incentive for creating the ESOP. To highlight the advantages of an ESOP sale, CSG pointed out that to "match the $307.8MM in after-tax proceeds [to the Sellers], a traditional [mergers and acquisitions] transaction would have to" value Constellis at $421 million, which exceeded CSG's estimated valuation of Constellis by $100 million. Id. CSG continued to stress the benefit to the Sellers, reporting on September 26, 2013, one day after its preliminary presentation, that CSG had "looked at every possible scenario" and had not "seen any possible

6

alternative that produces more after tax cash than the ESOP." PTX 625.  Similarly, in a

presentation to the Sellers and Constellis' management team on October 4, 2013, CSG focused

on demonstrating the benefits to the shareholders of the proposed "advanced" ESOP.  PTX 628.

Immediately after the September 26, 2013, presentation, Constellis' management and the

Sellers decided to move forward with the proposed ESOP.  CSG had recommended that

Constellis hire Wilmington to act as the trustee for the ESOP.  Protas approved that choice after

speaking with Greg Golden ("Golden"), a vice president of Wilmington, discussing the choice

with Constellis' outside counsel, and conducting Internet research on Wilmington.  Tr. at

1422:24–1423:4.  Wilmington was chosen because Protas was impressed by her initial telephone

conversation with Golden and considered Wilmington to be a "household name."  Id.  Within

Wilmington, the Constellis transaction was overseen by the Fiduciary Services Sub-Committee

("FSSC"), which had four voting members for purposes of the Constellis transactions: Golden;

Jennifer Matz ("Matz"), who was a Wilmington vice president and chair of the FSSC; John

Lindak ("Lindak"); and Boyd Minnix ("Minnix").  The fifth FSSC member, Karen Bonn

("Bonn"), served as Wilmington's relationship liaison for Constellis and was therefore recused

from voting on matters related to the Constellis ESOP.[5]  See id. at 84:5–9.  Wilmington, in turn,

retained Taylor English Duma, LLP ("Taylor English"), to act as its legal counsel because that

firm was already on a list of approved law firms maintained by the legal team of Wilmington's

parent corporation, M&T Bank.  Id. at 326:7–15.  The Taylor English attorneys working with

Wilmington included corporate partners Denny Summers ("Summers") and Emily Horn

("Horn"), both of whom had worked on ESOP transactions for many years.  DTX 251, 252.

---

[5] For medical reasons, Bonn was unavailable to testify at trial.

Wilmington also needed a financial advisor, for which it turned to the firm of Stout Risius and Ross ("SRR"), which had extensive ESOP experience and had been on Wilmington's list of approved financial advisors since 2009. DTX 5 at 1. As of 2013, it had provided "valuation and advisory services to every major institutional ESOP trustee in the United States" and its ESOP practice included 15 full time professionals, including Scott Levine ("Levine") and Aziz El-Tahch ("El-Tahch"), who were the primary analysts tasked with the Constellis valuations. See id. at 1–2. Levine was a Certified Public Accountant ("CPA"), Accredited in Business Valuation ("ABV"), a Chartered Financial Analyst ("CFA"), and an Accredited Senior Appraiser ("ASA") with 18 years of experience who had performed roughly 1,500 ESOP valuations. Id. at 2. El-Tahch was a CFA with 12 years of experience who had conducted roughly 750 ESOP valuations. Id.

Although Constellis had no previous relationship with CSG or Wilmington, SRR, TED, CSG, GT, and Wilmington had worked with one another regularly. Records show that between 2010 and 2015, CSG was listed as the referral for more than 50% of Wilmington's ESOP projects. See PTX 159. SRR acted as Wilmington's financial advisor for 14 of those ESOPs. Id. As of the date Constellis engaged Wilmington, CSG had already referred 23 ESOPs to Wilmington. Id. GT had referred business to Wilmington on at least four occasions, and actually served as Wilmington's counsel in one instance. Id. SRR and Wilmington have worked together at least 25 times, id., and Matz could not recall Wilmington ever asking SRR to revise any of its valuation reports, Tr. at 1405:4–13.

For its services in connection with the 2013 Purchase, Wilmington charged Constellis a flat fee of $150,000, to be paid regardless of whether or not the ESOP transaction closed. Tr. at 335:19–23. If the transaction closed, Wilmington would also receive a minimum payment of

8

approximately $80,000 per year in fees for serving as the ESOP's ongoing trustee.[6] Id.
at 336:16.  Protas approved the fee arrangement, after consulting those familiar with the industry,
finding it to be reasonable in light of the overall amount at stake in the deal. Id. at 1423:18–21.
There is no evidence in the record suggesting that these fees were unreasonable and the Court
finds that they were reasonable.[7]

### C. Constellis' Value in 2013

A crucial step in forming an ESOP is to arrive at the fair market value of the stock that
the ESOP is going to purchase.  The "fair market value" is "the price at which the property
would change hands between a willing buyer and a willing seller, neither being under any
compulsion to buy or sell and both having reasonable knowledge of relevant facts." Estate of
Godley v. Comm'r of Internal Revenue, 286 F.3d 210, 214 (4th Cir. 2002) (internal citations and
quotation marks omitted).  It is a widely shared view, and the Court finds, that valuing closely
held stock is an "inexact science," see, e.g., Donovan, 716 F.2d at 1473, in which valuation
professionals commonly employ two basic methodologies, each of which incorporates a
substantial degree of latitude for "judgment calls" by the analyst, see, e.g., Tr. at 672:19–20;
823:6–9.

The first method, which all of the experts considered more useful in trying to value a
closely held corporation like Constellis, is the Discounted Cash Flow ("DCF") method.  See
PTX 1 at 53.  This method begins by estimating the company's projected cash flow far enough

---

[6] Because the ESOP was terminated after existing for just two quarters, Wilmington only earned
around $40,000 from these ongoing fees.  Tr. at 336:18–20.

[7] The money to pay Taylor English and SRR came out of Constellis' fee to CSG, rather than
from Wilmington, because Constellis was the sponsoring company.  See Tr. at 1342:18–20.  This
payment arrangement is typical when an ESOP is being created because the ESOP has to rely on
the sponsoring employer to fund the transaction.

into the future to arrive at the company's "terminal growth rate," or the rate at which it can plausibly be expected to grow indefinitely into the future. Id. at 54. That projection is then discounted by a number of factors designed to take into account current cash reserves and liabilities. Id. at 55. Because the DCF is calculated by default on a marketable, controlling-interest basis, additional discounts may be necessary to reflect the nature of the shareholder's stake. Id.

The second method, the Guideline Company Method ("GCM")[8] begins by identifying various publicly traded companies (the "guideline companies") that experience similar market forces as the company that is the subject of the valuation (the "subject company"). PTX 1 at 45. When conducting a GCM analysis, the goal is to identify a factor by which the subject company's EBITDA or revenue must be multiplied to estimate the company's total enterprise value (a "multiple"). Id. The first step in determining the subject company's multiples is to identify the guideline companies' multiples. Id. To calculate the guideline companies' multiples, each guideline company's stock price is used to derive an enterprise value for that company. See id. at 46. That enterprise value is then divided by the guideline company's EBITDA (or revenue) to arrive at the multiple. Id. at 47. By default, these calculations are made on a single share basis, and may be adjusted based on market forces. PTX 2 at 46. Once the multiples for the guideline companies have been identified, the risk that the guideline companies face is compared to any risks the subject company may have. Id. at 50. If the subject company is riskier than the guideline companies, lower multiples should be applied to the subject

---

[8] This method is sometimes referred to as the Guideline Public Company Method or the Comparable Company Method.

company's EBITDA and revenue to estimate an enterprise value for the subject company.  Tr. at

1216:13–20.  If the subject company is less risky, higher multiples are used.  See id.

The analyst must next determine how to reconcile the results of the DCF and GCM

methods.  All analysts agreed, and the Court finds, that it is preferable for these numbers to be

close to each other.  Tr. at 1534:19–22.  If they are not, some process must be used to merge the

two results into a single enterprise value for the company.  Once the enterprise value is

determined, the company's liabilities must be subtracted and any cash on hand added to arrive at

an equity value.  PTX 2 at 59.  The equity value may be discounted further to account for certain

business realities, such as a lack of control or a lack of marketability.  See id. at 60.  When the

final equity value has been reached, that number is divided by the number of outstanding shares

to arrive at a per share value for the stock in question.  Id. at 61.

SRR was the second valuator to calculate a fair market value for Constellis' stock in

2013.  The first was Andy Smith ("Smith") of the McLean Group ("McLean"), who had been

performing an annual valuation of a single share of Constellis stock for at least the three

preceding years.  See PTX 1, 4, 5.  Constellis used the McLean reports to price employee stock

options and for financial reporting purposes.  Tr. at 536:17–19.  The 2013 McClean report

provided a valuation of Constellis as of January 31, 2013, incorporating only information that

was "known and knowable" as of January 31, even though the report was not completed until

June 19, 2013.  Tr. at 652:16–19.  Smith performed both a DCF and GCM evaluation, although

he found the guideline companies to be so different from Constellis that he did not ultimately

give the GCM result any weight in his final valuation.  See Tr. at 655:1–23.  This approach was

consistent with his habit of performing both evaluations and then choosing the more reliable,

except where the two results were relatively close.  Id. at 655:14–19.

11

In performing his DCF analysis, Smith relied on "management's prepared forecasts" which only covered "the remaining 11 months of 2013 to 2014." PTX 1 at 54. In using those projections to arrive at an enterprise value, Smith had to calculate a "weighted average cost of capital" ("WACC"), which is used to discount projected cash flows. Id. at 55. Smith calculated a WACC of 15%, in part by factoring in a "Specific Company and Industry Risk Factor" of 7%. Id. Smith acknowledged that a 7% risk is relatively high, but he felt it was necessary because "Constellis represents more of a risk to potential investors than that of the sector as a whole," in large part because of its "heavily concentrated contract backlog." Id. at 57. Given that a high percentage of Constellis' revenue was tied up in a small number of contracts primarily involving two government agencies, the Court finds that it was reasonable and prudent for Smith to adjust his valuation downward due to the company's performance being so highly dependent on the continued performance on those few contracts. Factoring in the 15% WACC, Smith estimated Constellis' enterprise value to be $213,397,018. Id. at 10. After adding in cash and subtracting debt, he calculated Constellis' equity value at $165,015,140. Id. This resulted in an estimated fair market value of $1,838.11 per share for the voting stock and $1,746.20 for the non-voting stock after further discounting for lack of control[9] and lack of marketability. Id.

Less than one year later, SRR produced a draft evaluation, dated November 14, 2013. PTX 170. Using the same basic approach used by McLean but differing in the details, that evaluation concluded that the fair market value range for a single share of stock on a controlling interest basis was between $3,865 and $4,600. Id. at 35. One of the most significant differences between the two valuations was that SRR factored both the GCM and DCF methods into its final conclusion, and added a 10% control premium to the comparable company multiples in its GCM

_____

[9] Smith did not discount voting stock for lack of control. PTX 1 at 10.

analysis.  According to SRR, adding a control premium was appropriate because the ESOP would hold 100% of the stock and have some rights typically associated with being a majority shareholder.[10]  See PTX 2 at 116.  SRR chose multiples for Constellis that were at or below the low end of the range produced by the guideline companies' multiples for EBITDA, but mostly above the median for revenue.  PTX 170 at 24.  This produced a range of enterprise value from $290 million to $345 million.  Id.

Like McLean, SRR's DCF analysis began by adopting management projections.  See PTX 170 at 26.  According to SRR and Wilmington, Constellis had a relatively "robust" process for developing projections.  Tr. at 1378:19–25.  Both lauded the "bottoms up" approach that Constellis used, id. at 1257:17, meaning that the projections were developed by looking at each contract or prospective contract, and giving the contract one of three designations: "backlog," for an awarded contract upon which more revenue was due; "option," for contracts that Constellis had the option to obtain; or "pipeline," for contracts for which Constellis was planning to submit a proposal and anticipated a non-trivial chance of winning.  Id. at 1354:22–1355:5.  The process was overseen by Raymond Randall ("Randall"), who was then Constellis' Senior Vice President for Strategic Initiatives, and who reported to Magnani.  Id. at 1353:16–17; 1355:11.

Constellis gave SRR projections that extended to the year 2018, as opposed to the one year of projections that McLean received.  In these projections, Constellis advised SRR that it expected EBITDA of $67.5 million for 2014, compared to the $52.2 million figure it had given McLean.  Compare PTX 170 at 26, with PTX 1 at 59.  SRR considered those projections to be

---

[10] The appropriateness of applying a control premium was hotly disputed, and will be discussed in the Conclusions of Law section below.

