# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| **TIM P. BRUNDLE, on behalf of the Constellis Employee Stock Ownership Plan,** | |
| **Plaintiff,** | **Civil Action No. 1:15-cv-1494 (LMB/IDD)** |
| **v.** | |
| **WILMINGTON TRUST, N.A., as successor to WILMINGTON TRUST RETIREMENT AND INSTITUTIONAL SERVICES COMPANY,** | |
| **Defendant.** | |

**REPORT OF PROFESSOR CHARLES SILVER ON PLAINTIFF'S AND PLAINTIFF'S COUNSEL'S REQUEST FOR A STATUTORY FEE AWARD AND A COMMON FUND FEE AWARD**

I, Charles Silver, declare as follows:

**1.      SUMMARY OF OPINIONS**

- Plaintiff and Plaintiff's Counsel request a lodestar-based statutory fee award from the Defendant and a percentage-based common fund fee award in favor of Plaintiff's Counsel from the judgment.  Both requests are reasonable.

**2.      CREDENTIALS**

1.      In this Report, I offer my perspective as an expert on attorneys' fees, a subject I have studied and written about for years.  My résumé appears below in Appendix A.

2.      I have testified as an expert on attorneys' fees many times.  Judges have cited or relied upon my opinions when awarding fees in the following major cases, as well as many smaller

ones: *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 991 F.Supp.2d 437 (E.D.N.Y. 2014) (awarding $544.8 million fee on recovery of $5.7 billion); *Silverman v. Motorola, Inc.*, No. 07 C 4507, 2012 WL 1597388 (N.D. Ill. May 7, 2012) (unpublished) (fee award of 27.5 percent on recovery of $200 million); *In re Checking Account Overdraft Litigation*, 830 F. Supp. 2d 1330 (S.D. Fla. 2011) (fee award of 30 percent on recovery of $410 million); *In re Enron Corp. Securities, Derivative & "ERISA" Litig.*, 586 F. Supp. 2d 732 (S.D. Tex. 2008) ($688 million fee award on a $7.2 billion recovery); *Allapattah Services, Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006) (31.33 percent fee award on recovery exceeding $1 billion).

3.      Professionally, I hold the Roy W. and Eugenia C. McDonald Endowed Chair in Civil Procedure at the University of Texas School of Law, where I also serve as Co-Director of the Center on Lawyers, Civil Justice, and the Media.  I joined the Texas faculty in 1987, after receiving an M.A. in political science at the University of Chicago and a J.D. at the Yale Law School.  I received tenure in 1991.  Since then I have been a Visiting Professor at the University of Michigan School of Law, the Vanderbilt University Law School, and the Harvard Law School.

4.      From 2003 through 2010, I served as an Associate Reporter on the American Law Institute's PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION (2010).  Many courts have cited the PRINCIPLES with approval, including the U.S. Supreme Court.

5.      I have taught, researched, written, consulted with lawyers, and testified about attorneys' fees and related subjects for 30 years.  I have published over 80 major writings, many of which appeared in peer-reviewed publications and many of which focus on subjects relevant to this Report.  In 2015, two coauthors and I published a major study of fee awards in securities class actions in the COLUMBIA LAW REVIEW.  Lynn A. Baker, Michael A. Perino, and Charles Silver, *Is

*the Price Right? An Empirical Study of Fee-Setting in Securities Class Actions*, 115 COLUMBIA L. REV. 1371 (2015).  My writings are cited and discussed in leading treatises and other authorities, including the MANUAL FOR COMPLEX LITIGATION, THIRD (1996) and the MANUAL FOR COMPLEX LITIGATION, FOURTH (2004).  In 2009, the Tort Trial and Insurance Practice Section of the American Bar Association gave me the Robert B. McKay Award in recognition of my scholarship in the areas of tort and insurance law.

6.      Finally, because awards of attorneys' fees may be thought to raise issues relating to the professional responsibilities of attorneys, I note that I have an extensive background, publication record, and experience as an expert witness testifying on matters relating to this field.  For example, I am a coauthor of William T. Barker and Charles Silver, PROFESSIONAL RESPONSIBILITIES OF INSURANCE DEFENSE COUNSEL (LexisNexis Mathew Bender, Updated 2014).  I also served as the Invited Academic Member of the Task Force on the Contingent Fee created by the Tort Trial and Insurance Practice Section of the American Bar Association.  I have also taught the subject of legal ethics for years, including a specialized course titled "Professional Responsibility for Civil Litigators" that includes a good deal of material on aggregate lawsuits and lawyers' fees.

## 3.      DOCUMENTS REVIEWED

7.      When preparing this Report, I reviewed the items listed below, which, unless noted otherwise, were generated in connection with this case.  I may also have reviewed other items including, without limitation, cases, treatises, news reports, correspondence, and published scholarly works.

- Memorandum Of Law In Support Of Plaintiff's Motion For Attorneys' Fees And Costs, And Plaintiff's Counsel's Motion For Attorney's Fees And Reimbursement Of Expenses (in draft) ("Plaintiff's Fee Memorandum")

3

- Declaration of Gregory Y. Porter (in draft)

**4.     FACTS**

8.     The facts relevant to this Report are known to the Court and are set out in Plaintiff's

Fee Memorandum.   In brief, this is an ERISA case in which, following a grant of summary

judgment on the main claim in favor of the Plaintiff and a six-day trial to the Court on affirmative

defenses, Plaintiff obtained a judgment in excess of $29.7 million on behalf of an Employee Stock

Ownership Plan and its approximately 1,787 participants, each of whom stands to receive more

than $16,000 apiece, on average.

9.     The Plaintiff and Plaintiff's Counsel (the Movants) now apply to the Court for an

award of fees and costs pursuant to 29 U.S.C. § 1132(g)(1), which empowers the Court to award

"a reasonable attorney's fee and costs of action to either party."   They have also applied for a

common fund award from the judgment in favor of Plaintiff's Counsel.

**5.     ANALYSIS**

10.     This is a model piece of litigation.   After a pre-filing investigation, the original

plaintiff and Plaintiff's Counsel filed a complaint in mid-November of 2015.   Pre-trial motions

then ensued, one of which led to the replacement of the original plaintiff and another of which led

to a grant of summary judgment in favor of the new named plaintiff on the main ERISA claim in

October of 2016.   Discovery occurred throughout this period.   Starting on November 28, 2016, the

case was tried to the Court over a period of six days for the purpose of determining whether the

Defendant could establish affirmative defenses.   The Court found in favor of the Plaintiff on March

13, 2017 and entered judgment for over $29.7 million the same day.   I find it hard to imagine that

this lawsuit could have been managed more efficiently.

11.     The Movants argue that the Plaintiff's victory on the merits satisfies the

requirements for an award of attorneys' fees under ERISA.   In this Report, I assume that is true.

The Movants also request an award of fees from the $29.7 million common fund.  If the judgment survives on appeal and is collected, this request will be proper under common fund doctrine of the law of restitution and unjust enrichment.  In this Report, I attempt to provide information that may help the Court size the two fee awards appropriately.

12.     I begin by emphasizing that there are, in fact, two fee requests.  The first, made pursuant to 29 U.S.C. § 1132(g)(1), ERISA's fee-shifting provision, requests that an amount be added to the judgment that the Defendant will be required to pay.  The Court's ruling on the first request will liquidate the Defendant's fee-related obligation to the Plaintiff.  This is a remedy sought by the Plaintiff for the benefit of the Plaintiff and the Plan.

13.     The second request is for a fee award in favor of Plaintiff's Counsel from the $29.7 million judgment.  If granted, this award will liquidate the ERISA beneficiaries' fee-related obligations to Plaintiff's Counsel.  Notably, Plaintiff's counsel do not seek a percentage of the gross amount of the judgment augmented by the fees collected by Plaintiff under ERISA's fee-shifting statute.  This enhances the reasonableness of the requested common fund fee award, as I will explain in more detail below.

14.     Because different methodologies apply to the two fee requests, the two fee awards can differ in size.  The Movants' request for fees from the Defendant is governed by the lodestar method, which multiplies lawyers' reasonable hourly rates by the number of hours that lawyers reasonably expend and applies a limited number of enhancements.  The Movants' request for a fee award from the common fund recovery is governed by the percentage method.[1]  Because the

---

[1] District courts across the country use the percentage method when awarding fees from common funds.  Although the Fourth Circuit has not formally adopted this approach, district court judges in this circuit have used it many times.  *See, e.g., Manuel v. Wells Fargo Bank, National Association*, 2016 WL 1070819, at *5 (E.D. Va. Mar. 15, 2016) ("In the instant action, this Court will apply the percentage method preferred by most courts in common fund cases.").

percentage method is based more heavily on risks incurred and results obtained than on time expended, a common fund fee award can exceed a lodestar-based fee award, and typically will. Although many courts still use the lodestar method as a cross-check,[2] a study by Professor Brian Fitzpatrick found that judges used the percentage method 69 percent of the time. The lodestar method was strongly disfavored, being used in only 12 percent of the cases. Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards,* 7 JOURNAL OF EMPIRICAL LEGAL STUDIES 811, 832 (2010).

15.     An as-yet unpublished study that covers a more recent time period, 2009-2013, found that use of the lodestar as the primary fee-setting methodology continues to decline.

> The vast majority of fee awards during the 2009-2013 period were decided using the percentage method or the percentage method with a lodestar check. The percentage method was used in 53.61% of cases and used in combination with a lodestar check in an additional 38.23% of cases. The use of the pure lodestar method, on the other hand, was used in only 6.29% of cases during the 2009-2013 period. This is down from its use in 13.6% of cases during the 1993-2002 period and 9.6% of cases during the 2003-2008 period.

Theodore Eisenberg, Geoffrey P. Miller, and Roy Germano, *Attorneys' Fees in Class Actions: 2009-2013* NYU Law School Law & Economics Research Paper Series, Working Paper No. 17-02 (draft dated December 2016), available at SSRN.com.

