IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| TIM P. BRUNDLE, on behalf of the Constellis Employee Stock Ownership Plan and a class of other individuals similarly situated, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) 1:15-cv-1494 (LMB/IDD) ) |
| WILMINGTON TRUST N.A., as successor to Wilmington Trust Retirement and Institutional Services Company | ) ) ) ) |
| Defendant. | ) ) |

## ORDER

Before the Court is plaintiff Tim Brundle's ("plaintiff" or "Brundle") Motion to Strike the Declaration of Jeffrey S. Tarbell ("Motion to Strike") [Dkt. 318]. Tarbell's declaration was submitted by defendant Wilmington Trust ("defendant" or "Wilmington") in connection with its Motion to Amend the Judgment Pursuant to Rule 59(e), or, in the Alternative, for a New Trial Pursuant to Rule 59(a) ("Motion to Amend") [Dkt. 309]. For the reasons that follow, the Motion to Strike will be granted.

The factual background of this civil action which was brought under the Employee Retirement Income Security Act ("ERISA") is set out in the Memorandum Opinion [Dkt. 294] issued on March 13, 2017. In this civil action, plaintiff alleged that defendant, as trustee for the Constellis Employee Stock Ownership Plan ("ESOP"), caused the ESOP to engage in a transaction prohibited by ERISA when it failed to ensure that the ESOP paid no more than adequate consideration for Constellis' stock. Id. at 1. The Court held that the defendant was liable for causing the ESOP to engage in a prohibited transaction under 29 U.S.C. § 1106(a)(1)(A), but not

liable for transactions prohibited under 29 U.S.C. §§ 1106(a)(1)(B) or 1106(b), and awarded the ESOP $29,773,250 in damages. Id. at 2.

During discovery, each of the parties' experts produced three expert reports. In his first report, dated March 14, 2016, plaintiff's expert, Dana Messina ("Messina"), included a comprehensive two-step process for calculating damages. PTX 152 at 14–31. First, he identified a series of discrete errors that he believed Wilmington and its valuation firm Stout Risius Ross ("SRR") committed and assigned a monetary value to each of those errors. Id. Second, he aggregated those errors to determine the total effect on the price that the ESOP paid for Constellis' stock. Id. at 31.

Although that report put the defendant on clear notice as to the methodology that Messina was using to calculate the damages and the resulting damage amount, Tarbell's only response appeared in his second report, dated April 13, 2016, in which he wrote in the overview of his opinion that Messina's estimate of Constellis' equity value was "greatly understated" and that consequently his estimate of damages is "similarly overstated." DTX 233 ¶ 7. In a subsequent section entitled "Damages Theory," which was only four paragraphs long, Tarbell summarized Messina's approach but offered no alternative method for calculating damages or damage total, stating:

> In any event, I offer no opinion on the appropriate method of determining 'loss' as a matter of law. However, from an economic and financial context, Messina's proposed damages methodology is illogical. The ESOP and its participants made no cash investment in the 2013 Transaction. The ESOP's purchase was financed with debt, to be repaid through company contributions to the ESOP, and with no financial responsibility or recourse to the ESOP participants. In short, the ESOP participants made no financial investment and bore no financial risk in the 2013 Transaction. Accordingly, it is unclear how one might justify that the ESOP participants incurred a loss in the event that the 2013 Transaction was overpriced. This logic is supported by the ESOP's economic outcome of the subsequent 2014 Transaction.

Id. ¶ 118.  In the final paragraph, Tarbell concluded that the plaintiff suffered no damage:

> Messina cites no evidence that the ESOP would have been successful in acquiring Constellis from the Sellers if the ESOP had offered only (Messina's concluded value of) $136.0 million[1] for the company.  Without such evidence, Messina's analysis fails to establish that the ESOP suffered any economic loss.

Id. ¶ 119.

In Messina's second report, also dated April 13, 2016, he restated his opinion on damages, once again identifying the errors he perceived in Wilmington and SRR's valuations and determining how each error affected the final purchase price.  PTX 74 at 3.  Tarbell's third report, dated June 1, 2016, did not address damages at all.  See DTX 234.

