IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

TIM P. BRUNDLE, on behalf of the  )
 Constellis Employee Stock Ownership Plan, )
 and on behalf of a class of all other persons )
 similarly situated  )
  )  1:15-cv-1494 (LMB/IDD)
  Plaintiff  )
  )
 v.  )
  )
WILMINGTON TRUST, N.A., as successor to )
 Wilmington Trust Retirement and )
 Institutional Services Company )
  )
  Defendant.  )

## MEMORANDUM OPINION

The factual background of this civil action is fully set out in the Memorandum Opinion issued on March 13, 2017. See Mem. Op., [Dkt. 294]. Put briefly, plaintiff Tim P. Brundle ("plaintiff" or "Brundle"), acting on behalf of the Constellis Employee Stock Ownership Plan ("ESOP"), alleged that defendant, as the ESOP's trustee, caused the ESOP to engage in a transaction prohibited by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq., when it failed to ensure that the ESOP paid no more than adequate consideration for Constellis' stock. Id. at 1. Following a six-day bench trial, the Court held that the defendant was liable for causing the ESOP to engage in a prohibited transaction under 29 U.S.C. § 1106(a)(1)(A), but not liable for transactions prohibited under 29 U.S.C. §§ 1106(a)(1)(B) or 1106(b), and awarded the ESOP $29,773,250 in damages. Id. at 2.

In the instant Motion to Amend the Judgment Pursuant to Rule 59(e), or, in the Alternative, For a New Trial Pursuant to Rule 59(a) ("Motion to Reconsider") [Dkt. 309],

defendant argues that the Court made several discrete errors that require reconsideration of the finding of liability and the amount of damages awarded.[1]

Separately, plaintiff has filed a Motion for Attorneys' Fees and Costs, and Plaintiff's Counsel's Motion for Attorneys' Fees and Reimbursement of Expenses ("Fee Petition") [Dkt. 312], seeking both reasonable attorneys' fees pursuant to ERISA's fee-shifting provision and an award of a one-third contingent fee, based on counsel's retainer agreement with Brundle, to be offset by any fee amount recovered under ERISA. Defendant objects that the fees claimed under ERISA are unreasonable and that the contingent fee is a "common fund" award that is unavailable in ERISA cases.

For the reasons that follow, defendant's Motion to Reconsider will be denied, and plaintiff's Fee Petition will be granted in part, denied in part, and held in abeyance in part.

## I.    DISCUSSION

### A.  Motion to Reconsider Standard of Review

Rule 59 "is an extraordinary remedy which should be used sparingly." Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co., 148 F.3d 396, 403 (4th Cir. 1998) (internal quotation marks and citation omitted). The Fourth Circuit has recognized three grounds for granting relief under Rule 59: "(1) an intervening change in the controlling law, (2) new evidence that was not available at trial, or (3) that there has been a clear error of law or a manifest injustice," Robinson v. Wix Filtration Corp., LLC, 599 F.3d 403, 407 (4th Cir. 2010); however, Rule 59 "motions may not be used . . . to raise arguments which could have been raised prior to the issuance of the judgment, nor may they be used to argue a case under a novel legal theory that the party had the ability to address in the first instance." Pac. Ins. Co., 148 F.3d at 403.

---

[1] Defendant argues in the alternative for a new trial on damages.

## B. Liability

### 1. Control

Wilmington first argues that the Court erred when it concluded that the ESOP lacked a substantial degree of control over Constellis after finding that "[a]t most, the ESOP had the power to veto certain transactions by the Sellers[2] and their chosen directors, but that power had to be exercised by filing a lawsuit." Def. Mem., [Dkt. 310] at 17 (quoting Mem. Op., [Dkt. 294] at 46). In support of its argument, Wilmington maintains that controlling Delaware case law, Rohe v. Reliance Training Network, Inc., No. 17992, 2000 WL 1038190 (Del. Ch. July 21, 2000) (unpublished), "makes it clear that [the ESOP's] rights as 100% Stockholder are paramount, and that Constellis and/or the Selling Stockholders would face a steep burden in challenging the Trustee's action." Def. Mem., [Dkt. 310] at 18–19.

As an initial matter, this is a new legal theory that could have been presented at trial, and therefore should not have been raised for the first time in a Rule 59 motion. Indeed, this argument was not only not raised at trial, it actually contradicts the understanding of defendant's own trial witness, Juliet Protas, Constellis' former general counsel, who testified that if Wilmington wanted to stop "an action by the board of directors . . . [it] felt . . . was inconsistent with ERISA, . . . the only recourse would be to 'file a lawsuit and fight about it.'" Mem. Op., [Dkt. 294] at 26. Protas' opinion was supported by the marketing materials prepared by CSG, the investment banking firm that designed the ESOP structure used by Constellis, which stated that the advantage of the warrants issued in connection with the sale was that the Sellers would retain control of the company until the ESOP paid off its debt. Id. at 6. Although Rohe, the case that Wilmington cites as having established the contrary proposition, was decided in 2000,

---

[2] "Sellers" refers to shareholders who sold Constellis' stock to the ESOP in December 2013.

Wilmington did not probe its witnesses about this issue and did not cite Rohe during its closing argument, see Tr. at 1635–61, or in its proposed findings of fact and conclusions of law, see [Dkt. 270].

Moreover, Rohe merely established a presumptive rule of construction for contractual agreements; it did not create a "guarantee," as defendant has asserted, entitling Wilmington to intervene and block an offending sale. See Rohe, 2000 WL 1038190, at *16. In fact, Rohe opened the door to precisely the scenario envisioned by Protas and the Court: a situation where Wilmington and the board would have to go to court and "fight about it." Mem. Op., [Dkt. 294] at 29. The only relevance Rohe has for the Court's analysis is the burden and standard of proof that such litigation would involve. See Rohe, 2000 WL 1038190, at *16 ("[O]ur courts rightly hesitate to construe a contract as disabling a majority of a corporate electorate from changing the board of directors unless that reading of the contract is certain and unambiguous."). If anything, this burden and standard of proof provide additional support for the Court's conclusion that the lack of control discount should be 5% rather than the 20% proposed by plaintiff's expert Dana Messina ("Messina"), because the Rohe presumptions suggest that the ESOP would have more power than an ordinary shareholder to prevent the sale, but would still lack the first mover advantage possessed by the Sellers via their control of the board of directors.[3] Accordingly, Rohe provides no cause for the Court to reconsider its finding of liability.[4]

---

[3] It makes no difference that the Sellers and the board in fact obtained Wilmington's permission before selling the stock to ACADEMI in 2014. The decision to consult Wilmington does not prove that the Sellers and the board were legally obligated to obtain Wilmington's permission. In fact, there was testimony at trial that Wilmington was only consulted at ACADEMI's request. Tr. at 861:3–6.

[4] Wilmington also argues that the Court "err[ed] in fact and law in stating that 'a mechanism' needed to be spelled out in the Investor Rights Agreement, the Trust, and the Plan in order for there to be an ample mechanism for Wilmington Trust to exercise its" power to block a sale.