"conservative," both because of the method Constellis used and because historical data showed that Constellis had beaten its projections almost every year. Tr. at 1204:9–22; 1517:2–6.

SRR also differed somewhat from McLean in how it calculated the WACC discount rate. Of particular significance, SRR used a metric called "beta" to assess the risk of Constellis relative to that of the industry overall. PTX 170 at 27. A beta of 1.0 would mean that Constellis faced the same risk as the industry as a whole. See Tr. at 388:9–16. A lower number meant Constellis was less risky, and a greater number meant Constellis was more risky. See id. SRR chose a beta of 0.7, reflecting its belief that Constellis was a less risky investment than other companies in the industry. PTX 170 at 27. SRR's overall WACC was 11.5%. Id. Using these numbers, SRR's enterprise value range under the DCF method was $290 million to $322 million. Id. at 35.

Like all the experts in this case, SRR felt that the DCF method was better suited to valuing a closely held corporation like Constellis. Accordingly, it gave the DCF value twice the weight of the GCM result. See PTX 170 at 35.[11] As a result, SRR concluded that Constellis' enterprise value ranged from $275 million to $330 million. Id. After adding cash and removing debt, Constellis' equity value was found to range between from $283 million and $338 million. Id. SRR then applied a 5% discount for lack of marketability.[12] Id. Although there was no readily accessible market for Constellis' stock, ESOP participants would be able to exercise a "put" option to sell the stock back to the company, which SRR felt justified a small discount.

---

[11] Specifically, SRR weighted the DCF value at 67% and the GCM value at 33% in its November draft report. PTX 170 at 35 n.[a]. In the final version in December, SRR did not specify exactly what percentage it weighted the DCF value, and Wilmington's own expert could not recreate it. Tr. at 1543:1–3.

[12] On cross-examination, Smith agreed that a 5% discount for lack of marketability is usually appropriate for an ESOP.

SRR concluded that the range of fair market value of equity was $256 million to $305 million, with the median being $281 million. PTX 170 at 35. Divided equally among the number of shares outstanding, SRR found the fair market value per share to range from $3,865 to $4,600, with the median fair market value of equity per share being $4,232.50, which SRR rounded up to $4,235. See id.

Each party called a financial expert to testify concerning SRR's work. Dana Messina ("Messina"), plaintiff's expert, is the Chief Executive Officer of Kirkland Messina, a financial services firm. Tr. at 693:13–21. He holds a Master's in Business Administration from the Harvard Business School, PTX 152 at 33, has 25 years of experience providing business valuations in ESOP transactions, Tr. at 694:2–13, and has consulted for the Department of Labor in over 100 investigations, id. at 696:7–12. Jeffrey Tarbell ("Tarbell"), defendant's expert, is a director of the financial services firm Houlihan Lokey and a Co-Head of their ESOP Valuation practice. DTX 232 at 5. He holds a Master's in Business Administration from the University of Chicago and the ASA and CFA accreditations. Id. He is currently vice chair of the Business Valuation Committee of the American Society of Appraisers and is the immediate past chair of the Valuation Advisory Committee of the ESOP Association. Id.

### D. Wilmington's Evaluation of the Constellis ESOP

The Court finds that Wilmington rushed its evaluation of the Constellis ESOP, failed to follow its own policies, and failed to adequately vet SRR's conclusions.

Wilmington had scheduled a meeting to discuss the November 2013 SRR valuation report for Thursday, November 14, 2013 at 1:00 p.m. Although Wilmington's policy called for receiving any valuation report at least 48 hours in advance of any meeting scheduled to discuss the report, Tr. at 72:10–18, SRR's November 2013 Report was not forwarded to the FSSC until

4:58 p.m. on Tuesday, November 12, and not all members of the FSSC had reviewed the entire

draft before the meeting with SRR. Golden testified that he did not need to review every part of

the report because he had already seen Constellis' audited financial statements as well as a

Confidential Information Memorandum ("CIM"), which included much of the raw data

underlying SRR's analysis. Tr. at 98:16–99:3. Matz's testimony about whether she reviewed

the entire report before the meeting was inconsistent, and the Court finds her original answer at

her deposition when she testified that she could not specifically recall reading the report more

credible than her contradictory trial testimony.[13] Id. at 1400:15–1401:17.

   Both Golden and Matz took handwritten notes at the November 14 meeting, which was

conducted by conference call. See PTX 173; 174. Each relied heavily on those notes when

asked to discuss what occurred at the meeting, and neither had any specific recollection beyond

what was preserved in the notes. Those notes showed that SRR discussed several features of its

report, including Constellis' growth and diversification efforts; SRR's conclusion that the

projections provided by Constellis' management were "conservative," PTX 174 at 2; the

management role of the founders; Constellis' proposed acquisition of CGI Group and Strategic

Social, LLC; the 2012 Vestar offer to buy Constellis, which SRR reported as having involved a

$338 million enterprise value;[14] an audit by the Defense Contracting Auditing Agency

---

[13] Lindak was not specifically asked if he read the entire document, and Minnix did not testify.

[14] On the morning of the November 14 meeting, Timothy Ma ("Ma") of CSG emailed El-Tahch to advise that "the projections sent for the Vestar proposal were more aggressive for the purposes of putting the company in a better light;" however, Ma reassured El-Tahch that "[p]rojections for the ESOP are more realistic and frankly, conservative." PTX 221 at 1. El-Tahch responded that this was "typical for companies going through a sales process." Id. Even though SRR's report pointed to the Vestar offer as a data point supporting its valuation, El-Tahch did not advise Wilmington that the projections underlying the Vestar offer were "more aggressive." Tr. at 1335:20. SRR also did not include the lower number Vestar finally offered after due diligence, instead saying that the Vestar acquisition fell through "due to Vestar's inability to

("DCAA") for overbilling by $62 million; and the valuation conclusions that SRR reached in its draft report. Id. at 2–4.

Once El-Tahch finished presenting SRR's report, members of the FSSC asked a number of questions about SRR's analysis. A non-voting FSSC member asked about the financing terms for the ESOP transaction. PTX 174 at 5. Lindak inquired about how Constellis' projections incorporated risk. Id.; Tr. at 1487:10–15. He also asked whether the different types of outstanding stock were treated differently for purposes of the control premium (they were not). PTX 174 at 5. Summers asked about the DCAA audit, and was assured that Constellis was confident that it would not be liable for having to repay $62 million, in part because Constellis believed that the statute of limitations had run on some claims. Id. at 6. Matz asked whether there was a chance that Constellis' planned acquisitions of CGI and Strategic Social could fall through, and El-Tahch advised that they were "advanced but could always fall through." Id. He assured her that if that happened, the transaction price would not "fall out of [SRR's] range." Id. A question was asked about who formulated the projections, and El-Tahch responded that it was independent management rather than the Sellers. Id.

By the November 14 meeting, Golden admits that he knew that another firm had prepared a valuation of Constellis in 2013. See Tr. at 120:23–121:6. Even so, no one from Wilmington asked to see the McLean report. See id. at 121:14. In fact, Golden could not even say that anyone from Wilmington had asked basic questions about the McLean report, including who performed it, when, and what methodology it employed. See id. at 121:7–14.

---

secure sufficient financing." PTX 2 at 27. There is no evidence in this record of anyone from Wilmington asking about the Vestar offer.

17

At the meeting, Wilmington also held a discussion about how to proceed with the deal. The FSSC decided that it would seek a special indemnity from the Sellers for the full amount of the potential DCAA audit liability, notwithstanding Constellis' assurances that it was unlikely to have to pay anything. Tr. at 1013:8–14. With that proviso, the FSSC authorized Golden, Bonn, SRR, and Taylor English to carry out negotiations on a price per share within a range of $3,900 to $4,235. PTX 174 at 7. There is nothing in any of the Wilmington officials' notes reflecting any questioning about the range of share prices SRR presented or about how to negotiate an appropriate price. In terms of timing, SRR noted that minority shareholders had to be given a tender offer at least 20 days before closing. Between that requirement and the December 31 deadline for being eligible to obtain the tax advantages for 2013, there was a relatively short window in which to agree on a price with Constellis and extend the tender offer. PTX 174 at 1; DTX 51 at 1.

Constellis and CSG sent their opening position of $4,525 per share, a figure just $75 below the maximum of the range calculated by SRR, on Wednesday, November 13, 2013, a day before Wilmington's meeting. Negotiations over the price and term sheet began in earnest on Friday, November 15, 2013, the day after Wilmington's meeting with SRR. Throughout those negotiations, Constellis was represented by CSG's Thacker, and Wilmington communicated with Thacker only through representatives from Taylor English, although the lawyers spoke with Golden and Bonn to develop a negotiation strategy. Wilmington's opening bid was $3,900, the bottom of the range it was willing to pay. DTX 56 at TED016013. Thacker replied at 3:02 p.m., proposing that the parties "come to an agreement on the per share value" while Constellis and CSG worked on their response to the term sheet "because the tender offer documents are scheduled to go out next Monday." PTX 50 at 8. In the same email, he lowered Constellis'

18

asking price to $4,350 per share. Id. Sometime shortly after this email, someone from Wilmington's team proposed a price of $4,100 per share, to which Thacker responded with $4,250 as the per share price, remarking that "in the interest of time," Wilmington should respond to the share price "while the term sheet is being finalized." Id. at 7. At 4:50 p.m., Wilmington rejected $4,250, informing Thacker that its "best and final offer" was $4,235 per share and requiring that "the period during which the Warrant Holders can control the Board of Directors . . . be limited to 12 years." Id. at 6. Thacker accepted the share price on behalf of Constellis at 4:59 p.m. Id. at 5–6.

The parties did not reach a final agreement on the complete term sheet until Friday, November 22, 2013. In the final version, the warrants were divided into two series, with "Series A" expiring at the end of ten years and "Series B" expiring at the end of 15 years. PTX 50 at WT_709. Only the holders of the Series A warrants were entitled to designate members of the Constellis board of directors. Id. at WT_710. According to the term sheet, the strike price of the warrants was to be set at "no less than 90 percent of the post-transaction fair market value per share." Id. at WT_709. By email, Thacker assured Wilmington's team that Constellis would be using 100% of the fair market value as the strike price, and that "a higher strike price is more beneficial for the Trustee." Id. at 2.

Under the terms of the transaction, Constellis agreed to adopt a "management retention plan." PTX 50 at WT_710. Essentially, this meant that it would pay a cash bonus to certain key members of the management team if they agreed to stay on for a set period of time following the transaction to ensure continuity of management, which would be a benefit to the ESOP as the new owner of Constellis. The final term sheet did not specify how long management would need to stay to earn the bonus, a change from an earlier version that would have required staying on

19

for 36 months. Compare PTX 50 at WT_710, with DTX 56 at TED016019. It was "anticipated" in the term sheet that the management incentive plan would be paid in cash and would be worth 5% of the transaction price in total, meaning that the amount paid to management was linked to the overall sale price. See PTX 50 at WT_710.

On top of the cash bonus, the term sheet authorized Constellis to issue stock appreciation rights ("SARs") to management. PTX 50 at WT_710. Although the exact group of people eligible for SARs was to be determined later, the Sellers were prohibited from participating in the SARs program. PTX 50 at WT_710. When the transaction closed, there was no guarantee that the SARs would be issued or exercised. Nevertheless, the SARs were to be an incentive to "help management get to" Constellis' projected growth levels, Tr. at 156:25, and the Court finds that all parties expected the SARs eventually to be issued.

Finally, the Sellers and Constellis agreed to include "reasonable commercially acceptable and customary representations and warranties[.]" PTX 50 at WT_711–12. For most potential breaches, the aggregate amount of the indemnification would be capped at "30% of the Transaction Price for actual loss due to breach of representation and warranties through setoff of the Seller notes." Id. at WT_712.[15] In other words, the ESOP would only be reimbursed for a breached warranty for an amount up to 30% of the total purchase price. Id. Moreover, the ESOP would only receive cash as compensation for a breached warranty if the value of any resulting injury exceeded the balance of the debt owed to the Sellers; otherwise, it was to be compensated by reducing the amount owed to the Sellers. Id. Notwithstanding the general 30% cap, the

---

[15] The setoff provision applied even if Constellis assumed the Seller notes, which it later did. See PTX 50 at WT_712.

Sellers agreed to indemnify the ESOP trust for the full amount of any liability arising from any "adverse outcome in the DCAA matter." Id.