---

[2] For example, in *Fangman v. Genuine Title, LLC,* 2017 WL 86010, at *3 (D. Md. Jan. 10, 2017), Judge Richard D. Bennett recently wrote:

> For the reasons explained in this Court's prior Memorandum Opinion of November 18, 2016 (ECF No. 411), the "percentage of recovery" method shall be used to calculate Settlement Counsels' attorneys' fees and expenses in this case. However, this Court will cross-check the "percentage of recovery" analysis with a lodestar analysis. This Court has previously recognized that "using the percentage of fund method and supplementing it with the lodestar cross-check ... take[s] advantage of the benefits of both methods." *Singleton v. Domino's Pizza, LLC*, 976 F. Supp. 2d 665, 681 (D. Md. 2013) (quoting *In re The Mills Corp. Securities Litig*., 265 F.R.D. 246, 261 (E.D. Va. 2009)).

This passage accurately describes a common practice.

16.     The difference in methodology—lodestar vs percentage of the recovery—reflects a difference in purpose.  The Supreme Court has mandated the use of the lodestar method in statutory fee-shifting cases because, in its judgment, this method comports with Congress' desire to enable persons with meritorious claims to obtain competent legal representation.  The purpose of the common fund doctrine, by contrast, is to remedy unjust enrichment, which occurs when passive beneficiaries free-ride on others' efforts and enjoy the benefits of successful lawsuits without sharing in the costs.  Because the usual cost of hiring a lawyer is the market rate, the law of restitution and unjust enrichment requires passive beneficiaries to pay that amount, on the theory that they would have paid the market rate had they hired lawyers directly.

**A.      The Statutory Fee Award Payable By The Defendant**

17.     As mentioned, the lodestar method governs requests for statutory fee awards from opposing parties.  One must evaluate the reasonableness of the hourly rates, hours, and multipliers, if any, when applying this method.

i.   Plaintiff's Counsels' Hourly Rates

18.     The hours and hourly rates for the lawyers and staff members who delivered services for the benefit of the plaintiff class are listed in the table below, which is based on information found in Plaintiff's Fee Memorandum.   In my opinion, the requested rates are reasonable.

| TIMEKEEPERS, HOURLY RATES, AND TIME EXPENDED | | | | |
|---|---|---|---|---|
| **Name** | **Position** | **Hourly Rate** | **Hours** | **Fee** |
| Brian Glasser | Partner | $750 | 221.8 | $166,350.00 |
| Gregory Porter | Partner | $750 | 899.5 | $674,625.00 |
| Ryan Jenny | Partner | $550 | 1332.7 | $732,985.00 |
| Thanos Basdekis | Partner | $550 | 1181.7 | $649,935.00 |
| Patrick Muench | Senior Associate | $400 | 875.5 | $350,200.00 |
| Benjamin Lajoie | Associate | $225 | 85.8 | $19,305.00 |
| Denise Milhoan | Paralegal | $175 | 15.8 | $2,765.00 |
| Loc Le | Paralegal | $200 | 129.5 | $25,900.00 |
| Melissa Chapman | Paralegal | $175 | 104.3 | $18,252.50 |
| Melissa Kestner-Clay | Paralegal | $200 | 739.3 | $147,860.00 |
| Pratik Budhdev | Business Analyst | $300 | 91.84 | $27,552.00 |
| | | $499 | 5585.90 | $2,788,177.50 |
| | | **Weighted Average** | **Total** | **Total** |

19.     Over the past three decades, I have worked with dozens of lawyers who handle class actions and other large, complex lawsuits and have reviewed or read about countless fee applications. Both my general familiarity with the market for legal services and particular examples lead me to conclude that the listed rates are comparable to those charged by other lawyers and legal assistants with similar experience and qualifications who practice in urban areas.

20.     For example, one law firm that I worked with on a prior matter served as counsel in the Flat Panel Antitrust Litigation, which produced a billion-dollar settlement. The firm's charges, which were granted by the court, ran from about $765 per hour for senior partners to $175 per hour for paralegals, rates that are comparable to those requested here. See *Amended Order Granting Direct Purchaser Class Plaintiffs' Motion for Attorneys' Fees, Reimbursement of Expenses, and Incentive Awards, In Re: TFT-LCD (Flat Panel) Antitrust Litigation*, 2011 WL 7575003 (N.D. Cal. Dec. 27, 2011). Many courts have approved rates similar to those requested by Plaintiff's Counsel when awarding fees pursuant to fee-shifting statutes or from common funds.

8

21.     I also gained perspective on Class Counsel's requested rates by consulting surveys of law firms' billing rates taken by the NATIONAL LAW JOURNAL (NLJ) in various years.  The surveys contain information regarding the high, low, average, and median billing rates for partners and associates at large law firms that handle business matters and that typically have offices in metropolitan areas.  The number of firms participating in the NLJ surveys varies from year to year but always exceeds 100.  The NLJ surveys are often cited to courts as evidence supporting hourly rates in fee applications.  See, e.g., *Parkinson v. Hyundai Motor Am.*, 796 F. Supp. 2d 1160, 1172-73 (C.D. Cal. 2010) (admitting into evidence and relying upon expert report by Professor William Rubenstein, which was based in part on NLJ surveys).

22.     Because the law firms included in the NLJ surveys are of the type that normally represent defendants in lawsuits like this one, the rates they charge provide an especially helpful basis on which to assess the reasonableness of Plaintiff's Counsel's requested rates.  ERISA beneficiaries deserve representation of the same caliber that large corporate defendants receive. Plaintiff's Counsel provided just such high-quality services here.  They grappled with some of Virginia's best lawyers and won.

23.     The 2010 NLJ survey reported that the range for "Partner Bill Rate High"—the category that includes senior partners—ran from $1,120 to $385 and averaged $700.  The rates requested for the lawyers listed as "partners" in Plaintiff's Fee Memorandum who did the bulk of the work fall near or below the middle of this range.  Their charges are reasonable even when compared to rates that lawyers charged when the current decade began.

24.     The comparison seems even more favorable when more recent rates are applied. Today, many top-flight lawyers charge more than $1,000 per hour.  The subtitle to a report on the NLJ's 2014 billing survey communicated this plainly: "$1,000 Per Hour Isn't Rare Anymore."

Karen Sloan, *NLJ Billing Survey:  $1,000 Per Hour Isn't Rare Anymore,* THE NATIONAL LAW

JOURNAL (January 13, 2014).  Reading the text of the article, one learns that "[n]early 20 percent

of the firms included in THE NATIONAL LAW JOURNAL's annual survey of large law firm billing

rates [in 2014] had at least one partner charging more than $1,000 an hour."  No partner-level

lawyer involved in this case requests an hourly rate anywhere close to that amount.

25.     The 2014 NLJ survey, which contained information for 159 of the largest law firms

in the U.S., found a median rate for the highest partner billing category of $775.  This means that

at half of the firms, the highest-charging partner billed at a rate above $775 while at the other half

the highest-charging partner charged that amount or less.  For all firms surveyed, partners charged

an average of $604 per hour while associates billed $370.  National Law Journal, Billing Rates

Across          the          Country          (Jan.          13,          2014),

http://www.nationallawjournal.com/id=1202636785489/Billing-Rates-Across-the-Country.

26.     Here, the rates requested for the two top-billing partner-level attorneys who led the

trial team—Brian Glasser and Gregory Porter, both of whom request $750 per hour—fall below

the $775 median for highest-billing partners reported by the NLJ.  Two other partners who also

bore laboring oars, Ryan Jenny and Thanos Basdekis, bill at the rate of $550.  Their charges fall

$50 per hour below the average for all partners, and are also reasonable.

27.     Turning from partners to associates, the 2014 NLJ survey reported a median high

hourly rate for associates of $510 and a median low rate of $235. The average associate rate was

found to be $370.  Here, the two associates who expended significant amounts of time—Patrick

Muench and Benjamin Lajoie—request $400 and $225 per hour, respectively.  That these charges

are reasonable is patent.

28.     When considering the reasonableness of Class Counsel's requested hourly rates, the rates being charged by the Defendant's attorneys are also relevant.  The table below provides information about the hourly rates charged by lawyers at McGuireWoods LLP taken from two NLJ surveys, one conducted in 2010 and the other in 2013.  As is clear, the rates requested by Plaintiff's Counsel are in line with those charged by lawyers of comparable rank at McGuireWoods LLP.

| HOURLY RATES FOR MCGUIREWOODS ATTORNEYS AS REPORTED BY THE NATIONAL LAW JOURNAL | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| NLJ Publi- cation Year | Firm Name | Location | Partner Billing Rate High | Partner Billing Rate Average | Partner Billing Rate Low | Associate Billing Rate High | Associate Billing Rate Average | Associate Billing Rate Low |
| 2010 | McGuire Woods | Richmond, Va. | $830 | $543 | $325 | $600 | $355 | $220 |
| 2014 | McGuire Woods | Richmond, Va. | $725 | $595 | $450 | $525 | $360 | $285 |

29.     Federal district courts in Virginia have approved lodestar-based fee award requests based on similar rates.  A summary of recently-approved rates appeared in *Brown v. Transurban USA, Inc.*, 2016 WL 6909683 (E.D. Va. Sept. 29, 2016):

> *See, e.g.*, *In re Neustar*, 2015 WL 8484438, at *10 (approving rates of $260–$310 for paralegal services, $420–$700 for associates, and $800–$975 for partners, in part because the fee award requested represented a substantial discount off the total lodestar calculated using these rates); *Hosch v. BAE Systems Info. Sols., Inc.*, No. 1:13–CV–00825 (AJT/TCB), 2015 WL 12227738, at *3 n.4 (E.D. Va. Apr. 28, 2015) (finding that rates of up to $650/hour were "within the acceptable range of reasonableness" even though the court determined the hours billed were excessive and reduced the fee award accordingly); *In re Microstrategy, Inc.*, 172 F.Supp.2d 778, 788 n.33 (E.D. Va. 2001) (concluding that $555 per hour for a senior partner and $220 per hour for a junior associate in 2001 were rates "not inconsistent with the rates charged by lawyers in large, prominent, and ... expert law firms"); *Phillips v. Triad Guar. Inc.*, No. 1:09–CV–71, 2016 WL 2636289, at *8 (M.D.N.C. May 9, 2016) (finding that partner billing rates of $640–$880 per hour and associate billing rates of $375–$550 per hour were "within the range of reasonableness[,]" especially given that "the market for class action attorneys is nationwide and populated by very experienced attorneys with excellent credentials"); *Boyd v.*

*Coventry Health Care Inc.*, 299 F.R.D. 451, 467 (D. Md. 2014) (accepting as reasonable rates ranging from $325–$700 per hour).