At his deposition, Tarbell was asked to clarify the scope of his opinion as to damages:

> Q: Were you retained in this lawsuit to offer an opinion on damages?
> A: No.
> Q: Are you a damages expert?
> A: I don't know.  I've offered opinions on damages in the past.
> Q: Are you a—were you retained in—in this lawsuit to offer opinions on economic loss?
> A: Well, I think my opinion is related to that issue, but I'm not retained to provide my own estimate of the economic loss incurred by the ESOP.
> . . .
> Q: Are you offering an opinion in any of your reports on how damages should be calculated in this lawsuit?
> A: I'm not offering an affirmative opinion on that.  I offer a rebuttal opinion that I don't believe Messina's theory of damages is logical.
> . . .
> Q: So if the Court disagrees with you and finds the SRR report to be noncredible and unreliable and not accurately reflecting the value of Constellis as of December 20th, 2013, would you be in a position to offer the court an opinion as to the true value of Constellis as of that date?
> . . .
> A: Not without conducting an appraisal.

---

[1] Although Messina's March 2016 report concluded that the damages amounted to $103.9 million, he found that the equity value of Constellis at the time of the sale was $136.0 million.  Compare PTX 152 at 29, with id. at 31.

3

Tarbell Dep., [Dkt. 319-1] at 32:7–38:11. At trial, Tarbell reiterated that his "only opinion on damages . . . would be that Messina's opinion on damages is invalid" and that he had "no affirmative opinion on damages." Tr. at 1586:4–6.[2]

Following a seven-day bench trial, the Court found for the plaintiff and calculated damages, explaining that:

> Messina is the only witness who provided a comprehensive estimate of damages. He did so by identifying a series of discrete errors that SRR and Wilmington committed, and estimating how much each error inflated the price of Constellis stock. . . . Wilmington's expert, Tarbell, testified that Messina's method was conceptually flawed because valuation estimates are highly interdependent so that it is artificial to provide a line-item estimate of how any particular error might have affected the final valuation range. Although there is some merit to Tarbell's concern, his failure to provide any alternative method for calculating damages leaves Messina's estimates as the only evidence as to damages.

Mem. Op. 59.

Accordingly, the Court used the same two-step method as Messina to determine damages. See id. at 59–65. First, it identified the value of each error that Wilmington and SRR committed. See id. At this stage, the Court considered evidence presented by both plaintiff and defendant, and often departed from Messina's proposed amounts. See id. On the second step, determining how each error affected the overall purchase price, the Court accepted Messina's method of aggregating each error, because defendant had presented no alternative approach beyond Tarbell's conclusory assertion that Messina's method was illogical. See id.

In its post-trial Motion to Amend, Wilmington challenges the Court's calculation of damages, relying in part on a 12-page declaration from Tarbell, in which he accepts the first step used by the Court in calculating the magnitude of each error, and now opines on the proper method for the second step, determining the impact of those errors on the final purchase price. See

---

[2] References to "Tr." are to the trial transcript.

4

[Dkt. 310-1] at 4–8. According to Tarbell, the approach proposed by Messina and adopted by the Court does not appropriately factor each error into the valuation methods used by Wilmington and SRR. See id. at 4–11. Tarbell states that the method was flawed for "four primary reasons:" (1) the method applied adjustments to enterprise value directly to equity value;[3] (2) the method did not account for the relative weighting of the two valuation techniques at issue;[4] (3) the method included "value-dependent" adjustments that have to be "re-calculated when other valuation inputs change;" and (4) the method inappropriately applied adjustments affecting 100% of the stock to the ESOP's purchase of 75% of the stock. Id. at 3–4.

Plaintiff argues that these opinions must be excluded because they were not disclosed in any of Tarbell's three expert reports provided during discovery, or during either his deposition or trial testimony. Pl. Mem., [Dkt. 319] at 1. Defendant responds that the declaration does not contain a new theory of damages, or in the alternative that its failure to disclose the opinions therein is harmless and substantially justified because those opinions are "consistent with" Tarbell's expert report and testimony and could not have been created until after the Court determined which of Messina's alleged errors it was going to accept. Def. Opp., [Dkt. 323] at 4. Those arguments are unpersuasive.

---

[3] "Enterprise value is the amount the business is worth . . . before taking into account any liabilities. Equity value is the enterprise value minus the company's debts[.]" S.J. Mem. Op., [Dkt. 260] at 6 (internal citations and quotation marks omitted).