2. Warranty

Defendant's second challenge to the liability finding is that the Court misstated the
warranty arrangement between the Sellers and the ESOP. This arrangement was relevant to the
Court's consideration of the reliability of Constellis management's revenue projections, which
were relied upon by Wilmington and SRR. Mem. Op., [Dkt. 294] at 42. The Court found that
Wilmington's due diligence regarding those projections was lackluster compared to a traditional
arms-length purchaser, a finding not contested in Wilmington's Rule 59 motion. Wilmington
defended this lackluster due diligence in part by citing to the Sellers' representations and
warranties about the veracity of those projections, arguing that the Sellers would have to repay
the ESOP if the projections turned out to be deficient; however, the Court concluded that the
"key warranty about the financial health of the company was made by Constellis, not the
Sellers," and that without a representation and warranty by the Sellers themselves there was "no
external source of money to protect the ESOP's investment in the company if the financial
disclosures proved inadequate." Id. at 44.

Defendant argues that this conclusion was wrong, based on a provision in the Stock
Purchase Agreement ("SPA") that the Sellers were liable on a pro rata basis for "[a]ny
inaccuracy in or breach of any representation or warranty made by the Sellers or the Company in
Sections 3.2 and 3.3 [of the SPA]," which included the relevant warranties about the financial
health of the company. DTX 112 at 30. Although no party highlighted this provision of the SPA

---

Def. Mem., [Dkt. 310] at 20. This argument mischaracterizes the opinion, which merely stated
that these documents "did not identify any specific mechanism," not that a mechanism was
required. Mem. Op., [Dkt. 294] at 24. Moreover, even if the mechanism that Wilmington now
proposes in its memorandum would have worked, there was no evidence at trial that any
Wilmington witness was aware of this process during the relevant 2013–2014 period, making it
unlikely that such a mechanism would have been utilized.

at trial, plaintiff has not challenged this argument, and the Court agrees that it erred in not finding that this provision made the Sellers financially responsible for violations of Constellis' representations and warranties regarding the company's finances.

This corrected understanding of the SPA does not alter the Court's conclusion about liability. The remaining evidence independently showed that Wilmington failed to adequately probe the soundness of the warranties and representations in the SPA and the associated indemnification regime. Mem. Op., [Dkt. 294] at 44–45. That conclusion is supported by Golden's inability to point to this provision when he was asked point blank if the Sellers had represented or warranted as to the truth of the financial information upon which Wilmington relied. Golden evaded this issue by testifying, "The company—you know, it was independent management that was running the company. They had audited financial statements and had an extremely robust forecast process, and to the best of my knowledge, the sellers, you know, weren't involved in the day-to-day operations of the company. So they didn't come up with those forecasts." Tr. at 209:2–10. This answer reveals that Golden did not even know that the Sellers would be financially responsible for any breach of the warranty regarding the financial projections.

Additionally, this corrected understanding does not alter the conclusions about the inadequacy of the indemnification regime and Wilmington's inadequate investigation into the soundness of Constellis' financial projections. Even omitting its erroneous view of the Sellers' representations and warranties, the Court relied on management's financial incentive to inflate the purchase price; the inadequate indemnification for an ongoing government investigation with a potential for over $60 million in liability; the indication from that government investigation of inadequate record keeping and billing practices; the riskiness of Constellis' contract

6

concentration; the multiple sets of projections that Constellis generated in a short period of time; and SRR's inadequate explanation for internal inconsistencies regarding the impact of two proposed acquisitions on its calculation of Constellis' value. Mem. Op., [Dkt. 294] at 41–45. The corrected understanding of the SPA does nothing to undermine any of those other red flags. Accordingly, in evaluating the totality of the circumstances regarding liability, the erroneous understanding of the SPA was marginal and inconsequential.[5]

### 3. Projections

Wilmington next attacks the conclusion that Wilmington inadequately probed SRR's reliance on revenue projections prepared by Constellis' management by ignoring or downplaying "several red flags indicating that these projections were inflated." Mem. Op., [Dkt. 294] at 41. Because Wilmington does not challenge any of the factual bases for the Court's conclusion, beyond the warranty issue already addressed, this is nothing more than an attempt to relitigate an issue exhaustively addressed at trial, and nothing more needs to be said about it to conclude that Rule 59 relief is unwarranted; however, in the interest of completeness, the Court will nevertheless address these arguments in greater detail.

Wilmington relies heavily on Delaware case law that "prefers valuations based on contemporaneously prepared management projections." Def. Mem., [Dkt. 310] at 23 (quoting Doft & Co. v. Travelocity.com, Inc., No. Civ. A. 19734, 2004 WL 1152338, at *5 (Del. Ch. May 20, 2004) (unpublished)). That case law actually expresses a preference for reliable management projections. Id. ("Often, [management] projections of this sort are shown to be reasonably reliable and are useful in later performing a DCF analysis. In this case, however, the

---

[5] This error also did not affect the damage calculation, because there was no separate line item for this problem in the Court's damages analysis. See Mem. Op., [Dkt. 294] at 58–66.

court is persuaded from a review of all the evidence that the [management projections do] not provide a reliable basis for forecasting future cash flows."). This Court fully agrees with that preference, and concluded that that the Constellis projections were not reliable for all the reasons stated in the previous section. See also Mem. Op., [Dkt 294] at 41–45.

Wilmington also highlights trial testimony from two Constellis officers—former Chief Financial Officer Thomas Magnani ("Magnani") and Senior Vice President for Strategic Initiatives Raymond Randall ("Randall")—vouching for the reliability of the projections. Def. Mem., [Dkt. 310] at 22. This testimony did not persuade the Court the first time around and it does not do so now, primarily because the key question on liability was whether Wilmington adequately probed SRR's reliance on management projections at the time. There was no evidence at trial that Wilmington made any inquiries of Magnani and Randall at the time, and there was an abundance of evidence, see Mem. Op., [Dkt. 294] at 41–45, that ought to have given Wilmington cause for concern. It was Wilmington's failure to ask those questions during the valuation process that led to the Court's conclusion on liability. Id. at 41. To the extent that the evidence now cited by Wilmington mitigates the damage caused by that failure, the Court considered that evidence when it halved Messina's conclusion about how much Wilmington's failure to probe the projections affected the purchase price. See id. at 59–60.

4. Beta

Wilmington's final argument on liability is that the Court misunderstood the definition of a valuation factor known as beta. In its opinion, the Court defined beta as a method "to assess the risk of Constellis relative to that of the industry overall." Mem. Op., [Dkt. 294] at 14. Citing the testimony of all three valuation experts who testified at trial, Wilmington argues (and plaintiff does not dispute) that beta in fact measures the risk of a particular industry relative to

8

the risk of the market overall. Def. Mem., [Dkt. 310] at 24. The Court concedes that this definition of beta is correct.

What Wilmington fails to mention in this argument is that the Court based its definition of beta on the definition given by the defendant's Rule 30(b)(6) witness. See Mem. Op., [Dkt. 294] at 14. At trial, Wilmington's counsel asked Golden, "What is beta?" Tr. at 388:8. Golden responded:

> Beta is a measure of a company's volatility compared to the market, so if you have a beta—if a company has a beta of 1, they would have—you know, as the market is volatile, the company would be equally volatile.
> If it's under 1, the subject company is considered to be less volatile than the market, and vice versa. If it's over 1, the company is—would be more volatile in price fluctuations and performance versus the market.