### E. The 2013 Purchase

The tender offer issued on Monday, November 18, 2013, four days after Wilmington's meeting with SRR, with December 20 set for closing. SRR issued a complete opinion on the fairness of the transaction, including a revised valuation of the stock, in the days leading up to the closing.[16] That December 2013 report contained several revisions from the November draft. By December, Constellis' proposed acquisition of CGI had fallen through. As a result, projected revenues had declined. Tr. at 472:11–13. The second major change related to outstanding stock options. In November, SRR had assumed that nearly all people holding stock options would exercise them before the transaction closed, see Tr. at 415:7–12, diluting the value of the company by $4.5 to $5.9 million, PTX 170 at 35. By December, it was clear that far fewer people had actually done so, Tr. at 1262:8–9, reducing the range of dilution to $300,000 to $400,000, PTX 2 at 61. These changes largely balanced one another out in the final valuation reconciliation. In the end, the GCM enterprise value range was unchanged, and the DCF range shifted downward by $2 million at the low end and $8 million at the high end. Compare PTX 2 at 61, with PTX 170 at 35. This brought the concluded enterprise value range down to $275 million to $325 million. Compare PTX 2 at 61, with PTX 170 at 35. Instead of providing a revised median market value on a per share basis, the December report simply repeated the agreed upon purchase price of $4,235. PTX 2 at 61.

---

[16] The fairness opinion was formally dated December 20, 2013, the same day the transaction closed, but SRR circulated it on December 18, 2013. PTX 2; DTX 97.

Key numbers from the 2013 McLean and SRR reports discussed above are summarized

in the following table:

| Valuation Metric | McLean January 2013 | SRR November 2013 | SRR December 2013 |
|---|---|---|---|
| GCM Enterprise Value | n/a | $290 to $345 million | $290 to $345 million |
| DCF Enterprise Value | $213,397,018 | $267 to $322 million | $265 to $314 million |
| Concluded Enterprise Value | $213,397,018 | $275 to $330 million | $275 to $325 million |
| Marketable, Controlling Interest Value of Equity | $165,015,140 | $283 to $338 million | $279 to $329 million |
| Fair Market Value on a Per Share Basis[17] | $1,838.11[18] | $3,865 to $4,600 | $3,865 to $4,555 |

Incorporating those changes, SRR opined that

> the consideration to be paid by the ESOP for shares of Class A Common stock
> pursuant to the terms of the ESOP Purchase is not greater than Fair Market Value of
> such shares; the interest rate[s][on the debt the ESOP was to take on] . . . are not in
> excess of a reasonable rate; the financial terms . . . are at least as favorable as would
> be the financial terms of a comparable loan resulting from arm's-length negotiations
> between independent parties; and the exercise price of the Warrants, on a per share
> basis, is at least equal to 90% of the Fair Market Value of the underlying common
> stock on a per share basis; and the terms and conditions of the Transaction, taken as a
> whole, are fair to the ESOP from a financial point of view.

DTX 111 at 4.

El-Tahch sent the draft of the report to the FSSC at 4:06 p.m. on December 18.  DTX 97.

Again, less than 48 hours after receiving that 125-page report, on December 19, 2013, the trustee

team held a final meeting with SRR to discuss the fairness opinion.  The meeting lasted only half

---

[17] For the McLean valuation, the per share value is on a single share basis.  For SRR, it is
calculated for a controlling interest.

[18] This reflects McLean's value for voting stock, rather than non-voting stock, because the ESOP
ultimately purchased Class A voting stock.  See DTX 111 at 4.

22

an hour, and FSSC members asked very few questions.[19] DTX 106; 107; see also Tr. at 185:4–5.

Indeed, Lindak did not even attend the meeting. Tr. at 1491:23. At the conclusion of this

meeting, the FSSC approved the 2013 Purchase. Tr. at 1381:20–21.

On December 20, 2013, the 2013 Purchase closed. The parties have stipulated that the

ESOP purchased purchased 47,586.55 shares of Class A Common Stock at $4,235 per share,

DTX 112 at 1, 8, making the total purchase price $201,529,032.77. [Dkt. 139] at 3. The Stock

Purchase Agreement ("SPA") provided that the Sellers would exchange the remainder of their

stock for warrants, making the ESOP the owner of 100% of Constellis' outstanding stock. DTX

112 at 1, 28–29. The funding for the 2013 Purchase came from three sources: approximately

24% from a cash contribution from Constellis, approximately 7% from a loan from Constellis,

and approximately 69% from a loan from the Sellers. PTX 2 at 7. On December 27, the parties

refinanced the transaction, DTX 118, with Constellis assuming the ESOP's debt to the Sellers,

and the ESOP executing a note in favor of Constellis for that amount. PTX 2 at 8.

Consistent with the term sheet, the SPA contained a series of representations and

warranties, which were divided between those made by the Sellers and those made by Constellis.

See DTX 112 at 8–25. Significantly, it was Constellis, not the Sellers, that represented to the

ESOP that "there has not been any event or condition of any character that has or would be

reasonably expected to have a Material Adverse Effect"[20] on the company. Id. at 11. By

contrast, the Sellers made no warranty about the accuracy of Constellis' financial projections.

---

[19] Golden's notes reflect very few interruptions of SRR's presentation. DTX 107.

[20] A "Material Adverse Effect" was defined as "any change, circumstance, fact, event, condition, or effect that is, or would reasonably be expected to result in a change adverse to the business, prospects, financial condition, assets or results of operations of the Company and its Subsidiaries, taken as a whole, in excess of $1,500,000," excluding events that affect the entire market or industry. DTX 112 at 5.

The Investor Rights Agreement ("IRA"), executed at the same time as the SPA, essentially enabled the Sellers to maintain control of Constellis by providing that, out of a five-member board of directors:

> [F]or so long as all of the Series A warrants have not been exercised or terminated, the holders of at least 51% of the outstanding Series A Warrants shall have the right to designate three of the members of the Board, and to select the replacement Board member in the event of the resignation, death or incapacity of any member of the Board designated by such holders[.]"

DTX 115 at 6. A fourth director would "be independent from management of the Company, who shall be selected by the remaining members of the Board[.]" Id. In short, under the IRA, the ESOP had the power to appoint only one member of the board. The IRA provided that the warrant holders could not exercise their power in a way that caused "the Trustee to violate its fiduciary obligations under ERISA," but did not identify any specific mechanism by which the trustee could stop the designation of a board member if it felt that its obligations under ERISA were in danger of being violated. See id.[21]

It was extremely unusual for the warrant holders to be able to appoint a majority of the board members when the ESOP held 100% of the company's shares. Smith testified that he knew of only one other ESOP that owned 100% of the shares but did not have a majority of the board of directors, and that the Department of Labor had opened an investigation into that case. Tr. at 619:25–620:2.[22] Indeed, Constellis' own counsel, Marc Baluda ("Baluda") of GT, sent an email to Protas and Thacker, among others, in November asking how many board members they envisioned after the transaction. PTX 242 at CSG027460. He observed that "warrant holders

---

[21] Similarly, the IRA required Wilmington to vote its shares as necessary to appoint the Sellers' designated board members "[s]ubject to [its] fiduciary obligations under ERISA or as otherwise required by law[.]" DTX 115 at 5.

[22] Smith is advising the Department of Labor in that case. Tr. at 619:25.

24

nor[m]ally have the right to appoint a minority, so two of five, three of seven, etc." Id. Thacker replied that in CSG's deals, warrant holders have "been given the right to appoint a majority." Id. He explained that this was "how they retain operational control over the company until they've been paid." Id.

The ESOP's lack of control was further reflected in the plan document ("Plan"), which directed Wilmington to "vote all Employer Securities held by it at such time and in such manner as the Administrator [i.e., Constellis] decides[.]" DTX 120 at 46. The Plan identified several exceptions to that requirement, with the most relevant being for a "merger or consolidation, recapitalization, reclassification, liquidation, dissolution, sale of substantially all assets of a trade or business, or such similar transaction as may be prescribed in Treasury regulations." Id. Golden and Summers agreed that a sale of the company, as opposed to a sale of its assets, was not covered by this exception. Tr. at 249:24–250:1; 1041:14–16. Therefore, under the Plan Wilmington had no authority to break from Constellis' instructions when voting on a sale of the company.

A companion document, executed to establish the trust to hold the ESOP's assets (the "Trust Agreement"), further outlined the trustee's duties. According to § 3.03 of the Trust Agreement, the trustee had to vote, tender, and exchange the stock it held on behalf of the ESOP "in the manner set forth in the Plan . . . and consistent with its duties described in Section 2.03 herein." DTX 121 at 9. Section 2.03, in turn, provided that the Trustee must perform its duties "in accordance with the terms of the Trust Agreement to the extent, in the good faith judgment of the Trustee, that the Trust Agreement is consistent with the provision of the [Internal Revenue] Code and ERISA." Id. at 3.

25

Read together, the Plan, the Trust Agreement, Triple Canopy's by-laws, and the IRA[23] did not provide a clear avenue for relief if the trustee felt that directions from Constellis with respect to a sale of the company were in tension with its ERISA obligations. When asked how the ESOP might go about stopping an action by the board of directors given its minority position, if Wilmington felt the action was inconsistent with ERISA, Protas admitted that the only recourse would be to "file a lawsuit to fight about it." Tr. at 1448:6–8. As a practical matter, she continued, "I guess [the board] could do anything." Id.

**F. Developments in Early 2014**

Constellis experienced a number of setbacks at the beginning of 2014, the most significant of which related to a contract with DoS to provide fixed-site security in Iraq. The umbrella contract, known as the Worldwide Protective Services ("WPS") contract, was divided into task orders. Constellis had been awarded a $300 million task order to provide security in Basra, Iraq. DTX 2 at 17. The incumbent protested that award, and in January 2014 the DOS rescinded the award and requested new, best and final offers from Triple Canopy and its competitor. Id. This change both reduced Constellis' projected revenue from the contract by over $100 million and pushed that revenue further into the future. Id.

---

[23] The IRA did give the ESOP certain powers beyond those of an ordinary shareholder. Most significantly, Wilmington as trustee was entitled to obtain certain proprietary financial information not generally available. DTX 115 at 5. This included "such regularly prepared annual financial reports . . . and projections provided to its senior lender and/or to such independent appraiser as may be retained from time to time to enable the Company to meet the obligations imposed by [the Internal Revenue Code] . . . and . . . such other financial information as the Trustee reasonably requests from time to time," id.; however, Wilmington could not require the company to "prepare additional information to comply" with a request. Id. Finally, the IRA capped the compensation for certain investors and management personnel. Id. at 4.

Another major development in 2014 involved Constellis' sub-contract on the Kuwait Base Operations Security Support Services ("KBOSSS") contract, which involved providing fixed-site security at two military bases in Kuwait. DTX 2 at 17. In February 2014, the prime contractor, Exelis Inc., informed Constellis that it planned to hold a competition to fill the sub-contractor role that Constellis had been expecting to fill. Id. This development also reduced Constellis' projected revenues by tens of millions of dollars. Id.

Constellis suffered a number of smaller problems, including the DoS making a formal demand for payment of $62.2 million in connection with the DCAA audit. DTX 2 at 18. Although Constellis planned to defend against that demand, eventual liability seemed more likely. See id. Even though the ESOP had successfully negotiated an indemnification for the full amount of any ensuing liability, that amount would have to be set off against the Seller notes rather than being paid to the company in cash. See id. Consequently, as SRR observed in the summer of 2014, "repayment of the claim would negatively affect [Constellis'] operating liquidity." Id.

Two other developments contributed to the inauspicious beginning of 2014 for Constellis. First, Constellis lost its bid for a $338 million contract to provide protective services in Germany. DTX 2 at 18. The company persuaded the DoD to rescind its award to a competitor and reopen discussions with Constellis, but management put the odds of winning this contract no higher than 33%, and probably lower than that. Id. Second, the DoD informed Constellis that it would be terminating a contract to provide security to a U.S. Marine Corps base in Afghanistan, Camp Leatherneck, four months earlier than anticipated. Id. This decision reduced Constellis' backlog for 2014 by several million dollars. Id.

27

### G. The ACADEMI Sale

As this bad news was breaking, in February 2014, Katis was contacted by Jason DeYonker ("DeYonker"), the founder and managing partner of Forté Capital Advisors ("Forté"), who was interested in buying Constellis. Tr. at 1118:18–24. Forté owned ACADEMI, which was formerly known as Blackwater, a major competitor of Constellis in the private security market. Id. at 1221:10–14; 1119:16–21. DeYonker's interest in Constellis had been piqued by the press release announcing Constellis' sale to the ESOP. Id. at 1118:18–24.

Katis initially balked at the idea of selling Constellis to ACADEMI, in part because there was bad blood between the two companies. Not only had Katis and Mann founded Constellis in an effort to combat the bad reputation that Blackwater had given the industry, the two companies openly feuded for years. Tr. at 1119:16–21. Katis believed that Blackwater had used unfair tactics in competing against Triple Canopy and Constellis. Id. at 1119:22–25. DeYonker managed to convince Katis that ACADEMI had changed under new leadership. Id. at 1120:1–15. In Katis' words, DeYonker and his partners had come in "and bought the ashes of what had been Blackwater," bringing "not only new investors but a whole new board and a whole new management team." Id. at 1120:10–15.