Most of these rates are similar to those requested here; some are higher.

### ii.  Plaintiff's Counsels' Hours Expended

30.     I turn now to the time that Plaintiff's Counsel expended.  The statutory fee request reflects almost 5,700 hours of billed time by attorneys, specialists, and paralegals combined.  This total was calculated after applying billing judgment, which led to the exclusion of time spent defending the appeal of the Court's ruling on the original plaintiff, time spent by persons who billed fewer than ten hours, and other hours there were deemed not proper to bill, including time spent on Plaintiff's fee motion.

31.     Several considerations support the conclusion that the time expended is reasonable.  First, Plaintiff's Counsel recorded their hours contemporaneously.  Second, much of the lawyering that took place in this case was observed directly or indirectly by the Court.  The docket sheet, which contains over 300 entries, indicates that the litigation was continuously active.  A considerable fraction of the time expended also related to preparations for or actions taken during the six-day trial.  The Court is well placed to evaluate the reasonableness of these lawyering activities.

32.     Most importantly, I note that Plaintiff's Counsel had every reason to be frugal with their time.  Unlike lawyers who are paid by the hour, and who must consequently be discouraged from expending time needlessly, Plaintiff's Counsel worked on contingency.  Their incentive was to expend too little time, not too much.  The risk of nonpayment encourages plaintiffs' attorney to be cautious with their time, and the fact that they receive only a fraction of the gains enjoyed by their clients discourages them from overworking.  I have explained these incentives many times, and federal judges have recognized them too.  For example, in *Parkinson v. Hyundai Motor Am.*,

12

796 F. Supp. 2d 1160, 1172-73 (C.D. Cal. 2010), the court observed that "'lawyers are not likely to spend unnecessary time on contingency fee cases in the hope of inflating their fees. The payoff is too uncertain, as to both the result and the amount of fee'" (quoting *Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008)).  Although Plaintiff's Counsel did send more than one attorney to several depositions for the purpose of enhancing their collective knowledge of the case, hours for attorney's who attended but did not take the deposition have not been charged.

33.     The remarkable thing is that Plaintiff's Counsel took this case on contingency and expended the time needed to win, while also bearing the required out-of-pocket costs.  It made economic sense to expend these resources only when and because the expected return for the beneficiaries so greatly exceeded the cost as to generate a sufficient premium to pay attorneys' fees.  I know of no study finding that lawyers who work on contingency routinely expend excessive amounts of time, and I know of several reporting that plaintiffs' law firms operate efficiently.

**B.  The Common Fund Fee Award Payable by the Absent Beneficiaries**

34.     I turn now to the common fund fee award, the purpose of which is to cure unjust enrichment by compensating Plaintiff's Counsel for services delivered to absent ERISA beneficiaries who will participate in the recovery.  Plaintiff's Counsel requests an award equal to one-third (33.33 percent) of the judgment amount, approximately $29.7 million.  As mentioned above, Plaintiff's Counsel do not seek to collect a common fund fee on the statutory fee award, even though that will be part of the ERISA beneficiaries' recovery.

i.   The Common Fund Fee Award Should Reflect Lawyers' Market Rates

35.     I have repeatedly urged judges to apply market rates when awarding fees out of common fund recoveries in class actions.  I did so in the first article I published after becoming a law professor and, much more recently, in an article I prepared for an academic conference on

13

securities litigation last year. *See* Charles Silver, *A Restitutionary Theory of Attorneys' Fees in Class Actions*, 76 CORNELL L. REV. 656 (1991) (hereinafter *Restitutionary Theory*); and Charles Silver, *The Mimic-the-Market Method of Regulating Common Fund Fee Awards: A Status Report on Securities Fraud Class Actions*, *presented at* the Fourth Annual Workshop on Corporate & Securities Litigation, Chicago, IL, Sept. 30-Oct 1, 2016, and *forthcoming in* Sean Griffith, Jessica Erickson, David H. Webber, and Verity Winship, Eds., RESEARCH HANDBOOK ON REPRESENTATIVE SHAREHOLDER LITIGATION (2017). Altogether, I have espoused this view hundreds of times in published writings, conference presentations, live testimony, and expert witness reports. By market rates I mean the rates at which plaintiffs' attorneys are compensated in the market where plaintiffs hire lawyers on contingency, not the market in which they hire lawyers at guaranteed hourly rates.

36.     The reasons for mimicking the market are several. First, the right to compensation arises under the law of restitution and unjust enrichment, and that body of law uses service providers' usual and customary charges as the measure of compensation. The reason is simple. Restitution operates in contexts where it is impracticable for parties to contract for payments in advance. It then reasons that, had no impediment to contracting existed, a beneficiary and a service provider would have settled on the market rate because there would have been no reason for the former to pay more or for the latter to accept less.

37.     Second, market rates incentivize lawyers to represent class members zealously, as both Rule 23(a)(4) of the Federal Rules of Civil Procedure and the Due Process Clause require. Again, the thinking is straightforward. When sophisticated clients hire lawyers, they use fee formulas that encourage their attorneys to maximize the expected net value of their claims, that is, the amounts they expect to keep after deducting attorneys' fees and litigation costs. Class members

would want to achieve the same object if they were able to hire lawyers directly.  They cannot do so, however, so Rule 23 and the Due Process Clause fill the gap by requiring judges to incentivize lawyers properly for them.  The mimic-the-market approach makes this task easy by providing an objective basis upon which the soundness of fee arrangements may be tested.  Arrangements like those used by sophisticated clients pass the test; all other arrangements fail.

38.     Third, the mimic-the-market approach guides judges' discretion and reduces the likelihood that improper considerations will influence the size of fee awards.  By itself, the multi-factor approach sometimes used by courts does neither.  As Judge D. Brock Hornby observed, the multi-factor approach "offers little predictability," "would support equally a fee award of 16%, 20%, 25%, 30%, or 33-1/3%," "is not a rule of law or even a principle," "allows uncabined discretion to the fee-awarding judge," employs "factors [that] seem inconsistent with … [the goal of] creat[ing] incentives for the lawyer to get the most recovery for the class by the most efficient manner," and "consume[s] significant lawyer and judicial resources."  *Nilsen v. York County*, 400 F.Supp.2d 266, 277-278 (D. Me. 2005).  Judge Frank Easterbrook, who sits on the Seventh Circuit, put the matter more succinctly, writing that "a list of factors without a rule of decision is just a chopped salad."  *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 719 (7th Cir. 2001).  "[A]ny method other than looking to prevailing market rates assures random and potentially perverse results."  *Id.*

39.     The mimic-the-market approach's potential to minimize the impact of the hindsight bias is especially important.  The hindsight bias is a known defect in human reasoning that causes people who know about actual outcomes to misestimate *ex ante* risks.  If allowed to operate, the hindsight bias would bias fee awards downward by causing judges to under-estimate litigation

15

risks. This would hurt class members by weakening their lawyers' incentives.[3]  The mimic-the-market approach ensures that lawyers will represent class members zealously by focusing judges' attentions on the terms that real clients actually use when hiring attorneys.  Because those terms take account of ex ante risks correctly, desirable incentives are preserved.

      ii.   <u>More and More Judges Are Mimicking The Market When Awarding Fees In Class Actions</u>

40.     As mentioned, my 1991 article, *Restitutionary Theory*, introduced the idea that judges should mimic the market when awarding fees in class actions.  Thereafter, the idea quickly took root and spread.  Only a year or so later, the Seventh Circuit embraced this approach in *In re Continental Illinois Securities Litigation*, 962 F.2d 566, 572 (7th Cir. 1992), where Judge Richard A. Posner wrote that "[t]he object in awarding a reasonable attorney's fee [from a class action settlement] ... is to give the lawyer what he would have gotten in the way of a fee in an arm's length negotiation, had one been feasible." *See also id.* at 568 ("[I]t is not the function of judges . . . to determine the equivalent of the medieval just price.  It is to determine what the lawyer would receive if he were selling his services in the market rather than being paid by court order.").  Since then, Seventh Circuit judges adhering to this doctrine have awarded fees at market rates, even in

---

[3] Judge Easterbrook wrote about the hindsight bias in *In re Synthroid Mktg. Litig.*, 264 F.3d at 718–19.

> On remand the district court must estimate the terms of the contract that private plaintiffs would have negotiated with their lawyers, had bargaining occurred at the outset of the case (that is, when the risk of loss still existed).  The best time to determine this rate is the beginning of the case, not the end (when hindsight alters the perception of the suit's riskiness, and sunk costs make it impossible for the lawyers to walk away if the fee is too low). This is what happens in actual markets. Individual clients and their lawyers never wait until after recovery is secured to contract for fees. They strike their bargains before work begins…. Only *ex ante* can bargaining occur in the shadow of the litigation's uncertainty[.]… [T]he court must set a fee by approximating the terms that would have been agreed to *ex ante*, had negotiations occurred.

class actions with large recoveries. For example, in *Standard Iron Works v. ArcelorMittal et al.*, No. 08 C 5214, 2014 WL 7781572, at *1 (N.D. Ill. Oct. 22, 2014), which settled for $164 million, the district court found "that a 33% fee comport[ed] with the prevailing market rate for legal services of similar quality in similar cases."

41.     The Second Circuit endorsed the principle of using market rates a few years later. In *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 52 (2d Cir. 2000), it observed that "market rates, where available, are the ideal proxy for [lawyers'] compensation." The Second Circuit's only concern was the difficulty of "know[ing] precisely what fees common fund plaintiffs in an efficient market for legal services would agree to, given an understanding of the particular case and the ability to engage in collective arm's-length negotiation with counsel." *Id.* This, of course, is an *endorsement* of the mimic-the-market approach, not a criticism. When the evidence supports a solid inference regarding the terms that would have been set in the market for legal services, the market rate should determine the fee.