[4] The Discounted Cash Flow method projects future cash flows and then discounts those cash flows "by a number of factors designed to take into account current cash reserves and liabilities." Mem. Op., [Dkt. 294] at 10. The Guideline Company Method attempts to estimate a value by comparing the company that is the subject of the valuation to comparable publicly traded companies. Id.

5

Fed. R. Civ. P. 37(c)(1) provides that "[a] party that without substantial justification fails to disclose the information required by [Fed. R. Civ. P. 26][5] is not, unless such failure is harmless, permitted to use as evidence . . . on a motion any witness or information not so disclosed." The Fourth Circuit has identified five factors that a court must consider when determining whether a party's failure to comply with Rule 26's disclosure requirements is "harmless" and "substantially justified:"

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the non-disclosing party's explanation for its failure to disclose the evidence.

Southern States Rack & Fixture, Inc. v. Sherwin-Williams Co., 318 F.3d 592, 597 (4th Cir. 2003). The first four factors "relate mainly to the harmlessness exception, while the remaining factor . . . relates primarily to the substantial justification exception." Id.

The Fourth Circuit recently applied these principles in Bresler et al. v. Wilmington Trust Co., __ F.3d __, No. 15-2086, 2017 WL 1407709 (4th Cir. Apr. 20, 2017), a breach of contract matter unrelated to this civil action. In Bresler, the district court admitted expert testimony about damages offered by the plaintiffs at trial even though the "information was submitted after the deadline for such disclosures" and "was not included in [the] expert report." Id. at *6. The Fourth Circuit affirmed. Id. at *7. Although the court agreed with the defendant that "plaintiffs did not timely disclose" the calculations discussed at trial, it held that the omission "was harmless and did not materially affect Wilmington's defense in the litigation[.]" Id. The court observed

---

[5] Rule 26 requires pretrial disclosure of, among other things, "a complete statement of all opinions the witness will express and the basis and reasons for them," and requires a party to supplement its disclosures "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing[.]"

6

that although the expert report had omitted the exact calculations, it had put the defendant on notice that the expert "would testify regarding the value" of the damages. Id. at *10. Moreover, "decisively, the collective result of [the] changes was a decrease in the amount of damages collected," meaning that the defendant had not been "'blindsided' by an expert witness' testimony that damages would be greater, or from a different source, than the witness earlier had indicated." Id. (emphasis in original). Moreover, the defendant had ample time to cure any surprise because it had access to an exhibit containing the formula used by the expert for two months before trial. Id. at *11.

In the instant action, the tables have turned. Although Wilmington sought to exclude undisclosed damages testimony in Bresler, here it seeks to introduce Tarbell's declaration, arguing that it is not a new theory of damages because it is consistent with his expert reports and deposition testimony. This argument is disingenuous. At his deposition, Tarbell testified that if the Court were to disagree with him and find that the SRR report did not accurately reflect the value of Constellis, he would not be in a position to offer an opinion about damages without conducting an appraisal. Tarbell Dep., [Dkt. 319-1] at 38:4–11. Now, apparently without having conducted an appraisal, Tarbell has nevertheless produced an opinion about damages, which calls into question the rigor of his damages analysis. Moreover, each time Tarbell stated that he thought Messina's opinion on damages was "illogical," DTX 233 ¶ 118, "invalid," Tr. at 1586:5, or "overstated," DTX 233 ¶ 7, he also represented that he had no other opinions about Messina's approach to damages and could not offer an affirmative opinion on the subject, DTX 233 ¶ 118; Tarbell Dep., [Dkt. 319-1] at 36:9; Tr. at 1586:6. In his April 2013 expert report, Tarbell supported those characterizations with two and only two reasons: that the ESOP participants made no investment in the ESOP and therefore suffered no loss, and that the ESOP would not have been created at the

7

price that Messina identified. DTX 233 ¶¶ 118–19. He provided no further elaboration in either his deposition or trial testimony.