Id. at 388:9–16 (emphases added). Accordingly, to the extent that the Court erred in stating that beta was a measure of risk that applies to an individual company rather than to an industry, that erroneous view was shared by Wilmington's party representative. See id. That the Wilmington witness most intimately involved in the Constellis ESOP did not fully understand the significance of beta reinforces the Court's conclusion on liability, rather than undermining it. Moreover, the Court did not rely heavily on the discussion of beta in its conclusion on liability.[6] See Mem. Op., [Dkt. 294] at 43.

In short, Wilmington's arguments on liability are primarily inappropriate efforts to introduce new legal theories or relitigate issues already addressed at trial and in the Court's previous Memorandum Opinion, and the few errors that have been acknowledged addressed marginal issues and are insufficient to support any change to the Court's conclusion, based on

---

[6] Defendant has argued in the alternative that the Court's findings regarding beta in the damages section of the opinion must be amended in light of the revised definition. That argument is addressed infra in Part C.

the totality of the circumstances, that Wilmington failed to adequately probe the reliability of SRR's valuation report and the fairness of the 2013 purchase price. Accordingly, Wilmington's motion to reconsider the Court's finding of liability will be denied.

## C. __Damages__

As described in the Order entered on May 16, 2017, the Court used a "two-step method" to determine damages. [Dkt. 326] at 4 (citing Mem. Op., [Dkt. 294] at 59–65). "First, [the Court] identified the value of each error that Wilmington and SRR committed." Id. Second, it determined "how each error affected the overall purchase price." Id. On this second step, "the Court accepted [plaintiff's expert] Messina's method of aggregating each error, because defendant had presented no alternative approach beyond [defense expert] Tarbell's conclusory assertion that Messina's method was illogical." Id.

### 1. Methodology

Wilmington's first argument is that Messina's method of aggregating each error is flawed, and that a different procedure must be used to determine the impact of the errors on the final purchase price. The Court has already addressed defendant's proposed procedure in the May 16, 2017, Order striking the new declaration from defendant's expert Jeffrey Tarbell, which was found to have violated Fed. R. Civ. P. 26's disclosure requirements. See [Dkt. 326]. Wilmington now presses the same arguments without relying on Tarbell's declaration, arguing that they are "based on nothing more than the record before the Court, common sense, and simple math." Def. Rep., [Dkt. 330] at 11 n.6.

Just as the Court concluded that these arguments were "substantively different and considerably more detailed than those previously revealed" when packaged in Tarbell's declaration, they also constitute a new theory that could have been, but was not, presented at

10

trial, and therefore cannot be raised in a Rule 59 motion. See [Dkt. 326] at 8; Pac. Ins. Co., 148 F.3d at 403. As the Court has already found, by March 14, 2016, when he produced his expert report, defendant was on notice about the methodology Messina used to calculate damages. [Dkt. 326] at 2. Defendant was also provided on April 13, 2016, with a copy of Messina's "Difference in Value" table, which it now directly attacks. See PTX 74 at 3. Despite this notice, defendants failed to present these arguments, or any other evidence on damages, at trial. See [Dkt. 326] at 10.

At this late stage in the litigation, after the trial has ended and judgment has been entered, defendant argues for the first time that Messina's method was flawed because it did not deduct the impact of his errors "through calculation of an adjusted Enterprise and Equity Value" and that "[o]nce the Enterprise Value has been recalculated based on the Court's findings, the total Fair Market Value of Equity can be derived and then divided by 66,270 shares to arrive at a new fair market value on a per share basis." Def. Rep., [Dkt. 330] at 12–14. Plaintiff's response, that Messina's model "already account[s] for the calculations [Wilmingon] claims the Court should now undertake," Pl. Opp., [Dkt. 324] at 6, is an apt demonstration of why it is so important for parties to raise arguments like these at trial, rather than afterwards. Without reopening the fact-finding process, the Court cannot receive the testimony of expert witnesses to determine which of these fundamentally different views is correct. Because Wilmington chose not to raise its methodological disputes at trial, it cannot do so now, and the Court will not reconsider its damages calculation based on Wilmington's new theory of damages.

Wilmington argues in the alternative that a new trial is warranted to determine the issue of damages. A new trial is only available under Rule 59 if "[1] the verdict is against the clear weight of the evidence, or [2] is based on evidence which is false, or [3] will result in a

11

miscarriage of justice[.]" Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors, Inc., 99 F.3d 587, 594 (4th Cir. 1996). None of those circumstances is present here. As the Court found, Messina presented the "only evidence as to damages" at trial, Mem. Op., [Dkt. 294] at 59, and the defendant's newly offered competing theory of the appropriate methodology does not make the evidence upon which the Court relied "false." Additionally, given the Court's findings on liability, there is no indication that a "miscarriage of justice" has taken place. Accordingly, a new trial is not warranted.

2. Setoff

Wilmington also argues that the damages should have been offset by the $20 million that the ESOP received when it sold its shares to ACADEMI in 2014. Plaintiff responds that this argument embraces an erroneous view of how damages are calculated in prohibited transaction cases.

ERISA holds fiduciaries responsible for "any losses" that result from breaching obligations imposed on them, but does not define the term "loss," leaving the definition of that term to courts. See 29 U.S.C. § 1109(a); Donovan v. Bierwith, 754 F.2d 1049, 1052 (2d Cir. 1985). In cases involving overpayments by ESOPS, courts "generally" have "estimate[d] the [fair market value] of the [company's] stock at the time of [the] transaction and deduct[ed] it from the higher amount the ESOP actually paid." Perez v. Bruister, 823 F.3d 250, 265 (5th Cir. 2016). In situations where the defendant's conduct "caused the [ESOP] to sell too cheaply or buy too dearly . . . it is appropriate to hold . . . defendants liable for the difference between what the plaintiffs paid or received in payment and what the stock was in fact worth." Donovan, 754 F.2d at 1055. The overriding principle is a desire to fashion a measure of loss that is linked to the specific conduct prohibited by ERISA to deter such behavior. Id.

12

In arguing that the Court must consider the $20 million gained in connection with the sale of Constellis' stock to ACADEMI in 2014, defendant cites several authorities, none of which are applicable given the facts of this case. First, Wilmington points to Rego v. Westvaco Corp., 319 F.3d 140, 146 (4th Cir. 2003), which suggested that the ERISA plaintiff in that case could only recover an "out of pocket loss[.]" But Rego was neither an ESOP case nor did it involve a prohibited transaction; instead, it dealt with a claim by a single plan participant that "defendants had prevented him from withdrawing his share of one of the benefits plans in time to take advantage of a high stock price." Id. at 142. Accordingly, the nature of the defendant's alleged violation was that it prevented plaintiff from taking advantage of a particular price on a particular day. See id. The Rego court suggested[7] that the appropriate measure of damages would be the difference between the price on the day plaintiff's stock should have been valued and the price that he eventually obtained for his stock. Id. at 146. The claim in Rego turned on an entirely different theory of liability than the claim in this civil action, and the measure of damages is correspondingly different.