Katis approached Constellis' senior management team with the overture. After overcoming initial skepticism from Balderas, they agreed that selling to ACADEMI was in the best interest of the company. Tr. at 1124:7–1125:18. Both Katis and Protas thought the deal would generate significant business benefits for both companies. See id. at 1122:20–1124:3; 1440:18–22. By selling itself to ACADEMI, Constellis would gain access to a training facility, a skilled group of board members and advisors, and "incredible access to capital[.]" Id. at

28

1440:18–22.  Management believed that the two companies "would be so much stronger together than apart," and together they could "become the leader in the industry." Id. at 1440:23–1441:2.

Once management signed off on the idea of the sale, negotiations over the terms began. ACADEMI's initial offer was a total purchase price of $230 million, with no consideration going directly to the ESOP because of the "significant amount of leverage outstanding from the Original ESOP Transaction." DTX 2 at 15.  After some negotiation with Constellis, ACADEMI sent its first formal letter of intent on March 24, 2014.  Id.  In this offer, the purchase price went up to $283.3 million, with $10 million in cash going to the ESOP.  Id. at 16.  At this point, Constellis executed the letter of intent.  Id. at 15.  The Sellers initially believed they could sell Constellis without the ESOP's approval, but ACADEMI insisted on getting the ESOP's approval.  Tr. 861:3–6.  Once the March 24 letter was executed, Constellis shared it with Wilmington.  DTX 2 at 15.  The next day, March 25, Constellis retained Wilmington to act as the ESOP's transactional trustee for the 2014 Sale.  PTX 262 at 1.[24]

Wilmington held its first meeting to discuss ACADEMI's offer on April 8, 2014, which Golden, Bonn, Levine, El-Tahch, Summers, and Horn attended.  Tr. at 486:15–18.  At the meeting, Wilmington and its advisors asked what would happen if they did not want to sell. DTX 139.  Although Golden could not recall the answer to the question, he testified that he supposed there would be tension with the board, which wanted to move forward with the ACADEMI sale and would not be happy if Wilmington interfered with the transaction.  Tr. 487:21–488:12.  The trustee team went on to discuss the setbacks that Constellis had experienced since the beginning of 2014.  Id. at 487:1–2.  All members of the FSSC, except for Lindak, met

---

[24] Although the agreement is dated March 25, Golden did not sign it on behalf of Wilmington until May 16, 2014.  PTX 262 at 7.

on April 10, 2014, for Golden's update about the offer.  Id.  At that meeting, "Golden noted that

[Constellis] will have a problem if Wilmington Trust declines the acquisition offer," and that

Constellis could "decline or terminate working with" Wilmington if it failed to approve the sale.

DTX 142.[25]

The trustee team met with Constellis' management on April 18, 2014. DTX 145.  At that

meeting, El-Tahch pressed Constellis about whether it had any indication of the troubles it was

about to experience as of December 20, the date of the ESOP purchase.  DTX 145 at 1.  Protas

was "adamant that they did not know of the risks."  Id. at 6.

Ultimately, Wilmington concluded that $10 million was not sufficient consideration to

the ESOP.  Over the next three rounds of negotiation, Wilmington managed to double that figure

on behalf of the ESOP.  See DTX 2 at 16.  In the letter of intent executed by the trustee on May

5, the total purchase price increased to $288.3 million, with $20 million to be paid in cash to the

ESOP.  Id.  In addition, the Sellers agreed to reduce the amount owed to them on the Seller notes

by $33 million.  Id. at 15.  The terms of the sale also provided that the ESOP participants would

become 100% vested once the sale occurred, a benefit at least to those participants who were

contemplating leaving the company before reaching the six year mark for full vesting or

retirement age.  Tr. at 1251:18–1252:1.

Multiple members of the trustee's team expressed discomfort with how quickly the

ACADEMI sale followed on the heels of creating the ESOP.  Summers testified, "I thought one

of the questions that would come up would be why the sale took place so soon after the ESOP

transaction. . . . And I know that some of the folks at Wilmington wanted to know that and had

concerns in trying to understand why this would even be considered so quickly after the ESOP."

---

[25] Although the ESOP owned Constellis' stock, it was still possible for Constellis to fire
Wilmington as trustee because the Sellers retained control of Constellis' board.

Tr. at 991:1–7. According to Matz, she "was concerned because the ESOP had just been established in December, and . . . any benefit plan is supposed to be a long-term benefit, not something you set up and terminate in a matter of months." Id. at 1385:15–18. Golden testified that he understood that if an ESOP is "open for less than two years, it can, you know, cause it to be looked at a little bit closer." Tr. at 272:13–15. Driven in part by these concerns, Wilmington sought a formal opinion letter from Taylor English as to whether the ESOP met the tax exemption requirements of the Internal Revenue Code, see DTX 201, something it did not request during the process of creating the ESOP in 2013, see Tr. at 1068:20–23.

SRR prepared a new analysis of transaction fairness, dated July 25, 2014, essentially using the same methodology as in 2013, including incorporating a 10% control premium in the GCF analysis. See DTX 2 at 59–60. Because the ESOP was now the seller, rather than the buyer, SRR made a few methodological adjustments that were designed to augment the value of the company. Tr. at 1228:5–8. For example, it increased the beta measurement for risk to 0.8, id. at 64; removed the company specific risk premium altogether, Tr. at 1226:18; did not apply a discount for lack of marketability, DTX 2 at 73; and included in the value of the company the tax refund that the ESOP would receive, even though it would not ordinarily incorporate a benefit unique to the ESOP in valuing a company. Tr. at 1227:19–22.

SRR could not adequately reflect the value of the company without building in certain assumptions about Constellis' success on the recompetition of the KBOSSS contract and the impact of any "special contribution" to the ESOP, which could increase the company's income tax refund. See DTX 2 at 72. Accordingly, SRR prepared four valuations of Constellis, addressing every permutation of those events. Key numbers from those four conclusions are reproduced in the table below:

31

|  | With KBOSSS and Special Contribution | With KBOSS, Without Special Contribution | Without KBOSSS, With Special Contribution | Without KBOSSS or Special Contribution |
|---|---|---|---|---|
| GCM Enterprise Value Range | $260 to $310 million | $260 to $310 million | $240 to $285 million | $240 to $285 million |
| DCF Enterprise Value Range | $233 to $282 million | $233 to $282 million | $221 to $266 million | $221 to $266 million |
| Concluded Enterprise Value Range | $242 to $291 million | $242 to $291 million | $227 to $272 million | $227 to $272 million |
| Marketable, Controlling Value of Equity (Rounded) Range | $6,500 to $48,900 | $0 to $33,300 | $0 to $33,500 | $0 to $14,300 |
| Median of Marketable, Controlling Value of Equity | $27,700 | $16,650 | $16,750 | $7,150 |

DTX 2 at 73–76. This analysis supported SRR's subjective judgment that Constellis was a less valuable investment in mid-2014 than it had been at the end of 2013. Id. at 78. In light of this analysis, SRR opined that "the Total ESOP Consideration is not less than the Fair Market Value of the Class A common shares of the Company owned by the ESOP; and the terms and conditions of the Transaction, taken as a whole, are fair to the ESOP from a financial point of view." Id. at 84. After receiving SRR's opinion, Wilmington gave its final approval to the transaction on July 25, 2014, causing the ESOP to sell its shares to ACADEMI at a total purchase price of $281.103 million.[26] This transaction resulted in termination of the ESOP a little over seven months after it had been created.

   This brief lifespan made Constellis' ESOP an extreme outlier in the ESOP world. Both Smith and Summers, two comparatively neutral witnesses with significant ESOP experience,

---

[26] The record does not clearly state a per share purchase price for the 2014 Sale, in part because only a portion of the total consideration went to the only shareholder, the ESOP.

testified that they had never worked on an ESOP that lasted for less than a year. See Tr. at 641:22; 947:12. El-Tahch testified that he had worked on just one other ESOP that lasted less than a year, out of approximately 200 ESOP transactions. Id. at 1248:23–1249:3. Tarbell also testified that he knew of only a single ESOP that lasted less than a year besides Constellis' ESOP. Id. at 1611:24. Summers put the short end of the range of a typical ESOP's lifespan at three years, id. 947:17; Smith put that range at nine or ten years, id. at 641:23–642:3. Even Tarbell conceded that the low end of the range with which he was familiar was approximately five years. See id. at 1612:9–11.

To complete the process of terminating the ESOP, Constellis sought a favorable determination letter from the Internal Revenue Service ("IRS"). See DTX 212 at HALL 17. That request sought approval for Constellis to convert the ESOP into a profit sharing plan, which would then pay out the cash it held to the former ESOP participants. See id. The IRS subsequently informed Constellis that it was putting its favorable determination request on hold because the Department of Labor had opened an investigation into the actions of Wilmington and other fiduciaries in connection with Constellis' ESOP. As of the date of this opinion, that investigation has not been completed.

**H. Financial Impact of the ESOP's Termination**

It is difficult to determine the extent to which the ESOP ultimately improved the fortunes of the various groups of Constellis people involved in this case. Although Katis could not give a precise figure, he believes he personally benefitted from the ESOP transactions by "a substantial amount of money." Tr. at 1133:8–12. Benefits for the Sellers included a 1040 tax rollover that was only available because they had sold their stock to the ESOP. Id. at 1133:16–18. The management personnel benefitted from the management incentive program (but not the SARs,

33

which were not issued in light of the quick turnaround). Id. at 1481:5–13;1459:16–18. Protas testified that she believed she would have been better off if Constellis had simply sold itself to ACADEMI without going through the ESOP, id. at 1481:9–11; however, the evidence shows that the only reason ACADEMI reached out to Constellis was because the ESOP had been created, id. at 1118:22–25.

Brundle was an administrative employee who had been working on KBOSSS and a WPS task order in Baghdad. Tr. at 17:18–18:5. Because Brundle worked for at least 1,000 hours in both 2013 and 2014, he was 20% vested at the time of the 2014 Sale. According to Brundle, the ESOP participants were given no advance warning of the 2014 Sale. Id. at 22:22–23. As a result of the sale to ACADEMI, Brundle is set to receive $20,000, although no payments will be made until the IRS concludes its investigation. Id. at 31:17–32:2.[27]

## II.   CONCLUSIONS OF LAW

### A.  Section 1106(a) Prohibited Transactions

#### 1. Section 1106(a) and 1108(e)

In addition to imposing a general fiduciary duty on trustees, ERISA prohibits a trustee from engaging in certain transactions deemed risky for plan participants. See Henry v. Champlain Enters., Inc., 445 F.3d 610, 618 (2d. Cir. 2006). Two such transactions are the sale "of any property between the plan and a party in interest" and the "lending of money or other extension of credit between the plan and a party in interest." 29 U.S.C. § 1106(a)(1).

Literally construed, § 1106 would effectively ban the creation of most ESOPs, because it would be very difficult for a nascent plan to obtain the capital necessary to purchase employer

---

[27] Brundle testified that this amount does not adequately reflect his value to the company, and reported that his co-workers generally received news of the ESOP's termination poorly. Id. at 25:9–26:12.

34

securities without the participation of the sponsoring employer, which is an "interested party." This dilemma contradicts Congress' clear intention "to encourage the formation of ESOPs by passing legislation granting such plans favorable treatment," and its warning "against judicial and administrative action that would thwart that goal." Donovan, 716 F.2d at 1466.

Section 1108(e) solves the dilemma by creating an affirmative defense exempting "the acquisition or sale by a plan of qualifying employer securities" if three criteria are met.[28] See Elmore v. Cone Mills Corp., 23 F.3d 855, 865 (4th Cir. 1994) (holding that § 1108 creates an affirmative defense for which the defendant bears the burden of proof). First, the trustee may not charge a commission with respect to the transaction. 29 U.S.C. § 1108(e)(2). Second, the plan must be an "eligible individual account plan (as defined in section 1107(d)(3) of this title[.]" Id. at § 1108(e)(3)(A). Third, the sale must be "for adequate consideration." Id. at § 1108(e)(1). Plaintiff has not alleged that Wilmington charged a commission with respect to any of the transactions involving the Constellis ESOP, but disputes that the ESOP was an "eligible" plan and that the 2013 Purchase was "for adequate consideration." Because the consideration requirement is dispositive of this civil action, the Court does not need to reach a conclusion about the ESOP's eligibility.

ERISA defines "adequate consideration" as "the fair market value of the asset as determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan and in accordance with regulations promulgated by the Secretary [of Labor]." 29 U.S.C.