42.     Although no other circuit has formally adopted the mimic-the-market approach, a look at the cases reveals that district court judges everywhere take guidance from the market routinely. In *Allapattah Services, Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1211 (S.D. Fla. 2006), a case from the Eleventh Circuit, Judge Alan Gold agreed that "the more appropriate measure of a reasonable percentage is the market rate for a contingent fee in commercial cases" and awarded a fee of 31.33 percent from a billion-dollar recovery. In the First Circuit, District Court Judge D. Brock Hornby has applied the mimic-the-market approach repeatedly, and has gained adherents among his brethren. *See Nilsen v. York County*, 400 F. Supp. 2d 266, 277-278

(D. Me. 2005) (endorsing market-based approach);[4] and *In re Cabletron Systems, Inc. Securities Litigation*, 239 F.R.D. 30 (D. N.H. 2006) (Judge Smith) (following *Nilsen*). And in the Ninth Circuit, Judge Helen J. Frye took the market into account when awarding 40 percent of a $29.25 million partial settlement as fees *In re: Melridge, Inc. Securities Litigation*, No. CV 87-1426-FR (D. Or. Apr. 15, 1996). She observed that, "[i]n Portland[, Oregon], it is normal for contingent fee arrangements entered into at arm's length to provide for a fee of one-third of the recovery if settlement is reached prior to trial, with a larger percentage of 40% if the case proceeds to trial." Combining all of the partial settlements in *Melridge*, the total fee award was 37 percent of the $56.5 million aggregate recovery.

### iii. A Survey of Prevailing Market Rates

43. In this section, I discuss what is known about the fees that clients pay when hiring lawyers on contingency. With but two exceptions, neither of which applies here, the evidence shows that when sophisticated clients serve as plaintiffs in high-stakes commercial lawsuits—including but not limited to class actions—they typically pay their lawyers 25-40 percent of their gross recoveries, with fees in the 33.33-40 percent range being especially common.

44. Judges have known this for years. For example, in 1993, Ralph G. Thompson, then Chief Judge of the Western District of Oklahoma, made the following observation when awarding class counsel one-third of a $35 million common fund recovery: "Fees in the range of 30–40% of any amount recovered are common in complex and other cases taken on a contingent fee basis."

---

[4] In addition to *Nilsen v. York County*, 400 F. Supp. 2d 266, 277-278 (D. Me. 2005), discussed in the text, Judge Hornby applied the mimic-the-market approach in *Scovil v. FedEx Ground Package System, Inc.*, No. 1:10-CV-515-DBH, 2014 WL 1057079, at *5 (D. Me. Mar. 14, 2014); *In re New Motor Vehicles Canadian Export Antitrust Litigation*, 842 F. Supp. 2d 346 (D. Me. 2012); and *Prescott v. Prudential Ins. Co. of America*, No. 2:09-CV-00322-DBH, 2011 WL 6662288, at *2 (D. Me. Dec. 20, 2011).

*Cimarron Pipeline Constr., Inc. v. Nat'l Council on Compensation Ins.,* 1993 WL 355466, at *2 (W.D. Okla. June 8, 1993).  To my knowledge, judges generally agree that the market rate falls in this range.

### 1.  Fees Promised by Sophisticated Named Plaintiffs in Class Actions

45.     In the course of my studies of class actions and expert witness engagements, I have gathered information about the fees that named plaintiffs agree to pay when hiring lawyers to handle class actions.  This information strongly supports the conclusion that contingent fees normally fall within the 25-40 percent range, and cluster more narrowly with 33.33-40 percent.

46.     Consider first the series of antitrust class actions against pharma companies listed in the table below.  The class members were drug wholesalers who appeared in the cases repeatedly, including several of Fortune 500 size or bigger.  Many had in-house or personal counsel monitoring the litigations.  The potential damages in several of the cases were enormous.  One case, *King Drug Company of Florence, Inc. v. Cephalon, Inc.*, No. 2:06-cv-1797-MSG (E.D. Pa. Oct. 8, 2015), settled for over $500 million, and the series as a whole recovered more than $1 billion.  In all of the cases the wholesalers actively supported fee awards in what I have identified as the normal range.  Many submitted declarations or letters urging judges to pay the indicated amounts.  Seeing that these sophisticated clients believed that class counsel had earned the dollars they requested, the presiding judges gave great weight to their opinions.

| RECOVERIES AND FEE AWARDS IN PHARMACEUTICAL ANTITRUST CASES, SORTED BY SETTLEMENT DATE | | |
|---|---|---|
| **Case** | **Recovery (millions)** | **Fee Award** |
| *King Drug Company of Florence, Inc. v. Cephalon, Inc.*, No. 2:06-cv-1797-MSG (E.D. Pa. Oct. 8, 2015) | $512 | 27.5% plus expenses |
| *In re Doryx Antitrust Litig.*, No. 12-3824 (E.D. Pa. Sept. 15, 2014) | $15 | 33⅓% plus expenses |
| *In re Neurontin Antitrust Litig.*, No. 02-1830 (D.N.J. Aug. 6, 2014) | $191 | 33⅓% plus expenses |
| *In re Skelaxin (Metaxalone) Antitrust Litig.*, No. 12-cv-83 (E.D. Tenn. June 30, 2014) | $73 | 33⅓% plus expenses |
| *In re Flonase Antitrust Litig.*, No. 08-cv-3149 (E.D. Pa. June 14, 2013) | $150 | 33⅓% plus expenses |
| *In re Wellbutrin XL Antitrust Litig.*, No. 08-cv-2431 (E.D. Pa. Nov. 7, 2012) | $37.50 | 33⅓% plus expenses |
| *Rochester Drug Co-Operative, Inc. v. Braintree Labs., Inc.*, No. 07-142 (D. Del. May 31, 2012) | $17.25 | 33⅓% plus expenses |
| *In re DDAVP Antitrust Litig.*, No. 05-2237 (S.D.N.Y. Nov. 28, 2011) | $20.25 | 33⅓% plus expenses |
| *In re Wellbutrin SR Antitrust Litig.*, No. 04-5525 (E.D. Pa. Nov. 21, 2011) | $49 | 33⅓% plus expenses |
| *Meijer, Inc. v. Abbott Labs.*, No. C07-5985 CW (N.D. Cal. Aug. 11, 2011) | $52 | 33⅓% plus expenses |
| *In re Nifedipine Antitrust Litig.*, No. 03-mc-223-RJL (D.D.C. Jan. 31, 2011) | $35 | 33⅓% plus expenses |
| *In re Oxycontin Antitrust Litig.*, No. 04-md-1603-SHS (S.D.N.Y. Jan. 25, 2011) | $16 | 33⅓% plus expenses |
| *In re Tricor Direct Purchaser Antitrust Litig.*, No. 05-cv-340 (D. Del. April 23, 2009) | $250 | 33⅓% plus expenses |
| *In re Remeron Direct Purchaser Antitrust Litig.*, 2005 U.S. Dist. LEXIS 27013 (D.N.J. Nov. 9, 2005) | $75 | 33⅓% plus expenses |
| *In re Terazosin Hydrochloride Antitrust Litig.*, No. 99-MDL-1317, 2005 U.S. Dist. LEXIS 43082 (S.D. Fla. Apr. 19, 2005) | $74 | 33⅓% plus expenses |
| *In re Relafen Antitrust Litig.*, No. 01-12239, 2004 U.S. Dist. LEXIS 28801 (D. Mass. April 9, 2004) | $175 | 33⅓% plus expenses |
| *In re Buspirone Antitrust Litig.*, No. 01-CV-7951, 2003 U.S. Dist. LEXIS 26538 (S.D.N.Y. April 11, 2003) | $220 | 33⅓% plus expenses |
| *In re Cardizem CD Antitrust Litig.*, MDL No. 1278 (E.D. Mich. Nov. 26, 2002) | $110 | 30% plus expenses |

48.     The examples just described are not part of a new trend. Sophisticated clients have been paying fees of 33 percent or more in antitrust cases for years. A famous case from the 1980s involved the Texas law firm of Vinson & Elkins (V&E). ETSI Pipeline Project (EPP) hired V&E to sue Burlington Northern Railroad and other defendants, alleging a conspiracy on their part to

20

prevent EPP from constructing a $3 billion coal slurry pipeline.   In a sworn affidavit, Harry

Reasoner, then V&E's managing partner, described the financial relationship between EPP and

V&E.

> The terms of our retention were that our client would pay all out-of-pocket expenses
> as they were incurred, but all legal fees were contingent upon a successful outcome.
> We were paid 1/3 of all amounts received by way of settlement or judgment.   We
> litigated the matter for 5 years.   At the conclusion, we had settled with all
> defendants for a total of $634,900,000.00.   As a result, a total of $211,633,333.00
> was paid as contingent legal fees.

*Declaration of Harry Reasoner*, filed in *In re Washington Public Power Supply System Securities*

*Litigation,* MDL No. 551 (D. Ariz. Nov. 30, 1990).   Note that the fee was one-third even though

the client bore litigation costs.   Had V&E been asked to shoulder those too, the fee would likely

have been 40 percent, as shown by the discussion of patent cases below.

49.      Antitrust cases are not unique.   Sophisticated named plaintiffs agree to pay similar

fees in large class actions of other types.   Consider *In re U.S. Foodservice, Inc. Pricing Litigation*,

Case No. 3:07-md-1894 (AWT) (D. Conn.), a RICO class actions that produced a $297 million

settlement.   One of the named plaintiffs, Thomas & King Inc., was formerly one of the largest

operators of Applebee's franchises in the United States and the nation's eighth-largest restaurant

franchise company overall, with approximately 7,500 employees.   The other named plaintiff,

Catholic Healthcare West/Dignity Health, was the fifth largest health system in the nation and the

largest provider of non-profit hospital services in California.   Both clients were represented by

private counsel when they retained and negotiated fees with class counsel, and both agreed that

the fee award might be as high as 40 percent.   The court awarded one-third of the recovery as fees.

50.      *In re International Textile Group Merger Litigation*, C.A. No. 2009-CP-23-3346

(Court of Common Pleas, Greenville County, South Carolina), was a lawsuit filed by minority

investors that settled for relief valued at about $81 million.   Five sophisticated investors served as

named plaintiffs. Two, FURSA Alternative Strategies LLC and RAMIUS LLC, were, respectively, a hedge fund manager and a global investment manager.  All five clients agreed to pay 35 percent of the gross class-wide recovery as fees, with expenses to be separately reimbursed.  The 35 percent fee was bargained down after initially being set at over 40 percent.