The Court considered and rejected both of Tarbell's arguments in its Memorandum Opinion. See Mem. Op., [Dkt. 294] at 58, 66. That Tarbell's declaration is not inconsistent with his report and testimony does not mean that its contents were adequately disclosed under Rule 26. The opinions in the declaration are substantively different and considerably more detailed than those previously revealed. For example, where his pre-trial expert report said only that he considered Messina's approach "illogical," the declaration walks through at least 13 specific objections to the methodology proposed by Messina. Compare DTX 233 ¶ 7, with [Dkt. 310-1] at 4–8. Tarbell's declaration also includes three new charts which attack methods first proposed by Messina in his March 2016 report. Compare [Dkt. 310-1] at 10–12, with PTX 152 at 31. The opinions in the declaration clearly constitute "additional . . . information" that had "not otherwise been made known to" plaintiff, and therefore ought to have been disclosed under Rule 26(e). If defendant's arguments to the contrary were accepted, any expert who offers a conclusory opinion before trial would be free to introduce brand new reasoning supporting that opinion after trial, provided that the reasoning was not inconsistent with the expert's pre-trial conclusion. This procedure would effectively nullify Rule 26's disclosure requirements.

Wilmington's failure to disclose Tarbell's opinions was not harmless. Unlike in Bresler, where the Fourth Circuit considered it "decisive" that the undisclosed opinion helped the opposing party, Tarbell's new opinion, if credited, could erase plaintiff's damages award. Even though Tarbell's conclusion in the declaration is the same one he expressed in discovery and at trial—that plaintiff is not entitled to any damages—the reasons he provides for that conclusion were not revealed until months after the trial concluded, further distinguishing this case from Bresler. This

tardiness makes it difficult for plaintiff to cure the surprise, because he did not have the opportunity to call additional witnesses and may incur significant additional expense in retaining an expert to prepare a separate rebuttal. Indeed, once again distinct from Bresler, plaintiff was not on notice that Tarbell would offer any opinion about how plaintiff calculated damages, given his repeated and unequivocal disavowal of any opinion on the subject. The potential significance of the opinions in the declaration, bearing as they do directly on whether damages should have been awarded, makes it all the more important for Wilmington to have disclosed them, thereby allowing for full vetting through the adversarial process.

Wilmington next argues that the declaration cannot disrupt the trial because it is being presented during a post-trial motion. This argument represents an overly cramped view of the "disruption" at issue in Southern States. Of course evidence presented after a bench trial has concluded does not disrupt the bench trial itself; however, waiting to disclose a new expert opinion until after all the evidence is in and judgment has been entered is not only disruptive to the entire trial process, but would essentially undercut the federal rules addressing pretrial discovery. This is not a situation in which a party has discovered new material evidence which it could not have previously provided. Instead, this is a case where a party, for whatever reason, chose not to engage an expert to properly rebut an opinion disclosed by the opposing party's expert during discovery. As a result, allowing defendant to rely on such evidence at this stage would require the Court to revisit issues that have been decided and possibly require reopening the fact-finding process months after the litigation has concluded. It is to avoid this very result that a substantial justification for such a delay is required by Rule 37. Southern States, 318 F.3d at 595 n.2.

Wilmington argues that its failure to disclose the opinions in the declaration is justified because Tarbell could not have prepared these opinions until the Court determined which of

Messina's errors it was going to credit. Def. Opp., [Dkt. 323] at 4. This reasoning is meritless. Regarding the second step of Messina's damages calculation—applying the errors to determine what the final purchase price should have been—the Court accepted Messina's methodology without alteration, precisely because the only alternative evidence Wilmington presented was Tarbell's conclusory claim that Messina's approach was "invalid." Tr. at 1586:5. If the defendant wished to present a competing methodology, the time to do so was during discovery and at trial. Because no such alternative method was produced, the Court added nothing to Messina's methodological analysis on this second step, other than the final numbers. Mem. Op., [Dkt. 294] at 59. Wilmington did not need those final numbers to challenge Messina's methodology during discovery and the trial because methodology can be discussed independently of numerical inputs. Cf. Manpower, Inc. v. Ins. Co. of Penn., 732 F.3d 796, 806–07 (7th Cir. 2013) (distinguishing between the reliability of an expert's methodology and the validity of the underlying "data inputs" that the expert used).

Because Wilmington's failure to disclose Tarbell's opinions as required by Rule 26 is neither harmless nor substantially justified, plaintiff's Motion to Strike [Dkt. 318] is GRANTED and it is hereby

ORDERED that the Tarbell declaration [Dkt. 310-1] be and is STRICKEN.

The Clerk is directed to forward copies of this Order to counsel of record.

Entered this 16 day of May, 2017.

Alexandria, Virginia

/s/ _____
Leonie M. Brinkema
United States District Judge

10