Defendant next looks to Roth v. Sawyer-Cleator Lumber Co., 61 F.3d 599 (8th Cir. 1995), in which the plaintiffs, former ESOP participants, had exercised a "put option" to sell back their stock to the sponsoring company, which promised to pay them over a period of ten years. Id. at 601. After a little over a year, "the Company terminated its business operations and the Plan defaulted on payments due under the promissory notes." Id. The case does not help the defense, because although the court recognized that in such a situation a "broader time frame [was] appropriate" when assessing whether a loss occurred, id. at 603, it also recognized that in

---

[7] This statement was dictum because it was not necessary to the Court's holding. See Rego, 319 F.3d at 146.

cases involving "an overpayment," a "'snapshot' approach" that compared the Plan's assets "immediately before and after the alleged breach" would be appropriate. Id. at 603. Unlike the facts in Roth, plaintiff Brundle alleges a claim of overpayment; accordingly, the "snapshot" approach recognized in Roth is appropriate.

Finally, defendant turns to Donovan, which addressed whether a "loss" existed for purposes of § 1109 "if securities are purchased in breach of trust but are later sold at a price exceeding the purchase price[.]" 754 F.2d at 1052. The court concluded that "the measure of loss . . . require[d] a comparison of what the Plan actually earned . . . with what the Plan would have earned had the funds been available for other Plan purposes." Id. at 1056. At first blush, this conclusion appears relevant to issues in this civil action because the Constellis ESOP ultimately obtained $20 million without having invested any of its own money; however, several distinguishing characteristics make Donovan an inapt precedent. Most importantly, Donovan is not an ESOP case. The calculation of damages for pension plans, which may resemble typical investors with pre-existing assets, does not translate to ESOP cases because ESOPs typically come into existence through a fully leveraged transaction. Moreover, the Donovan court considered it significant that because the stocks purchased by the pension plan were publicly traded, "had the Trustees determined an hour later or the next day to sell the shares back into the market, it is likely that they would have received approximately the same price as they paid." Id. at 1054. That scenario is a far cry from the situation faced by an ESOP created by the purchase of closely held stock, for which there is no readily ascertainable third-party market and no easy way to determine the stock's value on the open market. Indeed, the Donovan court recognized that in other cases, the amount of overpayment alone would be the proper measure of damages, as in cases where "information that would affect the market price was improperly withheld from

14

the plaintiffs." Id. at 1054. This civil action more closely resembles that situation than the one

at issue in Donovan, because Wilmington's failure to adequately probe the value of Constellis'

stock on behalf of the ESOP deprived it of information that would have affected the fair market

value of that stock.

It is plaintiff who has provided the case closest to the facts before the Court. In Bruister,

which was a prohibited transaction case," the defendants were held liable for a "flawed valuation

process [that] led to an insupportable fair market value calculation, notwithstanding that it

coincidentally fell within a range later estimated by reliable methodology during the damages

portion of the case." 823 F.3d at 265 (emphasis in original). In that case, the defendants argued

that the damages, which were measured using the price by which the ESOP overpaid, ought to

have been offset by the value of debt subsequently forgiven by the sellers, arguing, much as

Wilmington does here, that to hold otherwise would result in a "windfall" for an ESOP that held

stock valued at $51 million after the ESOP paid only $45.5 million. Id. at 270–71. The Fifth

Circuit disagreed, joining "[e]very court to consider [the] question" to hold that damages should

not be offset by debt subsequently forgiven. Id. Citing the Second Circuit, the Fifth Circuit held

that "the debt cancellation should not 'be construed as having reduced, post facto, the purchase

price . . . and thus to have reduced any loss for which damages should be awarded.'" Id. at 271

(quoting Henry v. U.S. Trust Co. of Cal., N.A., 569 F.3d 96, 98–100 (2d Cir. 2009) (alteration in

original)). In support of this reasoning, the court observed that the "assumption of legal

indebtedness has immediate legal and economic consequences even before the borrower begins

to repay the debt." Id. (quoting Henry, 569 F.3d at 99 n.4).

Like the cancelled debt in Bruister, the $20 million obtained by the ESOP in connection

with the sale to ACADEMI does not ameliorate the conduct giving rise to Wilmington's liability.

Wilmington's failure to ensure that the ESOP paid adequate consideration for the Constellis stock caused the ESOP immediate damage by causing it to enter into more debt than it should have incurred to obtain that stock.[8] In other words, the ESOP was damaged when it bought the Constellis stock at an inflated price. Any success that Wilmington had in obtaining a separate benefit for the ESOP when the stock was sold seven months later, at a significant loss per share of stock, should not relieve it of liability for its failures in that initial transaction. Indeed, Wilmington's role as the ESOP's fiduciary for both the initial purchase and then the sale seven months later of the Constellis stock makes this ESOP suspect, because Department of the Treasury regulations provide than an ESOP is intended to be a permanent plan and that "abandonment of the plan for any reason other than business necessity within a few years . . . will be evidence that the plan from its inception was not a bona fide program[.]" 26 C.F.R. § 1.401-1(b)(2). In light of that regulatory framework, it would frustrate both the concept that an ESOP should provide long term benefit protection for employees as well as the remedial purposes of ERISA to allow a trustee to lessen its liability for causing an ESOP to initially overpay by arguing that the ESOP suffered no harm because it received some benefit when the stock was later sold in a separate transaction. Such a rule would significantly erode the high fiduciary obligations imposed on ESOP trustees by incentivizing precisely the kind of speculation that ERISA is designed to discourage.[9] Accordingly, it was not error for the Court to disregard the $20 million payment in 2014 in finding the defendant liable and calculating the

---

[8] As the Court held in its opinion, defendant cannot escape liability by arguing that the ESOP would not have been created at the lower price, because permitting such a loophole could prevent courts from holding defendants responsible for ERISA violations in a significant number of overpayment cases. Mem. Op., [Dkt. 294] at 66.

[9] There is evidence that Constellis, the Sellers, and their investment bank CSG engaged in precisely this kind of calculus when deciding whether to create the ESOP. See PTX 625, 626.

damages caused by the 2013 transaction. For these reasons, reconsideration on that basis will be denied.

3. Beta

Finally, defendant contends that the Court must revise its damages calculation in light of the erroneous definition of beta utilized in the opinion, arguing that Messina's calculation of 1.0, which the Court adopted, is unsustainable in light of the proper definition of beta as a measure of the risk of an industry compared to the market as a whole. Def. Mem., [Dkt. 310] at 24. Even using the correct definition, the Court finds no cause to reconsider its conclusion. Without citing to record evidence, Wilmington argues that the factors that affect the government contracting industry "tend to be less correlated with movements in the stock market as a whole." Id. Even if government contracting business does not fluctuate in correlation with the market, that does not mean that government contracting is necessarily more stable. In fact, the record contains evidence that the government contracting industry goes through periods where it is less stable than the market as a whole. See Tr. at 1195:9–1196:14 (El-Tahch discussing the significant "uncertainty for defense contractors" created by sequestration and the fiscal cliff). Moreover, Smith, whom the Court considered to be the most credible valuation expert, testified that beta leaves considerable room for judgment and that the set of public companies used to formulate beta were not a good match for Constellis. Tr. at 621:8–20. Accordingly, the record supports the conclusion that government contracting is no less risky than the market as a whole, and therefore that a beta of 1.0 was appropriate, especially given Wilmington's failure to contemporaneously probe SRR's contrary conclusion. The Court therefore has no cause to reconsider the damages calculation regarding beta, and denies defendant's motion to alter the damages award.