---

[28] All parties agree that the shares of Constellis stock involved in these transactions were "qualifying employer securities."

§ 1002(18).[29] To evaluate whether a trustee has satisfied this standard, a court does not determine the fair market value from scratch and then compare its calculation to the trustee's. See Brundle, 2016 WL 6542718 at *11. Instead, the focus is on whether the process the trustee used to determine fair market value is consistent with professional norms and its ERISA fiduciary obligations. See id. Although the subjective intent of the fiduciary is relevant to this inquiry, "a pure heart and an empty head are not enough." Donovan, 716 F.2d at 1467.

Whether the trustee has determined the fair market value "in good faith" must be measured by the "overriding" duty of the "prudent man standard of care" imposed by 29 U.S.C. § 1104. Donovan, 716 F.2d at 1467. Accordingly, even though plaintiff has not raised a § 1104 claim, it is still relevant whether Wilmington acted "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." See 29 U.S.C. § 1104(a)(1)(B).

The duty imposed on an ERISA fiduciary is the "the highest duty known to the law[.]" LaScala v. Scrufari, 479 F.3d 213, 220 (2d Cir. 2007) (internal citation and quotation marks omitted). Courts have repeatedly held that the duty obligates a trustee to do at least three things: "(1) investigate the expert's qualifications, . . . (2) provide the expert with complete and accurate information, . . . and (3) make certain that reliance on the expert's advice is reasonably justified under the circumstances." Howard v. Shay, 100 F.3d 1484, 1489 (9th Cir. 1996) (internal citations omitted); accord Perez v. Bruister, 823 F.3d 250, 263 (5th Cir. 2016); Keach v. U.S. Trust Co., 419 F.3d 626, 637 (7th Cir. 2005); Perez v. First Banker's Trust Servs., Inc., 12-cv-

---

[29] Although in 1988 the Department of Labor proposed regulations for evaluating "adequate consideration," it has never finalized them, meaning they do not bind this Court. See Perez v. Bruister, 823 F.3d 250, 262 n.13 (5th Cir. 2016).

8648, 2016 WL 5475997 (S.D.N.Y. Sept. 28, 2016). Whether a trustee has met these expectations is a question "not easily satisfied by application of bright-line rules." Donovan, 716 F.3d at 1465. To answer it, a court must consider the totality of the circumstances. See, e.g., Perez v. Bruister, 823 F.3d 250, 263–65 (5th Cir. 2016); Keach v. U.S. Trust Co., 419 F.3d 626, 636–37 (7th Cir. 2005); Donovan, 716 F.2d at 1465–68.

To satisfy the first of its three obligations, an ESOP fiduciary must appropriately vet any experts on whom it relies, including by examining their "reputation and experience" in the relevant field. Bussian v. RJR Nabisco, Inc., 223 F.3d 286, 301 (5th Cir. 2000). It is also important that the trustee and any advisors take care "to avoid any conflicts of interest" to ensure that they remain meaningfully independent from the sellers and their team of advisors. See Bruister, 823 F.3d at 263. Otherwise, there is a significant risk that the ESOP's representatives will not sufficiently challenge the assumptions and representations that they are fed by those on the sell side of the transaction. See id.

Having independent financial advice from a reputable firm is a good start to a fair market value determination, but it is not a "magic wand that fiduciaries may simply wave over a transaction to ensure that their responsibilities are fulfilled. It is a tool and, like all tools, is useful only if used properly." Donovan, 716 F.2d at 1474. For the fiduciary's reliance on its experts to be "reasonably justified under the circumstances," Howard, 100 F.3d at 1489, a fiduciary must probe the assumptions and conclusions of the financial advisors, see Donovan, 716 F.2d at 1474. This does not mean that the ESOP trustee must become an expert on all the minutiae of valuation theory. Howard v. Shay, 100 F.3d 1484, 1490 (9th Cir. 1996). In fact, the kinds of questions that an ESOP is required to ask have been well-summarized by Wilmington's

37

ᐧ

Specifically, Wilmington has not demonstrated that its reliance on SRR's report was "reasonably justified" in light of all the circumstances because it has not shown that it thoroughly probed the gaps and internal inconsistencies in that report. Four major failures stand out: the failure to consider the 2013 McLean report; the failure to probe SRR's reliance on management's representations and projections; the failure to investigate the appropriateness of SRR increasing the value of Constellis by applying a control premium; and the failure to probe SRR's practice of rounding numbers up, thereby increasing Constellis' value. Although these failings independently might not be sufficient to conclude that Wilmington failed to meet its duty, cumulatively they demonstrate that Wilmington was not sufficiently engaged in the Constellis transaction, which was rushed to be completed by the end of 2013.

### i. Failure to Investigate the McLean Report

When reviewing SRR's 2013 valuation, no one from Wilmington ever asked to see the McLean report, even though the FSSC knew of its existence. To this day, Golden has never read the McLean report. Tr. at 61:21–25. To explain that failure, Golden testified that the McLean report would not have been helpful because it was prepared with a different purpose in mind— the valuation of a single share, rather than a controlling interest. See id. at 120:23–121:6. Attempting to justify this reasoning, El-Tahch offered an analogy. He suggested that the situation was akin to an owner of property having two different appraisals of that property: one for tax purposes, for which a low appraisal would be preferred, and the other to list the house for sale, for which a high value would be sought. Id. at 1118:10–17.

The logic underlying Golden and El-Tahch's dismissal of the McLean report is not sound. Although the purposes of the McLean and SRR valuations differed, both used essentially the same methodology. McLean's Smith, a neutral third party to this civil action whom the

39

Court found to be highly credible, testified that as a valuation expert he would have wanted to see a report like his even if he were faced with SRR's task because more data is always better. Tr. at 626:4–16. He also explained that his approach for calculating the enterprise and equity values of Constellis was not affected by the differing purposes of the report. Id. at 610:2–611:7. Neither El-Tahch nor Tarbell challenged that testimony. Moreover, Smith only began making the adjustments necessary for valuing a single share after arriving at Constellis' enterprise and equity values. See PTX 1 at 10. Had someone from Wilmington looked at just the summary page of the McLean report, he would have seen that McLean calculated Constellis' enterprise value to be nearly $100 million below the enterprise value calculated by SRR just 11 months later. See id. A prudent trustee should have, at least, questioned the basis for the significant difference in value and more closely scrutinized the projections management provided to SRR and the assumptions underlying SRR's analysis.

El-Tahch testified that such scrutiny might not have produced any changes to SRR's final valuation because the market and Constellis were in a different position at the end of 2013 than at the beginning when Smith performed his analysis. According to El-Tahch, the uncertainty provoked by the federal government sequestration[30] and the fiscal cliff[31] at the end of 2012 was greatly reduced by December 2013. Tr. at 1195:22–1196:14. As evidence for his position, El-Tahch pointed to a 20 to 25% rise in the stock prices of the guideline companies over that same

---

[30] Sequestration is the name for the federal government's automatic budget cuts, which significantly impacted the DoD's spending.

[31] "Fiscal cliff" is the name given to a broader series of consequences that were projected to adversely affect the economy if the government failed to address deficit levels. Sequestration was a part of the fiscal cliff.

period, and to Constellis having paid back $60 million in debt over the course of 2013, which had the effect of augmenting Constellis' equity value.[32] Id. at 1197:2–1199:13.

El-Tahch's explanation is not satisfactory for two reasons. First, it is in significant tension with the opinion of Magnani, Constellis' former CFO, who testified that the company's position was not significantly different at the end of 2013 than it was at the beginning of 2013.[33] See Tr. at 544:1–554:19. More importantly, these answers are precisely the kinds of information that Wilmington, as trustee, should have sought and evaluated when it was probing Constellis' valuation.

### ii. Failure to Probe Riskiness and Reliability of Management Projections

Absent any reason for suspicion, an ESOP fiduciary might reasonably rely on the projections provided by management without questioning those projections. Indeed, Smith testified that he relied on Constellis' projections in conducting his January 2013 valuation. Tr. at 658:8. As an ERISA fiduciary, Wilmington had an obligation to probe SRR's choice to rely on those projections. The record shows that there were several red flags indicating that these projections were inflated, which Wilmington either ignored or downplayed.

First, Wilmington should have been cautious about projections prepared by Constellis' management because management personnel were set to receive a cash bonus based on 5% of the total purchase price. The higher the purchase price, the more that bonus was worth to

---

[32] El-Tahch also suggested that the 7% company and industry risk factor that Smith employed in his DCF analysis was too high, observing that if Smith had used the same risk factor as SRR the enterprise value would have exceeded $300 million. This argument is not helpful because SRR and McLean did not use the same method to build up the WACC. There is therefore no evidence that McLean's "Company and Industry Risk Factor" is comparable to the "Company Specific Risk Factor" that SRR employed.

[33] Magnani resigned at the end of 2013, but only after he was asked to quit in the first week of December 2013. There is therefore no reason to think Magnani was unfamiliar with the company's financial well-being before that point.

management.  Moreover, the final version of the term sheet did not specify how long those personnel would need to remain employed with Constellis to receive that bonus.  Compare PTX 50 at WT_710, with DTX 56 at TED016019.  Similarly, the value of the SARs, which management would also be eligible to receive, was set at 7% of the equity value of the company, PTX 50 at WT_710, meaning the higher SRR valued the company, the higher the value of the SARs to management.  Of course, management personnel were also eligible to participate in the ESOP, but that does not necessarily eliminate their incentives for the purchase price to be higher rather than lower.

There were several substantive deficiencies in SRR's analysis that should also have raised concerns about the sufficiency of management's projections, including its treatment of the DCAA audit.  Although Wilmington consistently raised the DCAA audit throughout the process, and refused to back down when the Sellers attempted to renege on the limited indemnification that Wilmington negotiated, DTX 110, its handling of this issue was still lacking.  The indemnification that Wilmington negotiated covered the full cost of any potential liability, but was not a cash indemnification.  See PTX 50 at WT_712.  Instead, the ESOP or Constellis would be entitled to offset the amount against the debt the ESOP owed to the Sellers.  Id.  The problem with this arrangement was that if Constellis were liable, it would have to repay the government in cash.  As of the time SRR completed its report, Constellis did not have $60 million cash on hand at any given moment.  See PTX 2 at 61.  Consequently, and as SRR recognized in its 2014 report, even with the indemnification that Wilmington negotiated, a $62 million liability would have created a significant liquidity crisis for Constellis and significantly hampered its ability to cover basic operating costs.  See DTX 2 at 18.

42

More fundamentally, the concerns voiced by the DCAA and DOS officials about Constellis' record-keeping and billing practices should have raised questions about the reliability of Constellis' system for developing its projections. The possibility that Triple Canopy had overbilled the government by tens of millions of dollars should have prompted Wilmington to probe Constellis' record-keeping more thoroughly, and ask questions about whether the backlog and pipeline projections developed by Constellis' management might be infected by the same errors. Constellis' proffered defense to the DCAA audit only exacerbated these concerns. Rather than denying the substance of the charges, management told Wilmington and SRR that it felt it had a statute of limitations defense. PTX 174 at 6. Confronted with this technicality, there is no evidence that Wilmington asked serious questions about whether Triple Canopy had in fact engaged in the practices that generated the audit, or whether any remedial measures had been put in place.

Another red flag to which Wilmington did not adequately respond was the riskiness of Constellis' contract concentration, a factor addressed by Smith in his valuation. At the time of the 2013 Purchase, about 70% of Constellis' revenue was tied up in just two contracts: WPS and KBOSSS. Tr. at 546:15–17. Although Wilmington recognized this as the most serious risk facing Constellis, there is little evidence that Wilmington probed how SRR compensated for that risk in its valuation. This is particularly concerning in light of SRR's choice of a beta factor of 0.7, reflecting its judgment that Constellis was less risky than the average company in its industry; again, a conclusion contrary to what Smith had found. SRR took the position that the risk was adequately reflected in Constellis' method of determining its revenue projections, but there is little evidence that anyone at Wilmington understood this to be the case or asked follow up questions about how this was done. Wilmington may not have been under an obligation to go

43

contract-by-contract and understand every risk, but WPS and KBOSSS were not just any

contracts. Together, they constituted 70% of Constellis' revenue at the time of the purchase, and

Wilmington was aware of that fact. Contracts that important deserved extra scrutiny from the

fiduciary. ACADEMI recognized as much, and insisted on access to key customers and job sites

during its due diligence review the following year. Tr. at 264:13–265:22.[34]

Wilmington explains its comparatively lackluster due diligence in part by pointing to the

representations and warranties it received in the 2013 SPA. As Golden put it:

> We did a different level of due diligence—and, you know, we understand this as
> ESOP trustees. . . . What's not typical that you see in the outside world is that we
> have these [representations] and warranties for which we're indemnified for [sic].
> So if there is anything, you know, in general, and my understanding is, you know,
> these [due diligence] items you just listed here that the, quote-unquote, real world
> buyer is going to do, they're going to pay to do the due diligence on that, because
> there isn't going to be those [representations] and warranties with that
> indemnification that protects them for if any of these things are not accurate.