51.     In all the cases just discussed, the named plaintiffs were sophisticated businesses with significant resources and ready access to the market for legal services.  Their willingness to promise fees ranging from one-third to 40 percent in large commercial class actions shows clearly that, in their judgment, fees in this range were reasonable.[5]

### 2.   Contingent Fees in Patent Cases

52.     There are many reports of percentage fees of one-third or higher being paid in patent cases, which, like antitrust cases, often involve difficult technical and empirical issues.  Indeed, the usual patent case is often less risky and protracted than the typical antitrust litigation because patent plaintiffs rarely face the risks and delay of class certification.  This makes the fees paid in patent litigation a conservative point of comparison.

53.     The most famous example of the prevalence of fees of one-third or more in high-stakes patent lawsuits involves the dispute between NTP Inc. and Research In Motion Ltd., the

---

[5] Examples of sizeable contingent fees can also be found in cases involving business clients who intervened in class actions.  In *In re Synthroid Marketing Litig.*, 264 F.3d 712, 719 (7th Cir. 2001), Judge Frank Easterbrook reported that, *after a settlement was already on the table*, "a group of more than 100 [third party payers] . . . contracted with two law firms to represent them. . . . [T]he contracts provided for a 25% contingent fee at maximum."  In an expert witness report submitted in the *High Fructose Corn Syrup Antitrust Litigation*, Professor John C. Coffee, Jr. reported that Gray & Co., an opt-out claimant, promised its lawyers 33-40 percent of the recovery in parallel litigation, depending on the time of settlement.  *Declaration of John C. Coffee, Jr.*, submitted in *In re High Fructose Corn Syrup Antitrust Litigation,* M.D.L. 1087, Dkt. No. 1421 (C.D. Ill. Oct. 7, 2004), pp. 1-2.  Notably, neither of these situations (*Synthroid* or *High Fructose*) presented anywhere near the risk for the lawyers associated with litigating a complex class action case from scratch.

company that manufactured the Blackberry. NTP, the plaintiff, promised its law firm, Wiley Rein

& Fielding (WRF), a one-third contingent fee. When the case settled for $612.5 million, WRF

received more than $200 million in fees. Yuki Noguchi, *D.C. Law Firm's Big BlackBerry Payday:*

*Case Fees of More Than $200 Million Are Said to Exceed Its 2004 Revenue*, WASHINGTON POST,

March 18, 2006, at D03.

54.     The terms in WRF's fee agreement were typical, as Professor David L. Schwartz

learned by interviewing 44 experienced patent lawyers and reviewing 42 contingent fee

agreements that were used in patent cases. Professor Schwartz reported that, across the board, fee

percentages fell within the range I have described as normal, typically clustered within 33-40

percent, and increased with case duration and appeals.

> On the whole, the contingent rates are similar to the "one-third" that a stereotypical
> contingent personal injury lawyer charges. There are two main ways of setting the
> fees for the contingent fee lawyer: a graduated rate and a flat rate. Of the
> agreements using a flat fee reviewed for this Article, the mean rate was 38.6% of
> the recovery. The graduated rates typically set milestones such as "through close
> of fact discovery," "through trial," and "through appeal," and tied rates to recovery
> dates. As the case continued, the lawyer's percentage increased. Of the agreements
> reviewed for this Article that used graduated rates, the average percentage upon
> filing was 28% and the average through appeal was 40.2%.

David L. Schwartz, *The Rise of Contingent Fee Representation in Patent Litigation,* 64 ALABAMA

LAW REVIEW 335, 360 (2012).

55.     Professor Schwartz did not have a random sample of engagement contracts used in

patent cases to consider. But his conclusions are consistent with both the examples discussed

above and with reports found in patent blogs, case reports, and other publications. For example,

the following passage appeared in Matt Cutler, *Contingent Fee Patent Litigation, and Other*

*Options*.

> *Contingent Fee Arrangements*: In a contingent fee arrangement, the client does not
> pay any legal fees for the representation. Instead, the law firm only gets paid from
> damages obtained in a verdict or settlement. Typically, the law firm will receive

23

between 33-50% of the recovered damages, depending on several factors—a strictly results-based system.

Matt Cutler, *Contingent Fee Patent Litigation, and Other Options*, PATENT LITIGATION, http://ipr-pgr.com/patent-litigationlaw-updates/cost-contained-u-s-patent-litigation. Mr. Culter's observation that fees sometimes run as high as 50 percent comports with Professor Schwartz's finding that the average rate through appeal was 40.2 percent.

56.    Sophisticated clients sometimes use scales of percentages in patent cases, but when they do the percentages seem not to fall below 25 percent. *Tanox, Inc. v. Akin, Gump, Strauss, Hauer & Feld, LLP, et al.*, 105 S.W.3d 244 (Tex. Appls.—Houston, 2003), provides an example. There, a sophisticated client "agreed to pay the [l]awyers a contingency fee pursuant to a sliding scale: 25% of the first $32 million recovered by Tanox, 33 1/3% of recovery from $32 million to $60 million, 40% of recovery from $60 million to $200 million, and 25% of recovery over $200 million." *Id*. at 248-249. The agreement also contained other provisions favorable to the lawyers, including a promise of "$100 million if they obtained a permanent injunction." "The total fees Tanox agreed to pay the Lawyers were capped at $500 million and the total fees derived from royalties were capped at $300 million." *Id*. at 249. Like NTP in the *Blackberry* litigation, Tanox agreed to pay both high percentages and a potentially enormous amount.

### 3.    Contingent Fees In Other Commercial Litigations

57.    Turning from patent lawsuits to matters of other types, many examples show that compensation as a significant percentage of recovery is common. In 2012, the U.S. Court of Appeals for the Tenth Circuit decided a case involving a dispute over the fee that a business client owed the law firm of Susman & Godfrey (S&G). S&G had handled an oil and gas matter for the client on the following terms. "Under the Fee Agreement, [the client] agreed to pay [S&G] 30% 'of the sum recovered by settlement or judgment,'" subject to caps based on when the lawsuit was

resolved. *Grynberg Production Corp. v. Susman Godfrey, L.L.P.*, No. 10-1248, 2012 U.S. App. LEXIS 3316, at *2 (10th Cir. February 16, 2012).  "[T]he Fee Agreement capped fees at $50 million if the case settled within one year after the action was filed."  *Id.* The fee agreement thus entitled S&G to be paid $50 million for a year's worth of work—and that is what an arbitrator decided S&G should receive, subject to an offset of less than $2 million that, for present purposes, is irrelevant.  The Tenth Circuit affirmed the fee award.

58.    Based on what lawyers who write about fee arrangements in business cases have said, contingent percentages of one-third or more remain common today.   In 2011, THE ADVOCATE, a journal produced by the Litigation Section of the State Bar of Texas, published a symposium entitled "Commercial Law Developments and Doctrine."  It included an article on alternative fee arrangements, according to which:

> A pure contingency fee arrangement is the most traditional alternative fee arrangement. In this scenario, a firm receives a fixed or scaled percentage of any recoveries in a lawsuit brought on behalf of the client as a plaintiff. Typically, the contingency is approximately 33%, with the client covering litigation expenses; however, firms can also share part or all of the expense risk with clients. Pure contingency fees, which are usually negotiated at approximately 40%, can be useful structures in cases where the plaintiff is seeking monetary or monetizable damages. They are also often appropriate when the client is an individual, start up, or corporation with limited resources to finance its litigation. Even large clients, however, appreciate the budget certainty and risk-sharing inherent in a contingent fee arrangement.

Trey Cox, *Alternative Fee Arrangements: Partnering with Clients through Legal Risk Sharing*, 66 THE ADVOCATE (TEXAS) 20 (2011).

59.    I could add examples to those already discussed, but the point has been made.  All of the evidence suggests that a fee equal to one-third of the recovery award is an amount that a sophisticated business client would willingly have agreed to pay Plaintiff's Counsel at the outset of litigation.  Sophisticated clients pay such percentage fees when the risks and costs of litigation warrant the expenditure, because they are better off hiring lawyers at market rates than giving up

on their claims.  To be clear, I am not saying that sophisticated business clients always pay fees in this range; they will pay less when they can hire competent lawyers on more attractive terms.  The point is just that they know how the market for legal services works: risks require offsetting rewards.

### 4.  Two Exceptions

60.     I mentioned at the outset that there are two exceptions to the rule that sophisticated clients typically pay fees within the 25-40 percent range, with fees of 33.33-40 percent being especially common.  One exceptional category includes personal injury lawsuits brought in the wake of commercial airplane accidents.  In these cases, fees are said to fall near 20 percent because the defendants usually concede liability, leaving only damages to be proven.  Because liability is routinely denied in class actions of all types, and obviously was vigorously contested here, airplane accident cases are irrelevant.

61.     The other exceptional category encompasses securities fraud class actions led by public pension funds.  In these cases, fee percentages are sometimes lower and declining scales are sometimes employed.  Nothing should be inferred from these cases, however, for two reasons.

62.     First, public pension funds are politically-controlled and may have agendas that deviate from maximizing class members' recoveries.  Professor John C. Coffee, Jr., the country's leading authority on class action lawsuits, previously made this point by offering political pressure as the explanation for public pension funds' unique behavior.

> I am aware that "declining" percentage of the recovery fee formulas are used by some public pension funds, serving as lead plaintiffs in the securities class action context.  However, I have never seen such a fee contract used in the antitrust context; nor, in any context, have I seen a large corporation negotiate such a contract (they have instead typically used straight percentage of the recovery formulas).  My belief is that public pension funds prefer the "declining percentage" formula largely for political reasons, while private corporations disdain such formula for economic reasons.  That is, public pension funds are frequently administered by elected political officials who are potentially subject to media and

> political criticism for conferring "windfall" fees on their attorneys.  Necessarily, they seek to avoid criticism, and the declining percentage formula seems primarily a defensive strategy to protect political officials from such criticism.  Corroborating this conclusion is the rareness of its use by private corporations (as Coca-Cola, PepsiCo and Admiral Beverage have implicitly confirmed in this case [by paying straight percentage fees in the typical range].