17

### D. Fee Petition

Plaintiff's counsel argue that they are entitled to recover $2,815,729.50 in attorneys' fees, and $643,584.50 in costs, under ERISA's fee shifting provision, and separately ask for a common fund award of one-third of the recovery based on a contractual contingent fee arrangement they have with the ESOP's representative, to be offset by the amount awarded under ERISA's fee-shifting provision. Pl. Memo., [Dkt. 313] at 13, 27. Defendant responds that plaintiff's counsel have not met their burden under ERISA's fee-shifting statute of establishing the reasonableness of the fees and costs sought and that they are not entitled to a common fund award. See generally Def. Opp., [Dkt. 325].

### 1. ERISA Fee Shifting

ERISA authorizes awarding "a reasonable attorney's fee and costs of the action to either party," 29 U.S.C. § 1132(g)(1), "so long as that party has achieved some degree of success on the merits." Williams v. Metro. Life Ins. Co., 609 F.3d 622, 634 (4th Cir. 2010) (internal quotation omitted). If some degree of success on the merits has been achieved, a court must then weigh the factors set out in Quesinberry v. Life Ins. Co. of N. Am., 987 F.2d 1017, 1029 (4th Cir. 1993), in deciding whether to award fees. The parties do not seriously dispute the application of the Quesinberry factors here, as defendant concedes that plaintiff "is entitled to some attorneys' fees." Def. Opp., [Dkt. 325] at 3. The real disagreement in this civil action is over the appropriate amount of fees to be awarded.

The process for calculating an attorney fee award is well established in this district. Salim v. Dahlberg, No. 1:15-cv-468, 2016 WL 2930943, at *3 (E.D. Va. May 18, 2016). The "court must first determine a lodestar figure by multiplying the number of reasonable hours expended times a reasonable rate. In deciding what constitutes a 'reasonable' number of hours

and rate . . . a district court's discretion should be guided by" the twelve factors enumerated

in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974) and adopted by

the Fourth Circuit in Barber v. Kimbrell's, Inc., 577 F.2d 216 (4th Cir. 1978). Robinson v.

Equifax Info. Servs., LLC, 560 F.3d 235, 243–44 (4th Cir. 2009) (internal citation

omitted). These factors include:

> (1) the time and labor expended; (2) the novelty and difficulty of the questions
> raised; (3) the skill required to properly perform the legal services rendered; (4)
> the attorney's opportunity costs in pressing the instant litigation; (5) the
> customary fee for like work; (6) the attorney's expectations at the outset of the
> litigation; (7) the time limitations imposed by the client or circumstances; (8) the
> amount in controversy and the results obtained; (9) the experience, reputation and
> ability of the attorney; (10) the undesirability of the case within the legal
> community in which the suit arose; (11) the nature and length of the professional
> relationship between attorney and client; and (12) attorneys' fees awards in
> similar cases.

Id. (quoting Barber, 577 F.2d at 226 n.28).

For attorneys' fees, plaintiff seeks $2,815,729.50, relying on the hourly totals and rates

reproduced below:

| Name | Position | Hourly Rate | Hours | Fee |
|---|---|---|---|---|
| Brian Glasser | Partner | $750 | 221.8 | $166,350 |
| Benjamin Lajoie | Associate | $225 | 85.8 | $19,305 |
| Denise Milhoan | Paralegal | $175 | 15.8 | $2,765 |
| Gregory Porter | Partner | $750 | 899.5 | $674,625 |
| Loc Le | Paralegal | $200 | 129.5 | $25,900 |
| Melissa Kestner-Clay | Paralegal | $200 | 739.3 | $147,860 |
| Melissa Chapman | Paralegal | $175 | 104.3 | $18,252.50 |
| Pratik Budhdev | Business Analyst | $300 | 91.84 | $27,552 |
| Patrick Muench | Senior Associate | $400 | 875.5 | $350,200 |
| Ryan Jenny | Partner | $550 | 1332.7 | $732,985 |
| Thanos Basdekis | Partner | $550 | 1181.7 | $649,935 |
| Total | | | 5677.74 | $2,815,729.50 |

Pl. Memo., [Dkt. 313] at 13.

Defendant argues that the hourly rates are excessive and that the number of hours is inflated by duplicative work and unrecoverable time such as travel delays. Each issue will be addressed in turn.

i. Hourly Rate

Plaintiff defends the hourly rate by pointing to the Vienna Matrix created by Craig Reilly and cited repeatedly by this court, most recently in BMG Rights Management (US) LLC v. Cox Commc'ns, Inc., __ F. Supp. 3d __, 2017 WL 600093, at *7 (E.D. Va. 2017):

| Years' Experience | Hourly Rate |
|---|---|
| 20+ | $505-820 |
| 11-19 | $520-770 |
| 8-10 | $465-640 |
| 4-7 | $350-600 |
| 1-3 | $250-435 |
| Paralegal | $130-350 |

Defendant responds that this Court should rely on the rates approved by the Fourth Circuit in Grissom v. The Mills Corp., 549 F.3d 313, 322 (4th Cir. 2008):

| Years' Experience | Hourly Rate |
|---|---|
| 20+ | $380 |
| 11-19 | $335 |
| 8-10 | $270 |
| 4-7 | $220 |
| 1-3 | $180 |

The Fourth Circuit has been very clear that the party seeking a fee award bears the burden of offering "specific evidence that the hourly rates sought for his attorneys coincided with the then prevailing market rates of attorneys in the Eastern District of Virginia of similar skill and for similar work[.]" Grissom, 549 F.3d at 323. Failure to provide such proof requires a reduction in the hourly rates claimed, even under the "extremely deferential standard of review" utilized by the court of appeals. See id. at 322. Citing to "examples of similar fee awards in like

cases" can be probative of an appropriate fee, but only if those examples address similar litigation during the relevant time frame in the same jurisdiction. See id. at 323.

Beyond citing to cases in which the Vienna Matrix has been used, plaintiff's counsel have only offered a single piece of evidence, a declaration by Professor Charles Silver ("Silver") of the University of Texas, to support the hourly rates they claim. See [Dkt. 313-1]. Silver avers that he has "taught, researched, written, consulted with lawyers, and testified about attorneys' fees and related subjects for over 30 years," id. ¶ 3, and that the rates claimed by plaintiff's counsel "are comparable to those charged by other lawyers and legal assistants with similar experience and qualifications who practice in urban areas," id. ¶ 19. As defendant rightly observes, this conclusion is substantially grounded in national data, rather than data regarding the Eastern District of Virginia. See generally id. In fact, beyond citing the same case law as the plaintiff's memorandum, the only data that Silver presents regarding this district is data regarding the rates charged by defense counsel's law firm in 2011 and 2014. See id. ¶ 28. Additionally, there is no evidence that Silver has ever tried a case in this district, or anywhere else for that matter. Accordingly, Silver's declaration does not meet the evidentiary standards set by the Fourth Circuit.