Tr. at 266:7–23.

This explanation does not satisfy. The key warranty about the financial health of the

company was made by Constellis, not by the Sellers. See DTX 112 at 8–25. If, in fact,

Constellis' financial disclosures failed to adequately represent the risks facing the company, it

was the company itself that would be liable to the ESOP. Id. But the ESOP's only asset was its

100% ownership stake in Constellis. Forcing the company to pay the ESOP would be equivalent

to robbing Peter to pay Paul. In other words, there was no external source of money to protect

the ESOP's investment in the company if the financial disclosures proved inadequate. There is

no evidence that Wilmington ever pressed the Sellers to make their own representations about

---

[34] The events in early 2014 further demonstrate that Smith's lower valuation of Constellis in
early 2013, which more accurately reflected Constellis' high concentration of revenue in just a
few vulnerable grant contracts, was more prescient than SRR's valuation.

the financial health of the company they were selling, or indeed that Wilmington ever expressed any concern about this arrangement.

Wilmington's skepticism should also have been piqued by the multiple sets of projections generated over the previous year or so. Knowing about Vestar's proposed purchase and the McLean reports, Wilmington should have recognized that Constellis must have prepared previous projections. An investigation into the Vestar episode would have revealed that Constellis had inflated its projections to Vestar. PTX 221 at 1. Moreover, by looking at the projections presented to Vestar and McLean, Wilmington would have seen that Constellis had not always produced projections four or five years into the future. Such variability should have called into question the reliability of Constellis' process for generating projections over the long time period used by SRR. In short, Wilmington's failure to request those previous projections resulted in a number of missed opportunities to appreciate some of the risks behind the projections relied upon by SRR.

A more modest, but equally telling, oversight by Wilmington was the role that the two pending acquisitions played in Constellis' projections. Plaintiff raised several questions about how SRR incorporated the proposed acquisitions into its valuation. For instance, there were dueling footnotes in the November 2013 SRR report, one suggesting that the acquisitions were included and another suggesting they were excluded. See Tr. at 116:4–117:14. Messina also observed that the CGI acquisition was projected to have no value to Constellis after just two years. Id. at 721:19–722:7. This raised a question about the accuracy of the projections, because it is difficult to understand why a rational buyer would contemplate such an acquisition. Id. Wilmington's representatives were unable to explain these anomalies at trial, and there is no evidence that they raised these issues or understood them when they were voting on the

45

transaction. Understanding the basic premises of the valuation expert's analysis, and probing

internal inconsistencies like these, are basic duties of the fiduciary. Wilmington's failure to do

so is further evidence that it did not live up to those duties.

### iii. Failure to Investigate the Control Premium

Another significant aspect of SRR's valuation that Wilmington did not investigate was

the appropriateness of applying a 10% control premium to the multiples used in the GCF

analysis and failing to discount the DCF analysis for lack of control. Although there is no hard

and fast rule for determining who "controls" a company, some elements of control are generally

agreed upon, including "an interest which allows the shareholder to 'unilaterally direct corporate

action, select management, decide the amount of distribution, rearrange the corporation's capital

structure, and decide whether to liquidate, merge, or sell assets.'" Godley, 286 F.3d at 215

(quoting Estate of Newhouse v. Comm'r, 94 T.C. 193, 251–52, 1990 WL 17251 (1990)).

When Wilmington approved the 2013 Purchase, it knew that the ESOP could not exercise

any of those prerogatives of control. At most, the ESOP had the power to veto certain actions by

the Sellers and their chosen directors, but that power had to be exercised by filing a lawsuit.

Given that majority and minority stakeholders alike have the right to file a lawsuit against the

directors or management of a company if they feel that fiduciary obligations are being violated,

see Gentile v. Rosette, 906 A.2d 91, 100 (S. Ct. Del. 2006), the ESOP essentially had no power

to control Constellis.[35]

---

[35] Although the ESOP had certain rights to information that a minority stakeholder would not traditionally have, these rights did not justify applying a control premium. If the ESOP or plan participants felt that the corporation was being mismanaged, it does them little good to be informed about the details of that mismanagement without the power to do anything about it.

Despite being aware of the lack of control the ESOP would have, Wilmington never

probed SRR's use of a control premium in the GCF analysis or its failure to discount the DCF

valuation for lack of control. Nor did the text of SRR's report sufficiently explain those choices.

Most of the report's discussion of this subject was generic—SRR devoted just one sentence to

articulating its decision to apply the 10% control premium. PTX 2 at 115–16. Again, this is

precisely the kind of flaw about which a prudent fiduciary should have been concerned.

The ESOP's lack of control is particularly troubling given the information that other

parties to this transaction had about how unusual this setup was. Throughout its promotional

materials, CSG made it clear that the Sellers would retain "control" of the corporation after the

ESOP was created, enabling them to capture the value of warrants and retain control over the

rate at which Constellis paid off its debt to the Sellers. This was the defining feature that made

CSG's design "more advanced" than a "traditional 100% ESOP." PTX 626 at 17. Constellis'

own lawyers at GT observed that "normally" a 100% ESOP controls at least a majority of board

seats, PTX 242 at CSG027460, and Smith testified that the only other ESOP he had seen with

this structure was under investigation by the Department of Labor, Tr. at 619:25–620:2. The

Court finds that there was no reasonable basis for SRR's decision to apply the control premium

as it did and that Wilmington breached its fiduciary obligation in failing to vigorously question

this aspect of SRR's report. Its failure to ask SRR even one question about the appropriateness

of the premium is inexplicable.

iv. Failure to Investigate Rounding

Because an ESOP fiduciary should generally be interested in achieving the lowest

possible purchase price for its client, the fiduciary should be concerned if the valuation experts

are consistently rounding up when approximating values. Although there may be good reasons

47

for rounding up, a fiduciary ought to probe those reasons. A trustee should not be willing to cause its client to pay hundreds of thousands of dollars simply because a nice, round number looks better. See Chao v. Hall Holding Co., Inc., 285 F.3d 415, 433 (6th Cir. 2002) (finding it "extremely disconcerting" that the person setting the price was willing to "charge the . . . ESOP an extra $44,900.00 . . . 'for purposes of communication'").

Messina testified that SRR consistently rounded up whenever it needed to estimate values in its 2013 valuation reports. Tr. at 743:10–18. Although El-Tahch testified, without explanation, that this rounding had "no material impact," he did not deny the allegation. Moreover, the report itself identifies several places where numbers are "rounded." See Tr. at 1262:22–1263:10; PTX 170 at 35. For example, in the November 2013 report, SRR reported the median per share value as $4,235, when in fact it was $4,232.50. See id. El-Tahch did not provide a spirited defense of this practice, instead testifying that "[e]veryone accepts the fact that fair market value is not a single point estimate. It's a broad and reasonable range. And because of that reality, . . . we round certain figures." Tr. at 1263:4–7. Golden admitted that Wilmington never asked SRR about its rounding, although he also testified that rounding is something he normally sees. Tr. at 133:12. Given the highly approximate nature of these valuations, it does seem natural that some rounding would take place. What does not make sense is why, given this latitude, SRR would round up, rather than down, when representing the buyer. El-Tahch could not explain the choice to round up satisfactorily at trial, and Wilmington never asked him to provide an explanation during its review of SRR's work. This omission compounds Wilmington's other oversights and further undermines its contention that it reasonably relied on SRR's valuation.

48

v. Relevance of ACADEMI's Offer

Wilmington argues that despite these omissions, SRR's report in fact reflected the fair

market value of the company. As evidence, it points to ACADEMI's willingness to pay

approximately $281 million for the company in the summer of 2014, a number that falls within

SRR's estimate of the enterprise value in 2013. Although SRR's 2014 report repeatedly refers to

this purchase price as an "implied enterprise value," as Messina aptly pointed out it is no such

thing, at least not from the ESOP's vantage point. Tr. at 901:1–17. Unlike the ESOP,

ACADEMI was a "strategic buyer," meaning that the price it paid incorporated certain values

that would only be captured by a buyer who has a presence in the industry. Id. As multiple

Constellis witnesses admitted, ACADEMI and Constellis were interested in the sale primarily

because they could harness synergies, such as ACADEMI's extensive training facility, that

would empower the resulting firm to be a market leader. Id. at 1441:5–14 (Protas); 1122:20–

1124:3 (Katis). Messina testified that those synergies were worth approximately $23 million, id.

at 901:9, a value that El-Tahch did not dispute, see id. at 1280:10–20. The value from synergies

would not be relevant, and therefore not reflected, in a fair market value calculation when

forming an ESOP. Discounting the synergies and other elements affecting the price ACADEMI

paid that would not impact fair market value,[36] the fair market enterprise value implied by

ACADEMI's offer was closer to $200 million than $300 million. See id. at 901:1–17.

Consequently, far from corroborating SRR's 2013 valuation, the ACADEMI offer further

undermines it.

---

[36] These other elements include the $30 million write-off by the Sellers and the tax refund that
Constellis was expecting. Tr. at 901:1–6.

### 3. Circumstantial Evidence of Wilmington's Neglect

Other aspects of Wilmington's approach to the Constellis ESOP reinforce the Court's conclusion that Wilmington did not act with the necessary care when assessing SRR's valuation report. These considerations are relevant to the Court's obligation to consider the totality of the "circumstances then prevailing." See Donovan, 716 F.2d at 1468.

Wilmington particularly neglected to investigate the motivations of Constellis and the Sellers for establishing an ESOP, which is an essential component of the ESOP's "eligibility" under ERISA and the Internal Revenue Code. Because the eligibility of the ESOP is critical to both the tax benefits that the parties, including the participants, hope to achieve, as well as the legality of the transaction under ERISA, the eligibility of a plan should be a serious concern of any fiduciary. Nevertheless, the evidence shows that Wilmington simply took Constellis' representatives at their word that they were seeking to establish the plan for the right reasons. Although Wilmington had engaged the law firm Taylor English to provide legal advice, Taylor English's role in the 2013 Purchase focused primarily on negotiating the terms of the transaction. In fact, Wilmington did not seek an opinion letter about the eligibility of the plan until the summer of 2014, in connection with the 2014 Sale. Tr. at 1068:20–23. Wilmington's failure to obtain a legal opinion as to the eligibility of the ESOP and its reliance on Constellis' representations that they were seeking to establish a plan for the right reasons are further examples of Wilmington's failure to act as a prudent fiduciary.

In defining "eligible individual account plan," 29 U.S.C. § 1108(e)(3) adopts the definition used in 29 U.S.C. § 1107(d)(3), which provides that an "eligible individual account plan" can include "an employee stock ownership plan." "Employee stock ownership plan" is statutorily defined as "an individual account plan (A) which is a stock bonus plan which is

50

qualified . . . under section 401 of Title 26, and which is designed to invest primarily in

qualifying employer securities, and (B) which meets other such requirements as the Secretary of

the Treasury may prescribe by regulation." 29 U.S.C. § 1107(d)(6). The Department of Labor

has supplemented the statutory requirements of 26 U.S.C. § 401(a) by regulation, requiring that

for a "stock bonus plan to constitute a qualified trust under section 401(a)," a series of nine "tests

must be met." 26 C.F.R. § 1.401-1(a)(3).

Among those tests is a requirement that the "stock bonus plan" be "established by an

employer for the exclusive benefit of his employees or their beneficiaries[.]" 26 C.F.R. § 1.401-

1(a)(3)(ii) (emphasis added). For a plan to be established "for the exclusive benefit of his

employees," the regulation refers to "paragraph (b)(2) through (5) of this section." Id.

Paragraph 2 provides that "[t]he term 'plan' implies a permanent as distinguished from a

temporary program. Thus, although the employer may reserve the right to change or terminate

the plan, and to discontinue contributions thereunder, the abandonment of the plan for any reason

other than business necessity within a few years after it has taken effect will be evidence that the

plan from its inception was not a bona fide program for the exclusive benefit of the employees in

general." Id. at § 1.401-1(b)(2). The next paragraph identifies a plan "so designed as to amount

to a subterfuge for the distribution of profits to shareholders" as an example of a plan not created

for the exclusive benefit of the employees, but cautions that "[a]ll of the surrounding and

attendant circumstances and the details of the plan will be indicative of whether it is a bona fide

stock bonus . . . plan for the exclusive benefit of employees in general." Id. at § 1.401-1(b)(3).