*Declaration of John C. Coffee, Jr.*, submitted in *In re High Fructose Corn Syrup Antitrust Litigation*, M.D.L. 1087 (C.D. Ill. Oct. 7, 2004), ¶ 22.  According to Professor Coffee, then, public pension funds do themselves and other investors a disservice by using inferior fee arrangements.  They may look good on paper because they appear to be keeping lawyers' fees low, but they actually endanger investors.

63.     *In re Merry-Go-Round Enterprises, Inc.*, 244 B.R. 327 (D. Md. 2000), where the court concluded that the market price for the legal services supported a 40% fee, provides an example supporting Professor Coffee's assessment that the market is not fond of declining percentage scales.  There, the bankruptcy trustee wanted to assert claims against Ernst & Young.  He looked for counsel willing to accept a declining scale of fee percentages, found no takers, and ultimately agreed to pay a law firm a straight 40 percent of the recovery. Ernst & Young subsequently settled for $185 million, at which point the law firm applied for $71.2 million in fees, 21 times its lodestar. The bankruptcy judge granted the request, writing: "Viewed at the outset of this representation, with special counsel advancing expenses on a contingency basis and facing the uncertainties and risks posed by this representation, the 40% contingent fee was reasonable, necessary, and within a market range." 244 B.R. 327 at 335. The court's logic is impeccable.

64.     Second, this case was tried to the Court, which entered judgment for the Plaintiff and other ERISA beneficiaries.  No system of declining incentives is likely to make sense when a case is tried.   Ordinarily, contingent fee contracts increase lawyers' compensation as more advanced procedural stages like trial are reached.

### 5.  Awards in Similar Cases

65.     In a study of all federal class actions that settled in 2006 or 2007, Professor Brian

Fitzpatrick confirmed that the range of fee awards mirrors the private market fairly well.  He found

that the vast majority of fee awards (exclusive of costs) ran from 25 percent of the recovery to 40

percent, and that more awards fell into the 30-35 percent range than any other.  Brian T. Fitzpatrick,

7 JOURNAL OF EMPIRICAL LEGAL STUDIES 811, 834 Fig. 4 (2010).  Common fund fee awards equal

to one-third of class action recoveries are exceedingly common.

66.     Professor Fitzpatrick also found that the average fee award in employee benefit

class actions—which includes only ERISA cases—was 26 percent.  *Id*., Table 8.  The unpublished

study by Professors Eisenberg, Miller, and Germano, *supra*, at Table 4, found the identical fee

percentage for these cases.

67.     Of course, when the average award is 26 percent, there are many, many awards in

the one-third range too.  Examples of ERISA cases in which courts awarded one-third of the

monetary recovery as fees include *Kruger v. Novant Health, Inc.*, No. 14-208, 2016 WL 6769066

(M.D.N.C. Sept. 29, 2016) (awarding plaintiffs' counsel one-third of $32 million

settlement); *Spano v. The Boeing Company*, No. 06-743, 2016 WL 3791123 (S.D. Ill. Mar. 31,

2016) (awarding plaintiffs' counsel one-third of $57 million settlement); *Abbott v. Lockheed

Martin Corp.*, No. 06-701, 2015 WL 4398475 (S.D. Ill. July 17, 2015) (awarding plaintiffs'

counsel one-third of $62 million settlement); *Krueger v. Ameriprise Financial*, No. 11-2781, 2015

WL 4246879 (D. Minn. July 13, 2015) (awarding plaintiffs' counsel one-third of $27.5 million

settlement); *Beesley v. Int'l Paper Co.*, No. 06-703-DRH, 2014 WL 375432 (S.D. Ill. Jan. 31,

2014) (awarding plaintiffs' counsel one-third of $30 million settlement). The judges who granted

these awards recognized that a one-third free was appropriate given the risks the lawyers incurred,

the results they obtained, the effort they expended, and the prevailing market rate.   These
considerations support a fee of the same size in this case.

68.      A fee of one-third of the recovery here would result in a multiplier of approximately
3.5, based on current hourly rates.   The Court has discretion to approve a lodestar multiplier of this
size.   Typical multipliers range from one to four depending on the facts, with many courts awarding
multipliers larger than four on case-specific grounds.   *See, e.g., Vizcaino v. Microsoft Corp.*, 290
F.3d 1043, 1050-51 & n. 6 (9th Cir. 2002) (awarding 3.65 multiplier from $96.9 million settlement
fund, and noting standard one to four multiplier range); *Newberg on Class Actions* § 14.6 (4th ed.
2009) ("multiples ranging from one to four frequently are awarded in common fund cases when
the lodestar method is applied").

69.      I mentioned above that Plaintiff's Counsel have not requested any fee for securing
a statutory fee award from the Defendant.   They could have included a fee-on-the-fee-award in
their common fund request, because the statutory fee award is just another remedy that increases
the ERISA beneficiaries' recovery.   The Supreme Court said as much in *Evans v. Jeff D.*, 475 U.S.
717 (1986), a civil rights case in which the question was whether the class' right to a statutory fee
award could be waived in a settlement.   The Court answered affirmatively because "Congress …
added [fee awards] to the arsenal of remedies available to combat violations of civil rights" for the
same reason it provided for damages and injunctive relief—to "promot[e] respect for civil rights."
*Jeff D.*, 475 U.S. at 731-732.   Those other forms of relief could be waived, so the right to a statutory
fee award could too.

70.      Given that a statutory fee award is just another remedy, then its value should be
included in the numerator to which the fee percentage is applied.   For example, if the statutory fee
award here is $3 million, the gross recovery will be approximately $32.7 million, one-third of

which would equal $10.9 million.  In fact, Plaintiff's Counsel have requested only $9.9 million—one-third of $29.7 million—$1 million less.  Assuming a $3 million statutory fee award, then, the common fund fee request actually equals 30 percent of the gross recovery.  The reasonableness of this amount is plain.

71.      The Fourth Circuit tends to award fee percentages in keeping with those in other circuits.  According to the unpublished study by Professors Eisenberg, Miller, and Germano, *supra*, at Table 3, the average class action recovery over the 2009-2013 period was $25 million and the average common fund fee award was 26 percent.  This figure is very close to the 25.2 percent figure found by Professor Fitzpatrick, *supra*, Table 9.  I note that most of the fees paid under common fund awards result from settlement, not judgment.  Plaintiff's Counsel took considerably more risk than in most cases by trying this case.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

DATED:  April 10, 2017

_____

CHARLES SILVER

**EXHIBIT 1: RESUME OF PROFESSOR CHARLES SILVER**

# CHARLES SILVER

## I.  CONTACT INFORMATION

Co-Director, Center on Lawyers, Civil Justice and the Media
School of Law
University of Texas
727 East Dean Keeton Street
Austin, Texas 78705

(512) 232-1337 (voice)

## II.  ACADEMIC EMPLOYMENTS

School of Law, University of Texas at Austin, 1987-Present
Roy W. and Eugenia C. McDonald Endowed Chair in Civil Procedure
W. James Kronzer Chair in Trial & Appellate Advocacy
Cecil D. Redford Professor
Robert W. Calvert Faculty Fellow
Graves, Dougherty, Hearon & Moody Centennial Faculty Fellow
Assistant Professor

Harvard Law School, Fall 2011
Visiting Professor

Vanderbilt University Law School, Fall 2003
Visiting Professor

University of Michigan Law School, Fall 1994
Visiting Professor

University of Chicago, 1983-1984
Managing Editor, Ethics: A Journal of Social, Political and Legal Philosophy

## III. EDUCATION

Yale Law School, JD (1987)
University of Chicago, MA (Political Science) (1981)
University of Florida BA (Political Science) 1979

## IV. PUBLICATIONS

### SPECIAL PROJECTS

Associate Reporter, American Law Institute, PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION, (2010) (with Samuel Issacharoff, Reporter, and Robert Klonoff and Richard Nagareda, Associate Reporters).

Invited Academic Member, ABA/Tort Trial & Insurance Practice Section, Task Force on Contingent Fees, REPORT ON CONTINGENT FEES IN CLASS ACTION LITIGATION, 25 Rev. Litig. 459 (2006).

Invited Academic Member, ABA/Tort Trial & Insurance Practice Section, Task Force on Contingent Fees, REPORT ON CONTINGENT FEES IN MASS TORT LITIGATION, 42 Tort Trial & Insurance Practice Law Journal 105 (2006), available at http://www.jstor.org/stable/25763828

Invited Academic Member, ABA/Tort Trial & Insurance Practice Section, Task Force on Contingent Fees, REPORT ON CONTINGENT FEES IN MEDICAL MALPRACTICE LITIGATION (2004) available at http://apps.americanbar.org/tips/contingent/MedMalReport092004DCW2.pdf; published at 25 Rev. Litig. 459 (2006).

Co-Reporter, International Association of Defense Counsel PRACTICAL GUIDE FOR INSURANCE DEFENSE LAWYERS (2002) (with Ellen S. Pryor and Kent D. Syverud, Co-Reporters); published on the IADC website (2003); revised and distributed to all IADC members as a supplement to the Defense Counsel J. (2004).

## BOOKS

AFTER OBAMACARE: MAKING AMERICAN HEALTHCARE BETTER AND CHEAPER (with David A. Hyman), Cato Institute (forthcoming 2018)

MEDICAL MALPRACTICE LITIGATION: HOW IT WORKS, WHAT IT DOES, AND WHY TORT REFORM HASN'T HELPED (with Bernard S. Black, David A. Hyman, Myungho Paik, and William M. Sage) (in progress).

HEALTH LAW AND ECONOMICS, Vols. I and II (Edward Elgar 2016) (coedited with Ronen Avraham and David A. Hyman).

LAW OF CLASS ACTIONS AND OTHER AGGREGATE LITIGATION, 2nd Edition (2012) (with Richard Nagareda, Robert Bone, Elizabeth Burch and Patrick Woolley) (updated annually).

PROFESSIONAL RESPONSIBILITIES OF INSURANCE DEFENSE COUNSEL (2012) (with William T. Barker) (updated annually).