Given these deficiencies in the plaintiff's evidence, defendant urges the Court to rely on the rates approved in Grissom, but those rates are inappropriately low in light of the Barber factors, particularly the complexity, novelty, and risk associated with this particular lawsuit. Moreover, the Grissom rates have largely passed their shelf life, as the award in that case was calculated based on prevailing rates in 2003–2004, suggesting that these rates are considerably below the market rate for 2017. See 549 F.3d at 322. Although this Court has used the Grissom rate over the Vienna Matrix in some more recent cases, see Integrated Direct Marketing,

21

No. 1:14-cv-1183, 2016 WL 3582065, at *4 (E.D. Va. June 28, 2016); Salim, 2016 WL 2930943, at *4–6, it has done so on the premise that those cases were not "complex civil litigation." This case, unquestionably, constitutes "complex civil litigation," involving multiple expert witnesses, hundreds of complicated financial exhibits, and intricate theories of corporate structure and valuation. Some of the legal issues involved in the case were novel, most notably the arguments regarding the eligibility of the ESOP under Department of the Treasury regulations.

Balancing the complexity and novelty of this civil action against the plaintiff's evidentiary shortcomings, the Court finds that hourly rates at the low end of the Vienna Matrix are appropriate and will adopt the following hourly rates[10]:

| Name | Position | Years of Experience | Hourly Rate[11] |
|---|---|---|---|
| Brian Glasser | Partner | 23 | $600 |
| Gregory Porter | Partner | 21 | $600 |
| Ryan Jenny | Partner | 17 | $505 |
| Thanos Basdekis | Partner | 20 | $505 |
| Patrick Muench | Senior Associate | 10 | $400 |
| Benjamin Lajoie | Associate | Not Provided | $225 |
| Loc Le | Paralegal | n/a | $150 |
| Melissa Kestner-Clay | Paralegal | n/a | $150 |
| Denise Milhoan | Paralegal | n/a | $130 |
| Melissa Chapman | Paralegal | n/a | $130 |

[10] For the reasons described in the following section, no fees will be given for the time credited to the Business Analyst; accordingly, there is no need to fix an hourly rate for him.

[11] These hourly rates fall within the range charged by defense counsel's Richmond office in 2014, as set out in Silver's report, [Dkt. 313-1] at 12:

| Partner (High) | Partner (Average) | Partner (Low) | Associate (High) | Associate (Average) | Associate (Low) |
|---|---|---|---|---|---|
| $725 | $595 | $450 | $525 | $360 | $285 |

ii. Number of Hours

Defendant argues that the hours claimed by plaintiff's counsel are inflated and argues that they should be discounted to account for (1) the lack of specificity that results from "block billing," or keeping time sheets that do not specify how much time was spent on each task described; (2) unsuccessful claims; (3) unsuccessful motions; (4) assigning too many lawyers to various hearings and briefs; (5) time spent traveling; (6) lawyers performing paralegal work; (7) paralegals doing clerical duties; (8) time charged by a "business analyst;" (9) time spent on an appeal in Halldorson v. Wilmington Trust, No. 16-1587; and (10) vague time sheet entries. Def. Opp., [Dkt. 325] at 8–16. For the reasons that follow, the Court concludes that some but not all of these discounts are appropriate. Because plaintiff engaged in block billing, it is often difficult to ascertain precisely how much time was attributable to a particular task or feature. In such circumstances, the Court has resorted to estimation.

Defendant correctly argues that fees should not be awarded for unsuccessful claims and motions. See Salim, 2016 WL 2930943, at *2. The first major category of unsuccessful work was that done on behalf of Andrew Halldorson ("Halldorson"), the original plaintiff in this civil action, who was dismissed on April 22, 2016, because he had contractually released his claims against defendant. See [Dkt. 95] at 25. Plaintiff's counsel began billing time on this civil action on January 15, 2015, before Brundle entered the litigation on March 10, 2016. See [Dkt. 329-1] at 1, 30. Between those dates, plaintiff's counsel billed approximately twelve percent of the total hours claimed in the Fee Petition. Normally, a court would be justified in disregarding all time billed on behalf of an unsuccessful plaintiff; however, because Halldorson and Brundle's claims were intimately related, at least some of those hours likely advanced Brundle's case. Accordingly, plaintiff's counsel will be given half-credit for time spent on the case before

23

Brundle retained them, and the total number of hours claimed will be discounted by only 6% across the board.

The second major unsuccessful category of work was the class certification motion.[12] Even after Brundle replaced Halldorson, substantial work was done on the motion to certify a class in this case. See, e.g., [Dkt. 329-1] at 34–68. This motion was not successful. See [Dkt. 89]. It would be especially inappropriate to award fees related to the class certification motion because it was largely irrelevant in light of Brundle's status as a representative of the ESOP. As Brundle has sued on behalf of the ESOP, any damages award must be paid to the plan, and, in turn, distributed to all participants, without requiring the class certification procedure. Because the class certification was a relatively small portion of the work done after Brundle joined this action, the Court finds that a relatively small reduction of 2% of hours across the board is sufficient to account for the failure of that motion.

The next reason to discount the number of hours is the repetitive billing for internal phone calls and meetings. At a minimum, plaintiff's counsel held a weekly phone conference, which often lasted for 30 minutes to an hour, for which three to five attorneys billed time. See, e.g., [Dkt. 329-1] at 46–47 (entry for Mar. 30, 2016); 64–64 (entry for Apr. 12, 2016). Later on, this phone call became "biweekly," in the sense of "twice a week." See, e.g., id. at 85–86 (entry for May 12, 2016). In addition, the attorneys included bilateral phone calls and meetings for which each attorney billed time on a near daily basis. See, e.g., id. at 92 (entries for Porter ("GYP") and Jenny ("RTJ") on May 19, 2016). A discount is required for this kind of double-

---

[12] Although defendant also argued for reductions based on the plaintiff's unsuccessful § 1106(a)(1)(B) and § 1106(b) claims, those issues were not heavily litigated separately from the § 1106(a)(1)(A) question and therefore any effect from such a discount would be de minimis.

counting, and given that it occurred on at least a weekly, and often near daily, basis, the Court

finds that an across the board discount of 5% of attorney time is appropriate.[13]

Plaintiff's counsel also billed duplicative time for attendance at hearings and the trial. As

this court has held, even though attorneys "no doubt wish[] to be at the argument to witness the

culmination of their efforts on [a] case, [a] client would not ordinarily pay for their presence"

when these attorneys are not necessary for the proceedings. BMG Rights Mgmt., 2017 WL

600093 at *10 (quoting Fross v. County of Allegheny, 848 F. Supp. 2d 547, 555 (W.D. Pa.

2012)). Plaintiff's counsel had four or more attorneys attend routine court hearings, see, e.g.,

[Dkt. 329-1] at 140–41 (four attorneys at final pretrial conference), and at least five attorneys at

trial, id. at 191–95, despite only two attorneys presenting the bulk of the case. A 3% discount of

attorney time is appropriate to compensate for this duplicative time.

The next discount is for travel time. Without claiming that they were doing work during

travel (beyond "email traffic"), multiple lawyers routinely billed for the time spent traveling to

and from court hearings and depositions. This extensive travel time should not be recovered at

the same hourly rate as "active legal work." Project Vote/Voting for Am., Inc. v. Long, 887 F.