Under this statutory and regulatory scheme, the crucial requirement for a plan to be

"eligible" is that the sponsor must intend for the plan to be permanent, or at least last a

sufficiently long time for it to produce meaningful results for the participants. There is no

51

evidence that Wilmington asked any serious questions about Constellis' goals for the ESOP,

even though Wilmington knew that as recently as 2012, the Sellers had actively considered

Vestar's interest in buying the company.  Had Wilmington probed this issue, they would have

learned several facts that raised serious questions about Constellis' <u>bona fides</u> in setting up the

ESOP.  For instance, the Sellers were more interested in the ESOP as an exit strategy than as a

benefits plan.  Tr. at 1418:16–22.  CSG's promotional materials, which Wilmington never asked

to see, reinforce this conclusion.  <u>See</u> PTX 626 at 6, 9.  Had Wilmington reviewed those

materials, it would have been more foreseeable that just two months after creating the ESOP, the

Sellers and Constellis management would begin seriously entertaining proposals to terminate it.

Although the Court does not hold that the plan was ineligible, Wilmington's failure to assure

itself of Constellis' intent is further evidence of its tendency to rubber stamp whatever Constellis

and SRR put in front of it, thereby violating its fiduciary duty to exercise prudence.

      Another instance of Wilmington's lack of prudence was the short time period to which it

agreed for approving a price for the 2013 Purchase.  Under this time restriction, the transaction

had to close by the end of 2013.  Although the record does not contain the exact date on which

Constellis first contacted Wilmington, Constellis did not decide to move forward with the ESOP

until the first week of October, and Wilmington's engagement letter was signed on October 25,

2017, PTX 168 at WT-10017.  Even assuming that Wilmington may have started to work on the

transaction before that date, no more than six weeks could have passed from the beginning of its

work until November 14, 2013, the date on which Wilmington approved the purchase price

range.  The only reason Golden could identify for Wilmington's agreement to work under such a

tight timeline was to maximize the tax benefits that the transaction would afford for Constellis

and the Sellers.  Tr. at 168:12–14.  A prudent fiduciary should have considered whether it had

52

sufficient time to perform an adequate due diligence. This record supports the conclusion that Wilmington did not have sufficient time to complete its work thoroughly.

The frequency and duration of Wilmington's meetings also suggest it was not fully engaged. The FSSC met only three times to discuss this transaction. Lindak, one of the four voting members of the FSSC, admitted that he only attended one meeting about the Constellis ESOP before the 2013 Purchase closed. Tr. at 1491:15–1492:1. According to the evidence in the record none of those meetings lasted longer than 90 minutes. Only one meeting with Constellis management occurred, and only Bonn attended that meeting in person. DTX 22. Matz and Golden's notes suggest that a substantial percentage of each meeting was dedicated to members of SRR talking without any significant interruption by Wilmington representatives. PTX 48, 182; DTX 53. This disengagement is reflected in the witnesses' lack of recollection about the details surrounding this transaction. Although these witnesses are professionals who must juggle numerous transactions at a time, Golden and Matz's inability to recall details of this transaction without referring to their written notes was striking, given that these events took place less than three years ago. This inability to recall also suggests that at the time, these witnesses were not sufficiently engaged in their work for it to leave a significant impression.

The last circumstance supporting the conclusion that Wilmington failed to act as a prudent fiduciary is the way in which it negotiated the per share price it agreed to pay.[37] Cf. Keach, 419 F.3d at 639 (finding that negotiating a 20% reduction in price was evidence that a fiduciary had fulfilled its ERISA obligations). Having been told by SRR that anywhere from $3,865 to $4,555 per share would constitute fair market value, Wilmington authorized an

---

[37] Wilmington's retained law firm, Taylor English, actually negotiated the share price and terms of the sale, although Golden and Bonn were throughout the process and had to agree to the negotiation strategy. Constellis was represented throughout the negotiations by CSG, the investment banking firm which had proposed the "more advanced" ESOP.

opening offer at $3,900, a number above that minimum. PTX 174 at 7. Most economically rational actors entering a negotiation would begin by low-balling their first offer, in an effort to test the waters and drive down their counterpart. When asked why Wilmington set its floor inside the range provided by SRR for fair market value, rather than somewhere below that floor, no one from Wilmington could give a clear answer. See, e.g., Tr. at 149:4–25.

Viewed charitably, Wilmington's defense is that it was concerned about maintaining its credibility in the face of Constellis' opening position of $4,525 per share. As Summers put it, "[I]f we had come in and said, you know, a thousand dollars per share, it would have been too far out of the range, and we wouldn't have had any credibility. . . . [Y]ou want to make sure that you're not coming up with something that's ridiculous." Tr. at 955:3–9. That answer does not explain why Wilmington did not start by coming back with $3,525, $3,800, or even $3,865, the actual fair market value floor that SRR calculated. These fluctuations may seem small, but with over 47,000 shares in play, each dollar off the per share price represented over $47,000 less that the ESOP would have to pay.

Wilmington's lack of engagement and willingness to negotiate so favorably with CSG may have been motivated by its significant business relationship with CSG, which refers more ESOP business to Wilmington than all other firms combined. PTX 159. Indeed, Wilmington, CSG, and SRR were actually working on another ESOP transaction, for Martin Resources, at the same time they were negotiating the Constellis deal. Tr. at 1293:22–25. These long-term business relationships support the conclusion that Wilmington had become complacent in relying upon SRR's evaluation, and may have had an incentive to maintain its lucrative relationship with CSG.

54

As Smith acknowledged, "the ESOP world . . . [is] a very incestuous community[.]" Tr. at 651:12. Although this reality may make it more difficult for a fiduciary to maintain its independence from its counterparts, it also makes that duty all the more important. The dangers of excessive familiarity are readily apparent. In a field where the valuation of a business depends substantially on a series of judgment calls, familiarity with how a firm will handle those judgment calls can make the process of negotiation artificial. This threat is not merely hypothetical—emails show that SRR was willing to discuss its valuation strategies with CSG at a very granular level while negotiations were ongoing as long as those discussions were ostensibly hypothetical. See PTX 220. Given the extensive relationships that these parties shared, it is hardly surprising that Golden could not identify a single occasion when Wilmington had declined to approve an ESOP transaction after it was formally engaged to act as trustee. Tr. 350:19–23.

In sum, although the Court does not find that Wilmington's actions on behalf of the Constellis ESOP amounted to bad faith, ERISA demands more to excuse a fiduciary from liability. It requires a fiduciary contemplating an otherwise prohibited transaction to ask questions, probe its own experts, and jealously guard its independence. In the words of the pamphlet El-Tahch co-authored, the fiduciary must have "read and understood the valuation report; identified, questioned, and tested the underlying financial data and assumptions; verified that the conclusions are consistent with the data and analyses; and verified that the valuation report is internally consistent and makes sense." PTX 703. Wilmington did not live up to those obligations, whether pressured by time deadlines or motivated by its desire to maintain its business relationship with CSG. As a result, the ESOP paid more than adequate consideration to

55

acquire Constellis' stock,[38] and Wilmington is liable for engaging in a transaction prohibited by ERISA.[39]

## B. Section 1106(b) Prohibited Transactions

Plaintiff argues that in addition to violating § 1106(a), Wilmington also ran afoul of § 1106(b)(2), which prohibits ERISA fiduciaries from acting on behalf of a party with interests adverse to the plan, and § 1106(b)(3), which prohibits certain payments to an ERISA fiduciary from parties dealing with the plan. Wilmington maintains that these section do not apply, or, in the alternative, that they are exempted by § 1108(c)(2).

An ERISA fiduciary may not "act in any transaction involving the plan on behalf of a party . . . whose interests are adverse to the plan." 29 U.S.C. § 1106(b)(2). The Court agrees with the defendant that this provision does not apply to Wilmington. Despite the close relationship between CSG and Wilmington, there is no evidence to suggest that Wilmington actually represented two sides in this transaction. The relationship between Wilmington and CSG is properly addressed by § 1106(a), not § 1106(b)(2). Accordingly, Wilmington is not liable for violating § 1106(b)(2).

---

[38] Exactly how much the ESOP overpaid is addressed infra in Part III.

[39] Plaintiff has also argued that this transaction violated 29 U.S.C. § 1106(a)(1)(B), which prohibits the lending of money between the plan and a party in interest. Section 1108(b)(3) creates an exception to this prohibition for an ESOP when "(A) such loan is made primarily for the benefit of the participants and beneficiaries of the plan, and (B) such loan is at an interest rate which is not in excess of a reasonable rate." The test for establishing benefit for the participants is more generous in § 1108(b)(3) than in § 1108(e), requiring that the loan be "primarily" rather than "exclusively" for participants' benefit. Plaintiff has not attacked the Sellers' motives in extending the loan, and the interest rates on those loans were below market rates. Tr. at 1236:20–1237:1. The Court therefore finds that the loans were "primarily" for the participants' benefit, that the interest rate was reasonable, and that the defendant is not liable under this theory, which was not seriously pursued at trial.

A fiduciary is also prohibited from receiving "any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan," 29 U.S.C. § 1106(b)(3). Once again, there is an exception under § 1108, which provides that "[n]othing in section 1106 of this title shall be construed to prohibit any fiduciary from . . . receiving any reasonable compensation for services rendered, or for the reimbursement of expenses properly and actually incurred, in the performance of his duties with the plan[.]" 29 U.S.C. § 1108(c)(2).

Wilmington cites to a litany of cases holding fiduciaries liable under § 1106(b)(3) in which the fiduciary received a "kickback," or had some sort of side deal with a party in interest that motivated the fiduciary to approve the deal, arguing that these are the only arrangements to which this paragraph applies. See Def. Proposed Findings of Fact and Conclusions of Law, [Dkt. 270] at 48. None of those cases explicitly adopt such a restrictive reading of the statute. The plain text of § 1106(b)(3) refers broadly to "any consideration for his own personal account," not just to kickbacks. Moreover, if the provision did not by its terms apply to an ordinary fee, Congress would not have needed to create the exception for reasonable compensation found in § 1108(c)(2). The Court therefore rejects Wilmington's argument that § 1106(b)(3) only applies to kickback arrangements.

Nevertheless, the Court finds that Wilmington has satisfied its burden of showing that the $150,000 payment from Constellis was "reasonable compensation for services rendered . . . in the performance of . . . duties with the plan." 29 U.S.C. § 1108(c)(2). Protas testified that before Constellis agreed to that fee, she ran it past several people with experience in such transactions who agreed that it was within the range of a standard fee for the industry. Tr. at 1423:18–21. Likewise, the indemnification that Wilmington received from Constellis to cover its legal fees

57

for defending against this civil action is a form of "reimbursement for expenses properly and actually incurred." 29 U.S.C. § 1108(c)(2). As the Seventh Circuit has aptly observed, "Very few people would become [fiduciaries] if subjected to" the "extensive potential costs" associated with ERISA litigation. Leigh v. Engle, 858 F.2d 361, 369 (7th Cir. 1988). Wilmington is therefore not liable for violating § 1106(b)(3) by accepting either the $150,000 flat fee or a reimbursement of its defense costs.

### III.  CALCULATION OF DAMAGES

Constellis' ESOP participants did not invest a cent of their own money in the plan, and given the brief life of the ESOP there is no evidence that any employee relied on it for retirement planning purposes to their detriment. There is, therefore, no evidence in this record showing that the participants in this ESOP have actually suffered a loss. But ERISA does not direct the Court to ask simply whether the participants have been damaged. The real question is whether the ESOP has been damaged. It is the perception that employees are getting "something for nothing" that may tempt an employer to play fast and loose with a deferred compensation plan. Indeed, there is evidence from an April 18, 2014, meeting that Constellis held this view, when Protas commented that the ESOP was a "lottery ticket" for participants. Tr. at 1444:17–20. This perception is the precise evil that Congress sought to combat when it imposed the "highest duty known to the law" on an ERISA fiduciary. See Blessitt v. Retirement Plan for Emps. of Dixie Engine Co., 848 F.2d 1164, 1176 (11th Cir. 1988) ("Rather than enabling employees to get 'something for nothing,' . . . the essential purpose of ERISA is to prevent employees from getting 'nothing for something'—to prevent them from receiving fewer benefits than those they accrue through years of service."). The question this Court confronts, then, is how much the ESOP was damaged by overpaying for Constellis' stock. See Bruister, 823 F.3d at 265.