## ARTICLES BY SUBJECT AREA (* INDICATES PEER REVIEWED)

### Health Care Law & Policy

1.  "It Was on Fire When I Lay Down on It: Defensive Medicine, Tort Reform, and Healthcare Spending," in I. Glenn Cohen, Allison Hoffman, and William M. Sage, eds., OXFORD HANDBOOK OF AMERICAN HEALTH LAW (forthcoming 2016) (with David A. Hyman).*

2.  "Compensating Persons Injured by Medical Malpractice and Other tortious behavior for Future Medical Expenses Under the Affordable Care Act," 25 Annals of Health Law 35 (2016) (with Maxwell J. Mehlman, Jay Angoff, Patrick A. Malone, and Peter H. Weinberger).

3.   **"**Double, Double, Toil and Trouble: Justice-Talk and the Future of Medical Malpractice Litigation," 63 DePaul L. Rev. 574 (2014) (with David A. Hyman) (invited symposium).

4.   "Five Myths of Medical Malpractice," 143:1 Chest 222-227 (2013) (with David A. Hyman).**\***

5.   "Health Care Quality, Patient Safety and the Culture of Medicine: 'Denial Ain't Just A River in Egypt,'" (coauthored with David A. Hyman), 46 New England L. Rev. 101 (2012) (invited symposium).

6.   "Medical Malpractice and Compensation in Global Perspective: How Does the U.S. Do It?" in Ken Oliphant & Richard W. Wright, eds., MEDICAL MALPRACTICE AND COMPENSATION IN GLOBAL PERSPECTIVE (2013) (coauthored with David A. Hyman)\*; originally published in 87 Chicago-Kent L. Rev. 163 (2012).

7.   "Justice Has (Almost) Nothing to Do With It: Medical Malpractice and Tort Reform," in Rosamond Rhodes, Margaret P. Battin, and Anita Silvers, eds., MEDICINE AND SOCIAL JUSTICE, Oxford University Press 531-542 (2012) (with David A. Hyman).**\***

8.   "Medical Malpractice Litigation and Tort Reform: It's the Incentives, Stupid," 59 Vanderbilt L. Rev. 1085 (2006) (with David A. Hyman) (invited symposium).

9.   "Medical Malpractice Reform Redux: Déjà Vu All Over Again?" XII Widener L. J. 121 (2005) (with David A. Hyman) (invited symposium).

10.   "Speak Not of Error, Regulation (Spring 2005) (with David A. Hyman).

11.   "The Poor State of Health Care Quality in the U.S.: Is Malpractice Liability Part of the Problem or Part of the Solution?" 90 Cornell L. Rev. 893 (2005) (with David A. Hyman).

12.   "Believing Six Improbable Things: Medical Malpractice and 'Legal Fear,'" 28 Harv. J. L. and Pub. Pol. 107 (2004) (with David A. Hyman) (invited symposium).

13.   "You Get What You Pay For: Result-Based Compensation for Health Care," 58 Wash. & Lee L. Rev. 1427 (2001) (with David A. Hyman).

14.   "The Case for Result-Based Compensation in Health Care," 29 J. L. Med. & Ethics 170 (2001) (with David A. Hyman).**\***

### Empirical Studies of Medical Malpractice

15.   "Insurance Crisis or Liability Crisis? Medical Malpractice Claiming in Illinois, 1980-2010**,**" 13 J. Empirical Legal Stud. 183 (2016) (with Bernard S. Black, David A. Hyman, and Mohammad H. Rahmati).

16.   "Policy Limits, Payouts, and Blood Money: Medical Malpractice Settlements in the Shadow of Insurance," 5 U.C. Irvine L. Rev. 559 (2015) (with Bernard S. Black, David A. Hyman, and Myungho Paik) (invited symposium).

17.     "Does Tort Reform Affect Physician Supply? Evidence from Texas," Int'l Rev. of L. & Econ. (2015) (with Bernard S. Black, David A. Hyman, and Myungho Paik), available at http://dx.doi.org/10.1016/j.irle.2015.02.002.*

18.     "How do the Elderly Fare in Medical Malpractice Litigation, Before and After Tort Reform? Evidence From Texas" (with Bernard S. Black, David A. Hyman, Myungho Paik, and William M. Sage), Amer. L. & Econ. Rev. (2012), doi: 10.1093/aler/ahs017.*

19.     "Will Tort Reform Bend the Cost Curve? Evidence from Texas" (with Bernard S. Black, David A. Hyman, Myungho Paik), 9 J. Empirical Legal Stud. 173-216 (2012).*

20.     "O'Connell Early Settlement Offers: Toward Realistic Numbers and Two-Sided Offers," 7 J. Empirical Legal Stud. 379 (2010) (with Bernard S. Black and David A. Hyman).*

21.     "The Effects of 'Early Offers' on Settlement: Evidence From Texas Medical Malpractice Cases, 6 J. Empirical Legal Stud. 723 (2009) (with David A. Hyman and Bernard S. Black).*

22.     "Estimating the Effect of Damage Caps in Medical Malpractice Cases: Evidence from Texas," 1 J. Legal Analysis 355 (2009) (with David A. Hyman, Bernard S. Black, and William M. Sage) (inaugural issue).*

23.     "The Impact of the 2003 Texas Medical Malpractice Damages Cap on Physician Supply and Insurer Payouts: Separating Facts from Rhetoric," 44 The Advocate (Texas) 25 (2008) (with Bernard S. Black and David A. Hyman) (invited symposium).

24.     "Malpractice Payouts and Malpractice Insurance: Evidence from Texas Closed Claims, 1990-2003," 3 Geneva Papers on Risk and Insurance: Issues and Practice 177-192 (2008) (with Bernard S. Black, David A. Hyman, William M. Sage and Kathryn Zeiler).*

25.     "Physicians' Insurance Limits and Malpractice Payments: Evidence from Texas Closed Claims 1990-2003," 36 J. Legal Stud. S9 (2007) (with Bernard S. Black, David A. Hyman, William M. Sage, and Kathryn Zeiler).*

26.     "Do Defendants Pay What Juries Award? Post-Verdict Haircuts in Texas Medical Malpractice Cases, 1988-2003," J. Empirical Legal Stud. 3-68 (2007) (with Bernard S. Black, David A. Hyman, William M. Sage, and Kathryn Zeiler).*

27.     "Stability, Not Crisis: Medical Malpractice Claim Outcomes in Texas, 1988-2002," 2 J. Empirical Legal Stud. 207–259 (July 2005) (with Bernard S. Black, David A. Hyman, and William S. Sage).*

### Empirical Studies of the Law Firms and Legal Services

28.     "Medical Malpractice Litigation and the Market for Plaintiff-Side Representation: Evidence from Illinois," 13 J. Empirical Stud. 603-636 (2016) (with David A. Hyman, Mohammad Rahmati, Bernard S. Black).*

29.   "The Economics of Plaintiff-Side Personal Injury Practice," U. Ill. L. Rev. 1563 (2015) (with Bernard S. Black and David A. Hyman).

30.   "Access to Justice in a World without Lawyers: Evidence from Texas Bodily Injury Claims," 37 Fordham Urb. L. J. 357 (2010) (with David A. Hyman) (invited symposium).

31.   "Defense Costs and Insurer Reserves in Medical Malpractice and Other Personal Injury Cases: Evidence from Texas, 1988-2004," 10 Amer. Law & Econ. Rev. 185 (2008) (with Bernard S. Black, David A. Hyman, and William M. Sage).*

### Attorneys' Fees—Empirical Studies and Policy Analyses

32.   "The Mimic-the-Market Method of Regulating Common Fund Fee Awards: A Status Report on Securities Fraud Class Actions," RESEARCH HANDBOOK ON REPRESENTATIVE SHAREHOLDER LITIGATION, Sean Griffith, Jessica Erickson, David H. Webber, and Verity Winship, Eds. (forthcoming 2017).

33.   "Is the Price Right? An Empirical Study of Fee-Setting in Securities Class Actions," 115 Columbia L. Rev. 1371 (2015) (with Lynn A. Baker and Michael A. Perino).

34.   "Regulation of Fee Awards in the Fifth Circuit," 67 The Advocate (Texas) 36 (2014) (invited submission).

35.   "Setting Attorneys' Fees In Securities Class Actions: An Empirical Assessment," 66 Vanderbilt L. Rev. 1677 (2013) (with Lynn A. Baker and Michael A. Perino).

36.   "The Quasi-Class Action Method of Managing Multi-District Litigations: Problems and a Proposal," 63 Vanderbilt L. Rev. 107 (2010) (with Geoffrey P. Miller).

37.   "Incentivizing Institutional Investors to Serve as Lead Plaintiffs in Securities Fraud Class Actions," 57 DePaul L. Rev. 471 (2008) (with Sam Dinkin) (invited symposium), reprinted in L. Padmavathi, Ed., SECURITIES FRAUD: REGULATORY DIMENSIONS (2009).

38.   "Reasonable Attorneys' Fees in Securities Class Actions: A Reply to Mr. Schneider," 20 The NAPPA Report 7 (Aug. 2006).

39.   "Dissent from Recommendation to Set Fees Ex Post," 25 Rev. of Litig. 497 (2006).

40.   "Due Process and the Lodestar Method: You Can't Get There From Here," 74 Tul. L. Rev. 1809 (2000) (invited symposium).

41.   "Incoherence and Irrationality in the Law of Attorneys' Fees," 12 Tex. Rev. of Litig. 301 (1993).

42.   "Unloading the Lodestar: Toward a New Fee Award Procedure," 70 Tex. L. Rev. 865 (1992).

43.   "A Restitutionary Theory of Attorneys' Fees in Class Actions," 76 Cornell L. Rev. 656 (1991).

**Liability Insurance and Insurance Defense Ethics**

44. "The Treatment of Insurers' Defense-Related Responsibilities in the Principles of the Law of Liability Insurance: A Critique," 68 Rutgers U. L. Rev. 83 (2015) (with William T. Barker) (symposium issue).