Supp. 2d 704, 715–16 (E.D. Va. 2012) (quoting Rosenberger v. Rector & Visitors of Univ. of

Va., Civ. A. No. 91-0036-C, 1996 WL 537859, at *6 (W.D. Va. Sept. 17, 1996)). For most

attorneys, a discount of 2.5% is appropriate to compensate for this time, but Thanos Basdekis's

("Basdekis") travel time billings were particularly excessive. Not only did Basdekis travel

significantly more often than other attorneys, billing for travel on over 40 days during the nine

month period between March 2016 and the conclusion of the trial, but he routinely billed at his

full hourly rate for travel delays and flight cancellations, as well as for time spent commuting

---

[13] This translates to roughly two hours out of a standard 40-hour work week.

between his hotels and counsel's offices in various cities.[14] Although the Court recognizes that Basdekis was based in counsel's West Virginia office, this staffing decision greatly increased costs. It was counsel's choice to assign Basdekis to the case, therefore counsel should absorb much of the excess cost. Given that Basdekis billed all his time at his full hourly rate, his hours will be reduced by 15%.

The final discount applicable to the attorney hours is due to the vagueness of the time sheets. On a near daily basis, plaintiff's counsel block billed time for tasks such as "email traffic" and "communications." As trial approached, the time entries became even more cursory, with dozens that read simply "trial preparation" or some variant thereon. These descriptions are not sufficient to permit the Court to meaningfully determine whether the time claimed is reasonable. Cf. Salim, 2016 WL 2930943, at *12 ("Where [counsel's] descriptions do not apportion the time and do not demonstrate how much time was attributable to recoverable work,

---

[14] Examples of such billing include:

"Ride to airport; check in at airport; delays at CRW in connection with flight to Dulles International Airport; flight to IAD; cab ride to hotel in Tyson's Corner; set up and prepared files in advance of in-person meetings with Porter, Jenny and Muench. Continued document review. Email traffic throughout the day." (4/19/2016, 7.00 hours).

"Travel to airport in CRW. Arrived around 1 pm. Delayed plane flight from CRW to IAD in Washington, DC. Delayed plane flight from IAD to LGA in NYC. Cab to hotel. Arrived in room around 8:30 pm. Email traffic on various items throughout the day." (5/02/2016, 7.50 hours).

"Met with G. Porter to travel to site of deposition in NYC. Participated in deposition . . . Travel to LaGuardia airport from midtown. Had four flights cancelled on me that evening (three shuttle flights and also the flight from DCA to CRW). Returned to hotel around 11:35 p.m. Various email traffic throughout the day." (5/04/2016, 15.10 hours).

"Travel to airport in CRW and arrived around 10:25 a.m. Awaited flight in CRW, through Charlotte, and onto Philadelphia. Delays and down time in the airport. Took black car service from Philadelphia to the Hotel DuPont in Wilmington, DE. Checked into hotel around 6:30 p.m. Email traffic regarding upcoming deposition of Matz in Delaware." (5/22/2016, 8.10 hours).

none of the time will be awarded."). In light of the pervasiveness of this problem, particularly toward the trial date, the Court finds that an across the board reduction of 5% of attorney hours is appropriate.[15]

Plaintiff's counsel has also claimed time on behalf of Pratik Budhev ("Budhev"), a "business analyst" employed by the law firm. The tasks for which he billed time are overhead generally associated with running a law firm, not work that was necessary because of this civil action. See Abusamhadaneh v. Taylor, No. 1:11-cv-939, 2013 WL 193778, at *38 (E.D. Va. Jan. 17, 2013). Accordingly, it is not appropriate to award any fees for Budhev's work.

Two discounts apply specifically to the hours billed by the paralegals assigned to this civil action. First, although nearly all attorney time relating to the Halldorson appeal was written off, several time entries on the appeal remain in the time claimed for paralegals. See Def. Ex. I, [Dkt. 325-8]. The Court finds that a discount of 2% of paralegal time will appropriately account for this problem. Second, paralegals spent a significant amount of time on tasks that were "[p]urely clerical activities," which "regardless of who performs them, are considered overhead and are not compensable[.]" Abusamhadaneh, 2013 WL 193778, at *38; Def. Ex. G, [Dkt. 325-16]. The Court finds that an additional 4% discount of paralegal hours will account for this issue given that much of the clerical work would still require an analytical approach—such as determining how to appropriately frame an issue—and therefore falls within the "gray area" of tasks that are compensable. See Abusamhadaneh, 2013 WL 193778, at *38.

---

[15] This problem is less pervasive in the entries for the paralegals.

In summary, the Court finds that the hours will be discounted as reflected in this chart:

| Discount | Applicable To Whom | Amount |
|---|---|---|
| Pre-Brundle Work | All Timekeepers | 6% |
| Class Certification Motion | All Timekeepers | 2% |
| Double Counting Phone Calls and Meetings | All Attorneys | 5% |
| Excessive Attorney Court Attendance | All Attorneys | 3% |
| Travel Time | All Attorneys Except Basdekis | 2.5% |
| Travel Time | Basdekis | 15% |
| Vague Time Entries | All Attorneys | 5% |
| Work on Halldorson Appeal | All Paralegals | 2% |
| Work on Purely Clerical Activities | All Paralegals | 4% |

The total discounts are therefore:

| | |
|---|---|
| Attorneys Except Basdekis | 23.5% |
| Basdekis | 36% |
| Paralegals | 14% |

### iii. Costs

As for costs, because the plaintiffs have not provided any documentation of their expenses, beyond a spreadsheet that does not permit the Court to verify the expenses or determine whether they were reasonable, no costs will be awarded.[16] Grissom, 549 F.3d at 323 (requiring "satisfactory specific evidence" for a claim of fees or costs (internal quotation omitted)).

### iv. Total

Considering the revised hourly rates and numbers of hours, and omitting costs, the total fee to be awarded under § 1132 comes to $1,819,631.11, and is reflected in the following chart:

---

[16] Some of the costs appear excessive. For example, Basdekis' airfare routinely exceeded $1,000 on domestic flights, and lodging for several attorneys was frequently well in excess of $500 per night. See [Dkt. 329-3] at 2–7.

| Timekeeper | Hours Claimed | Discount | Hours Awarded | Revised Hourly Rate | Fees (in $) |
|---|---|---|---|---|---|
| Glasser | 221.8 | 23.5% | 169.677 | 600 | 101,806.20 |
| Porter | 899.5 | 23.5% | 688.1175 | 600 | 412,870.50 |
| Jenny | 1332.7 | 23.5% | 1,019.516 | 505 | 514,855.30 |
| Basdekis | 1181.7 | 36% | 756.288 | 505 | 381,925.40 |
| Muench | 875.5 | 23.5% | 669.7575 | 400 | 267,903.00 |
| Lajoie | 85.8 | 23.5% | 65.637 | 225 | 14,768.33 |
| Le | 129.5 | 14% | 111.37 | 150 | 16,705.50 |
| Kestner-Clay | 739.3 | 14% | 635.798 | 150 | 95,369.70 |
| Milhoan | 15.8 | 14% | 13.588 | 130 | 1,766.44 |
| Chapman | 104.3 | 14% | 89.698 | 130 | 11,660.74 |
| Budhev | 91.84 | n/a | n/a | n/a | n/a |
| | | | | Total Fees | $1,819,631.11 |

2. Contingent Fee

Plaintiff's counsel also ask for a "common fund" award, but more accurately they seek ratification of a contractual contingent fee agreed to by the plaintiff. Defendant protests that awarding a contingent fee is inconsistent with ERISA, redundant to the statute's fee shifting provision, excessive, and unfair to the remainder of the ESOP participants because it diminishes their recovery.[17]