Messina is the only witness who provided a comprehensive estimate of damages. He did

so by identifying a series of discrete errors that SRR and Wilmington committed, and estimating

how much each error inflated the purchase price of Constellis stock. PTX 512. Cumulatively,

Messina estimated that Wilmington's acceptance of SRR's errors caused the ESOP to overpay

for Constellis' stock by $103,862,000. Id. Wilmington's expert, Tarbell, testified that Messina's

method was conceptually flawed because valuation estimates are highly interdependent so that it

is artificial to provide a line-item estimate of how any particular error might have affected the

final valuation range. Although there is some merit to Tarbell's concern, his failure to provide

any alternative method for calculating damages leaves Messina's estimates as the only evidence

as to damages. Therefore, the Court will use those estimates as its baseline, but make

appropriate adjustments based on the evidence adduced at trial and the relative credibility of the

experts. See Perez v. Bruister, 54 F. Supp. 3d 629, 677 (S.D. Miss. 2014), aff'd 823 F.3d at 269.

As is typical in a battle of the experts, "each was partly in the right, and all were in the wrong."

See United States v. Sanchez, 969 F.2d 1409, 1411 (2d Cir. 1992) (quoting John Godfrey Saxe,

"The Blind Men and the Elephant" (1872)).

### 1. Growth Projections

As discussed in Part II.A.2.ii, Wilmington did not adequately probe SRR's reliance on

the growth projections furnished by Constellis' management team. Messina estimates that

relying on these projections inflated the value of Constellis by approximately $8.65 million. As

Tarbell credibly observed, Messina's calculations are a very rough approximation because he has

not presented a detailed analysis of how he arrived at his replacement projections. Tr. at 1520:4–

1521:2. The Court, therefore, finds that his analysis was likely impacted by his incentive to

work on behalf of the plaintiff in this case. As other courts have done in the past, faced with two

competing expert analyses and no precise mechanism for resolving them, this Court will use the midpoint between Messina's calculation and that of SRR and Tarbell. See Bruister, 823 F.3d at 269–71. Accordingly, the Court finds that Wilmington's acceptance of Constellis' projections inflated the price the ESOP paid for Constellis' stock by $4,325,000.

### 2. Beta

Messina describes SRR's decision to use a beta of 0.7 in the DCF method as indefensible because it wrongly implied that Constellis was less risky than other companies in its industry. All the experts agree that beta is a measure designed to capture the risk of a company relative to others in its industry, and that a beta of less than 1.0 implies that a company is less risky than the market as a whole. The record is replete with testimony, from witnesses on both sides of the case, that Constellis was riskier than most corporations in its industry. See, e.g., Tr. at 1527:1–5 (Tarbell); 385:15–24 (Golden); 847:14–18 (Messina). As Tarbell acknowledged, this is why SRR chose multiples that were below those of the guideline companies in its GCM analysis. Id. at 1527:1–5. Although there is testimony that the "conservative" nature of Constellis' projections would partially ameliorate this risk, at most that would bring Constellis' risk down to something like the standard risk in the industry. There is insufficient evidence in this record to support SRR's conclusion that the safeguards built into management's projections would have made Constellis somehow less risky than the average company in the industry, nor would it have made sense for Constellis to over-correct in this way. Wilmington should therefore have been skeptical of any beta below 1.0 in valuing Constellis, but there is no evidence that it raised any questions about SRR's choice to use a beta of 0.7. Messina's uncontradicted calculations found the damage caused by this use of a 0.7 beta to amount to $2,936,000, a number the Court accepts.

### 3. Company Specific Risk

Messina testified that a higher company specific risk factor should have been applied to Constellis in light of the particular problems that its highly concentrated contract and customer base posed. He calculated the damage from SRR's failure to consider this factor as $7,467,000. In response, El-Tahch and Tarbell testified that a company specific risk factor is an undisciplined metric leaving too much to judgment, and that a risk factor of 1.0 was appropriate in light of the "conservative" nature of Constellis' projections.

Several of the valuation factors at issue are designed to account for the riskiness of an investment. The least developed metric, both in terms of how it is created and how it applies to Constellis, is the company specific risk factor. Having already made two adjustments to compensate for the additional risks that Constellis faced, the Court declines to incorporate yet another variable to account for Constellis' riskiness. Therefore, the Court finds that Wilmington's reliance on SRR's company specific risk factor of 1.0 had no additional impact on the price the ESOP paid.

### 4. Perpetual Growth Rate

Messina claims that Wilmington further damaged the ESOP by accepting SRR's perpetual growth rate of 3%, explaining that blindly relying on the Federal Reserve's prediction is overly optimistic in light of recent lagging Gross Domestic Product growth rates.

Messina's position is countered by Smith's explanation that it makes little sense to think about a recent trend in growth rates when you are trying to estimate the average growth rate over an indefinite period into the future. Tr. at 674:9–18. Although projecting such a long term trend necessarily requires guesswork, Smith agreed with Tarbell that using 3% is standard in the industry. Id. at 673:24–675:1. Even Messina acknowledged that his position is an outlier. Id.

61

at 827:8–10. As a fiduciary, therefore, Wilmington would have had no reason to question SRR's

use of the prevailing perpetual growth rate in the industry, meaning that this factor did not

inappropriately augment the price the ESOP paid.

### 5. Methodology Weighting

Messina has quibbled with Tarbell and SRR over the relative weighting of the GCM and

DCF methods. Although Wilmington's disinterest about SRR's weighting scheme is further

evidence of its hands-off approach to probing SRR's work, there is no evidence that SRR's

choice damaged the ESOP. In fact, as Messina acknowledged, using the equal weighting he

proposed would have made the ESOP worse off, by increasing the price that it paid by $2.37

million. Tr. at 742:4–9. Accordingly, it makes no sense to increase the damages Wilmington

must pay because of SRR's obscure methodology for weighting the GCM and DCF methods.

### 6. Control

For the reasons discussed in Part II.A.2.iii, the Court finds that Wilmington's acceptance

of SRR increasing the value of Constellis by applying a 10% control premium was inappropriate

given that the ESOP would lack most of the meaningful elements of control over Constellis after

the 2013 Purchase. Accordingly, the Court agrees with Messina that SRR's evaluation should

not have incorporated a control premium and that this error damaged the ESOP by adding

$8,186,000 to the price it paid.[40] For the same reasons, Messina was also correct that some lack

of control discount ought to have been applied to the DCF analysis. The evidence shows that

---

[40] Tarbell testified that removing the control premium would not have impacted the valuation because SRR already chose below-median multiples compared to the guideline companies. Tr. at 1527:20–24. This explanation is not persuasive both because SRR only used below-median multiples for EBITDA, not revenue, see PTX 2 at 50, and because the reason it chose below-median multiples had to do with Constellis' risk relative to the guideline companies. There is no evidence in this record to support the position that the evaluation of market risk would be affected by the issue of control.

standard lack of control discounts range from 30-40%, but Messina has only proposed a 20%

reduction to account for the elements of control that the ESOP did obtain. The Court finds that

Messina did not give sufficient weight to those control elements, and instead concludes that a

more modest discount of 5% would have been appropriate. This reduces Messina's estimate of

the impact of this error by 75%, meaning that the Court finds this error inflated the price the

ESOP paid by $9,715,250. This brings the combined damages related to control of the company

to $17,901,250.

### 7. Comparable Company Discount

At trial, Messina did not adequately explain the purpose of the comparable company

discount or why it was appropriate to consider it. In the absence of any further explanation, the

Court credits Tarbell's explanation that it simply double counts the risk of Constellis relative to

the industry in a manner similar to the company specific risk premium. Tr. at 1543:25–1544:19.

Accordingly, the Court finds that Wilmington's failure to raise questions about the absence of a

comparable company discount did not damage the ESOP.

### 8. Stock Appreciation Rights

Messina testified that the amount that Constellis would owe after the issuance of SARs,

which were part of the broader management incentive plan adopted by Constellis in connection

with the creation of the ESOP, ought to have been deducted in the calculation of the company's

equity value. Wilmington and SRR respond that the SARs were not relevant to the valuation

because they were inchoate and had not been issued as of the transaction date. This position is

disingenuous. As Protas acknowledged, Constellis intended for the SARs to be issued. Tr.

at 1458:4–7. The only reason they were not eventually issued is because the company was sold

so quickly to ACADEMI. Id. at 1457:20–1458:7. The Court therefore agrees with Messina that

the value of the SARs should have been deducted, and, adopting the lower end of Messina's range, that failure damaged the ESOP by $1,611,000.

### 9. Rounding

As discussed in Part II.A.2.iv, Wilmington's failure to question SRR's consistent rounding up damaged the ESOP. SRR has not provided any explanation for why it chose to round up rather than round down, and Wilmington breached its fiduciary duty to the ESOP by not objecting to SRR's approach. Messina combined this line item with "other" to reach damages in the amount of $6.72 million. PTX 512. Because the record about what is included in "other" is underdeveloped, the Court will only assess $3 million in damages for the error attributable to rounding up. This represents the low end of the range testified about by Messina. Tr. at 744:2. The Court adopts the low end of that range because Messina's testimony about this factor was a rough approximation.

### 10. Total

As the following chart summarizes, the Court concludes that Wilmington's failure to adequately probe SRR's report inflated the price that the ESOP paid for Constellis' stock by $29,773,250.00, and not by the amount that Messina estimated.

| Item | Court's Findings of Impact on Price |
|---|---|
| Reliance on Management's Growth Projections | $4,325,000 |
| Use of 0.7 Beta | $2,936,000 |
| Use of 1.0 Company Specific Risk Factor | $0 |
| Use of 3% Perpetual Growth Rate | $0 |
| Weighting of DCF to GCM | $0 |
| Inclusion of Control Premium | $8,186,000 |
| Failure to Include Lack of Control Discount | $9,715,250 |
| Comparable Company Discount | $0 |
| Stock Appreciation Rights | $1,611,000 |
| Rounding | $3,000,000 |
| Total Damages | $29,773,250 |

Subtracting $29,773,250.00 from the total purchase price, $201,529,032.77, means that the ESOP should have paid $171,755,782.77, or $3,609.33 per share to purchase the Constellis stock, rather than the $4,235 it paid for each share of stock.

As an alternative to Messina's approach, Wilmington has argued that at most the damages should be calculated by subtracting the price that should have been paid from the low end of the range that SRR calculated, rather than the price that Wilmington agreed to pay, because most experts agree that fair market value can be expressed as a value range. Applying that method here, the $3,609.33 per share price would be subtracted from $3,865, which was the low end of SRR's range of fair market value. See PTX 2 at 61. Under this calculation the damages would total approximately $12,166,000. That argument is overly simplistic. Although fair market value is best expressed as a range, at some point a single price must be chosen. Wilmington relied heavily on the upper and lower boundary of SRR's range when developing its negotiation strategy and adopted SRR's "median" as the highest price it was willing to pay. Contrary to defendant's view, the Court finds that the entire range of fair market value should

65

have been shifted downward, resulting in new parameters within which the median price would have been set. Simply because the more appropriate range may overlap to some degree with the range that SRR used does not mean that the ESOP suffered less damage.

Finally, Wilmington argues that the ESOP suffered no damage because at the lower price presented by Messina's calculations, Constellis and the Sellers would not have agreed to sell the company to the ESOP. This argument is pure speculation. Although defendant points to Katis' testimony that he would not have agreed to sell Constellis at a price significantly below five times Constellis' EBITDA, such an argument could be raised in any ESOP case involving a claim that the fiduciary paid too much for the employer's stock. A fiduciary cannot evade liability by claiming that, if it had done its job properly and obtained a lower valuation, there would never have been an ESOP. This "heads I win, tails you lose" logic would make it all but impossible to award damages in ESOP cases, thwarting Congress' efforts to protect the participants in such plans. See Valley Nat'l Bank, 837 F. Supp. at 1284; Horn v. McQueen, 215 F. Supp. 2d 867 (W.D. Ky. 2002).

### 10. Pre-Judgment Interest

Plaintiff has also requested that pre-judgment interest be awarded. "ERISA does not specifically provide for pre-judgment interest, and absent a statutory mandate the award of pre-judgment interest is discretionary with the trial court." Quesinberry v. Life Ins. Co. of N. Am., 987 F.2d 1017, 1030 (4th Cir. 1993) (en banc). In federal question cases, the "rate of pre-judgment interest is a matter left to the discretion of the district court." Id. at 1031. The Court finds that pre-judgment is not appropriate in this case because the short life of the ESOP reduced the plan's participants' reliance on the proceeds of the plan.

66

IV.    CONCLUSION

For the reasons stated above, the Court finds that the defendant engaged in a prohibited

transaction by failing to ensure that the ESOP paid no more than adequate consideration for the

stock in Constellis and, as a result, damaged the ESOP by agreeing to overpay $29,773,250.00

for the stock.  An appropriate order entering judgment consistent with this finding will be issued

with this Memorandum Opinion.

Entered this 13 day of March, 2017.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge

67