45. "The Basic Economics of the Duty to Defend," in D. Schwarcz and P. Siegelman, eds., RESEARCH HANDBOOK IN THE LAW & ECONOMICS OF INSURANCE 438-460 (2015).*

46. "Insurer Rights to Limit Costs of Independent Counsel," ABA/TIPS Insurance Coverage Litigation Section Newsletter 1 (Aug. 2014) (with William T. Barker).

47. "Litigation Funding Versus Liability Insurance: What's the Difference?," 63 DePaul L. Rev. 617 (2014) (invited symposium).

48. "Ethical Obligations of Independent Defense Counsel," 22:4 Insurance Coverage (July-August 2012) (with William T. Barker), available at http://apps.americanbar.org/litigation/committees/insurance/articles/julyaug2012-ethical-obligations-defense-counsel2.html.

49. "Settlement at Policy Limits and The Duty to Settle: Evidence from Texas," 8 J. Empirical Leg. Stud. 48-84 (2011) (with Bernard S. Black and David A. Hyman).*

50. "When Should Government Regulate Lawyer-Client Relationships? The Campaign to Prevent Insurers from Managing Defense Costs," 44 Ariz. L. Rev. 787 (2002) (invited symposium).

51. "Defense Lawyers' Professional Responsibilities: Part II—Contested Coverage Cases," 15 G'town J. Legal Ethics 29 (2001) (with Ellen S. Pryor).

52. "Defense Lawyers' Professional Responsibilities: Part I—Excess Exposure Cases," 78 Tex. L. Rev. 599 (2000) (with Ellen S. Pryor).

53. "Flat Fees and Staff Attorneys: Unnecessary Casualties in the Battle over the Law Governing Insurance Defense Lawyers," 4 Conn. Ins. L. J. 205 (1998) (invited symposium).

54. "The Lost World: Of Politics and Getting the Law Right," 26 Hofstra L. Rev. 773 (1998) (invited symposium).

55. "Professional Liability Insurance as Insurance and as Lawyer Regulation: A Comment on Davis, Institutional Choices in the Regulation of Lawyers," 65 Fordham L. Rev. 233 (1996) (invited symposium).

56. "All Clients are Equal, But Some are More Equal than Others: A Reply to Morgan and Wolfram," 6 Coverage 47 (1996) (with Michael Sean Quinn).

57.   "Are Liability Carriers Second-Class Clients? No, But They May Be Soon-A Call to Arms against the Restatement of the Law Governing Lawyers," 6 Coverage 21 (1996) (with Michael Sean Quinn).

58.   "The Professional Responsibilities of Insurance Defense Lawyers," 45 Duke L. J. 255 (1995) (with Kent D. Syverud); reprinted in IX INS. L. ANTHOL. (1996) and 64 Def. L. J. 1 (Spring 1997).

59.   "Wrong Turns on the Three Way Street: Dispelling Nonsense about Insurance Defense Lawyers," 5-6 Coverage 1 (Nov./Dec.1995) (with Michael Sean Quinn).

60.   "Introduction to the Symposium on Bad Faith in the Law of Contract and Insurance," 72 Tex. L. Rev. 1203 (1994) (with Ellen Smith Pryor).

61.   "Does Insurance Defense Counsel Represent the Company or the Insured?" 72 Tex. L. Rev. 1583 (1994); reprinted in Practicing Law Institute, INSURANCE LAW: WHAT EVERY LAWYER AND BUSINESSPERSON NEEDS TO KNOW (1998).

62.   "A Missed Misalignment of Interests: A Comment on Syverud, The Duty to Settle," 77 Va. L. Rev. 1585 (1991); reprinted in VI INS. L. ANTHOL. 857 (1992).

### Class Actions, Mass Actions, and Multi-District Litigations

63.   "What Can We Learn by Studying Lawyers' Involvement in Multidistrict Litigation?  A Comment on Williams, Lee, and Borden, Repeat Players in Federal Multidistrict Litigation," 5 J. of Tort L. 181 (2014), DOI: 10.1515/jtl-2014-0010 (invited symposium).

64.   "The Responsibilities of Lead Lawyers and Judges in Multi-District Litigations," 79 Fordham L. Rev. 1985 (2011) (invited symposium).

65.   "The Allocation Problem in Multiple-Claimant Representations," 14 S. Ct. Econ. Rev. 95 (2006) (with Paul Edelman and Richard Nagareda).*

66.   "A Rejoinder to Lester Brickman, On the Theory Class's Theories of Asbestos Litigation," 32 Pepperdine L. Rev. 765 (2005).

67.   "Merging Roles: Mass Tort Lawyers as Agents and Trustees," 31 Pepp. L. Rev. 301 (2004) (invited symposium).

68.   "We're Scared To Death: Class Certification and Blackmail," 78 N.Y.U. L. Rev. 1357 (2003).

69.   "The Aggregate Settlement Rule and Ideals of Client Service," 41 S. Tex. L. Rev. 227 (1999) (with Lynn A. Baker) (invited symposium).

70.   "Representative Lawsuits & Class Actions," in B. Bouckaert & G. De Geest, eds., INT'L ENCY. OF L. & ECON. (1999).*

71. "I Cut, You Choose: The Role of Plaintiffs' Counsel in Allocating Settlement Proceeds," 84 <u>Va. L. Rev.</u> 1465 (1998) (with Lynn A. Baker) (invited symposium).

72. "Mass Lawsuits and the Aggregate Settlement Rule," 32 <u>Wake Forest L. Rev.</u> 733 (1997) (with Lynn A. Baker) (invited symposium).

73. "Comparing Class Actions and Consolidations," 10 <u>Tex. Rev. of Litig.</u> 496 (1991).

74. "Justice in Settlements," 4 <u>Soc. Phil. & Pol.</u> 102 (1986) (with Jules L. Coleman).*

### General Legal Ethics and Civil Litigation

75. "A Private Law Defense of the Ethic of Zeal" (in progress), available at http://ssrn.com/abstract=2728326.

76. "The DOMA Sideshow" (in progress), available at http://ssrn.com/abstract=2584709.

77. "Fiduciaries and Fees," 79 <u>Fordham L. Rev.</u> 1833 (2011) (with Lynn A. Baker) (invited symposium).

78. "Ethics and Innovation," 79 <u>George Washington L. Rev.</u> 754 (2011) (invited symposium).

79. "In Texas, Life is Cheap," 59 <u>Vanderbilt L. Rev.</u> 1875 (2006) (with Frank Cross) (invited symposium).

80. "Introduction: Civil Justice Fact and Fiction," 80 <u>Tex. L. Rev.</u> 1537 (2002) (with Lynn A. Baker).

81. "Does Civil Justice Cost Too Much?" 80 <u>Tex. L. Rev.</u> 2073 (2002).

82. "A Critique of *Burrow v. Arce*," 26 <u>Wm. & Mary Envir. L. & Policy Rev.</u> 323 (2001) (invited symposium).

83. "What's Not To Like About Being A Lawyer?" 109 <u>Yale L. J.</u> 1443 (2000) (with Frank B. Cross) (review essay).

84. "Preliminary Thoughts on the Economics of Witness Preparation," 30 <u>Tex. Tech L. Rev.</u> 1383 (1999) (invited symposium).

85. "And Such Small Portions: Limited Performance Agreements and the Cost-Quality/Access Trade-Off," 11 <u>G'town J. Legal Ethics</u> 959 (1998) (with David A. Hyman) (invited symposium).

86. "Bargaining Impediments and Settlement Behavior," in D.A. Anderson, ed., DISPUTE RESOLUTION: BRIDGING THE SETTLEMENT GAP (1996) (with Samuel Issacharoff and Kent D. Syverud).

87. "The Legal Establishment Meets the Republican Revolution," 37 <u>S. Tex. L. Rev.</u> 1247 (1996) (invited symposium).

88.    "Do We Know Enough about Legal Norms?" in D. Braybrooke, ed., SOCIAL RULES: ORIGIN; CHARACTER; LOGIC: CHANGE (1996) (invited contribution).

89.    "Integrating Theory and Practice into the Professional Responsibility Curriculum at the University of Texas," 58 Law and Contemporary Problems 213 (1995) (with Amon Burton, John S. Dzienkowski, and Sanford Levinson,).

90.    "Thoughts on Procedural Issues in Insurance Litigation," VII INS. L. ANTHOL. (1994).

### Legal and Moral Philosophy

91.    "Elmer's Case: A Legal Positivist Replies to Dworkin," 6 L. & Phil. 381 (1987).*

92.    "Negative Positivism and the Hard Facts of Life," 68 The Monist 347 (1985).*

93.    "Utilitarian Participation," 23 Soc. Sci. Info. 701 (1984).*

### Practice-Oriented Publications

94.    "Your Role in a Law Firm: Responsibilities of Senior, Junior, and Supervisory Attorneys," in F.W. Newton, ed., A GUIDE TO THE BASICS OF LAW PRACTICE (3D) (Texas Center for Legal Ethics and Professionalism 1996).

95.    "Getting and Keeping Clients," in F.W. Newton, ed., A GUIDE TO THE BASICS OF LAW PRACTICE (3D) (Texas Center for Legal Ethics and Professionalism 1996) (with James M. McCormack and Mitchel L. Winick).

96.    "Advertising and Marketing Legal Services," in F.W. Newton, ed., A GUIDE TO THE BASICS OF LAW PRACTICE (Texas Center for Legal Ethics and Professionalism 1994).

97.    "Responsibilities of Senior and Junior Attorneys," in F.W. Newton, ed., A GUIDE TO THE BASICS OF LAW PRACTICE (Texas Center for Legal Ethics and Professionalism 1994).

98.    "A Model Retainer Agreement for Legal Services Programs: Mandatory Attorney's Fees Provisions," 28 Clearinghouse Rev. 114 (June 1994) (with Stephen Yelenosky).

### Miscellaneous

99.    "Public Opinion and the Federal Judiciary: Crime, Punishment, and Demographic Constraints," 3 Pop. Res. & Pol. Rev. 255 (1984) (with Robert Y. Shapiro).*

## V.  PERSONAL

Married to Cynthia Eppolito, PA; Daughter, Katherine; Step-son, Mabon.

Consults with attorneys and serves as an expert witness on subjects in his areas of expertise.

First generation of family to attend college.