Brundle is statutorily authorized to seek relief on behalf of the Plan. See 29 U.S.C. § 1132(a)(2) ("A civil action may be brought . . . by a participant . . . for appropriate relief under section 1109 of this title[.]"); id. at § 1109(a) ("Any person who is a fiduciary with respect to a plan who breaches any of the . . . obligations . . . imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach[.]"). This statutory grant of authority to pursue a civil action on behalf of the plan includes the authority to retain counsel and enter into a contractual arrangement to compensate

---

[17] Although the amount of any contingent fee does not affect the amount of damages that defendant must pay, at oral argument defense counsel represented that Wilmington remains trustee for the ESOP and therefore still has fiduciary duties to the plan and its participants.

that counsel. Nevertheless, this Court's "supervisory jurisdiction over contingent fee contracts for services rendered in cases before [it] is well-established." In re Abrams & Abrams, P.A., 605 F.3d 238, 243 (4th Cir. 2010) (quoting Allen v. United States, 606 F.2d 432, 435 (4th Cir. 1979)). In particular, because the other participants of the ESOP are not independently represented on this matter, it falls to the Court to protect their interests. See id. ("This duty is intended to protect those who may be especially vulnerable to manipulation or who may be unable to protect themselves."). Accordingly, the Court cannot simply rubber stamp the contingent fee arrangement into which Brundle and his counsel entered, but must consider the legality and appropriateness of that arrangement.

Defendant argues that ERISA's anti-alienation provision bars any such contingent fee, but the case law does not support this position. The anti-alienation provision has been interpreted to bar awards from undistributed future benefits "while they are held by the plan administrator." Kickham Hanley PC v. Kodak Retirement Income Plan, 558 F.3d 204, 211 (2d Cir. 2009). It does not apply to situations where the funds are "contested . . . claims" that are not yet held by the plan administrator. Id. at 213 (quoting Lynn v. CSX Transp., Inc., 84 F.3d 970, 975 (7th Cir. 1996)); see also Savani v. URS Prof'l Solutions, 121 F. Supp. 3d. 564, 569 (D.S.C. 2015) (anti-alienation provision "only applies while the funds are in control of the Plan"); Conners v. Conn. Gen. Life Ins. Co., No. 98 Civ. 8522, 2003 WL 1888726, at *2 (S.D.N.Y. Apr. 15, 2003) (awarding fee-shifting fees and costs in an ERISA action litigated to judgment before settlement in addition to a contingent fee, and offsetting the contingent fee by the amount awarded in fee-shifted funds). Because the damages awarded in this civil action are not yet in the control of the plan administrator, the anti-alienation provision does not apply.

Defendant also argues that even if ERISA permits a contingent fee the Court should

decline to award one as a matter of prudence because such a fee would be redundant to ERISA's

fee shifting provisions. Defendant has cited several cases arguing that a contingent fee should be

categorically prohibited when a fee-shifting provision applies, but none of the cited cases

embrace that proposition. The closest is Pierce, which held that a common fund award is not

appropriate in a fee-shifting case "in the absence of a contract." Pierce v. Visteon Corp., 791

F.3d 782, 787 (7th Cir. 2015). The Pierce court did not address whether the statutory fee-shifting

provision precludes a contingent fee where, as here, a contractual agreement provides for one.

See id. The remaining cases cited similarly recognized that a common fund award might

sometimes be appropriate, but concluded that it was not warranted in the particular

circumstances presented. See US Airways, Inc. v. McCutchen, 133 S. Ct. 1537, 1550 (2013)

(holding that, when the terms of an ERISA-covered plan are silent, the common-fund doctrine

provides "the best indication of the parties' intent" regarding attorneys' fees); Humphrey v.

United Way of Tex. Gulf Coast, 802 F. Supp. 2d 847, 859 (S.D. Tex. 2011) ("The Court agrees

with Plaintiff that it has the power and discretion to award reasonable fees under both statute and

the common fund doctrine."); Brytus v. Spang & Co., 203 F.3d 238, 243 (3d Cir. 2000);

Carrabba v. Randalls Food Mkts., Inc., 191 F. Supp. 2d 815, 823 (N.D. Tex. 2002).[18]

Defendant's argument that a fee-shifting provision renders a common fund or contingent

fee award redundant fails to recognize that the Fourth Circuit has held that contingent fees exist

to compensate a prevailing plaintiff's counsel for more than the fee-shifting provision, and that a

contingency arrangement must be given weight in a court's "decisional calculus," even when a

---

[18] Another cited case, United States ex rel. Bogart v. King Pharms., 493 F.3d 323, 331 (3d Cir.
2007), is particularly inapplicable because the court concluded that the relator and his attorneys
"did not create a common fund for the benefit" of the relevant parties.

lodestar calculation is also performed. <u>Abrams</u>, 605 F.3d at 245. Unlike a fee-shifting provision, which is focused more narrowly on compensating counsel for time spent working on services rendered, contingency fees are designed to "transfer a significant portion of the risk of loss to attorneys taking a case." <u>Id.</u> at 246. Without "compensating attorneys for that risk," "[a]ccess to courts would be difficult to achieve[.]" <u>Id.</u> This is because "plaintiffs may find it difficult to obtain representation if attorneys know their reward for accepting a contingency case is merely payment at the same rate they could obtain risk-free for hourly work," given that the "downside is no payment whatsoever." <u>Id.</u> If that is true in relatively straightforward cases, it is all the more true in complex civil actions such as this one, where the likelihood of success can be especially difficult to gauge at the outset of the litigation process. Accordingly, the Court agrees with plaintiffs that a contingent fee is appropriate in this civil action where the plaintiff and his counsel had a contract providing for such a fee. In granting both fee-shifting and contingent fee awards, courts have recognized, and this Court agrees, that the contingent fee award must be offset by the amount awarded under the fee-shifting provision.[19] <u>See</u> <u>Conners</u>, 2003 WL 1888726, at *2.

Finally, defendant argues that the contractual amount of one-third is excessive, making the contingent fee unfair to the unrepresented participants in the ESOP, who stand to have their recovery diminished. Plaintiff has responded with citations to a number of ERISA cases (all but one of which was resolved by a settlement rather than being tried to judgment) in which one-third contingent fees were approved. <u>See</u> [Dkt. 328-2]. Although the Court agrees that a one-third contingent fee is a relatively standard arrangement, defendant's concerns about the fairness to the unrepresented ESOP participants are well-founded. Accordingly, the Court will require

---

[19] Plaintiff has not argued otherwise.

plaintiff's counsel to engage in a process analogous to the class settlement procedures established by Fed. R. Civ. P. 23, whereby plaintiff's counsel will make a good faith effort to notify the ESOP participants and provide them an opportunity to object to the contingent fee award. Once that process has been completed, the Court will resolve the contingent fee issue.

## II.  CONCLUSION

For the reasons stated above, the Motion for Reconsideration will be denied and the Fee Petition will be granted in part and denied in part as to the recovery of fees and costs under ERISA, with an award of attorneys' fees totaling $1,819,631.11, and held in abeyance as to the amount of the contingent fee by an appropriate Order to be issued with this Memorandum Opinion.

Entered this 23rd day of June, 2017.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge